No. 24-1133
DISTRICT COURT CASE NO. 2:24-CR-91-ODW
RELATED CASE NO. 2:24-mj-00166-DJA-1

---

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

ALEXANDER SMIRNOV,
Appellant-Defendant,

vs.

UNITED STATES OF AMERICA,
Appellee-Plaintiff.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

---

**APPELLANT'S APPENDIX OF EXHIBITS A THROUGH R**

**IN SUPPORT OF FRAP 9(a) APPEAL**

DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
dzchesnoff@cslawoffice.net
rschonfeld@cslawoffice.net
Attorneys for Appellant
ALEXANDER SMIRNOV

## APPENDIX OF EXHIBITS TO APPELLANT'S FRAP 9(A) APPEAL

TABLE OF CONTENTS

| EXHIBIT: | DESCRIPTION: |
|---|---|
| EXHIBIT A…………………… | ORDER OF DETENTION<br>- February 26, 2024<br>(Doc. 46)<br>2:24-CR-91-ODW<br>(AA000001-5) |
| EXHIBIT B…………………… | TRANSCRIPT OF FEBRUARY 26, 2024 HEARING<br>(Doc. 38)<br>2:24-CR-91-ODW<br>(AA000006-32) |
| EXHIBIT C…………………… | Calendar/Proceedings Sheet<br>- Filed February 26, 2024 (Doc. 43)<br>2:24-CR-91-ODW<br>(AA000033-34) |
| EXHIBIT D…………………... | DEFENDANT'S SUPPLEMENT TO OPPOSITION TO GOVERMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER<br>- Filed February 26, 2024 (Doc. 34)<br>2:24-CR-91-ODW<br>(AA000035-40) |
| EXHIBIT E…………………... | DEFENDANT'S OPPOSITION TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER<br>- Filed February 23, 2024 (Doc. 33)<br>2:24-CR-91-ODW<br>(AA000041-119) |

EXHIBIT F……………………GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER
- Filed February 21, 2024 (Doc. 11)
2:24-CR-91-ODW
(AA000120-169)

EXHIBIT G…………………...DEFENDANT'S EMERGENCY MOTION FOR IMMEDIATE DETENTION HEARING AND RELEASE ON PREVIOUSLY IMPOSED CONDITIONS
- Filed February 22, 2024 (Doc. 24)
2:24-mj-00166-DJA-1
(AA000170-225)

EXHIBIT H……………………DEFENDANT'S EMERGENCY MOTION FOR COURT ORDER DIRECTING THE UNITED STATES MARSHAL SERVICE TO KEEP THE DEFENDANT IN THIS DISTRICT PENDING DISPOSITION OF DEFENDANT'S EMERGENCY MOTION FOR IMMEDIATE DETENTION HEARING AND RELEASE ON PREVIOUSLY IMPOSED CONDITIONS
- Filed February 22, 2024 (Doc. 28)
2:24-mj-00166-DJA-1
(AA000226-230)

EXHIBIT I……………………ORDER SETTING HEARING ON GOVERNMENT MOTION FOR REVIEW OF RELEASE ORDER
- Filed February 22, 2024 (Doc. 27)
2:24-CR-91-ODW
(AA000231-233)

EXHIBIT J……………………. WARRANT FOR ARREST
- Issued February 22, 2024
2:24-CR-91-ODW

(AA000234-235)

EXHIBIT K………………….. DEFENDANT'S APPEARANCE BOND
- Filed February 20, 2024 (Doc. 18)
2:24-mj-00166-DJA-1
(AA000236-241)

EXHIBIT L……………………TRANSCRIPT OF FEBRUARY 20, 2024 HEARING
- Filed February 21, 2024 (Doc. 20)
2:24-mj-00166-DJA-1
(AA000242-287)

EXHIBIT M………………….. DEFENDANT'S RESPONSE TO GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION
- Filed February 20, 2024 (Doc. 16)
2:24-mj-00166-DJA-1
(AA000288-292)

EXHIBIT N…………………...GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION
- Filed February 20, 2024 (Doc. 15)
2:24-mj-00166-DJA-1
(AA000293-346)

EXHIBIT O………………….. DEFENDANT'S MOTION FOR PRETRIAL RELEASE
- Filed February 19, 2024 (Doc. 8)
2:24-mj-00166-DJA-1
(AA000347-361)

EXHIBIT P……...................... INDICTMENT
- Filed February 14, 2024 (Doc. 1)
2:24-CR-91-ODW
(AA000362-399)

EXHIBIT Q………………….. CENTRAL DISTRICT OF CALIFORNIA DOCKET
2:24-CR-91-ODW
(AA000400-407)

EXHIBIT R………………….. DISTRICT OF NEVADA DOCKET
2:24-mj-00166-DJA-1
(AA000408-414)

///

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of March, 2024, I caused the forgoing document to be filed electronically with the Clerk of the Court through the CM/ECF system for filing; and served on counsel of record via the Court's CM/ECF system including:

Derek Edward Hines
US Department of Justice
Office of Special Counsel David C. Weiss
950 Pennsylvania Avenue NW Room B-200
Washington, DC 20530
Email: deh@usdoj.gov

Leo J. Wise
US Department of Justice
Office of Special Counsel David C. Weiss
950 Pennsylvania Avenue, NW, Room B-200
Washington, DC 20530
Email: LJW@USDOJ.GOV

Christopher Michael Rigali
Office of Special Counsel, U.S. Dept. of Justice
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
Email: christopher.rigali2@usdoj.gov

/s/ Rosemary Reyes
Employee of Chesnoff & Schonfeld

# EXHIBIT A

# ORDER OF DETENTION - February 26, 2024

# 2:24-CR-91-ODW



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

Alexander Smirnov,

Defendant.

CASE NO. CR 24-00091-ODW

ORDER OF DETENTION

I.

A. ( ) On motion of the Government in a case allegedly involving:

1. ( ) a crime of violence.
2. ( ) an offense with maximum sentence of life imprisonment or death.
3. ( ) a narcotics or controlled substance offense with maximum sentence of ten or more years .
4. ( ) any felony - where the defendant has been convicted of two or more prior offenses described above.
5. ( ) any felony that is not otherwise a crime of violence that involves a minor victim, or possession or use of a firearm or destructive device or any other dangerous weapon, or a failure to register under 18 U.S.C § 2250.

B. ( ) On motion by the Government / ( ) on Court's own motion, in a case

allegedly involving:

( ) On the further allegation by the Government of:

1. (X) a serious risk that the defendant will flee.

2. ( ) a serious risk that the defendant will:

a. ( ) obstruct or attempt to obstruct justice.

b. ( ) threaten, injure, or intimidate a prospective witness or juror or attempt to do so.

C. The Government (X) is/ ( ) is not entitled to a rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance as required and the safety of any person or the community.

II.

A. (X) The Court finds that no condition or combination of conditions will reasonably assure:

1. (X) the appearance of the defendant as required.

( ) and/or

2. ( ) the safety of any person or the community.

B. ( ) The Court finds that the defendant has not rebutted by sufficient evidence to the contrary the presumption provided by statute.

III.

The Court has considered:

A. the nature and circumstances of the offense(s) charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

B. the weight of evidence against the defendant;

C. the history and characteristics of the defendant; and

D. the nature and seriousness of the danger to any person or to the community.

IV.

The Court also has considered all the evidence adduced at the hearing and the arguments and/or statements of counsel, and the Pretrial Services Report/recommendation.

V.

The Court bases the foregoing finding(s) on the following:

A. (X) As to flight risk:

B. ( ) As to danger:

VI.

A. ( ) The Court finds that a serious risk exists that the defendant will:

1. ( ) obstruct or attempt to obstruct justice.

2. ( ) attempt to/ ( ) threaten, injure or intimidate a witness or juror.

B. The Court bases the foregoing finding(s) on the following:

VII.

A. IT IS THEREFORE ORDERED that the defendant be detained prior to trial.

B. IT IS FURTHER ORDERED that the defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.

C. IT IS FURTHER ORDERED that the defendant be afforded reasonable opportunity for private consultation with counsel.

D. IT IS FURTHER ORDERED that, on order of a Court of the United States or on request of any attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to a United States marshal for the purpose of an appearance in connection with a court proceeding.

DATED: 2/26/24

[signature]
UNITED STATES ~~MAGISTRATE~~ District JUDGE

# EXHIBIT B

Transcript of February 26, 2024 hearing

2:24-CR-91-ODW

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 2:24-cr-00091-ODW-1 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| ALEXANDER SMIRNOV, | ) | Monday, February 26, 2024 |
| | ) | |
| Defendant. | ) | (9:05 a.m. to 9:41 a.m.) |

STATUS CONFERENCE

BEFORE THE HONORABLE OTIS D. WRIGHT, II,
UNITED STATES DISTRICT JUDGE

APPEARANCES: (CONTINUED ON PAGE 2)

For Plaintiff: AUSA LEO J. WISE
AUSA DEREK HINES
AUSA SEAN MULRYNE
AUSA CHRISTOPHER RIGALI
U.S. Department of Justice
Ofc. of Special Counsel David C. Weiss
950 Pennsylvania Ave. NW, Room B-200
Washington, DC 20530

For Defendant: RICHARD A. SCHONFELD, ESQ.
DAVID Z. CHESNOFF, ESQ.
Chesnoff & Schonfeld
520 South 4th St.
Las Vegas, NV 89101

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Sheila English

Transcribed by: Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES: (CONTINUED)

For Defendant: NASER J. KHOURY, ESQ.
14427 Sylvan Street
Van Nuys, CA 91401

Also present: MARK BRYNE, ESQ.

**Los Angeles, California; Monday, February 26, 2024; 9:05 a.m.**

**(Call to Order)**

**THE CLERK:** Calling Item 1, CR 24-91, United States of America versus Alexander Smirnov.

Counsel, may I have your appearances please?

**MR. WISE:** Good morning, Your Honor. Leo Wise, Derek Hines, Sean Mulryne and Christopher Rigali for the United States.

**THE COURT:** Gentlemen, good morning.

**ALL:** Good morning, Your Honor.

**MR. SCHONFELD:** Good morning, Your Honor. Richard Schonfeld appearing on behalf of the defendant, Alexander Smirnov. My partner, David Chesnoff, is also appearing. He has submitted an application to appear in this case pro hac vice. We also have local counsel, Naser Khoury, present; and substituting local counsel, if the Court permits it, Mark Bryne, present.

**THE COURT:** Good morning, gentlemen.

**ALL:** Good morning.

**THE COURT:** Good morning to you-all.

All right.

**(Pause)**

We've got a fairly busy calendar this morning so I want to be as efficient with our time as possible. The good looking gentleman sitting next to me is Judge Michael Wilner of

the Central District of California.

**(Pause; Court and Clerk confer)**

All right. Mr. Smirnov, I am going to assume, sir, that you have received the form upon which are listed all of your various rights, you know, your right to counsel and to have counsel appointed for you and all of the constitutional rights, the rights that you have to be -- to insist on being charged by an indictment -- and I think that is what has occurred here. You are entitled to plead not guilty to any offense and to persist in that plea. You are entitled to a jury trial; and if you and the Government both waive your right to a jury trial, you have the right to be tried by the Court.

Any of this sounding familiar at all?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** All right. And I also have a form here signed by your lawyer and a symbol, something like Prince I suppose would have done, which is an over-the-line marked signature of the Defendant. You recall signing --

**THE DEFENDANT:** Yes.

**THE COURT:** -- this form sir? Okay.

More importantly, have you spoken with your attorney about your various rights?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Did you all have a discussion about that?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Okay. Do you have any questions of the Court regarding any of your rights?

**THE DEFENDANT:** No, Your Honor.

**THE COURT:** All right. Have you seen the indictment? It is longer than it needs to be because it's got all kinds of little copies of things, screenshots, et cetera. Have you seen it, sir? It's a total of 37 pages. Have you seen it?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** You have the right to have this indictment read to you at this time. Would you like it read to you or do you give up that right?

**THE DEFENDANT:** No, thank you, Your Honor.

**THE COURT:** Okay. All right. You've indicated that you have received copies of the indictment and your statement of rights, your both statutory and your constitutional rights.

**THE DEFENDANT:** Yes, sir.

**THE COURT:** I don't see that you have signed that document so we're going to take care of that. Yes, here it is, wait a minute. And it's signed, yes, all right, good.

Do you have any questions at all, sir, about any of your statutory or constitutional rights?

**THE DEFENDANT:** No, Your Honor.

**THE COURT:** All right. Then I'll tell you what we'll do then. Let me get a response from you.

Is your true and correct name, sir, Alexander

Smirnov, as stated on the indictment?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Okay. Is there anything at all that you would like me to further explain to you? Anything at all? You've got an awful lot of legal horsepower over there. It's certainly fine for you to rely on that but if there's any questions that you have of me --

**THE DEFENDANT:** No, Your Honor.

**THE COURT:** None at all. All right. Then let's talk about what we're all here for.

A lot of words have been spent over this past week about the issue of your release or conditions of release or if I believe that we can establish conditions or combinations of conditions which will assure that you will show up for trial. I am concerned. And I've seen all of the papers and I will entertain further discussion now if counsel wish but just to let you know what I'm thinking, I'm not satisfied that there are conditions or combinations of conditions which will establish or satisfy my concern as to whether or not you will not flee the jurisdiction. Hang on.

**(Pause)**

Back to the two-count indictment charging making a false statement and creating a fictitious or a false record. I believe your plea has already been taken in the District Court of Nevada but indulge me.

How do you plead to the First Count of the Indictment charging a violation of Title 18, United States Code, Section 1001, *Making a False Statement*. How do you plead to that, sir?

**THE DEFENDANT:** Not guilty, Your Honor.

**THE COURT:** How do you plead to Count Two, a violation of Title 18, United States Code, Section 1519, *Creating a False or a Fictitious Record*. How do you plead?

**THE DEFENDANT:** Not guilty, Your Honor.

**THE COURT:** I am concerned about what appears to me to be a habit or practice of making false statements and I take no comfort in assurances that you may offer that you will not attempt to flee the jurisdiction but I will hear from your lawyers. I've read the papers and I saw the transcript of the proceedings, the Detention Hearing in Vegas. But if anyone wishes to expand upon what is already before the Court, I will entertain it.

**MR. CHESNOFF:** May it please the Court, Your Honor?

**THE COURT:** Yes?

**MR. CHESNOFF:** David Chesnoff, Your Honor. I do not want to speak without the Court first admitting me pro hoc vice out of respect to the Court. I've applied, I provided --

**THE COURT:** I haven't seen it. Let's deal with one thing at a time.

**MR. CHESNOFF:** Okay. May I proceed then?

**THE COURT:** Yes, please.

**MR. CHESNOFF:** Thank you. Thank you, Your Honor.

Your Honor, when the <u>Bail Reform Act</u> was enacted, Congress instituted various protections to make sure that only a small discreet group of people were to be detained. That would be people who had a history of fleeing or a history of violence or long criminal records.

In the instant case, Your Honor, our client has never been convicted of a crime. He has worked with the United States Government for at least a decade. There have never been any accusations of false statements attributed to him in all the years that he served the United States Government, particularly with respect to providing intelligence for both the FBI and the military. And so right now, Your Honor, the only false statements that we're concerned with are the ones in the indictment; and of course, Your Honor, that has not been tried to a jury or before Your Honor so there's been no finding.

Your Honor, the <u>Bail Reform Act</u> talks about cases where there's a presumption of a fear of flight and one where there isn't. This is not a presumption case. This is a case where the Court is asked by the Ninth Circuit through *Motamedi* and its progeny to shape conditions to ensure that the defendant appear.

The guidelines on this case, Your Honor, after conviction, at a minimum or a probability, would be 20 months;

at the maximum, 36 months. The penalty for bail jumping is higher than the penalties for this particular case.

In the courtroom today, Your Honor, are a woman who's been his significant other for 20 years and I'd ask her to stand so the Court can see her. She was in court in Las Vegas. She lives with the Defendant. He was with her for the period of time where the Nevada judge allowed him out. He left his home which is about 20 minutes from our office on his first day of freedom. He came to our office to work and was subsequently returned to Los Angeles. She is happy to have him with her. They've been together for all these years. And in fact, Your Honor, we submitted a supplement this morning where she has been willing to tell Your Honor that she would expect third-party custody of him, understanding that the Court could direct her to basically call Pretrial, call the Court if he did anything to deviate from any of the conditions that you set.

In addition in the courtroom, Your Honor, is a cousin of his who appeared from -- came from Miami to Nevada, went back to Miami when he got released and came back here when he got arrested because she's known him her whole life and she's a very reputable citizen with a long real estate career who also vouches for him.

In our pleadings, Your Honor, we attached a letter from the son of Diana, the woman willing to be third-party custodian, who honorably served this country as a sergeant in

the United States Marine Corps. He lived with the Defendant. He's written to Your Honor that he's known him for all these years and based on his experience with him, Your Honor, he would not disrespect this Court.

Your Honor, the Defendant has met with us at our office. He just pled not guilty. He intends to vigorously defend these allegations having never been in trouble his entire life.

Your Honor, he has no history of flight. He's always worked in some capacity, either for the Government or for his own business which is a financial business with investors and partners. He has --

Oh, important thing I want to point out to Your Honor.

The other day the Government represented that they were concerned that even though he's turned in his Israeli passport and his American passport that he could go to the U.S. consulate and get another Israeli passport. I took it upon myself, Your Honor, to speak to Ziv Bilaus who is the consular for the Consular Affairs for the Israeli Embassy in Los Angeles who informed me that if Your Honor were to direct correspondence to the Israeli consulate asking the Israeli government not to issue him any new passports at any other consular facilities, at any other embassies, that can be done.

I would also point out, Your Honor, that putting in

strict travel restrictions, you could have monitoring. They have geographic monitoring. All of these things are regularly used in cases where a judge may have had concern that the person is going to leave but they're used all the time. And there's nothing unusual about it and especially in a case where there is not a presumption of flight.

I respectfully point out to you the following Your Honor: Both Pretrial officers, entrusted with giving their best opinion to Article III judges, have both said that he can have conditions that will work.

This is going to be a interesting and complicated case, Your Honor, where we have a Defendant who is going to need to be able to assist us in defending him by contacting people in different parts of the world by phone, by computer. More importantly, there are language differences. He's fluent in English, he's fluent in Russian. He can speak and communicate with people that can assist us in refuting the allegations that have been made against him.

Yesterday morning I got here about 8:00 in the morning and I went to visit him at the MDC. He is not in regular population as a result in large part to what the Court said was a lot of things in an indictment that probably didn't need to be there, exposing the people that run the MDC to concerns for him because of the things that were said -- I'm drawing that conclusion -- in the indictment.

So he's in basically what's called "the shoe". He's isolated. He only has access to a phone once or twice a week. The ability to work with us on a case that's going to have voluminous documents is going to be limited. So I'm asking you, Your Honor, so that he gets a fair trial -- which we know he will get in this courtroom -- he has to be able to help us.

So having him released under electronic monitoring at his home in Las Vegas close to his office so he can work with us is one solution; or Your Honor, he would, through his friends and family, rent another place here in Los Angeles to reside if that's what the Court thinks is safer.

And this electronic monitoring that limits people from going to airports works. It's been used for some -- some of the most notorious people.

One final thing I would add, Your Honor --

**THE COURT:** Before you -- I said I wasn't going to interrupt you --

**MR. CHESNOFF:** No prob -- thank you.

**THE COURT:** -- but I can't help myself sometimes.

The electronic monitoring that you're referring to is the one that's generally strapped to your ankle?

**MR. CHESNOFF:** Yes, Your Honor.

**THE COURT:** With a plastic strap?

**MR. CHESNOFF:** I'm not -- I don't know the physics of it, Your Honor --

**THE COURT:** I do.

**MR. CHESNOFF:** Okay, I understand and it could be cut off. I'm --

**THE COURT:** Yes, it can be.

**MR. CHESNOFF:** But Your Honor, it's regularly used throughout the federal courts in the United States and in this instance it worked. You know how I know it worked, Your Honor? Because when he left his home to come work at his office when he was free, they were able to track him to my office where they arrested him. So the device works.

I understand the Court's concern. And based on the rendition that the Government gave you, I appreciate your concern. But I believe Your Honor can recognize -- and the magistrate judge as well from his own experience -- that the conditions that we are offering are the strictest conditions that can be imposed, especially in a non-presumption case where the penalties for the crime are so limited. This would be a very, very unique situation where someone similarly situated to Mr. Smirnov would not get out. And so far we've had two federal Pretrial offices, both entrusted with giving their best advice to the Court, both say that he should be released. And the conditions that they recommend, Your Honor, are less than the ones we're now offering you because we so badly want him to be out so we can fight this case, Your Honor.

**THE COURT:** One of those Pretrial offices has not

interviewed your client.

**(Pause; Counsel confers)**

**MR. CHESNOFF:** Oh, I was not aware of that, Your Honor. All I got was a report, I --

**THE COURT:** It's all right.

**MR. CHESNOFF:** Yeah.

**THE COURT:** All right. I won't interrupt anymore.

**MR. CHESNOFF:** No, no, that's fine.

**THE COURT:** But these are things that scrambled around in my mind. As you're speaking I'm thinking, okay, just how much is that worth?

**MR. CHESNOFF:** Well I appreciate that, Your Honor. And the last thing I would add to you is there's a couple of more points.

**(Pause; Counsel confers)**

**THE COURT:** Okay.

**MR. CHESNOFF:** Okay. The first full day he was out, he worked with us. The second full day he was out, he worked with us and that's when he got arrested. But Your Honor, he retained us -- and without going into detail on that -- with a significant legal fee which bespeaks the fact that someone who is going to flee is not going to give lawyers money and then take off and squander the money.

**THE COURT:** Unless it's not your money.

**MR. CHESNOFF:** Sorry?

**THE COURT:** Never mind.

**MR. CHESNOFF:** No, I heard you. It is his money but --

**THE COURT:** Okay.

**MR. CHESNOFF:** -- that's -- I point that out to you, Your Honor.

The final thing I would say to you is this: There were no misstatements about his finances.

We interviewed the Pretrial Officer in Las Vegas. We put it on the record in front of the magistrate. She simply asked him about his personal holdings, not his business holdings. The magistrate acknowledged that, one, it was done quickly; two, he had no counsel with him; three, there was a language issue; and four, the Pretrial Officer who interviewed him was in court, it was not refuted in any way and the magistrate accepted the representation.

The last thing I'll say is this, Your Honor.

If the Court wants, we will hire private security to monitor his 24 hours a day where he is. That's how important it is that he be out so he can work with us, Your Honor. And he would do that at his expense and it's been done in other cases. I think the Bernie Madoff who ripped off most of America and half of Europe, he was allowed to do that.

This is an isolated case. I remind the Court he gave 10 years of service to the United States. And it's now only

argued by the Government that he made a false statement about facts that occurred seven years ago which will be a highly contested part of his trial.

I appreciate the opportunity to be heard by you and thank you very much, Your Honor.

**THE COURT:** Thank you, sir.

**MR. CHESNOFF:** Oh, I'm sorry, my partner reminded me one last thing.

He has a very serious eye condition. He's undergone multiple surgeries, he has another surgery scheduled. He takes daily medication. And so another reason to need him out so that -- because he's not going to get the type of eye treatment he needs within the Bureau of Prisons MDC -- is so that he can visit his doctor and get the procedures he need because obviously we need him to maintain his sight while we go through this process. Thank you.

**MR. WISE:** Good morning, Your Honor. Just briefly I'll address some of the points that Counsel has made.

**THE COURT:** You're from DOJ?

**MR. WISE:** I am, Your Honor.

**THE COURT:** I'm surprised.

**MR. WISE:** Why is that?

**THE COURT:** I'll tell you later.

**MR. WISE:** Okay (chuckles).

Your Honor, I'll move perhaps in the order that -- or

reverse order from some of the points Counsel made.

He said that the misstatements that the Defendant made were from seven years ago. Well we know that's not accurate.

In September he was peddling a new story, new lies about a hotel in Kiev where supposedly Hunter Biden was recorded making calls to his father. This was a new disinformation story that's just a few months old that he admits came from Russian intelligence. So it is not the case that these are statements that were made seven years ago. And while it's correct that he was a source for many years, he clearly betrayed that trust.

Now, Mr. -- Counsel said that there are similarly -- he referred to similarly situated defendants to Mr. Smirnov. Well it is our submission based on the facts before this Court that there are not similarly situated defendants to Mr. Smirnov for two principal reasons. One, his contacts with foreign intelligence; and two, his access to more than six million dollars that he did not disclose.

Counsel, began his presentation talking about Ms. Lavrinyok (phonetic) acting as a third-party custodian. I will note that in the interview that was done with her by Pretrial Services here, she apparently doesn't know how much money she has in this account. That's what it says in the report. She survives on a savings account, amount unknown, and

fully owns her own apartment. But we know how much is in that account. As of February 20th, the day of the detention hearing, it was 3.7 million dollars. So the question is, how could someone who doesn't know they have access to 3.7 million dollars be asked to act as a third-party custodian?

Further in the report it indicates that both Defense Counsel and the individual that was pointed out from Florida say that she doesn't handle the bills. Well we also know that that account is used to pay Mr. Smirnov's bills. For instance, more than 108,000 in CitiCard credit card payments in 2022 and more than 275,000 in 2023. So either she is paying the bills but is -- did not disclose that, or he's using the account or some other third party is using the account. So she certainly does not present a suitable third-party custodian.

Defense Counsel made much of the fact that he was arrested at their law office. That was done because he had nine firearms, including an assault-styled weapon in his home and so law enforcement chose a safe location in which to contact him.

We hear -- we've heard two conflicting accounts of what he does for a living. Defense Counsel said he's in the financial business while Mr. Smirnov told Pretrial that he was in the security business. And the accounts we've seen don't support either.

Defense Counsel points to both Pretrial Service

reports recommending conditions. Neither Pretrial Service Office had access to the information that was submitted to the magistrate court or to Your Honor. Those reports were prepared before those reports were delivered, specifically the contacts with foreign intelligence; and second, the amount of money he had access to. Obviously he did not disclose that.

Now, Counsel says well there was some confusion. Well there's no evidence of any confusion. While the Pretrial Services Officer said she did ask for personal funds, these accounts that we've pointed to, the account that had almost three million dollars in his -- that he has access to in the name of Avalon Group and the 3.7 million that Ms. Lavrinyok has access to, are used as personal accounts. They bought -- the home they live in was purchased out of those accounts, the credit card payments they make are out of those accounts, large volumes of cash are taken out of those accounts. So there's no question that those are personal accounts.

And instead, what he told Pretrial was he had $6500 in personal -- in a personal account. Well there is no such account that has that amount of money in it. The nearest thing we found was the single personal checking account that had a balance in the hundreds that appear to be used to pay a recurring charge to a small life insurance policy. So even what he disclosed as a personal account was inaccurate.

Nor did he accurately disclose his expenses. He

claimed a few thousand dollars a month in expenses when we know from the credit card payments that he has hundreds of thousands of dollars in personal expenses every year.

So all of that goes to the point that he cannot be trusted to provide truthful information to Pretrial Services. He has demonstrated that, putting aside the charges in the indictment which clearly point out that he cannot be trusted to provide information even to someone to whom he has a multi-year very close relationship; again, based on trust.

Lastly, Counsel spent a good deal of his argument talking about the need for Mr. Smirnov to help counsel assist in his representation. That of course is not a factor under the Bail Reform Act that augers either for or against detention or release.

But I will point out that Counsel says this is going to be a case that has voluminous documents. It is not. This is a fairly straightforward matter. The Defendant claimed meetings that didn't happen. There are not voluminous documents that demonstrate a meeting didn't happen or meetings didn't happen.

The records are fairly clear -- his own emails, text messages, travel records from himself and the people he claim to participate -- that he made it all up. That's not a voluminous case. This isn't a securities fraud case like Madoff where there were millions of documents. It's a fairly

discrete set of documents.

Counsel also says that he will be contacting people in different parts of the world. Well that of course wasn't even allowed under the conditions that were set by the magistrate judge. The magistrate judge imposed the condition that he had no contact, direct or indirect, with any witness in the investigation or prosecution. So they're not going to be able to have him contacting witnesses in this case. He can obviously point them to witnesses but they're going to have to contact them themselves and they're going to have to hire translators just like in any case. That's a standard condition that applies.

Your Honor, I'm not going to repeat what we included in our motion. The factors that they're actually under consideration clearly demonstrate that there are no conditions or set of conditions that can reasonably assure the appearance of the Defendant. Those are laid out under 3142(g). They are the nature and circumstances of the offense, that this is an offense based on a violation of trust which is precisely before the Court.

The weight of the evidence which is strong based on the voluminous indictment that includes much of that evidence to make it abundantly clear what the evidence against the Defendant is; and then of course his history and characteristics. The fact that he has little to no ties to Las

Vegas, no job, no home, no real family. All of those connections are overseas. And more extraordinarily, these self-professed contacts with foreign intelligence and access to a vast sum of money that he failed to disclosed.

So for all those reasons, the Defendant should be detained.

**THE COURT:** Thank you.

**MR. CHESNOFF:** Just briefly, Your Honor.

**THE COURT:** Yes.

**MR. CHESNOFF:** It's a catch-22, Your Honor. He has connections with foreign agents or foreign representatives at the direction of the Government. That's what he was doing for them. They had him do that. So to suggest that he has some nefarious contacts with foreign agents when in fact any contacts he had was in order to accomplish the work that the Government asked him to accomplish, not just the FBI but apparently there are, as the case develops, contacts with the Department of Defense as well.

So it's really unfair to him to say you shouldn't let him out because he has foreign contacts when in fact he had the foreign contacts as a result of their use of him. And now they've of course kind of thrown him to the wolves in that regard, Your Honor. As far as --

**THE COURT:** All of his foreign contacts are or were at the behest of the Government?

**MR. CHESNOFF:** I wouldn't represent that to you, Your Honor, because he obviously knows people in different places and that's what's made him valuable, his ability to know people. So but I would not suggest that everybody that he knows overseas is as a result of his contacts with the Government.

As far as the financial issue, Your Honor, courts routinely put restrictions through magistrate judges or district court judges on the ability of a client or a defendant to utilize funds. I've been in situations where Pretrial has to be approved transactions. They have to tell you whether or not you can make a financial transaction. That could be imposed by the Court. I mean there are just so many things that the Court can impose that he's willing to do to assure you so that he can defend himself.

The Government is connect that in the Bail Reform Act it doesn't talk about the right to defend yourself but you've just heard that the Government doesn't think he should be allowed to speak to any witnesses. We of course when we litigate this will say that there are witnesses that are not hostile witnesses that he should be able to talk to.

There's a case in -- an old case in the Ninth Circuit, U.S. v. Kinney (phonetic), in which the Ninth Circuit said the fact that the defendant came from a particular culture and his lawyer didn't, that the defendant needed to be released

from custody in order to assist his lawyer because witnesses wouldn't talk to the lawyer without either the approval or the assistance of the client. That's Ninth Circuit law.

I'm asking you, Your Honor, this is not the circumstance. He was out, Your Honor. And if he had been given the chance, most respectfully, he would have been here with us this morning voluntarily. He didn't try to run, he didn't try to move the money. All he did was get out, go home, take a shower and get ready to work on the case.

And so he should not be treated differently which is what my learned cocounsel just said, that he's different. He's not different. He's the same as every defendant that comes in front of you where a learned judge evaluates it and reaches a conclusion.

I really implore you, Your Honor, to allow us to defend this case with him out with restrictions. He will -- as the magistrate judge in Nevada said, "Please don't disappoint me," and he said he wouldn't, the same applies here, Your Honor. And I mean it.

**THE COURT:** I know. I wish that's all it took. "Please don't disappoint me."

I'm not going to get into this. I've read everyone's papers, I understand the arguments.

One of the things that I haven't been able to quite understand is the disparity in the money that's coming in -- I

believe that was $10,000 a month -- and the money that's going on. And you haven't brought it up, I'm not asking you directly. I'm just going to let it go but it's just one of those things, one of those unresolved things and there's a whole lot of them and I will make this one comment.

There is nothing garden variety about this case. To compare this to all the cases that we normally see, this is an outlier. Okay? So ...

All right. I have not changed my mind. This man will be remanded pending trial.

Deputies?

By the way, under Federal Rule of Criminal Procedure 5(f), the Government is ordered to comply with its disclosure obligations under Brady versus Maryland and related cases. Failure to do so may result in sanctions. And a written order to this effect will follow.

**MR. WISE:** Thank you, Your Honor.

**THE COURT:** Thank you, gentlemen.

**MR. CHESNOFF:** Your Honor, may I ask you one question?

**THE COURT:** Yes.

**MR. CHESNOFF:** We have some eye medication that he needs. Should I discuss that with the marshals?

**THE COURT:** Let's go off the record.

**MR. CHESNOFF:** Thank you.

(Off the record at 9:41 a.m.; proceeding adjourned)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Toni I Hudson — February 27, 2024

Signed — Dated

*TONI HUDSON, TRANSCRIBER*

# EXHIBIT C

## Calendar/Proceedings Sheet

## 2:24-CR-91-ODW

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, PLAINTIFF

v.

Alexander Smirnov DEFENDANT.

☑ LA ☐ RS ☐ SA DATE FILED: 2/14/2024

CASE NUMBER: 2:24-cr-00091-ODW ☐ Under Seal

INIT. APP. DATE: 2/26/2024 TIME: 9:00 AM

CHARGING DOC: Indictment

DEFENDANT STATUS: In Custody

☐ PREVIOUSLY CALENDARED HOSPITALIZED DEFENDANT

VIOLATION: 18:1001.F; 18:1519.F

COURTSMART/REPORTER: CS 02/26/2024

PROCEEDINGS HELD BEFORE UNITED STATES MAGISTRATE JUDGE Otis D. Wright

CALENDAR/PROCEEDINGS SHEET
LOCAL/OUT-OF-DISTRICT CASE

PRESENT: Sheila English (*Deputy Clerk*) Sean F Mulryne (*Assistant U.S. Attorney*) N A (*Interpreter / Language*)

☐ INITIAL APPEARANCE NOT HELD - CONTINUED
☒ Court issues Order under Fed. R. Crim. P. 5(f) concerning prosecutor's disclosure obligations; see General Order 21-02 (written order).
☒ Defendant informed of charge and right to: remain silent; appointment of counsel, if indigent; right to bail; bail review and ☐ preliminary hearing OR ☐ removal hearing / Rule 20.
☒ Defendant states true name ☒ is as charged ☐ is ______
☐ Court ORDERS the caption of the Indictment/Information be changed to reflect defendant's different true name. Counsel are directed to file all future documents reflecting the true name as stated on the record.
☐ Defendant advised of consequences of false statement in financial affidavit. All financial affidavits must be filed under seal.
☑ Attorney: David Z Chesnoff ☑ Retd. ☐ Apptd. ☐ Prev. Apptd. ☐ DFPD ☐ Panel ☐ Poss. Contribution Ordered (see separate order) ☐ Special appearance by: ______
☒ Government's request for detention is: ☒ GRANTED ☐ DENIED ☐ WITHDRAWN ☐ CONTINUED
☐ Contested detention hearing is held. ☐ Defendant is ordered: ☐ Permanently Detained ☐ Temporarily Detained (see separate order)
☐ BAIL FIXED AT $ ______ (SEE ATTACHED COPY OF CR-1 BOND FORM FOR CONDITIONS)
☐ Government moves to UNSEAL Complaint/Indictment/Information/Entire Case: ☐ GRANTED ☐ DENIED
☐ Preliminary Hearing waived. ☐ Class B Misdemeanor ☐ Defendant is advised of maximum penalties
☐ This case is assigned to Magistrate Judge ______. Counsel are directed to contact the clerk for the setting of all further proceedings.
☐ PO/PSA WARRANT ☐ Counsel are directed to contact the clerk for District Judge ______ for the setting of further proceedings.
☐ Preliminary Hearing set for ______ at ______ in Los Angeles
☐ Post-Indictment Arraignment set for: ______ at ______ in Los Angeles
☐ Government's motion to dismiss case/defendant ______ only: ☐ GRANTED ☐ DENIED
☐ Defendant's motion to dismiss for lack of probable cause: ☐ GRANTED ☐ DENIED
☐ Defendant executed Waiver of Rights. ☐ Process received.
☐ Court ORDERS defendant Held to Answer to ______ District of ______
  ☐ Bond to transfer, if bail is posted. Defendant to report on or before ______
  ☐ Warrant of removal and final commitment to issue. Date issued: ______ By CRD: ______
  ☐ Warrant of removal and final commitment are ordered stayed until ______.
☐ Case continued to (Date) ______ (Time) ______ ☐ AM / ☐ PM
☐ Type of Hearing: ______ Before Judge ______ /Duty Magistrate Judge.
Proceedings will be held in the ☐ Duty Courtroom ☐ Judge's Courtroom ______
☒ Defendant committed to the custody of the U.S. Marshal ☐ Summons: Defendant ordered to report to USM for processing.
☐ Abstract of Court Proceeding (CR-53) issued. Copy forwarded to USM.
☐ Abstract of Order to Return Defendant to Court on Next Court Day (M-20) issued. Original forwarded to USM.
☐ Electronic Release Order issued (*if issued using Release Book*: Release Order No. ______ ).
☒ Other: PIA held see separate order

*RECEIVED:* ☒ PSA ☐ PROBATION ☐ FINANCIAL ☒ CR-10 ☒ READY

Deputy Clerk Initials SE

: 36

EXHIBIT D

DEFENDANT'S SUPPLEMENT TO OPPOSITION TO GOVERMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER - Filed February 26, 2024

2:24-CR-91-ODW

DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice* pending
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant, ALEXANDER SMIRNOV

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
* * * * * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 2:24-CR-00091-ODW |
| v. | ) | |
| | ) | |
| ALEXANDER SMIRNOV, | ) | DATE OF HEARING: |
| | ) | February 26, 2024 |
| | ) | TIME OF HEARING: 9:00 a.m. |
| Defendant, | ) | |
| | ) | |

**DEFENDANT'S SUPPLEMENT TO OPPOSITION TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER**

COMES NOW, Defendant, ALEXANDER SMIRNOV ("Mr. Smirnov"), by and through his attorneys, DAVID Z. CHESNOFF, ESQ., and RICHARD A. SCHONFELD, ESQ., of the law firm of CHESNOFF & SCHONFELD and hereby

files his Supplement to Opposition (ECF 33) to Government's Application for pretrial Detention (ECF No. 11).

Dated this 26th day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ Richard A. Schonfeld
DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice* pending
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant
ALEXANDER SMIRNOV

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. THIS HONORABLE COURT CAN IMPOSE ADDITIONAL CONDITIONS OF RELEASE WHICH DO NOT REQUIRE DEFENDANT TO BE DETAINED PENDING TRIAL

United States Pretrial Services Officer Fernando Basulto, from the Central District of California, performed additional investigation so that a recommendation regarding custodial status could be made to this Honorable Court. Officer Basulto, similar to United States Pretrial Services Officer Emily McKillip in the District of Nevada, has recommended that Mr. Smirnov be released on conditions.

In the event that this Honorable Court continues to have concerns regarding Mr. Smirnov's alleged risk of flight, and considering that this is not a presumption case under 18 U.S.C. section 3142, Mr. Smirnov respectfully proposes that the Court could impose the following additional conditions:

- Corporate Surety bond;
- Appointment of Diana Lavrenyuk as third-party custodian;
- House arrest with the exception that Defendant can meet with his legal counsel and medical providers;
- Financial restrictions, such as appointment of a Special Master over the corporate account that Mr. Smirnov has access to and/or requiring that a different partner in the business act as signatory; and

- Execution of a Waiver of Extradition. It should be noted that Counsel Chesnoff confirmed with Ziv Bilaus, counsel for consular affairs at the Israeli Consulate in Los Angeles, that if the Court requests that the Israeli consulate(s) and Embassy not reissue a passport, they can honor the request.

Accordingly, conditions can be fashioned to ensure that Defendant is present for the court proceedings and trial in this case.

DATED this 26th day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ Richard A. Schonfeld
DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice* pending
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant
ALEXANDER SMIRNOV

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of February, 2024, I caused the forgoing document to be filed electronically with the Clerk of the Court through the CM/ECF system for filing; and served on counsel of record via the Court's CM/ECF system.

/s/ Rosemary Reyes
Employee of Chesnoff & Schonfeld

# EXHIBIT E

# DEFENDANT'S OPPOSITION TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER

- Filed on February 23, 2024

2:24-CR-91-ODW

DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice* pending
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant, ALEXANDER SMIRNOV

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
* * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDER SMIRNOV,<br><br>Defendant, | CASE NO. 2:24-CR-00091-ODW<br><br>DATE OF HEARING: February 26, 2024<br>TIME OF HEARING: 9:00 a.m. |

**DEFENDANT'S OPPOSITION TO GOVERNMENT'S "APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER"**

COMES NOW, Defendant, ALEXANDER SMIRNOV ("Mr. Smirnov"), by and through his attorneys, DAVID Z. CHESNOFF, ESQ., and RICHARD A. SCHONFELD, ESQ., of the law firm of CHESNOFF & SCHONFELD and hereby

move this Honorable Court to follow both 1) the guidance of the Pretrial Services Office in Las Vegas, Nevada, and 2) the ruling and guidance of the Honorable Magistrate Judge Daniel J. Albregts, and deny the government's application for pretrial detention. *See* Gov. App. (ECF No. 11) (Feb. 21, 2024).

This Opposition is made and based upon the attached Memorandum of Points and Authorities; the transcript of the detention hearing before the Magistrate Judge Albregts (Feb. 20, 2024) (attached as Exhibit 1) ("Tr."); the argument of counsel; and any other such evidence as may be presented at the time of hearing on the government's application.

This opposition is timely.

Dated this 23rd day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ Richard A. Schonfeld

DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice* pending
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant ALEXANDER SMIRNOV

## MEMORANDUM OF POINTS AND AUTHORITIES

### A. Background, Procedural History, and the Pretrial Services' Recommendation of Pretrial Release on Conditions

At the outset, Mr. Smirnov notes that he is an American citizen with dual-nationality (United States and Israel); that the Government has possession of his United States passport; that the undersigned counsel provided Mr. Smirnov's Israeli passport to the Pretrial Services Office for the District of Nevada after the detention hearing on February 20, 2024; that he lives in Las Vegas, Nevada; that, before moving to Las Vegas, he was a long time resident of the State of California; and that he has no criminal history of any sort.

Mr. Smirnov was arrested and detained on or about February 14, 2024, in Las Vegas, Nevada. The two-count Indictment filed in the Central District of California charges Mr. Smirnov with : 1) Making False Statements to a Government Agent, in violation of 18 U.S.C. § 1001; and 2) Falsification of Records in a Federal Investigation, in violation of 18 U.S.C. § 1519.

As alleged in the Indictment, Mr. Smirnov served as a confidential human source ("CHS") for the FBI for several preceding years. Virtually all of the allegations recited in Count One, however, occurred in 2020 (*see* Ind. at 34, ¶57) and the alleged falsifications pertain to alleged acts taking place between 2015 and 2017. *See id.* at 34-35. Similarly, the alleged falsifications charged in Count Two pertain to alleged acts that took place in June 2020.

It should further be noted that the United States Sentencing Guidelines calculation for the offenses with which Mr. Smirnov is charged include a base offense level of 14 which results in a sentencing range of 15-21 months if convicted at trial. *See* U.S.S.G. § 2J1.2.[1]

On February 15, 2024, after making an initial appearance, Mr. Smirnov – for whom English is a second (if not third) language – was interviewed without counsel (at that point, the Public Defender) by Emily McKillip, Senior United States Pretrial Services Officer.

Officer McKillip thereafter prepared a Pretrial Services Report ("PTS"),[2] recommending Mr. Smirnov's release on the following conditions: 1) submit to supervision by and report for supervision to the U.S. Pretrial Services Offices; 2) continue to actively seek employment; 3) surrender any passport to U.S. Pretrial Services; 4) travel is restricted to the continental United States; and 5) avoid all

---

[1] In anticipation of the Government asserting that every conceivable guideline enhancement applies, which they do not, the highest guideline level that the Government could seek is a level 19 which results in a sentencing range of 30-37 months.

Moreover, in addition to the low guidelines range at issue here, neither crime charged in the Indictment carries a statutory presumption in favor of detention under 18 U.S.C. § 3142(e)(2),(3). *See* Tr. at 30.

[2] Because it contains personal information regarding Mr. Smirnov, the PTS will be cited to, but not included as an exhibit.

contact, directly or indirectly, who is or may be a victim or witness in the investigation or prosecution, including: government provide witness list. PTS at 3.

**B. Additional Relevant Background Information**

Mr. Smirnov is 43 years old, has no prior criminal history, has been in a relationship with his significant other, Diana Lavrenyuk ("Diana"), for decades, resides with Diana in her home in Las Vegas, has lived in Las Vegas for two years, has a Nevada Driver's License, and lived in California for the 16 years prior to moving to Las Vegas. Mr. Smirnov clearly has a stable residential history.

Mr. Smirnov also has significant ties to the United States with familial relationships. Diana's son (Nikolay Lavrenyuk, a former Marine Sergeant who has been a part of Mr. Smirnov's life for decades) lives in Washington D.C. along with his wife and has a good relationship with Mr. Smirnov. Additionally, Mr. Smirnov's cousin Linor Shefer resides in Florida and, like Nikolay, she flew to Las Vegas at her own expense to attend Mr. Smirnov's detention hearing on February 20, 2024. *See* Letters at Exhibits 2 and 3, attached.

Mr. Smirnov suffers from significant medical issues related to his eyes that require ongoing treatment. Mr. Smirnov has had seven surgeries in the last year; he must take prescription medication daily.

It should be noted that Mr. Smirnov has no history of drug or alcohol abuse and has no history of mental illness. His personal history supports release on conditions to be fashioned by this Honorable Court.

**C. After Briefing and a Full Detention Hearing, Magistrate Judge Albregts Orders Mr. Smirnov Released On Stringent Conditions**

From the outset, the Government has labelled Mr. Smirnov as inherently untrustworthy. *See, e.g.*, Tr. at 6 ("[T]he defendant has demonstrated he can't be trusted."), 7 (alleging he "lied to his FBI handler), 10-13 (alleging defendant lied about his net worth and cash in his various accounts), 14 ("So we've got lies, sort of, big and small in his very first instance of interacting with the Court[.]"), 14-15 (alleging that, "in his first interaction with Pretrial Services and the Court, he withheld information that shows he has access to millions of dollars that he could use if he were to flee the United States"). The Government asserted that while Mr. Smirnov lacked strong ties to the United States, *see* Tr. at 7-8 ("His family members live in Israel. He doesn't own any property here. He doesn't have a job here . . . . [T]hat doesn't make for significant ties"), he did maintain ties with "foreign intelligence." *See* Tr. at 8 (claiming that Mr. Smirnov's "contacts with foreign intelligence services, specifically Russian intelligence services and operatives," was "*the most extraordinary feature* of this defendant") (emphasis added).

Throughout the Government's presentation, the unbiased Magistrate Judge periodically interjected with questions designed to determine the strength of the

connection between the Government's torrent of allegations, on the one hand, and the relevant statutory bail factors, on the other. The Magistrate Judge was, to be sure, understandably alert to the potential flight risk posed by a dual citizen who routinely travelled abroad. *See, e.g.*, Tr. at 38 (Magistrate Judge agrees that Mr. Smirnov's foreign contacts are factors it should "notice and note" and further agrees "that that's a concern and certainly raised by the Government that I should consider it").

But the Magistrate Judge nevertheless questioned the Government whether those foreign contacts were sufficiently pronounced to make the possibility of a flight risk foreordained, and then preclude imposition of conditions to mitigate the risk. Tr. at 38 ("I just don't know . . . that that is *as grave a concern as the Government outlines*.") (emphasis added); *see also id.* (expressing skepticism that Mr. Smirnov would jump bail here and try to settle in Russia: "[M]y guess is at this stage he probably thinks that's not the most attractive place to go . . . .").

Thus, when the Government suggested that Mr. Smirnov had lied about the value of his assets to the Pretrial Services Officer, the [3]Magistrate Judge proposed a

---

[3] Defense counsel stated (and the Government did not contest) the following:

> Your Honor, we asked Pretrial Services about this question of financial disclosure because when we read their motion this morning, both Mr. Schonfeld and I said, "What happened here?" So we contacted the Pretrial officer. We asked to meet with her. And we asked her specifically, "Did you ask him about any other account than a personal account?" And the officer was candid

less sinister alternative, particularly for a non-English speaker who had just been arrested and was not, then, represented by counsel: "I mean, you're so certain that these are just blatant misrepresentations . . . why wouldn't it possibly be confusion when he's just been arrested, he's been taken into custody, and somebody shows up and starts asking him questions?" Tr. at 12; *see also* id. at 25-26 (defense counsel explains – and the Government never contests – the nature of Pretrial Services' questioning of Mr. Smirnov).

The Magistrate Judge also questioned whether, as the Government suggested: 1) the United States would be flatly unable to find Mr. Smirnov if he did flee abroad (*see* Tr. at 10: "You think the long arm of the United States of America couldn't find him on this planet?), or 2) Pretrial Services would somehow be unable to monitor him if he tried to flee. *See* Tr. at 23 (Magistrate asks "[w]hat if I put geographical limits on where he can go and we monitor that so that the minute he leaves Clark County, Pretrial's notified of that?" Government replies: "My understanding of the technology is that it's not that – it is limited, that there are lags, that there are – you know, that the geographic space is not tight enough to know if someone is in an

---

> and said no. *It's exactly why my client answered the question the way he did because he was not asked about anything else.*

Tr. at 27-28 (emphasis added). Nor did Officer McKillip, who addressed the Court repeatedly throughout the hearing, suggest that any of these representations were inaccurate.

airport as opposed to some other location."). The Government's "limited . . . understanding of the technology," was indeed later shown to be just that – electronic restrictions can, and often are, plausibly imposed as conditions of release. *See* Tr. at 41 (Officer McKillip assures the Court: "We *can* put an exclusion zone around the airport so if he goes into the area of the airport, we *will* get notified.") (emphases added).

Having considered the parties' arguments and invoked the applicable statutory principles (primarily, the Bail Reform Act and Section 3142), the Magistrate Judge issued a careful, balanced analysis:

> I think *it's pretty clear to this Court that Mr. Smirnov is a flight risk by a preponderance of the evidence*. His dual citizenship, his possession of passports, his foreign ties, his extensive foreign travel, and some questions about his employment and where he makes his money . . . clearly rise to the level that he's a risk of nonappearance by a preponderance of the evidence.
>
> The bigger question . . . is *whether or not there are conditions or a combination of conditions that can address those concerns.*
>
> I do have concerns about his access to money and . . . some of the representations made to Pretrial . . . , but I also place those in the context of . . . the language issue, the nature of the Pretrial interviews and how quickly they occur, he did not have counsel at the time, the context in which the questions were asked. . . . *I don't know that . . . I'm convinced that he was sitting there . . . intentionally lying to Pretrial to keep them from knowing about his finances*. I just . . . don't know that it rises to that level.
>
> The other concern . . . is the allegations and his relationship with his handler . . . . I do on some level . . . recognize that how he deals with his handler and the FBI . . . would probably be

> *different* than how he would treat a Court order or a Court decision, and whether or not the lack of trust he showed, according to the Government, with his handler would rise to the level of a lack of trust that he would not follow my orders . . . . *I'm not convinced of that given the complex nature of that relationship.*

Tr. at 36-37 (emphases added).

The Magistrate then noted that, despite its wide-ranging attacks on Mr. Smirnov, the substance of those attacks did not preclude the type of release contemplated by the Bail Reform Act – particularly where the independent Pretrial Services Office was itself recommending release on conditions.

> The Government has argued the nature and circumstances of the offense. They put about a quarter of their 28-page brief to discuss the nature and circumstances and the weight of the evidence. And . . . those are the least important factors . . . . And they argue that his ties to the community are weak, and they've argued that both in their pleading and here today such that there are no condition or combination of conditions that would address that . . . . [I] understand the concern about foreign intelligence agencies potentially resettling Mr. Smirnov outside of the United States, his connections to them, *but I think on some level that's speculative as well* . . . .
>
> [T]his Court . . . puts a lot of stock into Pretrial Services and their investigation and their recommendations and their belief about whether or not they believe somebody *can* be supervised with conditions. And in this case Pretrial Services believes, notwithstanding some of the issues that the Government's raised, *and they acknowledge those issues*, they believe that Mr. Smirnov *can* be supervised and that there *are* conditions that can be placed upon him . . . . And so that carries weight with the Court as well . . . . [I]t's not just [defense counsel] saying his client should be released, *but Pretrial Services believes that conditions can be fashioned.*

Tr. at 37-40 (emphases added).

The Magistrate Judge then fashioned the stringent conditions for Mr. Smirnov's release.

> I'm finding today that the Government has not met their burden as it relates to conditions because I believe that conditions can be fashioned because Pretrial believes that . . . .
>
> I'm going to release you on your personal recognizance, which is just your signature and promise to appear in court and to follow these conditions. If you do not, that will be revoked and you will be detained . . . .
>
> I'm going to go through [the conditions] somewhat quickly. If you don't understand everything, you will have time to talk to [defense counsel] and make sure you understand.
>
> First, you're to submit to supervision by Pretrial Services . . . immediately . . . and follow their direction for supervision.
>
> I'm going to allow them to order you to seek employment . . . . [Y]ou're not going to be able to continue with your consulting business while this case is pending. *You're going to have to figure out some other way to conduct business because I'm not going to allow foreign travel. In fact, I'm not going to allow any travel.* So you need to seek employment that Pretrial approves and that's appropriate while this case is pending.
>
> You're to surrender your U.S. passport and your Israeli passport to Pretrial Services immediately. I believe that the Government took your United States passport. [Defense counsel]. . . shall give [the Israeli passport] to Ms. McKillip upon the conclusion of this hearing.
>
> Number four, *you shall not obtain a passport or any other international travel documents.*

> Number five, I'm going to order you that your travel is restricted to Clark County, Nevada . . . . I'm going to allow the travel in Clark County alone and exclude you from the airport. *So if you are in the zone of the airport, . . . they will be notified immediately . . . . So you are not allowed to go to that airport.*

Tr. at 40-42.

Despite the stringency of these conditions, Mr. Smirnov – after being released and spending a single day out of from custody – was rearrested at his lawyer's office while preparing his defense. He was ordered detained and transported to California *See* Exhibit 4 (attached).

**D. Statement of the Law: *De Novo* Review Does Not Justify Prejudging a Detention Issue**

While this Court reviews the Magistrate Judge's release order under a *de novo* standard, *see, e.g., United States v. Koenig*, 912 F.2d 1190, 1192-93 (9th Cir. 1990), that non-deferential standard does not justify what is happening here: that is, *pre-judging of a detention issue.*

Thus, in ordering Mr. Smirnov summarily rearrested, detained, and brought to California, this Court stated flatly that – in doing their jobs and representing their client – defense counsel was "likely to *facilitate his absconding* from the United States." Order Setting Hearing on Gov't Mot. for Review of Release Order (Feb. 22, 2024) at 1 (emphasis added) (attached as Exhibit 4). The suggestion that defense counsel is participating in an unlawful plot by advocating for release under Section 3142 is wrong. The Court's Order stating that it had already granted the

Government's Application, without having heard from the Defendant, further revealed that this Court has already decided to detain Mr. Smirnov at the February 26 hearing.

Nevertheless, in a case where the detention issue had not been prejudged, the starting point would be *United States v. Salerno*, 481 U.S. 739, 107 S. Ct. 2095 (1987). There, the Supreme Court stated that, in the United States, liberty is the norm, and detention is the carefully limited exception. The Court found that the Bail Reform Act of 1984 operates only on individuals who have been arrested for particularly serious offenses, and carefully delineates the narrow circumstances under which detention is permitted.

The Bail Reform Act of 1984 does allow a court to detain a defendant if no release conditions "will reasonably assure the appearance of the person and the safety of any other person in the community." But it is only under those rare circumstances where no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community, that a court may reasonably (not to mention, constitutionally) order the pretrial detention of a never-convicted, presumptively innocent defendant like Mr. Smirnov.

These principles were reinforced in *United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991), where the Ninth Circuit stated that the Bail Reform Act required

release of persons under the least restrictive condition or combination of conditions that will reasonably assure appearance of the person and the safety of community. *See Gebro*, 948 F.2d at 1121. "Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in the defendant's favor." *Id.* (citing *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)). Finally, "[o]n a motion for pretrial detention, the government bears the burden of showing [1] by a preponderance of the evidence that the defendant poses a flight risk, and [2] by clear and convincing evidence that the defendant poses a danger to the community." *Gebro*, 948 F.2d at 1121.[4]

Citing 18 U.S.C. § 3142(g), the *Motamedi* Court stated: "The court must take into account available information concerning the nature and circumstances of the offense charged, the weight of the evidence against the person, the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, record concerning appearance at court proceedings, and the nature and

[4] The parties and Magistrate Judge agreed that the principal detention issue in this case concerns the risk of non-appearance, not the danger to the community. *See* Tr. at 35 ("I'll take the . . . the danger prong, which requires the Government to provide evidence of clear and convincing evidence that he's a danger to the community. That's not what they've asked or argued, and that's not what any of the parties have raised.").

seriousness of the danger to any person or the community that would be posed by the person's release." *Motamedi*, 767 F.2d at 1407.

As shown below, these factors – coupled with the Pretrial Service Office's recommendation of pretrial release for Mr. Smirnov – militate overwhelmingly in favor of release in this case. Pointedly, when he was arrested for a second time, Mr. Smirnov was already free and working on his defense in his lawyers' office. This is hardly what would be expected of a person preparing to jump bail and flee the country; to the contrary, had he not been rearrested, Mr. Smirnov would have voluntarily traveled to Los Angeles with his lawyers to attend the upcoming hearing.

**E. The *Motamedi* Factors Militate Overwhelmingly In Favor Of Release:**

**Nature and seriousness of the offense charged.**

As stated above, Mr. Smirnov is charged under 18 U.S.C. § 1001 and 18 U.S.C. § 1519, both of which accuse him of making false statements in connection the current president's (and, particularly, the current president's son's) connection to a business deal with a company based in Ukraine. These allegations are makeweight and related to political issues; they do not involve espionage or theft and are thus not "serious," especially as to the penalty.

**Weight of evidence against defendant.**

The Ninth Circuit has held that the "weight of the evidence" is the least important factor to be considered during the pretrial detention hearing. *See, e.g.,*

*Motamedi*, 767 F.2d at 1408. This guards against the possibility of making a "preliminary determination of guilt" that then leads to punishment in the form of a refusal to grant release. *Id.* "The [ ] factor may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Id.*; *see also United States. v. Armstrong*, 2010 WL 5102203 (D. Ariz. 2010) (granting pretrial release to defendant charged with two separate armed bank robberies while recognizing that the evidence against the defendant was strong because bank surveillance photos show her committing the robberies and because she admitted her participation.).

While it is not clear what the government's evidence consists of at this preliminary stage, Mr. Smirnov vigorously disagrees with the Government's recitation of the facts. That aside, when the "evidence factor" is considered in conjunction with the other factors outlined here, the balance weighs in favor of release.

**Defendant's character, physical and mental condition.**

Mr. Smirnov has an exemplary character and is in good mental health. Mr. Smirnov has ongoing medical issues related to his eyes and will need continuing care.

**Defendant's family and community ties.**

Mr. Smirnov has lived in Las Vegas for two years, lived in California for the sixteen years prior to moving to Las Vegas, has relatives that live in the United States, and has his long term significant other that he resides with in Las Vegas. He thus has strong ties to the community and has the strong support of family and friends.

**Defendant's past conduct, history relating to drug and alcohol abuse, criminal history.**

Mr. Smirnov has no criminal history and there is no indication of any drug or alcohol abuse whatsoever.

**The nature and seriousness of danger to any person or community that would be posed by defendant's release.**

Mr. Smirnov is 43 years old and has no criminal history. Any concern that Mr. Smirnov is a danger while on release can be adequately addressed through the imposition of certain conditions including electronic monitoring, maintaining his residence, travel restrictions, and any other condition the Court deems necessary.

**Additional, Critical Factors Unique to This Case.**

In the days leading up to his detention hearing on February 20, 2024 in Nevada, Mr. Smirnov was detained by the U.S. Marshals. It took the undersigned counsel several hours on February 16 (not to mention many phone calls), to secure

even a brief phone call with Mr. Smirnov – at which the matter of legal representation, and nothing else, was discussed.

Moreover – and particularly relevant to the issue of pretrial release – a representative from the facility where Mr. Smirnov is being held advised counsel: 1) that Mr. Smirnov is in protective custody; and 2) that, given this restrictive classification, the entire facility needed to be "frozen" just so Mr. Smirnov could take this brief, non-substantive phone call. It is not anticipated that the confinement conditions will be drastically different in Los Angeles.

Given the foregoing – and coupled with the volume of records that the government will doubtless produce and the overriding need for in-person trial preparation with the client – it will be virtually impossible to mount an effective trial defense through intermittent telephone calls and truncated, sparse jail visits.

The federal courts warn that pretrial detention can hamstring trial preparation:

> The Supreme Court has recognized that "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during trial itself." *Maine v. Molton*, 474 U.S. 159, 170, 106 S. Ct. 477 (1985); see also Wolfish v. Levi, 573 F.2d 118, 133 (2d Cir.1978) ("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds, Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979).

*Estrada v. Munoz*, No. 2010 WL 1999525, at *2 (C.D. Cal. May 17, 2010).

Moreover, with Mr. Smirnov in custody he will not be able to facilitate his counsel's contact with critical witnesses, and assist counsel with language barriers

that are sure to exist. In *Kinney v. Lenon*, 425 F.2d 209 (9th Cir. 1970), the Ninth Circuit found the detention of a juvenile to interfere with his due process right to a fair trial, as the Defendant was likely the only person that witnesses would cooperate with due to "age and race." Here, with the cultural and language barriers, it is anticipated that Mr. Smirnov will be the only person that can effectively contact and facilitate interviews of critical witnesses for his defense.

Keeping Mr. Smirnov in custody will thus work an irreparable harm to his ability – indeed, *right* – to prepare effectively for trial.

**F. Mr. Smirnov is Neither a Flight Risk Nor a Danger to the Community**

Federal courts embrace the "strong presumption against detention." *See, e.g., United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009); *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004). And, along these lines, we refer this Court to Letters attached at Exhibits 2 and 3 for a personal explanation as to why Mr. Smirnov will not flee.

In both *Hanson* and *Karni*, the courts held that conditions for release could be fashioned to ensure the appearance of defendants who – unlike the Mr. Smirnov – did *not* have significant ties to the United States and who *did* pose a serious danger to the United States. There, the defendant was an Israeli national who had been residing in South Africa for the last eighteen years. He was charged with violating federal law by allegedly acquiring "products that are capable of triggering nuclear

weapons and [exporting] them to Pakistan, via South Africa, avoiding the requirement of obtaining an export license for the devices." *Karni*, 298 F. Supp. 2d at 130. Despite the serious nature of his crime and the fact that he "had no ties to the United States or to the Washington, D.C. area," the court determined that the defendant should be released subject to certain conditions including release into third party custody, home detention, and electronic monitoring.

In *Hanson*, the defendant was a Chinese citizen who had become a naturalized citizen of the United States. She was alleged to have illegally exported unmanned aerial vehicle ("UAV") autopilot components to the People's Republic of China. According to the government, Mrs. Hanson carried these UAV components to Germany and handed them to an acquaintance who took them to China. The government represented that these sophisticated components enable UAVs to perform certain tasks without the aid of human pilots, including autonomous take offs, bungee launches, and hand launches and landings, and that they have other tactical military uses. Moreover, according to the government's expert, UAVs equipped with these components could be used to simulate stealth planes and cruise missiles to test air defense detection systems, and potentially could be armed. The government argued that she was a flight risk because 1) she had closer ties to China than to the United States; 2) her marital relationship in the United States was faltering, and she had no other family ties here; 3) she faced a steep jail sentence and

the government had strong evidence against her; 4) it would have been easy for her to get a new Chinese passport and depart to China; 5) and she had strong business interests, family ties, and property in China. After hearing the evidence, the court – like the Magistrate Judge in this case -- found that conditions *could* be fashioned that would reasonably assure the defendant's presence.

These cases (and countless others like them) illustrate the type of conditions that can easily be fashioned to ensure that Mr. Smirnov attends all Court hearings.

Again, it should also be noted that Mr. Smirnov is dual-citizen who is lawfully in the United States. His dual citizenship should not be a concern for this Honorable Court, and both Pretrial Services and the Magistrate Judge in Nevada have recognized that conditions can be fashioned regarding the factor of alleged flight.

///

**G. Conclusion**

Despite this Court having already decided to arrest Mr. Smirnov, we are optimistic that it will apply the law of the Ninth Circuit and direct Mr. Smirnov's release, consistent with Pretrial Services' and Magistrate Judge Albregts' prior recommendations.

DATED this 23rd day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ Richard A. Schonfeld

DAVID Z. CHESNOFF, ESQ.
*Pro Hac Vice* pending
RICHARD A. SCHONFELD, ESQ.
California Bar No. 202182
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant ALEXANDER SMIRNOV

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of February, 2024, I caused the forgoing document to be filed electronically with the Clerk of the Court through the CM/ECF system for filing; and served on counsel of record via the Court's CM/ECF system.

__________/s/ Rosemary Reyes____
Employee of Chesnoff & Schonfeld

(71 of 420), Page 71 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 71 of 420

# EXHIBIT 1

AA000065

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>ALEXANDER SMIRNOV,<br>Defendant. | ) | Case No. 2:24-mj-00166-DJA<br>Las Vegas, Nevada<br>February 20, 2024<br>DETENTION HEARING<br>***CERTIFIED COPY*** |

TRANSCRIPT OF PROCEEDINGS

THE HONORABLE DANIEL J. ALBREGTS, UNITED STATES MAGISTRATE JUDGE

APPEARANCES: See Next Page

DIGITALLY RECORDED: Liberty Court Recorder 3:02 p.m.

TRANSCRIBED BY: PATRICIA L. GANCI (702) 385-0670

Proceedings recorded by electronic sound recording, transcript produced by mechanical stenography and computer.

APPEARANCES:

For the Plaintiff:

**LEO J. WISE, ESQ.**
**DEREK E. HINES, ESQ.**
**CHRISTOPHER R. RIGALI, ESQ.**
**SEAN F. MULRYNE, ESQ.**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
(771) 217-6091

For the Defendant:

**DAVID CHESNOFF, ESQ.**
**RICHARD A. SCHONFELD, ESQ.**
CHESNOFF & SCHONFELD
520 S. 4th Street
Las Vegas, Nevada 89101
(702) 384-5563

LAS VEGAS, NEVADA; TUESDAY, FEBRUARY 20, 2024; 3:02 P.M.

--oOo--

P R O C E E D I N G S

THE COURT: Thank you. Please be seated.

COURTROOM ADMINISTRATOR: United States of America versus Alexander Smirnov, 2:24-mj-166-DJA. This is a detention hearing.

Counsel, make your appearance for the record, please.

MR. WISE: Good afternoon, Your Honor. Leo Wise, Derek Hines, Christopher Rigali, and Sean Mulryne for the United States.

THE COURT: Good afternoon.

MR. CHESNOFF: May it please the Court, Your Honor. David Chesnoff, Richard Schonfeld, and also with us Peter Levitt here on behalf of Mr. Smirnov.

THE COURT: All right. Thank you. Good afternoon. Good afternoon, Mr. Smirnov.

All right. This matter is scheduled for the continued detention hearing this afternoon. However, a couple of other matters have been filed that I want to resolve here before we begin. Specifically, at Dockets Number 9, 10, 11, and 12 the Government has filed motions to admit all four Government attorneys. I will grant those here today. So 9, 10, 11, and 12 are granted.

Additionally, there was a motion to file documents

under seal filed by -- on behalf of the United States at Document Number 13.

Mr. Chesnoff, did the Defense receive and review the motion to file some of the documents related to their filing today under seal?

MR. CHESNOFF: Yes, Your Honor.

THE COURT: Does the Defense have an opposition to that?

MR. CHESNOFF: No, Your Honor.

THE COURT: All right. Well, I've reviewed the motion and I've reviewed the documents. I do note that the request to seal does not outline the Ninth Circuit case law that I believe would apply, *Kamakana* and its progeny. But when I apply *Kamakana* and its progeny, I do think that sealing these documents would be appropriate in this case.

I will of course remind the parties, as you well know, that there's a presumption of access to the courtroom documents and the public having access to those filings. And the Ninth Circuit outlines standards that I am to employ when deciding to change that and to seal things. And so I have done that analysis. And I do believe it's appropriate to seal Exhibits 1, 3, 4, 5, 6, 7, and 10 given the information that's contained in there and my analysis of the case law as it applies to those exhibits. So I will grant Number 13 as well and allow those documents to be filed under seal.

So the parties are aware, I have also reviewed the Defense's motion for release, which is found at Number 8. I reviewed the Government's memorandum in support of detention, which is found at Number 15. And I reviewed a filing that Mr. Chesnoff and Mr. Schonfeld entered later this afternoon at Document 16, which is a response.

Mr. Chesnoff, as it relates to that response, you note that the Government's was filed this morning, mid to late morning, and that you didn't have time to respond in whole to the memorandum and the hundreds of pages of exhibits that were attached thereto given that it was just filed this morning.

Are you prepared to proceed today with the detention hearing notwithstanding that or would you be requesting some more time to review and consider those -- those documents?

MR. CHESNOFF: Your Honor, considering the fact that he's been held for this many days when we believe that he should have been released and the report that we have from Pretrial Services, we'll -- we'll waive any defect in not being able to fully respond. We feel our arguments will cover enough of it to satisfy the Court, Your Honor.

THE COURT: All right.

All right. With that, then, I will hear from the Government regarding release or detention.

MR. WISE: Thank you, Your Honor.

The Government has moved for the defendant's detention

pursuant to 3142(f)(2)(A) and (B) because there is a serious risk the defendant will flee and a serious risk the defendant will obstruct justice. Applying the 3142(g) factors to the facts presented in the Government's memorandum in support of detention compels the conclusion that there are no conditions or combination of conditions that will reasonably assure the defendant's appearance. Therefore, pursuant to Section 3142(e) he should be detained pending trial.

As we outline in our papers, detention is appropriate where a defendant is either a danger to the community or a flight risk. It is not necessary for the Government to prove both. And while the former requires clear and convincing evidence, the latter is accomplished by a lower standard, by a preponderance of the evidence. And, again, as we cite in our memorandum, that means, and this is the District of Idaho case we cite, that the Government must demonstrate that it is more likely than not that there is a serious risk that the defendant will flee, not that it is more likely than not that the defendant will flee.

I'll briefly address the 3142(g) factors which we discuss at greater length in our memorandum. First as we outline, the nature and circumstances of the offense in this case support detention. In any situation, in any case, pretrial supervision is based on trust, and the defendant has demonstrated he can't be trusted. And this is something I'll

come back to.

Here, the defendant lied to his FBI handler after a nearly 10-year relationship. This is someone with whom he had nearly daily contact, somebody whom the defendant has described as family. If he's willing to betray someone under those circumstances, how can the Court have any confidence that he will provide truthful information to a Pretrial Services officer he has never met when his liberty is at stake?

As to the weight of the evidence against the defendant, and this is also summarized in -- in our papers and cites extensively to the speaking indictment, the evidence in this case will come from the defendant's own travel records, e-mail messages with his handler and others, and from travel records e-mails and messages with the individuals that he claimed participated in these meetings and phone calls where these outrageous allegations were made.

The trial won't be a swearing contest between the defendant and these witnesses, although witnesses will refute the defendant's story in no uncertain terms. But the Government's witnesses will be corroborated by these documents and other unimpeachable evidence, and the defendant's story won't be.

Turning to the history and characteristics of the defendant, Defense counsel asserts in his motion for pretrial release that Smirnov has significant ties to the United States,

but he does not. His family members live in Israel. He doesn't own any property here. He doesn't have a job here. According to his own motion for pretrial release, the only relation they can point to is a cousin in Florida, but that doesn't make for significant ties.

Now, while a consideration of these factors alone compels detention, the extraordinary characteristics of the defendant that we've outlined in our memorandum make it clear that there are no conditions that will reasonably assure his appearance. And I'll address these in more detail.

First, his self-professed claims of ties to foreign intelligence services including Russian intelligence; the between 3 million and $6 million in liquid funds he access to; three, the fact that he didn't disclose those assets to Pretrial Services or to the Court, and I'll address the defendant's recent reply on at least they only address the Pretrial Services disclosure and that, too, was deficient regardless of what's in their reply; and, finally, the fact that as a dual national he can obtain an Israeli passport at any time after he surrenders it.

Turning first to I think what is the most extraordinary feature of this defendant, his contacts with foreign intelligence. His contacts with foreign intelligence services, specifically Russian intelligence services and operatives, distinguish his case from the two cases cited by the defendant

in his motion for release, *Karni* and *Hanson*. And I would venture to guess that a situation like this has probably never been presented to the Court.

Those contacts are regular and recent. In our memorandum we quoted recently declassified FBI reporting summarizing the defendant's contact with Russian intelligence and others, and most notably his recent -- his most recent election disinformation story, the one he told the FBI in September 2023 about the Premier Palace Hotel in Kyiv and the recordings of Businessperson 1, came after he met with Russian intelligence.

Again, these contacts make this defendant different from other defendants who merely have foreign ties, and they heighten the risk of flight dramatically. And that is because he can use these contacts with foreign intelligence services to flee and to resettle overseas, something I would again venture to say is almost unique in the presentation of a defendant being considered for the pretrial release.

THE COURT: So let's say that happens. You don't think that the Federal Government would have the ability to find him and take action to bring him back? You think that these Russian ties that you're talking about are the type of people that would literally take him and secrete him from prosecution?

MR. WISE: If he were to resettle in Russian, we couldn't extradite him. Russian won't extradite under these

circumstances.

If he were to resettle in other -- in third countries, we couldn't extradite him. And so, yes, I think that is the case.

THE COURT: All right. Go ahead. I'll --

MR. WISE: That's even assuming we could find him. That's even assuming we could find him.

THE COURT: You think the long arm of the United States of America couldn't find him on this planet?

MR. WISE: Yes. I think the best thing we have going for us is the idea that people think we have that long arm, and having been in Government for 17 years, I'm routinely astonished at how short it is.

THE COURT: All right. Go ahead.

MR. WISE: The next factor that makes this defendant extraordinary is his access to funds and, worse, the fact that he didn't disclose these assets to Pretrial or to the Court last week.

Now, to be clear, the defendant's PSR says he has access to $6,500, $1,000 or $1,500 cash on hand and $5,000 in a checking account.

He actually has access to approximately $3 million in a -- in an account in the name of the Avalon Group where he is the sole signatory. We received a balance on that account as of this morning. It has $2,886,893.18. And contrary to what is in

the reply the Defense filed, this is not a business account. He uses it to pay personal expenses.

As we outlined in our filing, he's withdrawn $175,000 in cash out of it. He's transferred more than 2.6 million to his girlfriend who has then used that money to purchase the million dollar condominium they live in, to make credit card payments which is his primary means of paying these personal expenses in the amount of more than $100,000 in 2022, more than $275,000 in 2023, and there is no discernible business activity in this account nor can he or his girlfriend actually articulate what his business is.

The only personal checking account he appears to have has at last -- the last time we checked about $500 in it which is used only to make a very small recurring insurance payment. So this is his money. It is not the case that he was confused and thought this was a business account that he didn't have to disclose.

And, further, even if there was some confusion with Pretrial, which I submit there was not, these are his funds. We haven't seen the financial affidavit, but I have what -- I've seen what these financial affidavits that he filled out and submitted to Your Honor say. And it says: "Cash and bank accounts. Do you have any cash or money in savings or checking accounts?" Doesn't say personal accounts. Doesn't say business accounts. It says: "Cash or save" -- it says: "Cash or money

in savings or checking accounts." And he does.

THE COURT: Does the Government think -- well, let me ask first. Does the -- do you have any knowledge about what happens from the time of the arrest till the time of the initial appearance a few hours later?

MR. WISE: In what -- I'm sorry.

THE COURT: Well, just how the Pretrial interview goes and -- and the discussions and, you know, the time constraints that people are -- I mean, you're so certain that these are just blatant misrepresentations when there might have -- why wouldn't it possibly be confusion when he's just been arrested, he's been taken into custody, and somebody shows up and starts asking him questions?

MR. WISE: So if someone asked me what kind of funds I had access to and I had $3 million in an account and I told them I had $6,000 in an account, I think it would --

THE COURT: I don't know that they ask him what kind of funds he has access to. The questions are: Do you have a savings account? Do you have a checking account? And what's in them? I mean, I've sat in on these interviews for many, many years.

MR. WISE: And I think any defendant that was looking to be forthcoming would say, "I have this account that I use to pay my personal expenses out of. I have this account that I've transferred millions of dollars to the woman I live with to that

she's used to purchase the home we live in." I think -- I've heard these questions and I think they absolutely would call for this information.

THE COURT: Okay.

MR. WISE: And then when he sat in front of Your Honor and Your Honor asked him before appointing -- and as I said, we haven't seen the affidavit, but I'm fairly certain it didn't have $6 million on it or Your Honor wouldn't have appointed CJA for him. It says: "Do you have any cash or money or savings or checking accounts?" And he clearly did have that and he chose -- he chose not to disclose that information.

And, in addition, the balance in the DL -- what we refer to as the DL account as of today is an additional $3,784,218.51. And we see this pattern of him taking money out of the Avalon account, buying cashier's checks, giving it to DL. She then goes to a nearby branch within 30 minutes and deposit it, which makes it look like there's some kind of business relationship between her and this Avalon Group, but not with him.

THE COURT: Did you ever call Pretrial or reach out to Pretrial to ask about the circumstances of the questions to determine whether there might have been misunderstandings or that the questions weren't as direct so that it's not as clear in your mind that he's flat-out lying to them?

MR. WISE: Your Honor, my approach to Pretrial is that

they have a job to do as an agency of the Court, and I wouldn't be comfortable asking them to essentially become witnesses against the defendant under those circumstances. So I typical -- I haven't done that.

THE COURT: All right. Fair enough.

MR. WISE: But I think it is very clear that these are his funds as we outline --

THE COURT: Okay. So -- and you've made that clear in there. So move on past the funds. I understand that argument.

MR. WISE: And the other things -- you know, the other thing he said -- he made a number of statements to Pretrial that were untrue. He, for instance, said this condominium was leased by the girlfriend when we know in fact it was purchased by her with his funds. And Defense counsel even had to concede that in their -- in their filings. So we've got lies, sort of, big and small in his very first instance of interacting with the Court, when one would think you would err on the side of providing all of the information that might be necessary so that one might be released on conditions.

In short, the evidence that the defendant can't be trusted to abide by conditions and provide truthful information to Pretrial Services isn't speculation. He's shown that he can't be trusted by providing misinformation to his handler, and in his first interaction with Pretrial Services and the Court he withheld information that shows he has access to millions of

dollars that he could use if he were to flee the United States.

I'd like briefly now to turn, if Your Honor would like, or I can depending on how Your Honor -- the sequence, I can turn to some of the arguments made in the defendant's motion for pretrial release or I can wait until after they go, whatever Your Honor would prefer.

THE COURT: You argue how you feel appropriate.

MR. WISE: Sure.

So I'm not going to address all of the arguments. Some of them I think are -- are sort of on their face ones that I think I don't need to address, but the first -- the first thing I will note is that the defendant argues that the Government knew about Mr. Smirnov's alleged conduct for years, yet, took no steps to end his cooperation, seize his passports, or prosecute him for anything. And the Defense argues that should be kept firmly in mind when, as expected, the Government reverses course in this bail proceeding and suddenly protests that Mr. Smirnov now presents an extreme flight risk.

So the mistake the defendant makes is in thinking that the Government is a monolith. The FBI is divided into field offices and the Department of Justice and to U.S. Attorney's Offices. And while both organizations have some coordinating functions in Washington, they're limited.

And to be clear, in this case the defendant was the source for an agent based out of the Seattle field office and he

volunteered information about Burisma, volunteered, to that agent in 2017 which the agent recorded. Later in 2020 the FBI's Pittsburgh field office was conducting an assessment of information being provided by the public concerning the Ukraine, most notably Rudolph Giuliani, and reached out to the Seattle-based handler and asked him to interview the defendant about the defendant's 2017 reporting. And what the Seattle agent learned he reported back to the Pittsburgh Agent in June of 2020.

And -- and the FBI in Pittsburgh took some limited investigative steps, but their steps were limited by the fact that they were only conducting an assessment, which under FBI policies is not an investigation. And it prevents, for instance, the use of compulsory process like grand jury subpoenas or the compulsion of testimony. So based on that limited review, the FBI closed its assessment in August.

Fast-forward to July of 2023, that's when the FBI asked the U.S. Attorney's Office in the District of Delaware to assist in evaluating the claims in the 2020 1023. And in August the U.S. Attorney for the District of Delaware was made Special Counsel by the Attorney General. Also in August investigators in Delaware spoke with the defendant's handler for the first time, and then in September investigators in Delaware spoke with the defendant, again, for the first time.

After those meetings investigators began collecting

evidence on the defendant's allegations, including for the first time with the benefit of the grand jury. And it was through the use of the grand jury that investigators in Delaware learned that the defendant was lying. So it is not the case that the defendant -- that the Government knew he was lying back in 2020 and took no steps to address his conduct.

THE COURT: So what was the date, then, that you're saying you were aware that he was lying?

MR. WISE: Just this fall, in a run up to these charges. We first met with him in September --

THE COURT: That's the September 23rd -- September 2023 meeting you're talking about?

MR. WISE: Yes, Your Honor.

THE COURT: All right.

MR. WISE: That was the beginning -- after speaking with the handler in August that was really the beginning of the grand jury investigation, and then evidence was collected shortly thereafter that led to the presentation of these charges.

THE COURT: All right.

MR. WISE: Now, in addressing the 3142(g) factors, specifically the nature and seriousness of the offense, the defendants argues that "These allegations are make-weight and politically motivated. They do not involve espionage or theft and are, thus, not serious."

I didn't know what make-weight meant so I looked it up. According to Miriam Webster, the meaning of make-weight is something thrown into a scale to bring the weight to a desired value. I have no idea what that means in this context. Maybe Your Honor does.

And politically motivated, by whom? If Defense counsel is referring to his client's allegations, then we agree. His client's messages that are quoted in the indictment show political bias on his client's part.

Or is the -- is Defense counsel referring to us, the Government in this case? And that would certainly be curious. We're prosecuting Hunter Biden on tax and gun charges, and his lawyers make the unfounded claim that we're working at the direction of former President Trump and Congressional Republicans, although they can never explain why or how.

So then I guess what Defense counsel in this case is arguing is we're working at the direction --

THE COURT: Are you saying Mr. Chesnoff and Mr. Schonfeld said that in their pleadings?

MR. WISE: That's what they wrote. They wrote the charges in this case are make-weight and politically motivated.

THE COURT: So -- but where do they -- okay. But I -- you've taken that quite a bit beyond that they're saying -- what did you just say was ...

MR. WISE: Well, I'm trying to figure out -- it sounds

like they're saying we're working at the direction of the White House and the Biden campaign. And the other cases --

THE COURT: Is that a leap?

MR. WISE: And the other cases --

THE COURT: I guess you don't --

MR. WISE: -- the Defense counsels are making the opposite argument.

THE COURT: Well --

MR. WISE: So we're sort of curious which it is.

THE COURT: Well, and I'm not getting into the politics of this. I have to make a determination under the Bail Reform Act whether he's a flight risk or a danger and whether, if he is, there are conditions or a combination of conditions to address that.

MR. WISE: Right.

THE COURT: So I have no time for the politics of this case. I understand the underlying charges. There's a component to that. But I'm not going to spend a lot of time here talking about the politics.

MR. WISE: Good. Because when we saw that, we were shocked that he would make the accusations --

THE COURT: So go on and continue with your argument.

MR. WISE: Now, the Defense counsel calls the charges not serious, which begs the question is he serious. The defendant's lies have captured --

THE COURT: All right. I'm not going to get personal with the attacks on counsel. All right? Let's keep it to the facts and the law. You don't need to make snide remarks about "is he serious." And I'm not going to tolerate that from either side.

MR. WISE: Understood, Your Honor.

The defendant's lies in this case have captured the national imagination. And while the -- while the filing says they do not involve espionage, of course the charges do involve foreign intelligence services. The defendant claims to have met with Russian intelligence agencies on multiple occasions, and the U.S. intelligence community has concluded that Russian intelligence interfered in the 2020 election and continues to interfere in our elections by spreading misinformation.

And I can supplement the record with these two public reports, but in January of 2017 the Office of the Director of National Intelligence made public a declassified version of a highly classified assessment regarding Russia's efforts to interfere in the 2016 presidential election. And in 2020 the ODNI published a similar declassified report regarding the 2020 U.S. presidential election. And one of the key judgments of that report, which was expressed with high confidence, was that Putin authorized and a range of Government organize -- and a range of Russian government organizations conducted influence operations aimed at denigrating President Biden's candidacy and

the Democratic Party, supporting former President Trump, undermining public confidence in the electoral process, and exacerbating sociopolitical divisions in the United States. And that's a quote from that report that we can file as a supplement to the direct -- for the record.

Now, the defendant also argues for release, in part, based on where the defendant is currently housed. That's premised on the idea that he'll actually stay in that location, and I don't think that's correct. I think he was brought to that location temporarily, but if he were detained, I believe he would be detained in the Central District of California, not in the District of Nevada. And so whatever the conditions are at that facility I don't think bear on --

THE COURT: I think that's correct. If he's detained, he'll under Rule 5 be transferred to the Central District of California and they'll have the decision as to where he's housed and incarcerated -- or detained. I shouldn't say incarcerated. Detained pending trial. But go ahead.

MR. WISE: And the issue -- and this came up in the previous hearing. You know, the issue of the defendant's -- where he is detained, the conditions under which he is detained, those are all things that the Marshals or the Bureau of Prisons or we can work with Defense counsel to address. They are not factors that the law or the statute recognizes as bearing on whether he poses a risk of flight or whether there are

conditions that can reasonably assure his appearance.

In the last hearing we discussed the fact that he is, as the indictment makes clear, or was a confidential informant. And we take -- we take security seriously. We take safety seriously. And those -- those issues need to be addressed and will be addressed, but none of that bears on the determination of whether he poses a serious risk of flight which for all of the reasons we identify in our motion we believe he does.

THE COURT: And why -- there's no addressing -- and I think I know the answer, but I'd like to hear it from you -- no addressing the conditions that Pretrial suggests and why, you know, with the idea that it's -- Bail Reform Act, it's the least restrictive, you know, that I have to consider and the least restrictive conditions. Why won't some of the things that they recommended address these things? Is it just the trust issue or is there something more?

MR. WISE: So the trust issue is at the heart of it, Your Honor, but as we said, I mean, when you combine the resources he has access to, the fact that he can travel internationally on the second passport -- and as we point out, there is -- there is literally no way to prevent that. And this is a problem that's present with dual nationals where they can go into a consulate. They can say they lost their passport. They'll be issued another passport. There's no way that the Government -- our Government learns of that. There's no way

that there can be a stop at the border over that. It simply is --

THE COURT: What if I put geographical limits on where he can go and we monitor that so that the minute he leaves Clark County Pretrial's notified of that?

MR. WISE: My understanding of the technology is that it's not that -- it is limited, that there are lags, that there are -- you know, that the geographic space is not tight enough to know if someone is in an airport as opposed to some other location.

My experience with that is not that it's as precise as one would -- would think or hope.

THE COURT: All right. All right.

MR. WISE: But as I said, Your Honor, you know, usually the arguments are someone's whole family is here, their whole life is here, their job is here, this is where their, you know, livelihood comes from. We've seen none of that in this case. And that's why to answer Your Honor's question, I think -- I think the conditions simply -- simply don't reasonably assure his appearance.

And if -- if we could -- I mean, Defense counsel when he called me on Friday said, "Is there some" -- "Are there some conditions that we could agree on?" If we could, we would. I mean, this is not hyperbole. If we thought there was some way that we could reasonably assure that he would appear in this

proceeding, that would be where we'd go. But in light of the contact with foreign intelligence, in light of the $6 million in funds, in light of our experience so far with him, we simply don't believe that's the case.

THE COURT: All right. Thank you very much.

MR. WISE: Thank you, Your Honor.

THE COURT: Mr. Chesnoff, Mr. Schonfeld. One or the other, not both, please.

MR. CHESNOFF: May it please the Court.

Your Honor, it's amazing to me that the question the Court asked about the power of the Government to find somebody is so limited that to have the Government's position adopted by the Court would mean that nobody who they are concerned could run ever gets out. And that's not the Ninth Circuit law. The Court is well aware it's the least restrictive. The idea that someone cannot be geographically controlled, I've had multiple cases, as the Court knows, where people have been restricted not to go to a bus station, not to go to an airport, not to rent a car.

I have with me, Your Honor, his Israeli passport which I secured so that we could give it to Pretrial. The idea that the Court cannot make a condition that says you are not to apply for a new passport, U.S. or Israeli, happens all the time, Your Honor. Judges impose those conditions. If the Court could not impose those conditions, the Bail Reform Act, *Motamedi* and all

of its progeny, would have no meaning at all, at all.

I'm old enough, Your Honor, to have remembered when the Bail Reform Act was enacted in 1984. I did a deep dig into the legislative history. The legislative history of the Bail Reform Act, it was created to protect flight and danger from a small and discrete group of people, either violent offenders, people with prior records, people who had history of not showing up in court.

We have a gentleman who's an American citizen. He has an Israeli passport as well which he's willing to turn in. He's lived in L.A. where this case is for 16 years. He's lived here for two years. He lives with his significant other who's present in court.

I -- I -- the Court observed the idea of what happened in the beginning. His English is better than hers, but it's not the best. I don't think an interpreter was supplied to him during any of the interviews. I know for a fact that when his significant other spoke to Pretrial, she had the limited ability to communicate. I got her in my office. I got someone who spoke Russian. She then gave all the right and truthful answers to Pretrial Services.

Your Honor, we asked Pretrial Services about this question of financial disclosure because when we read their motion this morning, both Mr. Schonfeld and I said, "What happened here?" So we contacted the Pretrial officer. We asked

to meet with her. And we asked her specifically, "Did you ask him about any other account than a personal account?" And the officer was candid and said no. It's exactly why my client answered the question the way he did because he was not asked about anything else.

THE COURT: What about Mr. Wise's point, and I think there's some legitimacy to it, that, you know, you're in there talking that maybe he thinks, "Well, should I talk about these other accounts? You know, they're asking me about money" --

MR. CHESNOFF: Perhaps, if I had been there with him, Your Honor, because he didn't have counsel with him, I wasn't there, then those issues would be ferreted out. We would have explained to him the importance of being as complete as possible. But in this instance it was completely not his fault that the question was not asked, and he responded truthfully to the question.

Their suggestion that somehow that should lead the Court to question his overall truthfulness considering the context, the language, the fact that the Pretrial officer made her own evaluation of him when she spoke to him and has recommended to you that he be released, answers that question in my opinion, Your Honor.

Your Honor, the fact that they can document foreign travel, the Court can't lose sight of the fact that a lot of the foreign travel was at their behest. So it's kind of like a

catch 22. We're going to let you go there. We're going to send you there. We're going to use you for our purposes, which is what they did. And now they turn around and tell Your Honor, "See, he travels everywhere."

The other thing that they said was that the handler somehow found out now that he was untruthful. But for 10 years, Your Honor, apparently, he was truthful. Now, the question of whether he's not truthful now has not been decided. And as the Court knows, that's a factual question which is the least important factor that this Court should consider. And I can tell you, Your Honor, that there will be a vehement defense to the argument that in fact he was not truthful. He had this personal relationship with the handler. It was so personal, Your Honor, that he wouldn't even call him on his FBI phone; he would call him on his personal phone. So we're going to dig down once we start defending this case and we're going to find out who knew what when.

Now, when we made the suggestion, Your Honor, that he deserves to be out because of the fact that he needs to defend himself and the housing situation, I can tell you, Your Honor, I visited the MDC in L.A. for years representing clients. The conditions there are even tougher than the conditions in Pahrump vis-à-vis attorneys. The waiting period of time sometimes to see a client is hours upon hours.

If they are going to have him in PC like they do in

Pahrump, which I assume they will since they've managed to put out to the entire world his cooperation without any concern for his safety, but ultimately he is safer out as opposed to being in a detention facility in a major metropolitan city where I can tell you, Your Honor, I would be concerned about his safety.

THE COURT: I know there's constitutional considerations when it talks -- you know, when we consider his right to meet with counsel and prepare for trial and look at documents. But how does that play into the Bail Reform Act and my decision that I have to make?

MR. CHESNOFF: I can tell you, Your Honor.

It's almost a due process question that comes into conflict maybe with just looking at the Bail Reform Act as the only thing the Court considers. I cited to a case called *U.S. v. Kinney* where a State Court was holding somebody, and the Court decided that because of social reality it would be harder for a Defense attorney to speak to witnesses because the defendant came from a community that was foreign to the Defense lawyer.

In this case, Your Honor, we are going to need to speak to people in foreign countries that don't speak English, that speak Russian. Not to have the -- and I can tell you, Your Honor, the MDC in L.A. is not going to allow us to be calling Kyiv from the MDC with our client to speak to people.

So the -- the harm to him in defending himself against

-- and, Your Honor, when we say "not serious," obviously we're in Federal Court. It's a federal crime. What we're talking about, Your Honor, is this. Our guideline calculations show that at a max he's looking at three years. So when I say "not serious," it's not 10 years.

Why would somebody risk a bail jumping charge on top of really an admission of guilt by fleeing when in reality the maximum punishment at the best with the guidelines is three years? It's even lower without all the potential enhancements. It's absurd, Your Honor.

The only reason they want to keep him in is so that he cannot defend himself in a way which shows that the allegations that are being made against him are being made for whatever the Bureau's reasons, whatever Justice's reasons are. But he has a right, Your Honor, to straighten the record out as far as he's concerned, especially in light of the 10 years of service that he gave to the United States Government and to the people of the United States.

So to hold him in custody and restrict his ability to truly defend himself on a case where he's looking at 20 months, Your Honor, I -- I can't even really comprehend it.

THE COURT: So when you said "serious" or "not serious" in your pleading, you were referring to the amount of time and the potential exposure as opposed to the underlying --

MR. CHESNOFF: Yeah.

THE COURT: -- current of the case and the political ramifications?

MR. CHESNOFF: You know me -- known me a long time. I'm not belittling the seriousness that the Government feels about this. What I was talking about is the seriousness in terms of the ultimate --

THE COURT: Potential.

MR. CHESNOFF: -- potential problem.

(Defense conferring.)

MR. CHESNOFF: Mr. Schonfeld points out to me it's also not a presumption case, Your Honor, and that bespeaks the recommendation that has been made by Pretrial.

Court's indulgence.

(Pause.)

MR. CHESNOFF: Your Honor, every condition that's required by the Ninth Circuit law in terms of history, no drug usage, no alcohol, none of the things that are indicia of danger or flight exists. There's not a single representation, Your Honor, that he's ever committed a violent act, nothing, in the 10 years of his service with the FBI.

THE COURT: What -- you know, they raise a good point about being concerned about his access -- so let's set aside the disclosures to Pretrial and whether or not the circumstances rise to the level of he's not trustworthy such that I'll detain him. That will be something I address here in a moment.

But really, I mean, it's legitimate to say he's got access to a lot of money and he knows a lot of people that might be willing to help him out. I mean, how do I address those concerns that the Government's raised?

MR. CHESNOFF: Your Honor, he's on electronic monitoring. He's at -- we've offered, we suggest, third-party custodian. His lady friend is present in court. I've explained to her the implications of that, that she has an obligation to the Court if in fact he is doing anything that he's not supposed to do. I don't know what more you can do other than -- Your Honor, anybody can -- anybody can run. That's a fact. The fact that he has connections overseas, that can be addressed by the Court in terms of the conditions it sets: You stay -- this is where you're staying. This is what you're wearing.

Your Honor, you can even limit in terms of phone usage if you want, Your Honor. There are things that can be done, but the idea that somehow he's going to escape and the United States Government is not going to find him, I mean, they got I don't know how many people are here --

THE COURT: Yes, but counsel raises a good point that even though they know he's in Russia, they can't get him back.

MR. CHESNOFF: Well, I have a feeling the idea of him going to Russia is not really such a good idea for him since they've revealed that he helped the United States vis-à-vis Ukraine, and I don't think Russia's going to be too happy about

that.

THE COURT: Well, that's -- that's a relevant point. All right. Go ahead.

MR. CHESNOFF: Your Honor, I -- I think that the Court should follow the recommendation. I think that the Court understands that this is a situation where a man deserves an opportunity to truly defend himself. And he's never shown anybody that he has any disrespect for a courtroom or a Court. And the question of the veracity issue, that's the try -- that's the case, but that's not been proven. We just had a -- that's not proven.

THE COURT: All right.

MR. CHESNOFF: Thank you, Your Honor.

THE COURT: All right, Mr. Wise. Anything in response?

MR. WISE: Just briefly, Your Honor.

Counsel started with saying -- holding up the Israeli passport saying, "Well, the Court can impose a condition that you can't get a new passport." But of course the issue is you can impose the condition, but you can't police it. And that's what makes the problem of dual nationality particularly unique.

As to the question of a GPS anklet or bracelet, in addition to the technology not being as precise as one might assume in 2024, defendants can and do cut them off and then they alarm, but it's not like law enforcement can instantly respond. And in any location that's near a major city with an

international airport, the amount of response time is usually not -- is usually not short enough that it would prevent someone from going to an international airport or a location where they could -- where they could use air travel.

Counsel mentioned that the foreign -- what he calls the foreign travel was at our behest. Well, let me be very clear this -- we're not talking about foreign travel. What we point out is that the defendant self -- he claims himself to have all of these contacts with foreign intelligence services. He volunteers that information to the handler.

And, for instance, this most recent trip where he came back with this new disinformation story was absolutely of his own doing. And -- and he pushed that story when we met with him in September, and it shows that the bad conduct is not, as counsel says in their memorandum, limited to 2020. It is much more recent and much more -- and much more pronounced.

Counsel says, you know, that the Court can somehow address how he could have contact with overseas witness -- with folks overseas. I have no idea how that could be addressed by a court in the United States whose jurisdiction is limited to the United States. Counsel said there could be limits on phone usage. You can go to a kiosk in a mall and buy a burner phone. He was actually communicating over Signal and Telegram. Those are web-based applications that the Court would have no ability to police or prevent.

You know, while counsel claims, I guess -- I mean, in addition -- and I hear him say now that the "serious" comment was about the -- the sentence, but that's -- that's not actually what he wrote. He wrote: "These allegations are make-weight and politically motivated. They do not involve espionage or theft and are, thus, not serious."

That's -- that's his words. And he -- he actually ascribes bad motives to us. He says the only reason we want to keep him in is so that he can't defend himself, and he mentioned improper motives of the Bureau. I wasn't quite following what he meant.

MR. CHESNOFF: Your Honor, could you ask him to stop? Like, suggest -- enough is enough.

THE COURT: I'm allowing some leeway. Let's finish the argument.

Counsel.

MR. WISE: Third-party custodians that are wives or intimate partners are in the worst possible position one could be in. And I've seen this in case after case. To ask someone to --

THE COURT: I'm not going to do a third party. If I release, that's not going to be a condition so go ahead.

MR. WISE: Okay. Putting someone in that position I think is really untenable.

So I don't think that any of the -- any of the

suggestions that counsel make even come close to addressing the risks that this defendant presents for all the reasons we've outlined.

THE COURT: All right. Thank you.

Mr. Chesnoff, briefly.

MR. CHESNOFF: Yeah, just briefly. It's not just Chesnoff who says it; it's Pretrial that says it, Your Honor.

THE COURT: On the release?

MR. CHESNOFF: Yeah.

THE COURT: Understood. All right.

(Pause.)

THE COURT: Well, as the parties know, my decision is based upon what the Bail Reform Act tells me to consider and to apply to this particular case and this particular defendant, Mr. Smirnov, and his personal characteristics and history. There's two prongs to that. The first -- or I'll take the second which is generally the second, which is the danger prong, requires the Government to provide evidence of clear and convincing evidence that he's a danger to the community. That's not what they've asked or argued, and that's not what any of the parties have raised.

And so while one may argue the underlying politics of the case or the danger to our system as a whole or to the free elections or some of those issues, and while those may be issues that are ripe for intelligent, honest discussion, they aren't a

consideration for this Court under the Bail Reform Act as it relates to clear and convincing evidence of danger.

And so I don't find that Mr. Smirnov is a danger notwithstanding the underlying allegations. I know the Pretrial report suggested that he could be a danger based upon the underlying allegations. And as the parties have acknowledged, Mr. Chesnoff has argued, and I've stated, the underlying facts under Ninth Circuit case law are the least important factor of all of the other factors to consider, except on the level that it relates to the trust factor that the Government argues.

And so in terms of considering Mr. Smirnov's underlying actions, I think they do come into this idea of whether or not he can be trusted to the point where I would release him.

I think it's pretty clear to this Court that Mr. Smirnov is a flight risk by a preponderance of the evidence. His dual citizenship, his possession of passports, his foreign ties, his extensive foreign travel, and some questions about his employment and where he makes his money I think clearly rise to the level that he's a risk of nonappearance by a preponderance of the evidence. The bigger question, obviously, is whether or not there are conditions or a combination of conditions that can address those concerns.

I do have concerns about his access to money and -- and some of the representations made to Pretrial on Thursday, but I also place those in the context of the case insofar as the

language issue, the nature of the Pretrial interviews and how quickly they occur, he did not have counsel at the time, the context in which the questions were asked. I don't know that that rises to the level that I'm convinced that he was sitting there Thursday morning intentionally lying to Pretrial to keep them from knowing about his finances. I just -- I don't know that it rises to that level.

The other concern, obviously, is the allegations and his relationship with his handler. I will tell you I cannot even begin to understand or know what goes on in a relationship between an FBI handler and somebody who's cooperating and the dynamics of that relationship. I would suspect it gets close. I don't know how it couldn't when you're working that close with people.

I do on some level, like Mr. Chesnoff noted, recognize that how he deals with his handler and the FBI and how they're dealing with him in that complicated context would probably be different than how he would treat a Court order or a Court decision and whether or not the lack of trust he showed according to the Government with his handler would rise to the level of a lack of trust that he would not follow my orders or violate them if I gave him that chance. I'm not convinced of that given the complex nature of that relationship.

The Government has argued the nature and circumstances of the offense. They put about a quarter of their 28-page brief

to discuss the nature and circumstances and the weight of the evidence. And, again, those are the least important factors for the Court to consider. And they argue that his ties to the community are weak, and they've argued that both in their pleading and here today such that there are no condition or combination of conditions that would address that. And then they raise the four others.

I -- you know, I understand the concern about foreign intelligence agencies potentially resettling Mr. Smirnov outside of the United States, his connections to them, but I think on some level that's speculative as well because, as Mr. Chesnoff points out, I don't know what Mr. Smirnov will be thought of in Russia, but my guess is at this stage he probably thinks that's not the most attractive place to go either if he was in fact inclined to go hide somewhere.

So while I notice and note that that's a concern and certainly raised by the Government that I should consider it, I just don't know in the context of what's happened in the last couple of weeks with his arrest and everything else that that is as grave a concern as the Government outlines.

I've already addressed the concern about the money, and I'll have to make a decision here whether or not his access to those funds can be addressed with conditions. I've already addressed his disclosure of those and how that came about to Pretrial and the context in which I am placing that in. And

then the Government argues that as a dual citizen he can walk into an Israeli consulate and obtain a passport and be gone. And, again, the question is are there conditions that can address that.

As the parties may or may not know, this Court, as do most courts across the country, when making these decisions puts a lot of stock into Pretrial Services and their investigation and their recommendations and their belief about whether or not they believe somebody can be supervised with conditions. And in this case Pretrial Services believes notwithstanding some of the issues that the Government's raised, and they acknowledge those issues, they believe that Mr. Smirnov can be supervised and that there are conditions that can be placed upon him if I were to consider his release today. And so that carries weight with the Court as well. As Mr. Chesnoff points out, it's not just Mr. Chesnoff saying his client should be released, but Pretrial Services believes that conditions can be fashioned.

And, again, I recognize the underlying political ramifications of this investigation in this case and what the Government believes the effect on our country and on our elections that this might have had. But, again, other than how that relates to the trust issue, which I've discussed, and as it relates to his relationship with his handler, I'm not sure that those factors are of huge importance to the Court in making my determination.

So, Mr. Smirnov, you know, there's a lot of different issues here. But I do think that I can fashion conditions for your release. You may or may not make a mockery of me when I do that, but that's not for my consideration either. And when I say "mockery," meaning you don't follow the conditions or you flee. And so I recognize that the Government's made some arguments, but I think that despite those conditions can be fashioned.

But as you now know, under the Bail Reform Act -- and this may not be the end of it. They may decide to appeal this. But under the Bail Reform Act you can be detained, and in a case like this, as Mr. Chesnoff has referenced, it could be a lot of time before they can be ready for a trial and that could be a long time that you're detained while that's pending.

I'm finding today that the Government has not met their burden as it relates to conditions because I believe that conditions can be fashioned because Pretrial believes that, and so I'm going to give you that opportunity.

But if you come back before this Court or a Court in the Central District of California, I can assure you that if it is proven you have violated any of those conditions, there will not be any hesitation to revoke your release and to remand you to custody. And listen to the conditions because there's going to be some more that are not in the Pretrial report.

And I want to ask Pretrial, if we do the monitor travel

restrictions, I know Clark County is easier because of the different municipalities, but can we restrict him from the international airport as well?

OFFICER MCKILLIP: Yes, Your Honor. We can put an exclusion zone around the airport so if he goes into the area of the airport, we will get notified.

THE COURT: And that would be, say, without prior permission. So that if he with his lawyers say, "We're going to L.A. to appear or we're going to L.A. to work on the case, we'll be in the airport," that's something you can monitor as well?

OFFICER MCKILLIP: Yes, Your Honor, as long as he tells us beforehand.

THE COURT: Right.

All right. I'm going to release you on your personal recognizance, which is just your signature and promise to appear in court and to follow these conditions. If you do not, that will be revoked and you will be detained.

You will have time to go over these conditions with your officer and with your lawyers. I'm going to go through them somewhat quickly. If you don't understand everything, you will have time to talk to them and make sure you understand.

First, you're to submit to supervision by Pretrial Services. You should report immediately to their office and follow their direction for supervision.

I'm going to allow them to order you to seek

employment. I have -- you're not going to be able to continue with your consulting business while this case is pending. You're going to have to figure out some other way to conduct business because I'm not going to allow foreign travel. In fact, I'm not going to allow any travel. So you need to seek employment that Pretrial approves and that's appropriate while this case is pending.

You're to surrender your U.S. passport and your Israeli passport to Pretrial Services immediately. I believe that the Government took your United States passport. Mr. Chesnoff has your Israeli passport. He shall give that to Ms. McKillip upon the conclusion of this hearing.

Number four, you shall not obtain a passport or any other international travel documents. Number five, I'm going to order you that your travel is restricted to Clark County, Nevada. And the reason I say "Clark County" is it's too difficult if you're in Las Vegas and you cross into Henderson or you cross into North Las Vegas, that could create an issue. So I'm going to allow the travel in Clark County alone and exclude you from the airport.

So if you are in the zone of the airport, and they'll explain the zones, they will be notified immediately. Government counsel may be correct that they can't do anything quickly, but my guess is they will try. So you are not allowed to go to that airport.

You can go to Los Angeles for court appearances in this case and to prepare your case, but for no other reason. So while this case is pending, you're in Clark County, Nevada.

You are to avoid all contact directly or indirectly with any person who is or may be a victim or witness in the investigation or prosecution, and the Government will provide a list to you of who that is.

As it relates to the travel restriction, I'm going to order stand-alone monitoring with GPS. And again, as I've indicated, that will be restricted to Clark County and you will not be allowed to go to the airport.

We need a tampering restriction on that, don't we, Ms. McKillip? I think I might have one.

(Pause.)

OFFICER MCKILLIP: Yes, Your Honor. The defendant shall not tamper with, damage, or remove the monitoring device and shall charge the equipment according to the instructions provided by Pretrial Services.

THE COURT: All right. And, next, the defendant shall pay all or part of the costs of the location monitoring program based upon his ability to pay as determined by Pretrial Services or the supervising officer.

Ms. McKillip, do -- does Pretrial request any additional conditions to address the concerns that have been raised here today?

OFFICER MCKILLIP: No, Your Honor, but just in reference to the condition about not allowed to go to the airport, we would just ask without prior permission just so that he could get there --

THE COURT: Yes.

OFFICER MCKILLIP: -- to California for court.

THE COURT: Yes, without prior permission. But, again, the airport for that will only be to go to Los Angeles for court appearances, unless you find a need during the course of preparation for the defense that you need to travel somewhere else. But that will have to be outlined and get Court approval, Mr. Chesnoff.

MR. CHESNOFF: We will file whatever is appropriate, Your Honor.

THE COURT: All right.

All right. Mr. Chesnoff, Mr. Schonfeld, any questions about these conditions?

MR. CHESNOFF: No thank you, Your Honor.

THE COURT: Mr. Smirnov, any questions about these conditions?

THE DEFENDANT: No.

THE COURT: All right. Anything else from the Government, Mr. Wise?

MR. WISE: Your Honor, we would request -- respectfully request that you stay your order so that the Government can file

a motion for review in the court of original jurisdiction in the Central District of California before Judge Wright which we will do promptly.

THE COURT: All right. That will be denied.

Anything else?

MR. WISE: No, Your Honor.

THE COURT: Mr. Chesnoff, anything else?

MR. CHESNOFF: No. Have a nice afternoon, Your Honor.

THE COURT: All right. Court will be in recess.

MR. SCHONFELD: Thank you.

(Whereupon the proceedings concluded at 4:01 p.m.)

--oOo--

I, Patricia L. Ganci, court-approved transcriber, certify that the foregoing is a correct transcript transcribed from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ PATRICIA L. GANCI — Patricia L. Ganci

FEBRUARY 20, 2024 — Date

# EXHIBIT 2

February 23, 2024

Honorable Judge Otis D. Wright, II
First Street Courthouse
350 W. 1st Street, Los Angeles, CA. 90012
Courtroom 5D, 5th Floor

Re: *Alexander Smirnov*
*Case No. 2:24-CR-00091-ODW*

Dear Honorable Judge Otis D. Wright, II,

I am 38 years old and live in Florida. I have worked there as a licensed real estate agent for the past three years or so.

I have known Alex, my cousin, my whole life. Like him, I am a dual citizen of the United States and Israel.

I attended the hearing in Las Vegas on February 20, 2024. I bought myself a ticket at my own expense and flew in from Florida to attend because I was concerned for my cousin.

Alex's first language is Russian because, when we lived in Ukraine, it was part of the USSR and Russian was the spoken language. Alex also speaks Hebrew fluently, as we both grew up in Israel. Alex speaks English, but it is not his first language. Therefore, I believe when answering questions, he is being careful and makes sure to reply exactly to the question being served to avoid misunderstandings due to the language barrier. I know Alex to be honest, direct, and trustworthy.

In all my life, I have never known Alex to have any problems with drinking or drugs, or with the law. He is a law-abiding American citizen who pays his taxes.

Having known him for 38 years, I believe Alex will obey the conditions imposed on him by the Court. I believe he would never flee to another country or state. He is not a flight risk and is not a danger to the population.

As an immigrant and United States citizen, I am concerned that the prosecutor said Alex has no ties to the United States. Alex has spent almost half his life here, more than he lived in any other country. He also has a long-time significant other living here (Diana), and family, friends, and business partners in the United States that he would never jeopardize.

I know that Alex is a sick man who has a severe case of glaucoma and barely sees out of both of his eyes. He needs medication, sterile conditions, and physician care.

Sincerely,

DocuSigned by:
Linor Shefer
9E1CDDF6ECA1486...

LINOR SHEFER

(120 of 420), Page 120 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 120 of 420

# EXHIBIT 3

AA000114

February 23, 2024

Honorable Judge Otis D. Wright, II
First Street Courthouse
350 W. 1st Street, Los Angeles, CA. 90012
Courtroom 5D, 5th Floor

Re: *Alexander Smirnov*
*Case No. 2:24-CR-00091-ODW*

Dear Honorable Judge Otis D. Wright, II,

I am 39 years old and live in Fairfax, Virginia. I am a citizen of the United States and Israel.

I have worked for over 5 years as an economist in the Department of Labor, Bureau of Labor Statistics (BLS) in Washington, D.C. I am a staff member in the office of information and publications branch. This office is tasked with publishing estimates, explaining their meaning, and guiding data users to find the information of their interest.

I served in the United States Marine Corps for four years, receiving an honorable discharge at the end of my active duty contract in 2015.

I have known Alex Smirnov for 25 years. My mother, Diana Lavrenyuk, is Alex's long-time significant other and both live in the United States.

Alex's first language is Russian. His second language is Hebrew and his third language is English. Alex has never had a problem with drinking, drugs or violence.

In my opinion, Alex would not disobey a court's order or flee. Alex always keeps his word. Family is everything for Alex, and he would not disappoint them by fleeing.

Sincerely,

DocuSigned by:
B0B07558B9194C7...

NIKOLAY LAVRENYUK



(122 of 420), Page 122 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 122 of 420

AA000116

(123 of 420), Page 123 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 123 of 420

# EXHIBIT 4

AA000117

# United States District Court
# For The Central District of California

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br>Plaintiff,<br>v.<br>**ALEXANDER SMIRNOV**<br>Defendant. | ) | **2:24-CR-00091-ODW (CACD)**<br>**2:24-MJ-00166-DJA (DIST OF NEV)**<br>**ORDER SETTING HEARING ON GOVERNMENT MOTION FOR REVIEW OF RELEASE ORDER**<br>**(UNDER SEAL)** |

It has come to this Court's attention that counsel for defendant has sought an emergency hearing in the District of Nevada to arrange the release of Defendant Smirnov, likely to facilitate his absconding from the United States.

Defendant has been indicted by a grand jury sitting in the Central District of California. He was arrested on February 14, 2024 in the District of Nevada upon his arrival in the United States following an international flight. He was promptly brought before a magistrate judge who, while agreeing that the government had established a probability of Defendant fleeing the jurisdiction, but disagreeing that no conditions nor combination of conditions could be fashioned to assure his appearance for trial or other mandated court appearances. The

magistrate judge then issued an order for Defendant's release, with conditions.

The government then sought reconsideration or re-examination by this Court of the Nevada release order. That motion for reconsideration has been granted and this Court issued an arrest warrant specifying that upon his arrest Defendant should be brought promptly to **this** Court. Indeed, at 9:00 a.m. Monday, February 26, 2024 the USMS is to bring Defendant to courtroom 5-D located at the First Street Courthouse located at 350 West 1st Street, Los Angeles, CA for a detention hearing.

**The U.S. Marshal Service is advised there is to be no deviation from this Order.**

DATED February 22, 2024

OTIS D. WRIGHT, II DISTRICT JUDGE

# EXHIBIT F

# GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER
- Filed on February 21, 2024

2:24-CR-91-ODW

DAVID C. WEISS
Special Counsel
LEO J. WISE
Principal Senior Assistant Special Counsel
DEREK E. HINES
Senior Assistant Special Counsel
SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels
950 Pennsylvania Avenue NW, Room B-200
Washington, D.C. 20530
Telephone: (771) 217-6091
E-mail: Leo.Wise@USDOJ.GOV, DEH@USDOJ.GOV
Attorneys for the United States

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ALEXANDER SMIRNOV,<br>Defendant. | No. CR 2:24-cr-00091-ODW<br><br>GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS |

Plaintiff United States of America, by and through its counsel of record, the Office of Special Counsel David C. Weiss, hereby applies to Honorable Judge Otis D. Wright for review of the February 20, 2024, order of bail release upon conditions issued by the Honorable Magistrate Judge Daniel J. Albregts, of the United States District Court for the District of Nevada. The government moved Magistrate Judge Albregts to stay his order, which he denied.

//

The government continues to seek detention. In support of its continued request for detention, the government proffers (1) the contents of the Pre-Trial Services Report but not its conclusion; (2) the indictment, charging defendant with making a false statement to law enforcement, in violation of 18 U.S.C. § 1001 and causing the creation of a false and fictitious record in a federal investigation, in violation of 18 U.S.C. § 1519; (3) the attached memorandum of points and authorities; (4) the exhibits to that memorandum of points and authorities; and (5) such further argument or evidence as may be requested by the Court at the hearing on this matter.

Dated: February 21, 2024

Respectfully submitted,

DAVID C. WEISS
Special Counsel

LEO J. WISE
Principal Senior Assistant Special Counsel

DEREK E. HINES
Senior Assistant Special Counsel

SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels

United States Department of Justice

MEMORANDUM OF POINTS AND AUTHORITIES

I. INTRODUCTION

No condition or combination of conditions will reasonably assure the appearance of the defendant Alexander Smirnov as required. *See* 18 U.S.C. § 3142 (e)(1); *see also United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). As discussed in more detail below, the nature and circumstances of the offense, weight of the evidence, and the fact that Smirnov's ties to the community are weak establish that Smirnov should be detained. But, in addition, there are four indisputable facts related to the characteristics of Smirnov that compel detention.

First, he claims to have contacts with multiple foreign intelligence agencies and had plans to leave the United States two days after he was arrested last week for a months-long, multi-country foreign trip. During this trip, the defendant claimed to be meeting with foreign intelligence contacts. Those foreign intelligence agencies could resettle Smirnov outside the United States if he were released.

Second, he has access to over $6 million in liquid funds—more than enough money for him to live comfortably overseas for the rest of his life.

Third, Smirnov did not disclose to Pretrial Services his access to these funds. He told Pretrial Services he only had $1,500 in cash-on-hand and $5,000 in a personal checking account. *See* Exhibit 11 at page 2. As the attached bank statements make clear, as of the end-of-December, Smirnov has access to more than $2.9 million, *see* Exhibit 4 (under seal) and his wife/girlfriend (he refers to her both ways) (hereafter "DL") has access to more than $3.8 million, *see* Exhibit 7 (under seal). The latter's funds are available to him because most

of the money in DL's account originated with Smirnov and she pays his personal expenses out of her account; in other words, these appear to be shared funds or funds controlled by Smirnov, regardless of whose name is on the bank account. The fact that Smirnov misrepresented his assets alone should cause Smirnov to be detained because it shows that, at the first opportunity, he did not provide true and complete information to Pretrial Services.

Fourth, as an Israeli citizen, Smirnov can obtain a new passport at any time by visiting an Israeli consulate. The closest Israeli consulate is approximately 5 hours away in Los Angeles, California. Thus, even if he turns in his U.S. and Israeli passports, Pretrial Services has no way to prevent him from obtaining a new Israeli passport and leaving the United States using it at any time.

## II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

Smirnov was a confidential human source ("CHS") with the Federal Bureau of Investigation ("FBI"). Indictment ¶ 2. As a CHS, Smirnov was assigned a handling agent (hereafter "the Handler") who was a special agent on an FBI squad that investigated violations of federal criminal law. *Id.*

Despite repeated admonishments that he must provide truthful information to the FBI and that he must not fabricate evidence, Smirnov provided false derogatory information to the FBI about Public Official 1, an elected official in the Obama-Biden Administration who left office in January 2017, and Businessperson 1, the son of Public Official 1, in 2020, after Public Official 1 became a candidate for President of the United States of America. *Id.* at ¶ 6.

In March 2017, Smirnov reported to the Handler that he had had a phone call with the owner of Ukrainian industrial conglomerate Burisma Holdings, Limited (hereafter "Burisma Official 1") concerning Burisma's interest in acquiring a U.S. company and making an initial public offering ("IPO") on a U.S.-based stock exchange. *Id.* at ¶ 6(a). In reporting that conversation to the Handler, Smirnov also noted that Businessperson 1, Public Official 1's son, was a member of Burisma's Board, a fact that was publicly known. *Id.*

Three years later, in June 2020, Smirnov reported, for the first time, two meetings in 2015 and/or 2016, during the Obama-Biden Administration, in which he claimed executives associated with Burisma, including Burisma Official 1, admitted to him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1, when Public Official 1 was still in office, so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with [the then-Ukrainian Prosecutor General]." *Id.* at ¶ 6(b).

Smirnov also reported two purported phone calls between himself and Burisma Official 1 wherein Burisma Official 1 stated that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1. *Id.* at ¶ 6(c).

The events Smirnov first reported to the Handler in June 2020 were fabrications. *Id.* at ¶ 6(d). In truth and fact, Smirnov had contact with executives from Burisma in 2017, after the end of the Obama-Biden Administration and after the then-Ukrainian Prosecutor General had been fired in February 2016, in other words, when Public Official 1 had no ability to influence U.S. policy and when the Prosecutor General was no longer in office. *Id.* In short, Smirnov transformed his routine and unextraordinary business contacts with Burisma in 2017 and later into bribery allegations against Public Official 1, the presumptive nominee of one of the two major political parties for President, after expressing bias against Public Official 1 and his candidacy. *Id.*

When he was interviewed by FBI agents in September 2023, Smirnov repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after he said he met with Russian officials. *Id.* at ¶ 6(e).

On February 14, 2024, a federal grand jury in the Central District of California returned a two-count indictment charging Smirnov with one count of making false statements to federal law enforcement, in violation of 18 U.S.C. § 1001 (Count One) and; one count of fabricating information in a federal investigation, in violation of 18 U.S.C. § 1519 (Count Two). *United States v. Smirnov*, Cr. No. 2:24-cr-00091-ODW (C.D. Cal. Feb. 14, 2024, ECF 1).

That same day, Smirnov was arrested in the District of Nevada as he returned to the United States on an international flight. Smirnov

was scheduled to leave the United States two days later, on February 16, 2024, for a months-long, multi-country trip that, by his own description, involved meetings with officials of foreign intelligence agencies and governments. During his custodial interview on February 14, Smirnov admitted that officials associated with Russian intelligence were involved in passing a story about Businessperson 1.

On February 15, 2024, Smirnov had an initial appearance in the District of Nevada. At that time the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(a) and (b) on the basis that Smirnov posed a serious risk of flight and a serious risk of obstruction of justice. The Government requested a three (3) day continuance of the detention hearing, pursuant to 18 U.S.C. § 3142(f)(2).

A detention hearing was held scheduled in his matter on February 20, 2024, before United States Magistrate Judge Daniel J. Albregts of the United States District Court for the District of Nevada. At that hearing, United States Magistrate Judge Albregts found the government had proven that the defendant posed a serious risk of flight by a preponderance of the evidence but that the government had not proven by a preponderance of the evidence that no condition or combination of conditions could reasonably assure his appearance. United States Magistrate Judge Albregts ordered Smirnov released on a personal recognizance bond and conditions.

## III. APPLICABLE LAW

### A. Standard of Review

A de novo standard of review, not a deferential standard, is

applied to a district court's review of a magistrate's bail order. *United States v. Koenig*, 912 F.2d 1190, 1192-93 (9th Cir. 1990). The court in *Koenig* made clear that the district court's review is independent and that the district court may also hold an evidentiary hearing:

> [In reviewing a magistrate judge's bail order, the district court] should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference. If the performance of that function makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so, and its power to do so is not limited to occasions when evidence is offered that was not presented to the magistrate.

*Id.* at 1193.

B. <u>The Bail Reform Act</u>

The Bail Reform Act of 1984 ("the Act") permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985); *United States v. Kouyoumdjian*, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985). A finding that a defendant

Title 18, United States Code, Section 3142 (hereafter the "Bail Reform Act") specifically provides, in relevant part, that "the judicial officer shall, in determining whether there are conditions

of release that will reasonably assure the appearance of the person as required" consider the following factors:

> (1) the nature and circumstances of the offense charged …;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; …

18 U.S.C. § 3142(g); *United States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015). A finding that that there are no conditions that will reasonably assure a Smirnov's appearance need only be established by a preponderance of the evidence. *Santos-Flores*, 794 F.3d at 1090; *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir.1991); *United States v. Motamedi*, 767 F.2d 1403, 1407 (9th Cir. 1985). "More finely put, this means that the Government must demonstrate that it is more likely than not that there is a serious risk that the Smirnov will flee, not that that it is more likely than not that the Smirnov will flee. *United States v. Figueroa-Alvarez*, No. 4:23-CR-00171-DCN, 2023 WL 4485312, at *5 (D. Idaho July 10, 2023); see *United States v. Duarte-Vela*, No. 2:23-cr-00009-TOR-1, Amended Order Following Status Hearing Regarding Detention and Detention Hearing at 7 (Dkt. 32) (E.D. Wa. Jan. 25, 2023); *Alvarenga-Canan*, No. 1:23-

cr-00042-BLW, Tr. at 7 (Dkt. 26) ("It's got to be 51 percent of a serious risk.").

## IV. THE DEFENDANT POSES A SERIOUS RISK OF FLIGHT AND THERE ARE NO CONDITIONS THAT CAN REASONABLY ASSURE HIS APPEARANCE

### A. Smirnov is charged with lying to law enforcement and fabricating evidence.

The nature and circumstances of the offense make clear that there are no conditions of release that will reasonably assure the appearance of Smirnov. Pretrial supervision is, at its core, based on trust. Pretrial Services must trust a defendant to abide by the conditions the court imposes and to accurately report information requested by Pretrial Services as they attempt to police those conditions. The circumstances of the offenses charged—that Smirnov lied to his FBI Handler after a 10-year relationship where the two spoke nearly every day—means that Smirnov cannot be trusted to provide truthful information to Pretrial Services. Critically, Smirnov lied to his FBI Handler after repeated admonishments that the information he provided to the FBI must be truthful. And the false information he provided was not trivial. It targeted the presumptive nominee of one of the two major political parties in the United States. The effects of Smirnov's false statements and fabricated information continue to be felt to this day. Now the personal stakes for Smirnov are even higher. His freedom is on the line. If he could not be trusted to report truthful information to his FBI Handler, he cannot be trusted to report truthful information to Pretrial Services.

B. The weight of the evidence against Smirnov is strong.

As described in the indictment, the evidence against Smirnov is strong.

In sum, Smirnov's own travel records, emails and messages with his Handler, along with emails and travel records of the individuals who Smirnov claimed to have attended the two meetings with him, will all be used as evidence against him. Further, the individuals who participated in these meetings and phone calls will refute that there was ever any discussion of Public Official 1 or Businessperson 1 in those meetings or any phone calls at all.

C. The history and characteristics of Smirnov make clear that no conditions can reasonably assure his appearance.

Smirnov's personal history and characteristics also weigh in favor of detention. Smirnov has very weak ties to the community in Las Vegas. He has only lived in Las Vegas since 2022. Exhibit 11 at 1. The condominium where he lives is owned by DL, a fact about which he lied, as will be addressed below. Exhibit 1 (under seal). He has no family in Las Vegas. To the contrary, he reports that his mother, father, and sister all reside in Israel. *Id.* Smirnov lived in Israel from 1992 to 2006, longer than he has lived in the United States. *Id.* He does not report any employment that is located in Las Vegas. Instead, he claims to have a "security business," that is registered in California, where he used to live. *See* Exhibit 11 at 2. DL, with whom he lives, does not appear to even know what he does. *Id.* Nor do his bank records reflect that he is in the "security business," as he claims. *Id.* Instead, the statements for the accounts he controls show large wire transfers from what appear to be venture capital firms and

individuals. *See* Exhibit 4 (under seal).

1. <u>Smirnov claims to have contact with foreign intelligence agencies</u>.

While Smirnov has no ties to the community in Las Vegas, what he does have is extensive foreign ties, including, most troublingly and by his own account, contact with foreign intelligence services, including Russian intelligence agencies, and has had such contacts recently. Smirnov could use these contacts to resettle outside the United States.

As noted, law enforcement knows about Smirnov's contact with officials affiliated with Russian intelligence because Smirnov himself reported on a number of those contacts to his FBI Handler. As described below, these contacts are extensive and extremely recent, and Smirnov had the intention of meeting with one of these officials on his upcoming planned overseas travel.

Of particular note, Smirnov has reported numerous contacts with Russian Official 1, who has been described by Smirnov in a number of ways, including as the son of a former high-ranking Russian government official, someone who purportedly controls two groups of individuals tasked with carrying out assassination efforts in a third-party country, a Russian representative to another country, and as someone with ties to a particular Russian intelligence service. This latter fact was reported by Smirnov in October, 2023.

In December 2023, Smirnov reported to his Handler about a recent overseas trip, where Smirnov attended a meeting with Russian Official 2, who Smirnov has described as a high-ranking member of a specific Russian foreign intelligence service. According to Smirnov, the purpose of the meeting was to discuss a potential resolution to

Russia's war against Ukraine. During this same trip, Smirnov apparently attended a separate meeting with Russian Official 1, the individual who controls groups that are engaged in overseas assassination efforts. During this meeting with Russian Official 1, Russian Official 1 claimed that another individual, Russian Official 4, the head of a particular unit of a Russian Intelligence Service, ran an intelligence operation at a "club" located at a particular hotel. Smirnov told the FBI Handler that the Russian Intelligence Service intercepted cell phone calls made by guests at the hotel. The Russian Intelligence Service intercepted several calls placed by prominent U.S. persons the Russian government may use as "kompromat" in the 2024 election, depending on who the candidates will be. As described below, this story, which again was relayed by Smirnov to his Handler in/about December, 2023, appears to mirror the story that Smirnov was pushing on investigators and prosecutors during their meeting with him in September, 2023 (in which Smirnov pushed investigators to look into whether Businessperson 1 had been recorded in a foreign hotel).

Most recently, Smirnov has reported:

- Meetings in or about December 2023, outside the United States, between top officials of another country and Russian officials;
- Contact with a Russian official on November 27, 2023, where the Russian official provided Smirnov with information on his knowledge of certain Russian military operations in a third country; and
- Contact with a Russian intelligence service operative and top Russian representative to a third country on November 8, 2023.

Exhibit 2.

The following is a declassified summary of additional contacts that predate the contacts referenced above and in Exhibit 2. This summary was prepared by the FBI and taken from several reports he made to the FBI:

1. (U//FOUO) (Document 1)
   a. (U//FOUO) In or about October 2023, SMIRNOV reported the following:
      i. (U//FOUO) SMIRNOV was invited to and planned to attend the birthday party of an identified individual in the Middle East, COUNTRY A, which would include activities on a mega yacht owned by a high-ranking member of Russia's largest steel and mining company. SMIRNOV provided the names of individuals who might attend the birthday activities, including RUSSIAN OFFICIAL 1, who he identified as the son of a high-ranking former Russian government official, and RUSSIAN INDIVIDUAL 1, a high-ranking member of a Russia state-owned defense conglomerate.

2. (U//FOUO) (Document 2)
   a. (U//FOUO) In or about January 2023, SMIRNOV reported the following:
      i. (U//FOUO) In December 2022, SMIRNOV learned from a Russian Foreign Intelligence official the whereabouts of a particular Russian Foreign Intelligence officer living outside of Russia.
      ii. (U//FOUO) In or about January 2023, SMIRNOV spoke to another Russian Foreign Intelligence officer who provided the first name of the Russian Foreign Intelligence officer living outside of Russia.

3. (U//FOUO) (Document 3)
   a. (U//FOUO) On or about August 2023, SMIRNOV reported the following:
      i. (U//FOUO) SMIRNOV had been introduced to RUSSIAN INDIVIDUAL 2, a high-ranking member of a Russian steel company. RUSSIAN INDIVIDUAL 2 was organizing a birthday party for another person on RUSSIAN INDIVIDUAL 2's mega yacht. RUSSIAN INDIVIDUAL 2 mentioned that two of the oligarchs who would be attending the party have "connections" or "business ties" to a high-ranking member of a Russian Foreign

Intelligence Service, RUSSIAN OFFICIAL 2. Because of the language used by RUSSIAN INDIVIDUAL 2, SMIRNOV was not clear about the precise nature of the relationship between the identified Russian oligarchs and RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service.

4. (U//FOUO) <u>(Document 4)</u>

a. (U//FOUO) In or about October 2023, SMIRNOV reported the following information (this information was provided to supplement Document 1):

i. (U//FOUO) The planned COUNTRY A birthday party may be attended by RUSSIAN OFFICIAL 1, the son of a former high-ranking Russian government official. An associate of SMIRNOV provided SMIRNOV with a copy of RUSSIAN OFFICIAL 1's passport.

5. (U//FOUO) <u>(Document 5)</u>

a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:

i. (U//FOUO) SMIRNOV learned from RUSSIAN OFFICIAL 1 himself, that RUSSIAN OFFICIAL 1 has direct access to the highest levels of the Russian government. Although RUSSIAN OFFICIAL 1's father was a former high-ranking government official in Russia, RUSSIAN OFFICIAL 1's access to the highest levels of the Russian government is direct, and not through his father.

ii. (U//FOUO) RUSSIAN OFFICIAL 1 is a top, unofficial representative of Russia to COUNTRY B.

iii. (U//FOUO) SMIRNOV provided a photograph of RUSSIAN OFFICIAL 1 taken in or about November 2023, during RUSSIAN OFFICIAL 1's visit to COUNTRY A.

6. (U//FOUO) <u>(Document 6)</u>

a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:

i. (U//FOUO) SMIRNOV learned from sources, including RUSSIAN OFFICIAL 1, that a particular individual, RUSSIAN OFFICIAL 3, is the representative of the former head of a particular unit of a Russian Intelligence Service, RUSSIAN OFFICIAL 4.

ii. (U//FOUO) SMIRNOV provided information about RUSSIAN OFFICIAL 4's chain of command. SMIRNOV named three individuals who have direct, immediate access to the highest levels of the Russian government, including the father of RUSSIAN OFFICIAL 1.

7. (U//FOUO) (Document 7)
   a. (U//FOUO) In or about December 2023, SMIRNOV reported the following information (which is also reported in Document 6).
      i. (U//FOUO) SMIRNOV learned from sources, including RUSSIAN OFFICIAL 1, that a particular individual, RUSSIAN OFFICIAL 3, is the representative of the former head of a particular unit of a Russian Intelligence Service, RUSSIAN OFFICIAL 4.

8. (U//FOUO) (Document 8)
   a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:
      i. (U//FOUO) In October 2023, SMIRNOV had in-person conversations with RUSSIAN OFFICIAL 1 overseas. During these conversations, RUSSIAN OFFICIAL 1 discussed his knowledge and seeming control of two groups of Russian operatives who were previously tasked with the assassination of a high-ranking official of COUNTRY C. RUSSIAN OFFICIAL 1 offered to stop the assassination efforts in exchange for certain things, including an agreement by COUNTRY C to stop targeting civilian-family-members of certain Russian officials living in Moscow.
      ii. (U//FOUO) RUSSIAN OFFICIAL 1 also provided SMIRNOV with specific information about Russia's military resources for a winter attack in COUNTRY C. RUSSIAN OFFICIAL 1 also told SMIRNOV about the Russian government's intentions for their war in Ukraine.

9. (U//FOUO) (Document 9)
   a. (U//FOUO) In or about December 2023, SMIRNOV reported the following information:
      i. (U//FOUO) SMIRNOV attended a meeting in COUNTRY A in December 2023 that was attended by RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service. The primary purpose of the meeting was to discuss a potential resolution to the Russia-Ukraine war.
      ii. (U//FOUO) On this same trip, SMIRNOV attended another meeting with, among others, RUSSIAN OFFICIAL 1.
      iii. (U//FOUO) Unrelated to the above, SMIRNOV had a separate conversation with RUSSIAN OFFICIAL 1, wherein RUSSIAN OFFICIAL 1 claimed that RUSSIAN OFFICIAL 4, the head of a particular unit of a Russian Intelligence Service, ran an intelligence

operation at a "club" located on a particular floor of HOTEL 1, which is in COUNTRY C. SMIRNOV stated the Russian Intelligence Service intercepted cell phone calls made by guests at the hotel. The Russian Intelligence Service intercepted several calls placed by prominent US persons the Russian government may use as "kompromat" in the 2024 election, depending on who the candidates will be.

iv. (U//FOUO) SMIRNOV later had a meeting with another COUNTRY C government official, who stated it was common knowledge that the Russian Intelligence Service did, in fact, run such intelligence operations at HOTEL 1.

10. (U//FOUO) (Document 10)

a. (U//FOUO) In or about February 2022, SMIRNOV provided the following information:

i. (U//FOUO) When SMIRNOV was working in COUNTRY D circa 2002, he conducted a joint operation to recruit two individuals: 1) RUSSIAN OFFICIAL 5, Russian consular to COUNTRY D, who was caught spying; and, 2) a COUNTRY E consular to COUNTRY D.

ii. (U//FOUO) SMIRNOV first met RUSSIAN OFFICIAL 5 at an event/party COUNTRY D put on for foreign officials. Thereafter, SMIRNOV spent numerous months developing a "friendship" with RUSSIAN OFFICIAL 5. After some time, SMIRNOV was asked by COUNTRY D to contact RUSSIAN OFFICIAL 5 and tell them that COUNTRY D had info that RUSSIAN OFFICIAL 5 was spying. Rather than arresting/PNGing RUSSIAN OFFICIAL 5, COUNTRY D told RUSSIAN OFFICIAL 5 had to leave within 48 hours or there would be "adverse consequences", but that RUSSIAN OFFICIAL 5 should keep in touch with COUNTRY D and SMIRNOV. Thereafter, RUSSIAN OFFICIAL 5 would occasionally provide SMIRNOV with information. RUSSIAN OFFICIAL 5 never provided information that was "adverse" to Russia.

iii. (U//FOUO) Approximately three years before the time of this reporting, possibly in 2019, SMIRNOV traveled to Russia and met with RUSSIAN OFFICIAL 5. They had a very careful, coded conversation about what Russia might look like under different leadership. For background, SMIRNOV understood that RUSSIAN OFFICIAL 5's spouse is somehow related to RUSSIAN OFFICIAL 6, a former high-ranking member of a Russian Intelligence Service. SMIRNOV has never met RUSSIAN OFFICIAL 6, however SMIRNOV once called RUSSIAN OFFICIAL 5 who was in the car at the time

with RUSSIAN OFFICIAL 6, who spoke very briefly to SMIRNOV over speaker phone.

iv. (U//FOUO) During a subsequent meeting two days later, SMIRNOV and RUSSIAN OFFICIAL 5 spoke again about matters pertaining to Russia. RUSSIAN OFFICIAL 5 indicated that RUSSIAN OFFICIAL 6 was not happy with Russian leadership, and that RUSSIAN OFFICIAL 6 was also close friends/associates with RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service.

v. (U//FOUO) First call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): Prior to a recent overseas trip, SMIRNOV contacted RUSSIAN OFFICIAL 5 to see if he could arrange to have RUSSIAN OFFICIAL 2, speak to a high-ranking official of COUNTRY C. SMIRNOV contacted RUSSIAN OFFICIAL 5 and provided him with a proposed date and time for RUSSIAN OFFICIAL 2 to call. SMIRNOV obtained a "throw-phone" and foreign SIM card and provided RUSSIAN OFFICIAL 5 with the number. SMIRNOV indicated that a call subsequently took place between RUSSIAN OFFICIAL 2 and a high-ranking official COUNTRY C, the subject matter of which SMIRNOV was aware.

vi. (U//FOUO) Second call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): In January 2022, SMIRNOV had a second call with RUSSIAN OFFICIAL 2 (SMIRNOV used a second throw phone). SMIRNOV asked RUSSIAN OFFICIAL 2 for a "favor"—namely that Russian troops do not hurt SMIRNOV's associate, an official of COUNTRY C. RUSSIAN OFFICIAL 2 asked what SMIRNOV thought of SMIRNOV's associate. SMIRNOV later reiterated his "ask" that his associate not be harmed during any Russian incursion. RUSSIAN OFFICIAL 2 said he was told by RUSSIAN OFFICIAL 5, who SMIRNOV "befriended" years earlier after RUSSIAN OFFICIAL 5 was caught spying, that SMIRNOV was a "good guy," and therefore RUSSIAN OFFICIAL 2 would help to ensure SMIRNOV's associate was not killed or harmed.

vii. (U//FOUO) Third call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): After SMIRNOV returned from his overseas trip, he again asked RUSSIAN OFFICIAL 5 to set up another call with RUSSIAN OFFICIAL 2. During the call, SMIRNOV discussed the additional escalation of Russian troops along the Ukraine border and asked RUSSIAN OFFICIAL 2 whether he could provide any details about Russia's intentions. RUSSIAN OFFICIAL

2 stated he was 99% that only a skirmish would occur.

11. (U//FOUO) (Document 11)

a. (U//FOUO) In or about October 2023, SMIRNOV provided the following information:

i. (U//FOUO) Photo of passport of RUSSIAN OFFICIAL 1.

ii. (U//FOUO) In October 2023, SMIRNOV advised that RUSSIAN OFFICIAL 1, the son of a high-ranking former Russian government official, was invited to attend a birthday party in October 2023 in COUNTRY A, which will be held on RUSSIAN INDIVIDUAL 2's mega yacht. SMIRNOV received a copy of RUSSIAN OFFICIAL 1's Russian passport.

Smirnov's anticipated travel from the United States, on Friday of last week, two days after his return, was for the purpose of meeting with Russian intelligence officials, among others. Specifically:

12. (U//FOUO) (Document 12)

a. (U//FOUO) In or about January 2024, SMIRNOV provided the following information. The information was recorded in an FD-1040a, CHS travel/ET Activity Request Form.

i. SMIRNOV reported future travel and meeting itineraries to his FBI Handler, which outlined travel to various countries in February 2024. SMIRNOV planned to meet with RUSSIAN OFFICIAL 1, an operative of a Russian Intelligence Service. The primary purpose of the meeting with RUSSIAN OFFICIAL 1 was to discuss the exchange of Russian and Ukrainian military prisoners. The meeting was set to occur in COUNTRY A.

Smirnov's contacts with Russian officials who are affiliated with Russian intelligence services are not benign. At his meeting with FBI investigators in September 2023, Smirnov pushed a new story about Public Official 1 and Businessperson 1, as described in the indictment. Indictment at ¶51. Specifically, Smirnov wanted them to look into whether Businessperson 1 was recorded in a hotel in Kiev called the Premier Palace. *Id.* Smirnov told investigators that the entire Premier Palace Hotel is "wired" and under the control of the Russians.

*Id.* Smirnov claimed that Businessperson 1 went to the hotel many times and that he had seen video footage of Businessperson 1 entering the Premier Palace Hotel. *Id.* Investigators know that Smirnov's new story is false because Businessperson 1 has never travelled to Ukraine. *Id.* at ¶ 54.

Smirnov suggested that investigators check to see if Businessperson 1 made telephone calls from the Premier Palace Hotel since those calls would have been recorded by the Russians. *Id.* at ¶ 52. Smirnov claimed to have obtained this information a month earlier by calling a high-level official in a foreign country. *Id.* Smirnov also claimed to have learned this information from four different Russian officials. *Id.*

Smirnov told investigators that the four different Russian officials are all top officials and two are the heads of the entities they represent. *Id.* at ¶ 53. These Russians said that conversations with Ukrainians about ending the war will include the next U.S. election. Smirnov told investigators he is involved in negotiations over ending the war and had been for the previous four months. *Id.* According to Smirnov, the Russians want Ukraine to assist in influencing the U.S. election, and Smirnov thinks the tapes of Businessperson 1 at the Premier Palace Hotel is all they have. *Id.* Smirnov told investigators he wants them to ask Businessperson 1 how many times he visited and what he did while at the Premier Palace Hotel. *Id.*

Thus, Smirnov's efforts to spread misinformation about a candidate of one of the two major parties in the United States continues. The Court should consider this conduct as well when evaluating his personal history and characteristics. What this shows

is that the misinformation he is spreading is not confined to 2020. He is actively peddling new lies that could impact U.S. elections after meeting with Russian intelligence officials in November. In light of that fact there is a serious risk he will flee in order to avoid accountability for his actions.

2. <u>Smirnov has access to millions of dollars that he did not disclose to Pretrial Services</u>.

Smirnov has already demonstrated that he cannot be trusted to provide truthful information to Pretrial Services. When he was interviewed, he told Pretrial Services that he only had access to $1,500 in cash and another $5,000 in a checking account. *See* Exhibit 11 at 2.

That is not true. Smirnov is the sole signatory on a Bank of America business checking account ending with 3928 in the name of Avalon Group Inc. (hereafter "BOA 3928") Exhibit 3 (under seal). *As of December 31, 2023, BOA 3928 had a balance of $2,917,496.61.* Exhibit 4 (under seal). The fact that Smirnov lied to Pretrial Services in his very first interaction with them establishes conclusively that there are no conditions that could reasonably assure his appearance. That is because the effectiveness of any condition or combination relies on Pretrial Services ability to obtain truthful information from Smirnov.

Smirnov uses BOA 3928 to fund his and DL's lifestyle, although the transfers themselves look like payments from a business, "Avalon Group, Inc." to DL. From February 2020, when the account was opened, through December 31, 2022, Smirnov withdrew $1,737,500 to purchase cashier's checks in the name of "Avalon Group Inc." and payable to DL. *Id.* Those cashier's checks were then deposited in DL's account, in

some cases within 30 minutes of Smirnov withdrawing the funds to purchase the checks. *See* Exhibit 10 (under seal). DL deposited these cashier's checks into one of her accounts at a branch near where Smirnov withdrew the funds. *Id.* For example, on October 13, 2020, a withdrawal was conducted by Avalon Group Inc. in the amount of $599,000 from BOA 3928. Exhibit 5 (under seal). The transaction was conducted at a Bank of America branch located in San Juan Capistrano, California. *Id.* A handwritten note on the withdrawal slip identified "CADL XXXX349 4/26/2022," which was Smirnov's California driver's license. *Id.* Immediately following the withdrawal, Bank of America official check 1145711247 in the amount of $599,000 payable to DL was purchased using the funds. Exhibit 6 (under seal). On October 14, 2020, Bank of America official check 1145711247 was deposited to DL's Wells Fargo account ending 1356, for which she is the sole signer. *Id.* The transaction was conducted at a Wells Fargo branch located in San Juan Capistrano, California. *Id.* The withdrawal from BOA 3928 was funded by a previous wire transfer of $600,000 received from Economic Transformation Technologies Corporation on September 22, 2020. The BOA 3928 account balance prior to receipt of the wire transfer was approximately $31.

Smirnov also wired DL $785,000 in two payments, $740,000 at the end of 2020 and another $45,000 at the end of 2022. Exhibit 4 (under seal).

*As of February 1, 2024, DL had $3,827,460 in her Wells Fargo account ending in 1356.* Exhibit 7 (under seal).

In 2022 and 2023, after Smirnov began making these substantial transfers to DL, albeit using cashier's checks that make it appear she is receiving the funds from a business, "Avalon Group Inc.," DL made

payments to Smirnov's Citi credit card, which is the primary means by which he pays personal expenses. *See* Exhibit 10 (under seal). Specifically, in 2022, DL paid $108,916.52 towards Smirnov's Citi credit card debt and in 2023, she paid $275,869.44. *Id.*

Smirnov told Pretrial Services that he lives with DL in a condominium she leases. *See* Exhibit 11 at 1. That is also not true. The attached report shows she is in fact the owner, having purchased it on February 28, 2022, for the sale price of $1,425,000. *See* Exhibit 1 (under seal). In February 2022, DL purchased a condominium in Las Vegas where she and Smirnov reside. *Id.* While the condominium is titled in her name, she purchased it after receiving more than $2.4 million from Smirnov. *See* Exhibit 10 (under seal).

Smirnov also withdrew $174,219 in cash from the account, including $60,304.25 in 2023. Exhibit 4 (under seal). In addition to DL paying his personal expenses, Smirnov also pays various personal expenses out of this account including gasoline, credit card payments, restaurants, duty free shopping and others. *Id.*

The government assumes that Smirnov did not disclose these substantial assets to the Court when he submitted his financial affidavit. That is because while the government has not seen the affidavit, the Court appointed the Office of the Federal Public Defender to represent Smirnov at his initial appearance. The court specifically admonished Smirnov that he was submitting his financial affidavit under the penalties of perjury. If he did not disclose his substantial assets the this is a second example of an instance where Smirnov lied to the Court.

In the event that Smirnov did not disclose these assets, the government respectfully requests that the Court release the affidavit

to the government so that the government can consider whether to charge Smirnov with perjury.

3. Smirnov can obtain an Israeli passport at any time.

Finally, the Court should also consider that Smirnov is a dual national who holds both U.S. citizenship, and a U.S. passport, and Israeli citizenship, and an Israeli passport. While Smirnov can be ordered to turn both passports in to Pretrial Services and could be prohibited from obtaining a new U.S. passport, he cannot be prohibited from obtaining a new Israeli one. He can obtain a new Israeli passport in the United States by visiting any one of Israel's consulates in Washington, DC, New York, Houston, Miami or Los Angeles. *See* Exhibits 8 and 9.

## V. Conclusion

Based on the above, this Court should conclude that no condition or combination of conditions will reasonably assure the appearance of the Smirnov as required and order him detained pending trial.

(151 of 420), Page 151 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 151 of 420

# Exhibit 2

AA000145

## FD-209a CHS Contact Report

Federal Bureau of Investigation (FBI) • Source: ████    • Page 1 of 4

**OFFICIAL RECORD**

CHS Number:
Date:   11/08/2023
CHS Status:   Open
Created By:
CHS Last Opened Date:   09/30/2010
Case Agent:

Field Office.   Seattle

Squad:   █

## Filing and Security

**Overall Document Classification**

**Classification Block**

## Contact Report Details

**CHS Contact Report Synopsis**
Supplemental reporting re ████████ and top Russian representative to Country B, Russian Official 1

**Date of Contact**
11/8/2023

**Participant**
• ████████████

**Contact Type**
Messaging Platform

**Derogatory Information**
Does this form contain potentially derogatory information that might reduce the CHS's reliability or credibility?
No

## FD-209a CHS Contact Report


OFFICIAL RECORD

Federal Bureau of Investigation (FBI) • Source ███████ • Page 2 of 4

### Life Changes
Has the CHS experienced any of the following significant life changes?

- No, Child custody dispute
- No, Death or serious illness of close family member or friend
- No, Divorce or Separations
- No, Major life change, such as relocation, job loss, or significant loss of income
- No, Serious Illness of CHS
- No, Serious legal issues
- No, Other
- Yes, None of the above

### Appearance Changed
Has the CHS's appearance changed to indicate any of the following?

- No, Evidence of change in mental state
- No, Evidence of radicalization
- No, Evidence of significant increase in unexplained income
- Yes, None of the above

### Behavior Issues
Did the CHS exhibit any of the following?

- No, Egotism
- No, Excessive gambling
- No, Financial issues
- No, Impulsiveness
- No, Misuse of alcohol
- No, Misuse of prescription medication or illicit drug use
- No, Risky sexual behavior
- Yes, None of the above

### Disobeyed Instructions
Has the CHS done any of the following?

- No, Disclosed their FBI affiliation to a foreign entity without Handling Agent authorization
- No, Disclosed their FBI affiliation to a subject without Handling Agent authorization
- No, Disclosed their FBI affiliation to the media
- No, Failed to follow taskings or instructions
- No, Taken operational action without the Handling Agent's consent
- No, Unresponsive on multiple occasions to communication attempts, to include repeatedly cancelling meetings, missing meetings, or being late to meetings
- Yes, None of the above

### Inadequate Reporting
Was the CHS's information any of the following?

- No, Contradicted by other intelligence reporting
- No, Derived from open sources
- No, Indicative of deliberate deception, fraudulence, or fabrication
- Yes, None of the above

AA000147

FD-209a CHS Contact Report

**Investigative Techniques**
Describe the FBI investigative techniques and information revealed to the CHS for operational purposes

N/A

**Access to Information**
What was the CHS's access to the specific information being reported?
Direct

**Database Access**
Was the CHS tasked to obtain information from an employer database during this contact?

No

**Other Pertinent Information**
This field may be utilized for any pertinent information regarding the CHS contact, and should be used to identify CHS acquisition of information by sub-sources/3rd parties reported in the associated FD-1023.

N/A

(155 of 420), Page 155 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 155 of 420

FD-209a CHS Contact Report
Federal Bureau of Investigation (FBI) * Source [REDACTED] * Page 4 of 4

OFFICIAL RECORD

AA000149

# FD-209a CHS Contact Report

Federal Bureau of Investigation (FBI) * * Page 1 of 4

OFFICIAL RECORD

CHS Number:
Date: 12/04/2023
CHS Status: Open
Created By:
CHS Last Opened Date: 09/30/2010
Case Agent:

Field Office: Seattle

Squad: C3

## Filing and Security

**Overall Document Classification**

**Classification Block**

## Contact Report Details

**CHS Contact Report Synopsis**

Partial identification of Russian national Russian Official 3, an alleged representative of Russian Official 4, former head of .

**Date of Contact**

11/27/2023

**Participant**

**Contact Type**

In Person

**Derogatory Information**

Does this form contain potentially derogatory information that might reduce the CHS's reliability or credibility?

No

## FD-209a CHS Contact Report

Federal Bureau of Investigation (FBI) • Source: [redacted] • Page 2 of 4


OFFICIAL RECORD

### Life Changes
Has the CHS experienced any of the following significant life changes?

- No. Child custody dispute
- No. Death or serious illness of close family member or friend
- No. Divorce or Separations
- No. Major life change, such as relocation, job loss, or significant loss of income
- No. Serious Illness of CHS
- No. Serious legal issues
- No. Other
- Yes. None of the above

### Appearance Changed
Has the CHS's appearance changed to indicate any of the following?

- No. Evidence of change in mental state
- No. Evidence of radicalization
- No. Evidence of significant increase in unexplained income
- Yes. None of the above

### Behavior Issues
Did the CHS exhibit any of the following?

- No. Egotism
- No. Excessive gambling
- No. Financial issues
- No. Impulsiveness
- No. Misuse of alcohol
- No. Misuse of prescription medication or illicit drug use
- No. Risky sexual behavior
- Yes. None of the above

### Disobeyed Instructions
Has the CHS done any of the following?

- No. Disclosed their FBI affiliation to a foreign entity without Handling Agent authorization
- No. Disclosed their FBI affiliation to a subject without Handling Agent authorization
- No. Disclosed their FBI affiliation to the media
- No. Failed to follow taskings or instructions
- No. Taken operational action without the Handling Agent's consent
- No. Unresponsive on multiple occasions to communication attempts, to include repeatedly cancelling meetings, missing meetings, or being late to meetings
- Yes. None of the above

### Inadequate Reporting
Was the CHS's information any of the following?

- No. Contradicted by other intelligence reporting
- No. Derived from open sources
- No. Indicative of deliberate deception, fraudulence, or fabrication
- Yes. None of the above

AA000151

FD-209a CHS Contact Report

**Investigative Techniques**
Describe the FBI investigative techniques and information revealed to the CHS for operational purposes

N/A

**Access to Information**
What was the CHS's access to the specific information being reported?
Direct and Indirect

**Database Access**
Was the CHS tasked to obtain information from an employer database during this contact?

No

**Other Pertinent Information**
This field may be utilized for any pertinent information regarding the CHS contact, and should be used to identify CHS acquisition of information by sub-sources/3rd parties reported in the associated FD-1023.

N/A



FD-209a CHS Contact Report

FD-209a CHS Contact Report

OFFICIAL RECORD

CHS Number: [redacted]
Date: 12/06/2023
CHS Status: Open
Created By: [redacted]
CHS Last Opened Date: 09/30/2010
Case Agent: [redacted]

Field Office: Seattle

Squad: C3

## Filing and Security

**Overall Document Classification**

**Classification Block**

[redacted]

[redacted]

## Contact Report Details

**CHS Contact Report Synopsis**

Russian Official 1's [redacted] knowledge of certain Russian military operations in Country C.

**Date of Contact**

11/27/2023

**Participant**

[redacted]

**Contact Type**

In Person

[redacted]

**Derogatory Information**

Does this form contain potentially derogatory information that might reduce the CHS's reliability or credibility?

No

[redacted]

FD-209a CHS Contact Report

**Life Changes**
Has the CHS experienced any of the following significant life changes?

- No. Child custody dispute
- No. Death or serious illness of close family member or friend
- No. Divorce or Separations
- No. Major life change, such as relocation, job loss, or significant loss of income
- No. Serious Illness of CHS
- No. Serious legal issues
- No. Other
- Yes. None of the above

**Appearance Changed**
Has the CHS's appearance changed to indicate any of the following?

- No. Evidence of change in mental state
- No. Evidence of radicalization
- No. Evidence of significant increase in unexplained income
- Yes. None of the above

**Behavior Issues**
Did the CHS exhibit any of the following?

- No. Egotism
- No. Excessive gambling
- No. Financial issues
- No. Impulsiveness
- No. Misuse of alcohol
- No. Misuse of prescription medication or illicit drug use
- No. Risky sexual behavior
- Yes. None of the above

**Disobeyed Instructions**
Has the CHS done any of the following?

- No. Disclosed their FBI affiliation to a foreign entity without Handling Agent authorization
- No. Disclosed their FBI affiliation to a subject without Handling Agent authorization
- No. Disclosed their FBI affiliation to the media
- No. Failed to follow taskings or instructions
- No. Taken operational action without the Handling Agent's consent
- No. Unresponsive on multiple occasions to communication attempts, to include repeatedly cancelling meetings, missing meetings, or being late to meetings
- Yes. None of the above

**Inadequate Reporting**
Was the CHS's information any of the following?

- No. Contradicted by other intelligence reporting
- No. Derived from open sources
- No. Indicative of deliberate deception, fraudulence, or fabrication
- Yes. None of the above

## FD-209a CHS Contact Report

Federal Bureau of Investigation (DI)) * Source: ░░░░░░ * Page 3 of 4



**Investigative Techniques**
Describe the FBI investigative techniques and information revealed to the CHS for operational purposes

N/A

**Access to Information**
What was the CHS's access to the specific information being reported?
Direct

**Database Access**
Was the CHS tasked to obtain information from an employer database during this contact?

No

**Other Pertinent Information**
This field may be utilized for any pertinent information regarding the CHS contact, and should be used to identify CHS acquisition of information by sub-sources/3rd parties reported in the associated FD-1023.

N/A

FD-209a CHS Contact Report

# FD-209a CHS Contact Report

OFFICIAL RECORD

CHS Number: [redacted]
Date: 12/20/2023
CHS Status: Open
Created By: [redacted]
CHS Last Opened Date: 09/30/2010
Case Agent: [redacted]

Field Office: Seattle

Squad: C3

## Filing and Security

**Overall Document Classification**

**Classification Block**

[redacted]

[redacted]

## Contact Report Details

**CHS Contact Report Synopsis**
Meetings [redacted] in Country A, between top Country C officials and Russian Official 2 and Russian Official 1 [redacted]

**Date of Contact**
12/11/2023

**Participant**
- [redacted]

**Contact Type**
Messaging Platform

**Derogatory Information**
Does this form contain potentially derogatory information that might reduce the CHS's reliability or credibility?
No

FD-209a CHS Contact Report

**Life Changes**
Has the CHS experienced any of the following significant life changes?

- No. Child custody dispute
- No. Death or serious illness of close family member or friend
- No. Divorce or Separations
- No. Major life change, such as relocation, job loss, or significant loss of income
- No. Serious illness of CHS
- No. Serious legal issues
- No. Other
- Yes. None of the above

**Appearance Changed**
Has the CHS's appearance changed to indicate any of the following?

- No. Evidence of change in mental state
- No. Evidence of radicalization
- No. Evidence of significant increase in unexplained income
- Yes. None of the above

**Behavior Issues**
Did the CHS exhibit any of the following?

- No. Egotism
- No. Excessive gambling
- No. Financial issues
- No. Impulsiveness
- No. Misuse of alcohol
- No. Misuse of prescription medication or illicit drug use
- No. Risky sexual behavior
- Yes. None of the above

**Disobeyed Instructions**
Has the CHS done any of the following?

- No. Disclosed their FBI association to a foreign entity without Handling Agent authorization
- No. Disclosed their FBI association to a subject without Handling Agent authorization
- No. Disclosed their FBI association to the media
- No. Failed to follow taskings or instructions
- No. Taken operational action without the Handling Agent's consent
- No. Unresponsive on multiple occasions to communication attempts, to include repeatedly cancelling meetings, missing meetings, or being late to meetings
- Yes, None of the above

**Inadequate Reporting**
Was the CHS's information any of the following?

- No. Contradicted by other intelligence reporting
- No. Derived from open sources
- No. Indicative of deliberate deception, fraudulence, or fabrication
- Yes, None of the above

FD-209a CHS Contact Report

**Investigative Techniques**
Describe the FBI investigative techniques and information revealed to the CHS for operational purposes

N/A

**Access to Information**
What was the CHS's access to the specific information being reported?
Direct

**Database Access**
Was the CHS tasked to obtain information from an employer database during this contact?

No

**Other Pertinent Information**
This field may be utilized for any pertinent information regarding the CHS contact, and should be used to identify CHS acquisition of information by sub-sources/3rd parties reported in the associated FD-1023.

N/A

(167 of 420), Page 167 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 167 of 420

FD-209a CHS Contact Report
Federal Bureau of Investigation (FBI) * Source * Page 4 of 4

OFFICIAL RECORD

AA000161

(168 of 420), Page 168 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 168 of 420

# Exhibit 8

AA000162

# Issue or extend Israeli travel documents abroad

**Israeli citizens and residents living abroad can use this service to apply for or extend Israeli non-biometric tra**

### Who can apply

Israeli citizens and residents living abroad can apply for, and renew the following documents:

- Travel documents (passport or laissez-passer).
- Travel documents that have expired or whose pages have become full.
- New travel documents issued due to loss, theft, destruction, or wear and tear of the previous document

**All applications must be made in person by the applicant.**

## Applicants under 18

- Parents must make the application together with their children (who are under 18).
- Divorced, separated, common-law spouses, or single parents must submit written consent of both paren the presence of the a consul in any Israeli mission abroad, in the presence of a notary, or in an office of th Authority.

## Notes

- Travel documents (passports and laissez-passer documents) issued by the State of Israel to its citizens a must be kept safe.
- Israeli citizens must leave and enter Israel using Israeli travel documents only.
- Israeli biometric travel documents cannot be issued outside Israel.

### Replacing an expired or full travel document (passport or laissez-passer)

## What you need

- .Two current, identical, passport photos in color, 5 by 5 centimeters, on a white background
- .A photo ID (such as an ID card or Israeli driver's license)
- .the completed and signed passport or laissez-passer application form

.Application form for a passport or laissez-passer, completed and signed

Consult the fees table to see fees application prices:

- See fees in US Dollar and Euro
- For local currencies, check your local consul's fees table

**In addition to the service fee, you will be required to pay a fine for the loss, theft or damage of your trav**

### Extending an Israeli travel document

- You can extend the validity of a non-biometric passport if no more than 5 years have passed from the da extension period.
- You cannot extend the validity of a biometric passport.
- Extensions for citizens eligible for military service will be restricted subject to the regulation of their statu

Application for extending or making changes to a passport or laissez-passer

.The passport or laissez-passer that you want to extend

## The ser

Please note, if there is any difference or conflict between the information on this page and th provisions of the law will apply.

### Files for download

**Application to extend/make changes to a passport/laissez passer**

File type : pdf Size : 147.43 Kb

(171 of 420), Page 171 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 171 of 420

2/18/24, 6:11 PM Case 2:24-cr-00091-ODW Document 11-2 Filed 02/21/24 Page 4 of 4 Issue or extend Israeli travel documents abroad | Ministry of Foreign Affairs

MFA Scholarships for international students (academic year 2023-2024)

Pay for Ministry of Foreign Affairs services

This page was last updated on 05.11.2023

**Useful information**

All services

Contact the government

RSS

Terms of use

**Support**

Call Us 1299

Central Government Call Center

Technical support for online services

Contact information security

**More information**

About

Accessibility

Site map

Freedom of Information (Heb)

Use of cookies

You
Tube

AA000165

(172 of 420), Page 172 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 172 of 420

# Exhibit 9

AA000166

(173 of 420), Page 173 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 173 of 420

2/18/24, 6:17 PM Case 2:24-cr-00091-ODW Document 10-3 Filed 02/21/24 Page 2 of 4 Page ID #:103

# Israel's Diplomatic Missions

Search by selecting one or more of the following options

Continent

United States of America

Embassy

## 10 Results

Country and Region: United States of America X

**Country and Region:**
United States of America

**Embassy:**
Washington

**Status:**
Embassy

**Address:**
EMBASSY 3514 INTERNATIONAL DR. N.W. WASHINGTON D.C. 20008

**Tel:**
00-1-202-3645500

**Fax:**
00-1-202-3645607

**Reception hours:**
Mon - Fri 09:30 12:30

**Contact us:**
info@washington.mfa.gov.il

**Mission website:**
https://www.embassies.gov.il/washington/

**Visa to Israel:**
No

---

**Country and Region:**
United States of America

**Embassy:**
New York

**Status:**
Consulate General

**Address:**
CONSULATE GENERAL OF ISRAEL 800 SECOND AVENUE NEW YORK, N.Y. 10017

**Tel:**
00-1-212-4995000

**Fax:**
00-1-212-4995355

**Reception hours:**
Mon - Fri 09:30 12:30

**Contact us:**
info@newyork.mfa.gov.il

**Mission website:**
https://embassies.gov.il/new-york/Pages/defaul

**Visa to Israel:**
No

---

**Country and Region:**
United States of America

**Embassy:**
Atlanta

**Status:**
Consulate General

**Address:**
CONSULATE GENERAL 1100 SPRING ST.NW SUITE 440 ATLANTA, GEORGIA 30309 U.S.A

**Tel:**
00-1-404-4876500

**Fax:**
00-1-404-4876555

**Reception hours:**
Mon - Fri 09:00 13:00

**Contact us:**
info@atlanta.mfa.gov.il

**Mission website:**
https://atlanta.mfa.gov.il

**Visa to Israel:**
No

---

**Country and Region:**
United States of America

**Embassy:**
Boston

**Status:**
Consulate General

**Address:**
CONSULATE GENERAL 20 PARK PLAZA, SUITE 1020 BOSTON, MA 02116

**Tel:**
00-1-617-5350200

**Fax:**
00-1-617-5350255

**Reception hours:**

**Contact us:**

**Mission website:**

https://www.gov.il/en/Departments/dynamiccollectors/israeli-consular-services?skip=0&shem_mdn_a=United States of America 1/3

AA000167

Mon - Fri 10:00 13:00 | info@boston.mfa.gov.il | https://boston.mfa.gov.il

**Visa to Israel:**
No

---

**Country and Region:** United States of America
**Embassy:** Chicago
**Status:** Consulate General
**Address:** CONSULATE GENERAL 500 W. MADISON ST. CITIGROUP CENTER, SUITE 3100 CHICAGO, IL 60661 U.S.A
**Tel:** 00-1-312-3808800
**Fax:** 00-1-312-3808855
**Reception hours:** Mon - Thu 09:30 12:30 Fri 09:30 12:00
**Contact us:** info@chicago.mfa.gov.il
**Mission website:** https://chicago.mfa.gov.il
**Visa to Israel:** No

---

**Country and Region:** United States of America
**Embassy:** Houston
**Status:** Consulate General
**Address:** CONSULATE GENERAL 24 GREENWAY PLAZA, SUITE 1500 HOUSTON, TEXAS 77046 HOUSTON
**Tel:** 00-1-832-3013500
**Fax:** 00-1-832-2018700
**Reception hours:** Mon - Fri 09:30 12:30
**Contact us:** consular.dep@houston.mfa.gov.il
**Mission website:** https://embassies.gov.il/houston
**Visa to Israel:** No

---

**Country and Region:** United States of America
**Embassy:** Los Angeles
**Status:** Consulate General
**Address:** CONSULATE GENERAL 11766 WILSHIRE BLVD. SUITE 1600 LOS ANGELES,CALIFORNIA 90025 USA
**Tel:** 00-1-323-8525500
**Fax:** 00-1-323-8525555
**Reception hours:** Mon - Fri 09:00 12:00
**Contact us:** info@losangeles.mfa.gov.il
**Mission website:** https://embassies.gov.il/la
**Visa to Israel:** No

---

**Country and Region:** United States of America
**Embassy:** Miami
**Status:** Consulate General
**Address:** CONSULATE GENERAL 100 N. BISCAYNE BLVD SUITE 1800, MIAMI, FLORIDA 33132
**Tel:** 00-1-305-9259400
**Fax:** 00-1-305-9259451
**Reception hours:** Mon - Fri 09:30 12:30
**Contact us:** consular.dep@miami.mfa.gov.il
**Mission website:** https://miami.mfa.gov.il
**Visa to Israel:** No

---

**Country and Region:** United States of America
**Embassy:** San Francisco
**Status:** Consulate General
**Address:** CONSULATE GENERAL 456 MONTGOMERY ST. SUITE 2100 SAN FRANCISCO CA. 94104 U.S.A
**Tel:** 00-1-415-8447500
**Fax:** 00-1-415-8447555
**Reception hours:**
**Contact us:**
**Mission website:**

Mon - Fri 10:00 13:00 info@sanfrancisco.mfa.gov.il https://www.israeliconsulate.org

**Visa to Israel:**
No

---

**Country and Region:**
United States of America

**Embassy:**
New York/U.N

**Status:**
Delegation

**Address:**
PERMANENT MISSION TO THE UNITED NATIONS 800 SECOND AVENUE NEW YORK U.N 10017

**Tel:**
00-1-212-4995321

**Fax:**
00-1-212-4995516 00-1-212-4995515

**Reception hours:**
No info

**Contact us:**
info@newyork.mfa.gov.il

**Mission website:**
https://embassies.gov.il/un

**Visa to Israel:**
No

---

This page was last updated on 19.05.2021

**Useful information**

All services
Contact the government
RSS
Terms of use

**Support**

Call Us 1299
Central Government Call Center
Technical support for online services
Contact information security

**More information**

About
Accessibility
Site map
Freedom of Information (Heb)
Use of cookies

EXHIBIT G

DEFENDANT'S EMERGENCY MOTION FOR IMMEDIATE DETENTION HEARING AND RELEASE ON PREVIOUSLY IMPOSED CONDITIONS
- Filed on February 22, 2024

2:24-mj-00166-DJA-1

DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant, ALEXANDER SMIRNOV

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDER SMIRNOV,<br><br>Defendant, | CASE NO. 2:24-MJ-00166-DJA |

**DEFENDANT'S EMEREGENCY MOTION FOR IMMEDIATE DETENTION HEARING AND RELEASE ON PREVIOUSLY IMPOSED CONDITIONS**

COMES NOW, Defendant, ALEXANDER SMIRNOV ("Mr. Smirnov"), by and through his attorneys, DAVID Z. CHESNOFF, ESQ., and RICHARD A. SCHONFELD, ESQ., of the law firm of CHESNOFF & SCHONFELD and hereby move this Honorable Court to set an immediate hearing under Rule 5(a) to seek the release of Mr. Smirnov from custody, as more

fully explained below.

Dated this 22nd day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ David Z. Chesnoff
DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant ALEXANDER SMIRNOV

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.
### Procedural History

1. Mr. Smirnov was arrested in Las Vegas, Nevada on or about February 14, 2024.

2. The two-count Indictment filed in the Central District of California charges him with: 1) Making False Statements to a Government Agent, in violation of 18 U.S.C. § 1001; and 2) Falsification of Records in a Federal Investigation, in violation of 18 U.S.C. § 1519.

3. Mr. Smirnov had his initial appearance before this Court on February 15, 2024. At the conclusion of the initial hearing, and at the Government's request, his hearing under Rule 5 of the Federal Rules of Criminal Procedure (the "hearing") was continued to February 20, 2024 at 3:00 p.m.

4. Prior to the hearing, Mr. Smirnov filed a motion seeking his release on conditions, and the Government filed a motion for pretrial detention.

5. Prior to the hearing, the Pretrial Services Office issued a report recommending that Mr. Smirnoff be released on various conditions.

6. At the hearing on February 20, 2024, the parties argued their respective positions concerning pretrial release of detention. At the conclusion of the hearing, the Honorable Daniel J. Albregts, United States Magistrate Judge for the United States District Court for the District of Nevada, granted Mr. Smirnov's motion and ordered him released on various conditions. At the conclusion of the hearing, the Government asked to Court to stay its order of release; however, the Magistrate Judge denied that motion to stay on the record. *See* Transcript of Detention Hearing (Feb. 20, 2024) (attached as Exhibit 1).

7. Pursuant to the Magistrate Judge's order, Mr. Smirnov was released from custody on or about February 20, 2024. He has remained fully compliant with his conditions of release since his court-ordered release.

8. On February 21, 2024, the Government filed an application to reopen the detention hearing in the underlying case (*United States v. Smirnov*, 2:24-cr-00091-ODW-1) in the Central District of California. The Government's application makes no mention of any second, then-unserved arrest warrant for Mr. Smirnov based on the same charges.

9. Despite Judge Albregts's prior ruling, denial of the stay request, and Mr. Smirnov's prior release from custody, on the morning of February 22, 2024, Mr. Smirnov was arrested for a second time – on the same charges and based on the same indictment set forth *supra* at ¶2 – while at the undersigned counsel's law office for meetings with counsel. It should further be noted that the fact that the Defendant was attending a legal consultation meeting at his attorneys' office contradicts the notion that he is a risk of flight. It also highlights the interference with his cherished Sixth Amendment rights.

10. 18 U.S.C. section 3145 provides the Government's remedy if it disagrees with Judge Albregts's release order. That remedy is to file a motion for revocation or modification of the conditions of release. That motion is filed in the originating jurisdiction. The Government filed that Motion. There are no provisions for the re-arrest of Mr. Smirnov in this District after being Ordered released. Any such provision would undermine the entire purpose of a Defendant having the right to a Rule 5 hearing in the District in which he is arrested. It also undermines the Court's denial of the Government's request for a stay of the release order.

11. The arrest warrant for this second arrest was issued by the Central District of California and dated February 22, 2024, Los Angeles, California (attached as Exhibit 2).

12. As of February 22, 2024, no order setting a date and time for Mr. Smirnoff's appearance and detention hearing in California has been set. Thus, at no time since his release on February 20, 2024 has Mr. Smirnov left Clark County, Nevada, let alone appeared in court in California.

**II.**

**Applicable Legal Standards**

13. "Rule 9 states, in relevant part, that when following an arrest, the defendant first appears before the court, the court must proceed according to Rule 5 . . . . Rule 5 states, in relevant part, that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge. . ." Fed. R. Crim. P. 5(a)(1)(A). Thus, Rules 5 and 9 deal with unnecessary delay between a defendant's arrest and first appearance before a magistrate judge." *United States v. Brown*, 2007 WL 9711677, Nos. CR 03-0847 ABC, CR 04-0697 (Mar. 5, 2007) (unpublished).

14. Mr. Smirnov's research into available remedies (including a petition for a writ of habeas corpus) are ongoing.

15. At present, however, Mr. Smirnov respectfully requests that this Honorable Court set his second initial appearance "without unnecessary delay" which, under these bizarre circumstances, mean: forthwith, and Order his release. Alternatively, Mr. Smirnov requests an emergency hearing before the Chief Judge of the United States District Court for the District of Nevada.

16. If the Court cannot hold an immediate detention hearing, it is respectfully requested that the Court enter an interim Order directing the United States Marshal Service to keep Mr.

///

Smirnov in this district pending his Rule 5 hearing.

DATED this 20th day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ David Z. Chesnoff
DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant, BERK SMIRNOV

**EXHIBIT**
**1**

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>ALEXANDER SMIRNOV,<br>Defendant. | Case No. 2:24-mj-00166-DJA<br>Las Vegas, Nevada<br>February 20, 2024<br>DETENTION HEARING<br>*C E R T I F I E D  C O P Y* |

TRANSCRIPT OF PROCEEDINGS

THE HONORABLE DANIEL J. ALBREGTS,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES: See Next Page

DIGITALLY RECORDED: Liberty Court Recorder
3:02 p.m.

TRANSCRIBED BY: PATRICIA L. GANCI
(702) 385-0670

Proceedings recorded by electronic sound recording, transcript produced by mechanical stenography and computer.

APPEARANCES:

For the Plaintiff:

**LEO J. WISE, ESQ.**
**DEREK E. HINES, ESQ.**
**CHRISTOPHER R. RIGALI, ESQ.**
**SEAN F. MULRYNE, ESQ.**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
(771) 217-6091

For the Defendant:

**DAVID CHESNOFF, ESQ.**
**RICHARD A. SCHONFELD, ESQ.**
CHESNOFF & SCHONFELD
520 S. 4th Street
Las Vegas, Nevada 89101
(702) 384-5563

LAS VEGAS, NEVADA; TUESDAY, FEBRUARY 20, 2024; 3:02 P.M.

--oOo--

P R O C E E D I N G S

THE COURT: Thank you. Please be seated.

COURTROOM ADMINISTRATOR: United States of America versus Alexander Smirnov, 2:24-mj-166-DJA. This is a detention hearing.

Counsel, make your appearance for the record, please.

MR. WISE: Good afternoon, Your Honor. Leo Wise, Derek Hines, Christopher Rigali, and Sean Mulryne for the United States.

THE COURT: Good afternoon.

MR. CHESNOFF: May it please the Court, Your Honor. David Chesnoff, Richard Schonfeld, and also with us Peter Levitt here on behalf of Mr. Smirnov.

THE COURT: All right. Thank you. Good afternoon. Good afternoon, Mr. Smirnov.

All right. This matter is scheduled for the continued detention hearing this afternoon. However, a couple of other matters have been filed that I want to resolve here before we begin. Specifically, at Dockets Number 9, 10, 11, and 12 the Government has filed motions to admit all four Government attorneys. I will grant those here today. So 9, 10, 11, and 12 are granted.

Additionally, there was a motion to file documents

under seal filed by -- on behalf of the United States at Document Number 13.

Mr. Chesnoff, did the Defense receive and review the motion to file some of the documents related to their filing today under seal?

MR. CHESNOFF: Yes, Your Honor.

THE COURT: Does the Defense have an opposition to that?

MR. CHESNOFF: No, Your Honor.

THE COURT: All right. Well, I've reviewed the motion and I've reviewed the documents. I do note that the request to seal does not outline the Ninth Circuit case law that I believe would apply, *Kamakana* and its progeny. But when I apply *Kamakana* and its progeny, I do think that sealing these documents would be appropriate in this case.

I will of course remind the parties, as you well know, that there's a presumption of access to the courtroom documents and the public having access to those filings. And the Ninth Circuit outlines standards that I am to employ when deciding to change that and to seal things. And so I have done that analysis. And I do believe it's appropriate to seal Exhibits 1, 3, 4, 5, 6, 7, and 10 given the information that's contained in there and my analysis of the case law as it applies to those exhibits. So I will grant Number 13 as well and allow those documents to be filed under seal.

So the parties are aware, I have also reviewed the Defense's motion for release, which is found at Number 8. I reviewed the Government's memorandum in support of detention, which is found at Number 15. And I reviewed a filing that Mr. Chesnoff and Mr. Schonfeld entered later this afternoon at Document 16, which is a response.

Mr. Chesnoff, as it relates to that response, you note that the Government's was filed this morning, mid to late morning, and that you didn't have time to respond in whole to the memorandum and the hundreds of pages of exhibits that were attached thereto given that it was just filed this morning.

Are you prepared to proceed today with the detention hearing notwithstanding that or would you be requesting some more time to review and consider those -- those documents?

MR. CHESNOFF: Your Honor, considering the fact that he's been held for this many days when we believe that he should have been released and the report that we have from Pretrial Services, we'll -- we'll waive any defect in not being able to fully respond. We feel our arguments will cover enough of it to satisfy the Court, Your Honor.

THE COURT: All right.

All right. With that, then, I will hear from the Government regarding release or detention.

MR. WISE: Thank you, Your Honor.

The Government has moved for the defendant's detention

pursuant to 3142(f)(2)(A) and (B) because there is a serious risk the defendant will flee and a serious risk the defendant will obstruct justice. Applying the 3142(g) factors to the facts presented in the Government's memorandum in support of detention compels the conclusion that there are no conditions or combination of conditions that will reasonably assure the defendant's appearance. Therefore, pursuant to Section 3142(e) he should be detained pending trial.

As we outline in our papers, detention is appropriate where a defendant is either a danger to the community or a flight risk. It is not necessary for the Government to prove both. And while the former requires clear and convincing evidence, the latter is accomplished by a lower standard, by a preponderance of the evidence. And, again, as we cite in our memorandum, that means, and this is the District of Idaho case we cite, that the Government must demonstrate that it is more likely than not that there is a serious risk that the defendant will flee, not that it is more likely than not that the defendant will flee.

I'll briefly address the 3142(g) factors which we discuss at greater length in our memorandum. First as we outline, the nature and circumstances of the offense in this case support detention. In any situation, in any case, pretrial supervision is based on trust, and the defendant has demonstrated he can't be trusted. And this is something I'll

come back to.

Here, the defendant lied to his FBI handler after a nearly 10-year relationship. This is someone with whom he had nearly daily contact, somebody whom the defendant has described as family. If he's willing to betray someone under those circumstances, how can the Court have any confidence that he will provide truthful information to a Pretrial Services officer he has never met when his liberty is at stake?

As to the weight of the evidence against the defendant, and this is also summarized in -- in our papers and cites extensively to the speaking indictment, the evidence in this case will come from the defendant's own travel records, e-mail messages with his handler and others, and from travel records e-mails and messages with the individuals that he claimed participated in these meetings and phone calls where these outrageous allegations were made.

The trial won't be a swearing contest between the defendant and these witnesses, although witnesses will refute the defendant's story in no uncertain terms. But the Government's witnesses will be corroborated by these documents and other unimpeachable evidence, and the defendant's story won't be.

Turning to the history and characteristics of the defendant, Defense counsel asserts in his motion for pretrial release that Smirnov has significant ties to the United States,

but he does not. His family members live in Israel. He doesn't own any property here. He doesn't have a job here. According to his own motion for pretrial release, the only relation they can point to is a cousin in Florida, but that doesn't make for significant ties.

Now, while a consideration of these factors alone compels detention, the extraordinary characteristics of the defendant that we've outlined in our memorandum make it clear that there are no conditions that will reasonably assure his appearance. And I'll address these in more detail.

First, his self-professed claims of ties to foreign intelligence services including Russian intelligence; the between 3 million and $6 million in liquid funds he access to; three, the fact that he didn't disclose those assets to Pretrial Services or to the Court, and I'll address the defendant's recent reply on at least they only address the Pretrial Services disclosure and that, too, was deficient regardless of what's in their reply; and, finally, the fact that as a dual national he can obtain an Israeli passport at any time after he surrenders it.

Turning first to I think what is the most extraordinary feature of this defendant, his contacts with foreign intelligence. His contacts with foreign intelligence services, specifically Russian intelligence services and operatives, distinguish his case from the two cases cited by the defendant

in his motion for release, *Karni* and *Hanson*. And I would venture to guess that a situation like this has probably never been presented to the Court.

Those contacts are regular and recent. In our memorandum we quoted recently declassified FBI reporting summarizing the defendant's contact with Russian intelligence and others, and most notably his recent -- his most recent election disinformation story, the one he told the FBI in September 2023 about the Premier Palace Hotel in Kyiv and the recordings of Businessperson 1, came after he met with Russian intelligence.

Again, these contacts make this defendant different from other defendants who merely have foreign ties, and they heighten the risk of flight dramatically. And that is because he can use these contacts with foreign intelligence services to flee and to resettle overseas, something I would again venture to say is almost unique in the presentation of a defendant being considered for the pretrial release.

THE COURT: So let's say that happens. You don't think that the Federal Government would have the ability to find him and take action to bring him back? You think that these Russian ties that you're talking about are the type of people that would literally take him and secrete him from prosecution?

MR. WISE: If he were to resettle in Russian, we couldn't extradite him. Russian won't extradite under these

circumstances.

If he were to resettle in other -- in third countries, we couldn't extradite him. And so, yes, I think that is the case.

THE COURT: All right. Go ahead. I'll --

MR. WISE: That's even assuming we could find him. That's even assuming we could find him.

THE COURT: You think the long arm of the United States of America couldn't find him on this planet?

MR. WISE: Yes. I think the best thing we have going for us is the idea that people think we have that long arm, and having been in Government for 17 years, I'm routinely astonished at how short it is.

THE COURT: All right. Go ahead.

MR. WISE: The next factor that makes this defendant extraordinary is his access to funds and, worse, the fact that he didn't disclose these assets to Pretrial or to the Court last week.

Now, to be clear, the defendant's PSR says he has access to $6,500, $1,000 or $1,500 cash on hand and $5,000 in a checking account.

He actually has access to approximately $3 million in a -- in an account in the name of the Avalon Group where he is the sole signatory. We received a balance on that account as of this morning. It has $2,886,893.18. And contrary to what is in

the reply the Defense filed, this is not a business account. He uses it to pay personal expenses.

As we outlined in our filing, he's withdrawn $175,000 in cash out of it. He's transferred more than 2.6 million to his girlfriend who has then used that money to purchase the million dollar condominium they live in, to make credit card payments which is his primary means of paying these personal expenses in the amount of more than $100,000 in 2022, more than $275,000 in 2023, and there is no discernible business activity in this account nor can he or his girlfriend actually articulate what his business is.

The only personal checking account he appears to have has at last -- the last time we checked about $500 in it which is used only to make a very small recurring insurance payment. So this is his money. It is not the case that he was confused and thought this was a business account that he didn't have to disclose.

And, further, even if there was some confusion with Pretrial, which I submit there was not, these are his funds. We haven't seen the financial affidavit, but I have what -- I've seen what these financial affidavits that he filled out and submitted to Your Honor say. And it says: "Cash and bank accounts. Do you have any cash or money in savings or checking accounts?" Doesn't say personal accounts. Doesn't say business accounts. It says: "Cash or save" -- it says: "Cash or money

in savings or checking accounts." And he does.

THE COURT: Does the Government think -- well, let me ask first. Does the -- do you have any knowledge about what happens from the time of the arrest till the time of the initial appearance a few hours later?

MR. WISE: In what -- I'm sorry.

THE COURT: Well, just how the Pretrial interview goes and -- and the discussions and, you know, the time constraints that people are -- I mean, you're so certain that these are just blatant misrepresentations when there might have -- why wouldn't it possibly be confusion when he's just been arrested, he's been taken into custody, and somebody shows up and starts asking him questions?

MR. WISE: So if someone asked me what kind of funds I had access to and I had $3 million in an account and I told them I had $6,000 in an account, I think it would --

THE COURT: I don't know that they ask him what kind of funds he has access to. The questions are: Do you have a savings account? Do you have a checking account? And what's in them? I mean, I've sat in on these interviews for many, many years.

MR. WISE: And I think any defendant that was looking to be forthcoming would say, "I have this account that I use to pay my personal expenses out of. I have this account that I've transferred millions of dollars to the woman I live with to that

she's used to purchase the home we live in." I think -- I've heard these questions and I think they absolutely would call for this information.

THE COURT: Okay.

MR. WISE: And then when he sat in front of Your Honor and Your Honor asked him before appointing -- and as I said, we haven't seen the affidavit, but I'm fairly certain it didn't have $6 million on it or Your Honor wouldn't have appointed CJA for him. It says: "Do you have any cash or money or savings or checking accounts?" And he clearly did have that and he chose -- he chose not to disclose that information.

And, in addition, the balance in the DL -- what we refer to as the DL account as of today is an additional $3,784,218.51. And we see this pattern of him taking money out of the Avalon account, buying cashier's checks, giving it to DL. She then goes to a nearby branch within 30 minutes and deposit it, which makes it look like there's some kind of business relationship between her and this Avalon Group, but not with him.

THE COURT: Did you ever call Pretrial or reach out to Pretrial to ask about the circumstances of the questions to determine whether there might have been misunderstandings or that the questions weren't as direct so that it's not as clear in your mind that he's flat-out lying to them?

MR. WISE: Your Honor, my approach to Pretrial is that

they have a job to do as an agency of the Court, and I wouldn't be comfortable asking them to essentially become witnesses against the defendant under those circumstances. So I typical -- I haven't done that.

THE COURT: All right. Fair enough.

MR. WISE: But I think it is very clear that these are his funds as we outline --

THE COURT: Okay. So -- and you've made that clear in there. So move on past the funds. I understand that argument.

MR. WISE: And the other things -- you know, the other thing he said -- he made a number of statements to Pretrial that were untrue. He, for instance, said this condominium was leased by the girlfriend when we know in fact it was purchased by her with his funds. And Defense counsel even had to concede that in their -- in their filings. So we've got lies, sort of, big and small in his very first instance of interacting with the Court, when one would think you would err on the side of providing all of the information that might be necessary so that one might be released on conditions.

In short, the evidence that the defendant can't be trusted to abide by conditions and provide truthful information to Pretrial Services isn't speculation. He's shown that he can't be trusted by providing misinformation to his handler, and in his first interaction with Pretrial Services and the Court he withheld information that shows he has access to millions of

dollars that he could use if he were to flee the United States.

I'd like briefly now to turn, if Your Honor would like, or I can depending on how Your Honor -- the sequence, I can turn to some of the arguments made in the defendant's motion for pretrial release or I can wait until after they go, whatever Your Honor would prefer.

THE COURT: You argue how you feel appropriate.

MR. WISE: Sure.

So I'm not going to address all of the arguments. Some of them I think are -- are sort of on their face ones that I think I don't need to address, but the first -- the first thing I will note is that the defendant argues that the Government knew about Mr. Smirnov's alleged conduct for years, yet, took no steps to end his cooperation, seize his passports, or prosecute him for anything. And the Defense argues that should be kept firmly in mind when, as expected, the Government reverses course in this bail proceeding and suddenly protests that Mr. Smirnov now presents an extreme flight risk.

So the mistake the defendant makes is in thinking that the Government is a monolith. The FBI is divided into field offices and the Department of Justice and to U.S. Attorney's Offices. And while both organizations have some coordinating functions in Washington, they're limited.

And to be clear, in this case the defendant was the source for an agent based out of the Seattle field office and he

volunteered information about Burisma, volunteered, to that agent in 2017 which the agent recorded. Later in 2020 the FBI's Pittsburgh field office was conducting an assessment of information being provided by the public concerning the Ukraine, most notably Rudolph Giuliani, and reached out to the Seattle-based handler and asked him to interview the defendant about the defendant's 2017 reporting. And what the Seattle agent learned he reported back to the Pittsburgh Agent in June of 2020.

And -- and the FBI in Pittsburgh took some limited investigative steps, but their steps were limited by the fact that they were only conducting an assessment, which under FBI policies is not an investigation. And it prevents, for instance, the use of compulsory process like grand jury subpoenas or the compulsion of testimony. So based on that limited review, the FBI closed its assessment in August.

Fast-forward to July of 2023, that's when the FBI asked the U.S. Attorney's Office in the District of Delaware to assist in evaluating the claims in the 2020 1023. And in August the U.S. Attorney for the District of Delaware was made Special Counsel by the Attorney General. Also in August investigators in Delaware spoke with the defendant's handler for the first time, and then in September investigators in Delaware spoke with the defendant, again, for the first time.

After those meetings investigators began collecting

evidence on the defendant's allegations, including for the first time with the benefit of the grand jury. And it was through the use of the grand jury that investigators in Delaware learned that the defendant was lying. So it is not the case that the defendant -- that the Government knew he was lying back in 2020 and took no steps to address his conduct.

THE COURT: So what was the date, then, that you're saying you were aware that he was lying?

MR. WISE: Just this fall, in a run up to these charges. We first met with him in September --

THE COURT: That's the September 23rd -- September 2023 meeting you're talking about?

MR. WISE: Yes, Your Honor.

THE COURT: All right.

MR. WISE: That was the beginning -- after speaking with the handler in August that was really the beginning of the grand jury investigation, and then evidence was collected shortly thereafter that led to the presentation of these charges.

THE COURT: All right.

MR. WISE: Now, in addressing the 3142(g) factors, specifically the nature and seriousness of the offense, the defendants argues that "These allegations are make-weight and politically motivated. They do not involve espionage or theft and are, thus, not serious."

I didn't know what make-weight meant so I looked it up. According to Miriam Webster, the meaning of make-weight is something thrown into a scale to bring the weight to a desired value. I have no idea what that means in this context. Maybe Your Honor does.

And politically motivated, by whom? If Defense counsel is referring to his client's allegations, then we agree. His client's messages that are quoted in the indictment show political bias on his client's part.

Or is the -- is Defense counsel referring to us, the Government in this case? And that would certainly be curious. We're prosecuting Hunter Biden on tax and gun charges, and his lawyers make the unfounded claim that we're working at the direction of former President Trump and Congressional Republicans, although they can never explain why or how.

So then I guess what Defense counsel in this case is arguing is we're working at the direction --

THE COURT: Are you saying Mr. Chesnoff and Mr. Schonfeld said that in their pleadings?

MR. WISE: That's what they wrote. They wrote the charges in this case are make-weight and politically motivated.

THE COURT: So -- but where do they -- okay. But I -- you've taken that quite a bit beyond that they're saying -- what did you just say was ...

MR. WISE: Well, I'm trying to figure out -- it sounds

like they're saying we're working at the direction of the White House and the Biden campaign. And the other cases --

THE COURT: Is that a leap?

MR. WISE: And the other cases --

THE COURT: I guess you don't --

MR. WISE: -- the Defense counsels are making the opposite argument.

THE COURT: Well --

MR. WISE: So we're sort of curious which it is.

THE COURT: Well, and I'm not getting into the politics of this. I have to make a determination under the Bail Reform Act whether he's a flight risk or a danger and whether, if he is, there are conditions or a combination of conditions to address that.

MR. WISE: Right.

THE COURT: So I have no time for the politics of this case. I understand the underlying charges. There's a component to that. But I'm not going to spend a lot of time here talking about the politics.

MR. WISE: Good. Because when we saw that, we were shocked that he would make the accusations --

THE COURT: So go on and continue with your argument.

MR. WISE: Now, the Defense counsel calls the charges not serious, which begs the question is he serious. The defendant's lies have captured --

THE COURT: All right. I'm not going to get personal with the attacks on counsel. All right? Let's keep it to the facts and the law. You don't need to make snide remarks about "is he serious." And I'm not going to tolerate that from either side.

MR. WISE: Understood, Your Honor.

The defendant's lies in this case have captured the national imagination. And while the -- while the filing says they do not involve espionage, of course the charges do involve foreign intelligence services. The defendant claims to have met with Russian intelligence agencies on multiple occasions, and the U.S. intelligence community has concluded that Russian intelligence interfered in the 2020 election and continues to interfere in our elections by spreading misinformation.

And I can supplement the record with these two public reports, but in January of 2017 the Office of the Director of National Intelligence made public a declassified version of a highly classified assessment regarding Russia's efforts to interfere in the 2016 presidential election. And in 2020 the ODNI published a similar declassified report regarding the 2020 U.S. presidential election. And one of the key judgments of that report, which was expressed with high confidence, was that Putin authorized and a range of Government organize -- and a range of Russian government organizations conducted influence operations aimed at denigrating President Biden's candidacy and

the Democratic Party, supporting former President Trump, undermining public confidence in the electoral process, and exacerbating sociopolitical divisions in the United States. And that's a quote from that report that we can file as a supplement to the direct -- for the record.

Now, the defendant also argues for release, in part, based on where the defendant is currently housed. That's premised on the idea that he'll actually stay in that location, and I don't think that's correct. I think he was brought to that location temporarily, but if he were detained, I believe he would be detained in the Central District of California, not in the District of Nevada. And so whatever the conditions are at that facility I don't think bear on --

THE COURT: I think that's correct. If he's detained, he'll under Rule 5 be transferred to the Central District of California and they'll have the decision as to where he's housed and incarcerated -- or detained. I shouldn't say incarcerated. Detained pending trial. But go ahead.

MR. WISE: And the issue -- and this came up in the previous hearing. You know, the issue of the defendant's -- where he is detained, the conditions under which he is detained, those are all things that the Marshals or the Bureau of Prisons or we can work with Defense counsel to address. They are not factors that the law or the statute recognizes as bearing on whether he poses a risk of flight or whether there are

conditions that can reasonably assure his appearance.

In the last hearing we discussed the fact that he is, as the indictment makes clear, or was a confidential informant. And we take -- we take security seriously. We take safety seriously. And those -- those issues need to be addressed and will be addressed, but none of that bears on the determination of whether he poses a serious risk of flight which for all of the reasons we identify in our motion we believe he does.

THE COURT: And why -- there's no addressing -- and I think I know the answer, but I'd like to hear it from you -- no addressing the conditions that Pretrial suggests and why, you know, with the idea that it's -- Bail Reform Act, it's the least restrictive, you know, that I have to consider and the least restrictive conditions. Why won't some of the things that they recommended address these things? Is it just the trust issue or is there something more?

MR. WISE: So the trust issue is at the heart of it, Your Honor, but as we said, I mean, when you combine the resources he has access to, the fact that he can travel internationally on the second passport -- and as we point out, there is -- there is literally no way to prevent that. And this is a problem that's present with dual nationals where they can go into a consulate. They can say they lost their passport. They'll be issued another passport. There's no way that the Government -- our Government learns of that. There's no way

that there can be a stop at the border over that. It simply is --

THE COURT: What if I put geographical limits on where he can go and we monitor that so that the minute he leaves Clark County Pretrial's notified of that?

MR. WISE: My understanding of the technology is that it's not that -- it is limited, that there are lags, that there are -- you know, that the geographic space is not tight enough to know if someone is in an airport as opposed to some other location.

My experience with that is not that it's as precise as one would -- would think or hope.

THE COURT: All right. All right.

MR. WISE: But as I said, Your Honor, you know, usually the arguments are someone's whole family is here, their whole life is here, their job is here, this is where their, you know, livelihood comes from. We've seen none of that in this case. And that's why to answer Your Honor's question, I think -- I think the conditions simply -- simply don't reasonably assure his appearance.

And if -- if we could -- I mean, Defense counsel when he called me on Friday said, "Is there some" -- "Are there some conditions that we could agree on?" If we could, we would. I mean, this is not hyperbole. If we thought there was some way that we could reasonably assure that he would appear in this

proceeding, that would be where we'd go. But in light of the contact with foreign intelligence, in light of the $6 million in funds, in light of our experience so far with him, we simply don't believe that's the case.

THE COURT: All right. Thank you very much.

MR. WISE: Thank you, Your Honor.

THE COURT: Mr. Chesnoff, Mr. Schonfeld. One or the other, not both, please.

MR. CHESNOFF: May it please the Court.

Your Honor, it's amazing to me that the question the Court asked about the power of the Government to find somebody is so limited that to have the Government's position adopted by the Court would mean that nobody who they are concerned could run ever gets out. And that's not the Ninth Circuit law. The Court is well aware it's the least restrictive. The idea that someone cannot be geographically controlled, I've had multiple cases, as the Court knows, where people have been restricted not to go to a bus station, not to go to an airport, not to rent a car.

I have with me, Your Honor, his Israeli passport which I secured so that we could give it to Pretrial. The idea that the Court cannot make a condition that says you are not to apply for a new passport, U.S. or Israeli, happens all the time, Your Honor. Judges impose those conditions. If the Court could not impose those conditions, the Bail Reform Act, *Motamedi* and all

of its progeny, would have no meaning at all, at all.

I'm old enough, Your Honor, to have remembered when the Bail Reform Act was enacted in 1984. I did a deep dig into the legislative history. The legislative history of the Bail Reform Act, it was created to protect flight and danger from a small and discrete group of people, either violent offenders, people with prior records, people who had history of not showing up in court.

We have a gentleman who's an American citizen. He has an Israeli passport as well which he's willing to turn in. He's lived in L.A. where this case is for 16 years. He's lived here for two years. He lives with his significant other who's present in court.

I -- I -- the Court observed the idea of what happened in the beginning. His English is better than hers, but it's not the best. I don't think an interpreter was supplied to him during any of the interviews. I know for a fact that when his significant other spoke to Pretrial, she had the limited ability to communicate. I got her in my office. I got someone who spoke Russian. She then gave all the right and truthful answers to Pretrial Services.

Your Honor, we asked Pretrial Services about this question of financial disclosure because when we read their motion this morning, both Mr. Schonfeld and I said, "What happened here?" So we contacted the Pretrial officer. We asked

to meet with her. And we asked her specifically, "Did you ask him about any other account than a personal account?" And the officer was candid and said no. It's exactly why my client answered the question the way he did because he was not asked about anything else.

THE COURT: What about Mr. Wise's point, and I think there's some legitimacy to it, that, you know, you're in there talking that maybe he thinks, "Well, should I talk about these other accounts? You know, they're asking me about money" --

MR. CHESNOFF: Perhaps, if I had been there with him, Your Honor, because he didn't have counsel with him, I wasn't there, then those issues would be ferreted out. We would have explained to him the importance of being as complete as possible. But in this instance it was completely not his fault that the question was not asked, and he responded truthfully to the question.

Their suggestion that somehow that should lead the Court to question his overall truthfulness considering the context, the language, the fact that the Pretrial officer made her own evaluation of him when she spoke to him and has recommended to you that he be released, answers that question in my opinion, Your Honor.

Your Honor, the fact that they can document foreign travel, the Court can't lose sight of the fact that a lot of the foreign travel was at their behest. So it's kind of like a

catch 22. We're going to let you go there. We're going to send you there. We're going to use you for our purposes, which is what they did. And now they turn around and tell Your Honor, "See, he travels everywhere."

The other thing that they said was that the handler somehow found out now that he was untruthful. But for 10 years, Your Honor, apparently, he was truthful. Now, the question of whether he's not truthful now has not been decided. And as the Court knows, that's a factual question which is the least important factor that this Court should consider. And I can tell you, Your Honor, that there will be a vehement defense to the argument that in fact he was not truthful. He had this personal relationship with the handler. It was so personal, Your Honor, that he wouldn't even call him on his FBI phone; he would call him on his personal phone. So we're going to dig down once we start defending this case and we're going to find out who knew what when.

Now, when we made the suggestion, Your Honor, that he deserves to be out because of the fact that he needs to defend himself and the housing situation, I can tell you, Your Honor, I visited the MDC in L.A. for years representing clients. The conditions there are even tougher than the conditions in Pahrump vis-à-vis attorneys. The waiting period of time sometimes to see a client is hours upon hours.

If they are going to have him in PC like they do in

Pahrump, which I assume they will since they've managed to put out to the entire world his cooperation without any concern for his safety, but ultimately he is safer out as opposed to being in a detention facility in a major metropolitan city where I can tell you, Your Honor, I would be concerned about his safety.

THE COURT: I know there's constitutional considerations when it talks -- you know, when we consider his right to meet with counsel and prepare for trial and look at documents. But how does that play into the Bail Reform Act and my decision that I have to make?

MR. CHESNOFF: I can tell you, Your Honor.

It's almost a due process question that comes into conflict maybe with just looking at the Bail Reform Act as the only thing the Court considers. I cited to a case called *U.S. v. Kinney* where a State Court was holding somebody, and the Court decided that because of social reality it would be harder for a Defense attorney to speak to witnesses because the defendant came from a community that was foreign to the Defense lawyer.

In this case, Your Honor, we are going to need to speak to people in foreign countries that don't speak English, that speak Russian. Not to have the -- and I can tell you, Your Honor, the MDC in L.A. is not going to allow us to be calling Kyiv from the MDC with our client to speak to people.

So the -- the harm to him in defending himself against

-- and, Your Honor, when we say "not serious," obviously we're in Federal Court. It's a federal crime. What we're talking about, Your Honor, is this. Our guideline calculations show that at a max he's looking at three years. So when I say "not serious," it's not 10 years.

Why would somebody risk a bail jumping charge on top of really an admission of guilt by fleeing when in reality the maximum punishment at the best with the guidelines is three years? It's even lower without all the potential enhancements. It's absurd, Your Honor.

The only reason they want to keep him in is so that he cannot defend himself in a way which shows that the allegations that are being made against him are being made for whatever the Bureau's reasons, whatever Justice's reasons are. But he has a right, Your Honor, to straighten the record out as far as he's concerned, especially in light of the 10 years of service that he gave to the United States Government and to the people of the United States.

So to hold him in custody and restrict his ability to truly defend himself on a case where he's looking at 20 months, Your Honor, I -- I can't even really comprehend it.

THE COURT: So when you said "serious" or "not serious" in your pleading, you were referring to the amount of time and the potential exposure as opposed to the underlying --

MR. CHESNOFF: Yeah.

THE COURT: -- current of the case and the political ramifications?

MR. CHESNOFF: You know me -- known me a long time. I'm not belittling the seriousness that the Government feels about this. What I was talking about is the seriousness in terms of the ultimate --

THE COURT: Potential.

MR. CHESNOFF: -- potential problem.

(Defense conferring.)

MR. CHESNOFF: Mr. Schonfeld points out to me it's also not a presumption case, Your Honor, and that bespeaks the recommendation that has been made by Pretrial.

Court's indulgence.

(Pause.)

MR. CHESNOFF: Your Honor, every condition that's required by the Ninth Circuit law in terms of history, no drug usage, no alcohol, none of the things that are indicia of danger or flight exists. There's not a single representation, Your Honor, that he's ever committed a violent act, nothing, in the 10 years of his service with the FBI.

THE COURT: What -- you know, they raise a good point about being concerned about his access -- so let's set aside the disclosures to Pretrial and whether or not the circumstances rise to the level of he's not trustworthy such that I'll detain him. That will be something I address here in a moment.

But really, I mean, it's legitimate to say he's got access to a lot of money and he knows a lot of people that might be willing to help him out. I mean, how do I address those concerns that the Government's raised?

MR. CHESNOFF: Your Honor, he's on electronic monitoring. He's at -- we've offered, we suggest, third-party custodian. His lady friend is present in court. I've explained to her the implications of that, that she has an obligation to the Court if in fact he is doing anything that he's not supposed to do. I don't know what more you can do other than -- Your Honor, anybody can -- anybody can run. That's a fact. The fact that he has connections overseas, that can be addressed by the Court in terms of the conditions it sets: You stay -- this is where you're staying. This is what you're wearing.

Your Honor, you can even limit in terms of phone usage if you want, Your Honor. There are things that can be done, but the idea that somehow he's going to escape and the United States Government is not going to find him, I mean, they got I don't know how many people are here --

THE COURT: Yes, but counsel raises a good point that even though they know he's in Russia, they can't get him back.

MR. CHESNOFF: Well, I have a feeling the idea of him going to Russia is not really such a good idea for him since they've revealed that he helped the United States vis-à-vis Ukraine, and I don't think Russia's going to be too happy about

that.

THE COURT: Well, that's -- that's a relevant point. All right. Go ahead.

MR. CHESNOFF: Your Honor, I -- I think that the Court should follow the recommendation. I think that the Court understands that this is a situation where a man deserves an opportunity to truly defend himself. And he's never shown anybody that he has any disrespect for a courtroom or a Court. And the question of the veracity issue, that's the try -- that's the case, but that's not been proven. We just had a -- that's not proven.

THE COURT: All right.

MR. CHESNOFF: Thank you, Your Honor.

THE COURT: All right, Mr. Wise. Anything in response?

MR. WISE: Just briefly, Your Honor.

Counsel started with saying -- holding up the Israeli passport saying, "Well, the Court can impose a condition that you can't get a new passport." But of course the issue is you can impose the condition, but you can't police it. And that's what makes the problem of dual nationality particularly unique.

As to the question of a GPS anklet or bracelet, in addition to the technology not being as precise as one might assume in 2024, defendants can and do cut them off and then they alarm, but it's not like law enforcement can instantly respond. And in any location that's near a major city with an

international airport, the amount of response time is usually not -- is usually not short enough that it would prevent someone from going to an international airport or a location where they could -- where they could use air travel.

Counsel mentioned that the foreign -- what he calls the foreign travel was at our behest. Well, let me be very clear this -- we're not talking about foreign travel. What we point out is that the defendant self -- he claims himself to have all of these contacts with foreign intelligence services. He volunteers that information to the handler.

And, for instance, this most recent trip where he came back with this new disinformation story was absolutely of his own doing. And -- and he pushed that story when we met with him in September, and it shows that the bad conduct is not, as counsel says in their memorandum, limited to 2020. It is much more recent and much more -- and much more pronounced.

Counsel says, you know, that the Court can somehow address how he could have contact with overseas witness -- with folks overseas. I have no idea how that could be addressed by a court in the United States whose jurisdiction is limited to the United States. Counsel said there could be limits on phone usage. You can go to a kiosk in a mall and buy a burner phone. He was actually communicating over Signal and Telegram. Those are web-based applications that the Court would have no ability to police or prevent.

You know, while counsel claims, I guess -- I mean, in addition -- and I hear him say now that the "serious" comment was about the -- the sentence, but that's -- that's not actually what he wrote. He wrote: "These allegations are make-weight and politically motivated. They do not involve espionage or theft and are, thus, not serious."

That's -- that's his words. And he -- he actually ascribes bad motives to us. He says the only reason we want to keep him in is so that he can't defend himself, and he mentioned improper motives of the Bureau. I wasn't quite following what he meant.

MR. CHESNOFF: Your Honor, could you ask him to stop? Like, suggest -- enough is enough.

THE COURT: I'm allowing some leeway. Let's finish the argument.

Counsel.

MR. WISE: Third-party custodians that are wives or intimate partners are in the worst possible position one could be in. And I've seen this in case after case. To ask someone to --

THE COURT: I'm not going to do a third party. If I release, that's not going to be a condition so go ahead.

MR. WISE: Okay. Putting someone in that position I think is really untenable.

So I don't think that any of the -- any of the

suggestions that counsel make even come close to addressing the risks that this defendant presents for all the reasons we've outlined.

THE COURT: All right. Thank you.

Mr. Chesnoff, briefly.

MR. CHESNOFF: Yeah, just briefly. It's not just Chesnoff who says it; it's Pretrial that says it, Your Honor.

THE COURT: On the release?

MR. CHESNOFF: Yeah.

THE COURT: Understood. All right.

(Pause.)

THE COURT: Well, as the parties know, my decision is based upon what the Bail Reform Act tells me to consider and to apply to this particular case and this particular defendant, Mr. Smirnov, and his personal characteristics and history. There's two prongs to that. The first -- or I'll take the second which is generally the second, which is the danger prong, requires the Government to provide evidence of clear and convincing evidence that he's a danger to the community. That's not what they've asked or argued, and that's not what any of the parties have raised.

And so while one may argue the underlying politics of the case or the danger to our system as a whole or to the free elections or some of those issues, and while those may be issues that are ripe for intelligent, honest discussion, they aren't a

consideration for this Court under the Bail Reform Act as it relates to clear and convincing evidence of danger.

And so I don't find that Mr. Smirnov is a danger notwithstanding the underlying allegations. I know the Pretrial report suggested that he could be a danger based upon the underlying allegations. And as the parties have acknowledged, Mr. Chesnoff has argued, and I've stated, the underlying facts under Ninth Circuit case law are the least important factor of all of the other factors to consider, except on the level that it relates to the trust factor that the Government argues.

And so in terms of considering Mr. Smirnov's underlying actions, I think they do come into this idea of whether or not he can be trusted to the point where I would release him.

I think it's pretty clear to this Court that Mr. Smirnov is a flight risk by a preponderance of the evidence. His dual citizenship, his possession of passports, his foreign ties, his extensive foreign travel, and some questions about his employment and where he makes his money I think clearly rise to the level that he's a risk of nonappearance by a preponderance of the evidence. The bigger question, obviously, is whether or not there are conditions or a combination of conditions that can address those concerns.

I do have concerns about his access to money and -- and some of the representations made to Pretrial on Thursday, but I also place those in the context of the case insofar as the

language issue, the nature of the Pretrial interviews and how quickly they occur, he did not have counsel at the time, the context in which the questions were asked. I don't know that that rises to the level that I'm convinced that he was sitting there Thursday morning intentionally lying to Pretrial to keep them from knowing about his finances. I just -- I don't know that it rises to that level.

The other concern, obviously, is the allegations and his relationship with his handler. I will tell you I cannot even begin to understand or know what goes on in a relationship between an FBI handler and somebody who's cooperating and the dynamics of that relationship. I would suspect it gets close. I don't know how it couldn't when you're working that close with people.

I do on some level, like Mr. Chesnoff noted, recognize that how he deals with his handler and the FBI and how they're dealing with him in that complicated context would probably be different than how he would treat a Court order or a Court decision and whether or not the lack of trust he showed according to the Government with his handler would rise to the level of a lack of trust that he would not follow my orders or violate them if I gave him that chance. I'm not convinced of that given the complex nature of that relationship.

The Government has argued the nature and circumstances of the offense. They put about a quarter of their 28-page brief

to discuss the nature and circumstances and the weight of the evidence. And, again, those are the least important factors for the Court to consider. And they argue that his ties to the community are weak, and they've argued that both in their pleading and here today such that there are no condition or combination of conditions that would address that. And then they raise the four others.

I -- you know, I understand the concern about foreign intelligence agencies potentially resettling Mr. Smirnov outside of the United States, his connections to them, but I think on some level that's speculative as well because, as Mr. Chesnoff points out, I don't know what Mr. Smirnov will be thought of in Russia, but my guess is at this stage he probably thinks that's not the most attractive place to go either if he was in fact inclined to go hide somewhere.

So while I notice and note that that's a concern and certainly raised by the Government that I should consider it, I just don't know in the context of what's happened in the last couple of weeks with his arrest and everything else that that is as grave a concern as the Government outlines.

I've already addressed the concern about the money, and I'll have to make a decision here whether or not his access to those funds can be addressed with conditions. I've already addressed his disclosure of those and how that came about to Pretrial and the context in which I am placing that in. And

then the Government argues that as a dual citizen he can walk into an Israeli consulate and obtain a passport and be gone. And, again, the question is are there conditions that can address that.

As the parties may or may not know, this Court, as do most courts across the country, when making these decisions puts a lot of stock into Pretrial Services and their investigation and their recommendations and their belief about whether or not they believe somebody can be supervised with conditions. And in this case Pretrial Services believes notwithstanding some of the issues that the Government's raised, and they acknowledge those issues, they believe that Mr. Smirnov can be supervised and that there are conditions that can be placed upon him if I were to consider his release today. And so that carries weight with the Court as well. As Mr. Chesnoff points out, it's not just Mr. Chesnoff saying his client should be released, but Pretrial Services believes that conditions can be fashioned.

And, again, I recognize the underlying political ramifications of this investigation in this case and what the Government believes the effect on our country and on our elections that this might have had. But, again, other than how that relates to the trust issue, which I've discussed, and as it relates to his relationship with his handler, I'm not sure that those factors are of huge importance to the Court in making my determination.

So, Mr. Smirnov, you know, there's a lot of different issues here. But I do think that I can fashion conditions for your release. You may or may not make a mockery of me when I do that, but that's not for my consideration either. And when I say "mockery," meaning you don't follow the conditions or you flee. And so I recognize that the Government's made some arguments, but I think that despite those conditions can be fashioned.

But as you now know, under the Bail Reform Act -- and this may not be the end of it. They may decide to appeal this. But under the Bail Reform Act you can be detained, and in a case like this, as Mr. Chesnoff has referenced, it could be a lot of time before they can be ready for a trial and that could be a long time that you're detained while that's pending.

I'm finding today that the Government has not met their burden as it relates to conditions because I believe that conditions can be fashioned because Pretrial believes that, and so I'm going to give you that opportunity.

But if you come back before this Court or a Court in the Central District of California, I can assure you that if it is proven you have violated any of those conditions, there will not be any hesitation to revoke your release and to remand you to custody. And listen to the conditions because there's going to be some more that are not in the Pretrial report.

And I want to ask Pretrial, if we do the monitor travel

restrictions, I know Clark County is easier because of the different municipalities, but can we restrict him from the international airport as well?

OFFICER MCKILLIP: Yes, Your Honor. We can put an exclusion zone around the airport so if he goes into the area of the airport, we will get notified.

THE COURT: And that would be, say, without prior permission. So that if he with his lawyers say, "We're going to L.A. to appear or we're going to L.A. to work on the case, we'll be in the airport," that's something you can monitor as well?

OFFICER MCKILLIP: Yes, Your Honor, as long as he tells us beforehand.

THE COURT: Right.

All right. I'm going to release you on your personal recognizance, which is just your signature and promise to appear in court and to follow these conditions. If you do not, that will be revoked and you will be detained.

You will have time to go over these conditions with your officer and with your lawyers. I'm going to go through them somewhat quickly. If you don't understand everything, you will have time to talk to them and make sure you understand.

First, you're to submit to supervision by Pretrial Services. You should report immediately to their office and follow their direction for supervision.

I'm going to allow them to order you to seek

employment. I have -- you're not going to be able to continue with your consulting business while this case is pending. You're going to have to figure out some other way to conduct business because I'm not going to allow foreign travel. In fact, I'm not going to allow any travel. So you need to seek employment that Pretrial approves and that's appropriate while this case is pending.

You're to surrender your U.S. passport and your Israeli passport to Pretrial Services immediately. I believe that the Government took your United States passport. Mr. Chesnoff has your Israeli passport. He shall give that to Ms. McKillip upon the conclusion of this hearing.

Number four, you shall not obtain a passport or any other international travel documents. Number five, I'm going to order you that your travel is restricted to Clark County, Nevada. And the reason I say "Clark County" is it's too difficult if you're in Las Vegas and you cross into Henderson or you cross into North Las Vegas, that could create an issue. So I'm going to allow the travel in Clark County alone and exclude you from the airport.

So if you are in the zone of the airport, and they'll explain the zones, they will be notified immediately. Government counsel may be correct that they can't do anything quickly, but my guess is they will try. So you are not allowed to go to that airport.

You can go to Los Angeles for court appearances in this case and to prepare your case, but for no other reason. So while this case is pending, you're in Clark County, Nevada.

You are to avoid all contact directly or indirectly with any person who is or may be a victim or witness in the investigation or prosecution, and the Government will provide a list to you of who that is.

As it relates to the travel restriction, I'm going to order stand-alone monitoring with GPS. And again, as I've indicated, that will be restricted to Clark County and you will not be allowed to go to the airport.

We need a tampering restriction on that, don't we, Ms. McKillip? I think I might have one.

(Pause.)

OFFICER MCKILLIP: Yes, Your Honor. The defendant shall not tamper with, damage, or remove the monitoring device and shall charge the equipment according to the instructions provided by Pretrial Services.

THE COURT: All right. And, next, the defendant shall pay all or part of the costs of the location monitoring program based upon his ability to pay as determined by Pretrial Services or the supervising officer.

Ms. McKillip, do -- does Pretrial request any additional conditions to address the concerns that have been raised here today?

OFFICER MCKILLIP: No, Your Honor, but just in reference to the condition about not allowed to go to the airport, we would just ask without prior permission just so that he could get there --

THE COURT: Yes.

OFFICER MCKILLIP: -- to California for court.

THE COURT: Yes, without prior permission. But, again, the airport for that will only be to go to Los Angeles for court appearances, unless you find a need during the course of preparation for the defense that you need to travel somewhere else. But that will have to be outlined and get Court approval, Mr. Chesnoff.

MR. CHESNOFF: We will file whatever is appropriate, Your Honor.

THE COURT: All right.

All right. Mr. Chesnoff, Mr. Schonfeld, any questions about these conditions?

MR. CHESNOFF: No thank you, Your Honor.

THE COURT: Mr. Smirnov, any questions about these conditions?

THE DEFENDANT: No.

THE COURT: All right. Anything else from the Government, Mr. Wise?

MR. WISE: Your Honor, we would request -- respectfully request that you stay your order so that the Government can file

a motion for review in the court of original jurisdiction in the Central District of California before Judge Wright which we will do promptly.

THE COURT: All right. That will be denied.

Anything else?

MR. WISE: No, Your Honor.

THE COURT: Mr. Chesnoff, anything else?

MR. CHESNOFF: No. Have a nice afternoon, Your Honor.

THE COURT: All right. Court will be in recess.

MR. SCHONFELD: Thank you.

(Whereupon the proceedings concluded at 4:01 p.m.)

--oOo--

I, Patricia L. Ganci, court-approved transcriber, certify that the foregoing is a correct transcript transcribed from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ PATRICIA L. GANCI — Patricia L. Ganci

FEBRUARY 20, 2024 — Date

(229 of 420), Page 229 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 229 of 420

**EXHIBIT**
**2**

AA000223

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, PLAINTIFF, v. ALEXANDER SMIRNOV, DEFENDANT | CASE NUMBER: CR 24-00091-ODW |
|---|---|
| | **WARRANT FOR ARREST** |

To: UNITED STATES MARSHAL AND ANY AUTHORIZED UNITED STATES OFFICER

**YOU ARE HEREBY COMMANDED** to arrest **ALEXANDER SMIRNOV** and bring him forthwith to District Judge, Otis D. Wright, II, to answer an Indictment charging him with False Statement to Federal Law Enforcement, in violation of Title 18, United States Code, Section 1001, and Creating a False or Fictitious Record, in violation of Title 18 United States Code, Section 1519.

REC: Principal Senior Assistant Counsel Leo J. Wise
Senior Assistant Special Counsel Derek H. Hines

Brian D. Karth
NAME OF ISSUING OFFICER

TITLE OF ISSUING OFFICER

[signature]
SIGNATURE OF DEPUTY CLERK

February 22, 2024 Los Angeles, CA
DATE AND LOCATION OF ISSUANCE

By: Hon. Otis D. Wright, II
NAME OF JUDICIAL OFFICER

**RETURN**

THIS WARRANT WAS RECEIVED AND EXECUTED WITH THE ARREST OF THE ABOVE-NAMED DEFENDANT AT (LOCATION)

DATE RECEIVED

NAME OF ARRESTING OFFICER

DATE OF ARREST

TITLE

DESCRIPTIVE INFORMATION FOR DEFENDANT CONTAINED ON PAGE TWO

SIGNATURE OF ARRESTING OFFICER

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of February, 2024, I caused the forgoing document to be filed electronically with the Clerk of the Court through the CM/ECF system for filing; and served on counsel of record via the Court's CM/ECF system.

____/s/ Rosemary Reyes__________________
Employee of Chesnoff & Schonfeld

# EXHIBIT H

## DEFENDANT'S EMERGENCY MOTION FOR COURT ORDER DIRECTING THE UNITED STATES MARSHAL SERVICE TO KEEP THE DEFENDANT IN THIS DISTRICT PENDING DISPOSITION OF DEFENDANT'S EMERGENCY MOTION FOR IMMEDIATE DETENTION HEARING AND RELEASE ON PREVIOUSLY IMPOSED CONDITIONS - Filed on February 22, 2024

2:24-mj-00166-DJA-1

DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant, ALEXANDER SMIRNOV

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * * * * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALEXANDER SMIRNOV,

Defendant,

CASE NO. 2:24-MJ-00166-DJA

**DEFENDANT'S EMEREGENCY MOTION FOR COURT ORDER DIRECTING THE UNITED STATES MARSHAL SERVICE TO KEEP THE DEFENDANT IN THIS DISTRICT PENDING DISPOSITION OF DEFENDANT'S EMERGENCY MOTION FOR IMMEDIATE DETENTION HEARING AND RELEASE ON PREVIOUSLY IMPOSED CONDITIONS**

COMES NOW, Defendant, ALEXANDER SMIRNOV ("Mr. Smirnov"), by and through his attorneys, DAVID Z. CHESNOFF, ESQ., and RICHARD A. SCHONFELD, ESQ., of the law firm of CHESNOFF & SCHONFELD and hereby moves this Honorable Court for an Order Directing the United States Marshal Service to Keep the Defendant in this District Pending

Disposition of Defendant's Emergency Motion for Immediate Detention Hearing and Release on Previously Imposed Conditions.

Dated this 22nd day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ Richard A. Schonfeld

DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant ALEXANDER SMIRNOV

**MEMORANDUM OF POINTS AND AUTHORITIES**

On February 22, 2024, Defendant filed his Emergency Motion for Immediate Detention Hearing and Release on Previously Imposed Conditions. In that Motion the Defendant requested that the Court enter an interim order directing the United States Marshal Service to keep Mr. Smirnov in this District pending his Rule 5 hearing. *See*, Motion page 5 number 16.

On February 22, 2024, this Honorable Court entered a Minute Order directing the Government to respond to the Motion by February 23, 2024 at 4:30 P.M. PST. The Minute Order does not address the request that Mr. Smirnov remain in this District and there is a reasonable concern that the United States Marshal Service may transport the Defendant to the Central District of California prior to this Honorable Court ruling on the Emergency Motion. No hearing has been set on the review of Mr. Smirnov's release status in the Central District of California.

Accordingly, it is respectfully requested that the Honorable Court enter an Order directing the United States Marshal Service to keep Mr. Smirnov in this District pending disposition of the Emergency Motion.

DATED this 22nd day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ Richard A. Schonfeld
DAVID Z. CHESNOFF, ESQ.
RICHARD A. SCHONFELD, ESQ.
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of February, 2024, I caused the forgoing document to be filed electronically with the Clerk of the Court through the CM/ECF system for filing; and served on counsel of record via the Court's CM/ECF system.

/s/ Rosemary Reyes
Employee of Chesnoff & Schonfeld

# EXHIBIT I

# ORDER SETTING HEARING ON GOVERNMENT MOTION FOR REVIEW OF RELEASE ORDER

- Filed on February 22, 2024

2:24-CR-91-ODW

# United States District Court
# For The Central District of California

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Plaintiff,<br>v.<br>**ALEXANDER SMIRNOV**<br>Defendant. | **2:24-CR-00091-ODW (CACD)**<br>**2:24-MJ-00166-DJA (DIST OF NEV)**<br><br>**ORDER SETTING HEARING ON GOVERNMENT MOTION FOR REVIEW OF RELEASE ORDER**<br><br>**(UNDER SEAL)** |

It has come to this Court's attention that counsel for defendant has sought an emergency hearing in the District of Nevada to arrange the release of Defendant Smirnov, likely to facilitate his absconding from the United States.

Defendant has been indicted by a grand jury sitting in the Central District of California. He was arrested on February 14, 2024 in the District of Nevada upon his arrival in the United States following an international flight. He was promptly brought before a magistrate judge who, while agreeing that the government had established a probability of Defendant fleeing the jurisdiction, but disagreeing that no conditions nor combination of conditions could be fashioned to assure his appearance for trial or other mandated court appearances. The

magistrate judge then issued an order for Defendant's release, with conditions.

The government then sought reconsideration or re-examination by this Court of the Nevada release order. That motion for reconsideration has been granted and this Court issued an arrest warrant specifying that upon his arrest Defendant should be brought promptly to **this** Court. Indeed, at 9:00 a.m. Monday, February 26, 2024 the USMS is to bring Defendant to courtroom 5-D located at the First Street Courthouse located at 350 West 1st Street, Los Angeles, CA for a detention hearing.

**The U.S. Marshal Service is advised there is to be no deviation from this Order.**

DATED February 22, 2024

OTIS D. WRIGHT, II DISTRICT JUDGE

EXHIBIT J

WARRANT FOR ARREST
- Issued on February 22, 2024

2:24-CR-91-ODW

NFPV

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>PLAINTIFF,<br>v.<br>ALEXANDER SMIRNOV,<br>DEFENDANT | CASE NUMBER: CR 24-00091-ODW<br><br>**WARRANT FOR ARREST** |

To: UNITED STATES MARSHAL AND ANY AUTHORIZED UNITED STATES OFFICER

**YOU ARE HEREBY COMMANDED** to arrest **ALEXANDER SMIRNOV** and bring him forthwith to District Judge, Otis D. Wright, II, to answer an Indictment charging him with False Statement to Federal Law Enforcement, in violation of Title 18, United States Code, Section 1001, and Creating a False or Fictitious Record, in violation of Title 18 United States Code, Section 1519.

REC: Principal Senior Assistant Counsel Leo J. Wise
Senior Assistant Special Counsel Derek H. Hines

Brian D. Karth
NAME OF ISSUING OFFICER

TITLE OF ISSUING OFFICER

Adrila English
SIGNATURE OF DEPUTY CLERK

February 22, 2024 Los Angeles, CA
DATE AND LOCATION OF ISSUANCE

By: Hon. Otis D. Wright, II
NAME OF JUDICIAL OFFICER

## RETURN

THIS WARRANT WAS RECEIVED AND EXECUTED WITH THE ARREST OF THE ABOVE-NAMED DEFENDANT AT (LOCATION)

DATE RECEIVED

NAME OF ARRESTING OFFICER

DATE OF ARREST

TITLE

DESCRIPTIVE INFORMATION FOR DEFENDANT CONTAINED ON PAGE TWO

SIGNATURE OF ARRESTING OFFICER

EXHIBIT K

DEFENDANT'S APPEARANCE BOND
- Filed on February 20, 2024

2:24-mj-00166-DJA-1

# UNITED STATES DISTRICT COURT

for the

District of Nevada

United States of America
v.
ALEXANDER SMIRNOV
*Defendant*

Case No. 2:24-mj-166-DJA

## APPEARANCE BOND

### Defendant's Agreement

I, ALEXANDER SMIRNOV *(defendant)*, agree to follow every order of this court, or any court that considers this case, and I further agree that this bond may be forfeited if I fail:

( X ) to appear for court proceedings;
( X ) if convicted, to surrender to serve a sentence that the court may impose; or
( X ) to comply with all conditions set forth in the Order Setting Conditions of Release.

FILED ENTERED RECEIVED SERVED ON COUNSEL/PARTIES OF RECORD
FEB 20 2024
CLERK US DISTRICT COURT DISTRICT OF NEVADA
BY: DEPUTY

### Type of Bond

( X ) (1) This is a personal recognizance bond.

( ) (2) This is an unsecured bond of $ ____________.

( ) (3) This is a secured bond of $ ____________, secured by:

( ) (a) $ ____________, in cash deposited with the court.

( ) (b) the agreement of the defendant and each surety to forfeit the following cash or other property *(describe the cash or other property, including claims on it – such as a lien, mortgage, or loan – and attach proof of ownership and value)*:

If this bond is secured by real property, documents to protect the secured interest may be filed of record.

( ) (c) a bail bond with a solvent surety *(attach a copy of the bail bond, or describe it and identify the surety)*:

### Forfeiture or Release of the Bond

*Forfeiture of the Bond.* This appearance bond may be forfeited if the defendant does not comply with the above agreement. The court may immediately order the amount of the bond surrendered to the United States, including the security for the bond, if the defendant does not comply with the agreement. At the request of the United States, the court may order a judgment of forfeiture against the defendant and each surety for the entire amount of the bond, including interest and costs.

# UNITED STATES DISTRICT COURT
for the
District of Nevada

United States of America
v.
ALEXANDER SMIRNOV
*Defendant*

Case No. 2:24-mj-166-DJA

## ORDER SETTING CONDITIONS OF RELEASE

IT IS ORDERED that the defendant's release is subject to these conditions:

(1) The defendant must not violate federal, state, or local law while on release.

(2) The defendant must cooperate in the collection of a DNA sample if it is authorized by 34 U.S.C. § 40702.

(3) The defendant must advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number.

(4) The defendant must appear in court as required and, if convicted, must surrender as directed to serve a sentence that the court may impose.

The defendant must appear at: ______________________
*Place*

______________________

on ______________________
*Date and Time*

If blank, defendant will be notified of next appearance.

(5) The defendant must sign an Appearance Bond, if ordered.

## ADDITIONAL CONDITIONS OF RELEASE

Pursuant to 18 U.S.C. § 3142(c)(1)(B), the court may impose the following least restrictive condition(s) only as necessary to reasonably assure the appearance of the person as required and the safety of any other person and the community.

IT IS FURTHER ORDERED that the defendant's release is subject to the conditions marked below:

( ☐ ) (6) The defendant is placed in the custody of:
Person or organization ______
Address *(only if above is an organization)* ______
City and state ______ Tel. No. ______
who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Signed: ______ ______
*Custodian* *Date*

( ☑ ) (7) The defendant must:

( ☑ ) (a) submit to supervision by and report for supervision to the U.S. Pretrial Services Las Vegas
telephone number ______ , no later than ______ . 702-464-5630

( ☑ ) (b) continue or actively seek employment.

( ☐ ) (c) continue or start an education program.

( ☑ ) (d) surrender any passport to: US Pretrial Services

( ☑ ) (e) not obtain a passport or other international travel document.

( ☑ ) (f) abide by the following restrictions on personal association, residence, or travel: Clark Cnty, NV not allowed to go to airport. California for court purposes / airport only for court w/PTS approval

( ☑ ) (g) avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: Govt to provide list

( ☐ ) (h) get medical or psychiatric treatment: ______

( ☐ ) (i) return to custody each ______ at ______ o'clock after being released at ______ o'clock for employment, schooling, or the following purposes: ______

( ☐ ) (j) maintain residence at a halfway house or community corrections center, as the pretrial services office or supervising officer considers necessary.

( ☐ ) (k) not possess a firearm, destructive device, or other weapon.

( ☐ ) (l) not use alcohol ( ☐ ) at all ( ☐ ) excessively.

( ☐ ) (m) not use or unlawfully possess a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

( ☐ ) (n) submit to testing for a prohibited substance if required by the pretrial services office or supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. The defendant must not obstruct, attempt to obstruct, or tamper with the efficiency and accuracy of prohibited substance screening or testing.

( ☐ ) (o) participate in a program of inpatient or outpatient substance abuse therapy and counseling if directed by the pretrial services office or supervising officer.

( ☑ ) (p) participate in one of the following location restriction programs and comply with its requirements as directed.

( ☐ ) (i) **Curfew.** You are restricted to your residence every day ( ☐ ) from ______ to ______ , or ( ☐ ) as directed by the pretrial services office or supervising officer; or

( ☐ ) (ii) **Home Detention.** You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities approved in advance by the pretrial services office or supervising officer; or

( ☐ ) (iii) **Home Incarceration.** You are restricted to 24-hour-a-day lock-down at your residence except for medical necessities and court appearances or other activities specifically approved by the court; or

( ☑ ) (iv) **Stand Alone Monitoring.** You have no residential curfew, home detention, or home incarceration restrictions. However, you must comply with the location or travel restrictions as imposed by the court.
**Note:** Stand Alone Monitoring should be used in conjunction with global positioning system (GPS) technology.

## ADDITIONAL CONDITIONS OF RELEASE

(☑) (q) submit to the following location monitoring technology and comply with its requirements as directed:
- (☐) (i) Location monitoring technology as directed by the pretrial services or supervising officer; or
- (☐) (ii) Voice Recognition; or
- (☐) (iii) Radio Frequency; or
- (☑) (iv) GPS.

(☑) (r) pay all or part of the cost of location monitoring based upon your ability to pay as determined by the pretrial services or supervising officer.

(☐) (s) report as soon as possible, to the pretrial services or supervising officer, every contact with law enforcement personnel, including arrests, questioning, or traffic stops.

(☑) (t) ______________________________

**Location Monitoring**

The defendant shall not tamper with, damage, or remove the monitoring device and shall charge the said equipment according to the instructions proved by the pretrial services officer.

## ADVICE OF PENALTIES AND SANCTIONS

TO THE DEFENDANT: Alexander Smirnov 2:24 mj 166 DJA

YOU ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

Violating any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a revocation of your release, an order of detention, a forfeiture of any bond, and a prosecution for contempt of court and could result in imprisonment, a fine, or both.

While on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years and for a federal misdemeanor offense the punishment is an additional prison term of not more than one year. This sentence will be consecutive (*i.e.*, in addition to) to any other sentence you receive.

It is a crime punishable by up to ten years in prison, and a $250,000 fine, or both, to: obstruct a criminal investigation; tamper with a witness, victim, or informant; retaliate or attempt to retaliate against a witness, victim, or informant; or intimidate or attempt to intimidate a witness, victim, juror, informant, or officer of the court. The penalties for tampering, retaliation, or intimidation are significantly more serious if they involve a killing or attempted killing.

If, after release, you knowingly fail to appear as the conditions of release require, or to surrender to serve a sentence, you may be prosecuted for failing to appear or surrender and additional punishment may be imposed. If you are convicted of:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more - you will be fined not more than $250,000 or imprisoned for not more than 10 years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years - you will be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony - you will be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor - you will be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender will be consecutive to any other sentence you receive. In addition, a failure to appear or surrender may result in the forfeiture of any bond posted.

### Acknowledgment of the Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and surrender to serve any sentence imposed. I am aware of the penalties and sanctions set forth above.

[signature]
*Defendant's Signature*

LAS VEGAS, Nevada
*City and State*

### Directions to the United States Marshal

(✓) The defendant is ORDERED released after processing.

( ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judge that the defendant has posted bond and/or complied with all other conditions for release. If still in custody, the defendant must be produced before the appropriate judge at the time and place specified.

Date: 2/20/24

[signature]
*Judicial Officer's Signature*

DANIEL J. ALBREGTS
U.S. MAGISTRATE JUDGE
*Printed name and title*

DISTRIBUTION: COURT DEFENDANT PRETRIAL SERVICE U.S. ATTORNEY U.S. MARSHAL

EXHIBIT L

TRANSCRIPT OF FEBRUARY 20, 2024 HEARING

2:24-mj-00166-DJA-1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>ALEXANDER SMIRNOV,<br>Defendant. | Case No. 2:24-mj-00166-DJA<br>Las Vegas, Nevada<br>February 20, 2024<br>DETENTION HEARING<br>*C E R T I F I E D C O P Y* |

TRANSCRIPT OF PROCEEDINGS

THE HONORABLE DANIEL J. ALBREGTS,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES: See Next Page

DIGITALLY RECORDED: Liberty Court Recorder
3:02 p.m.

TRANSCRIBED BY: PATRICIA L. GANCI
(702) 385-0670

Proceedings recorded by electronic sound recording, transcript produced by mechanical stenography and computer.

APPEARANCES:

For the Plaintiff:

**LEO J. WISE, ESQ.**
**DEREK E. HINES, ESQ.**
**CHRISTOPHER R. RIGALI, ESQ.**
**SEAN F. MULRYNE, ESQ.**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
(771) 217-6091

For the Defendant:

**DAVID CHESNOFF, ESQ.**
**RICHARD A. SCHONFELD, ESQ.**
CHESNOFF & SCHONFELD
520 S. 4th Street
Las Vegas, Nevada 89101
(702) 384-5563

LAS VEGAS, NEVADA; TUESDAY, FEBRUARY 20, 2024; 3:02 P.M.

--oOo--

P R O C E E D I N G S

THE COURT: Thank you. Please be seated.

COURTROOM ADMINISTRATOR: United States of America versus Alexander Smirnov, 2:24-mj-166-DJA. This is a detention hearing.

Counsel, make your appearance for the record, please.

MR. WISE: Good afternoon, Your Honor. Leo Wise, Derek Hines, Christopher Rigali, and Sean Mulryne for the United States.

THE COURT: Good afternoon.

MR. CHESNOFF: May it please the Court, Your Honor. David Chesnoff, Richard Schonfeld, and also with us Peter Levitt here on behalf of Mr. Smirnov.

THE COURT: All right. Thank you. Good afternoon. Good afternoon, Mr. Smirnov.

All right. This matter is scheduled for the continued detention hearing this afternoon. However, a couple of other matters have been filed that I want to resolve here before we begin. Specifically, at Dockets Number 9, 10, 11, and 12 the Government has filed motions to admit all four Government attorneys. I will grant those here today. So 9, 10, 11, and 12 are granted.

Additionally, there was a motion to file documents

under seal filed by -- on behalf of the United States at Document Number 13.

Mr. Chesnoff, did the Defense receive and review the motion to file some of the documents related to their filing today under seal?

MR. CHESNOFF: Yes, Your Honor.

THE COURT: Does the Defense have an opposition to that?

MR. CHESNOFF: No, Your Honor.

THE COURT: All right. Well, I've reviewed the motion and I've reviewed the documents. I do note that the request to seal does not outline the Ninth Circuit case law that I believe would apply, *Kamakana* and its progeny. But when I apply *Kamakana* and its progeny, I do think that sealing these documents would be appropriate in this case.

I will of course remind the parties, as you well know, that there's a presumption of access to the courtroom documents and the public having access to those filings. And the Ninth Circuit outlines standards that I am to employ when deciding to change that and to seal things. And so I have done that analysis. And I do believe it's appropriate to seal Exhibits 1, 3, 4, 5, 6, 7, and 10 given the information that's contained in there and my analysis of the case law as it applies to those exhibits. So I will grant Number 13 as well and allow those documents to be filed under seal.

So the parties are aware, I have also reviewed the Defense's motion for release, which is found at Number 8. I reviewed the Government's memorandum in support of detention, which is found at Number 15. And I reviewed a filing that Mr. Chesnoff and Mr. Schonfeld entered later this afternoon at Document 16, which is a response.

Mr. Chesnoff, as it relates to that response, you note that the Government's was filed this morning, mid to late morning, and that you didn't have time to respond in whole to the memorandum and the hundreds of pages of exhibits that were attached thereto given that it was just filed this morning.

Are you prepared to proceed today with the detention hearing notwithstanding that or would you be requesting some more time to review and consider those -- those documents?

MR. CHESNOFF: Your Honor, considering the fact that he's been held for this many days when we believe that he should have been released and the report that we have from Pretrial Services, we'll -- we'll waive any defect in not being able to fully respond. We feel our arguments will cover enough of it to satisfy the Court, Your Honor.

THE COURT: All right.

All right. With that, then, I will hear from the Government regarding release or detention.

MR. WISE: Thank you, Your Honor.

The Government has moved for the defendant's detention

pursuant to 3142(f)(2)(A) and (B) because there is a serious risk the defendant will flee and a serious risk the defendant will obstruct justice. Applying the 3142(g) factors to the facts presented in the Government's memorandum in support of detention compels the conclusion that there are no conditions or combination of conditions that will reasonably assure the defendant's appearance. Therefore, pursuant to Section 3142(e) he should be detained pending trial.

As we outline in our papers, detention is appropriate where a defendant is either a danger to the community or a flight risk. It is not necessary for the Government to prove both. And while the former requires clear and convincing evidence, the latter is accomplished by a lower standard, by a preponderance of the evidence. And, again, as we cite in our memorandum, that means, and this is the District of Idaho case we cite, that the Government must demonstrate that it is more likely than not that there is a serious risk that the defendant will flee, not that it is more likely than not that the defendant will flee.

I'll briefly address the 3142(g) factors which we discuss at greater length in our memorandum. First as we outline, the nature and circumstances of the offense in this case support detention. In any situation, in any case, pretrial supervision is based on trust, and the defendant has demonstrated he can't be trusted. And this is something I'll

come back to.

Here, the defendant lied to his FBI handler after a nearly 10-year relationship. This is someone with whom he had nearly daily contact, somebody whom the defendant has described as family. If he's willing to betray someone under those circumstances, how can the Court have any confidence that he will provide truthful information to a Pretrial Services officer he has never met when his liberty is at stake?

As to the weight of the evidence against the defendant, and this is also summarized in -- in our papers and cites extensively to the speaking indictment, the evidence in this case will come from the defendant's own travel records, e-mail messages with his handler and others, and from travel records e-mails and messages with the individuals that he claimed participated in these meetings and phone calls where these outrageous allegations were made.

The trial won't be a swearing contest between the defendant and these witnesses, although witnesses will refute the defendant's story in no uncertain terms. But the Government's witnesses will be corroborated by these documents and other unimpeachable evidence, and the defendant's story won't be.

Turning to the history and characteristics of the defendant, Defense counsel asserts in his motion for pretrial release that Smirnov has significant ties to the United States,

but he does not. His family members live in Israel. He doesn't own any property here. He doesn't have a job here. According to his own motion for pretrial release, the only relation they can point to is a cousin in Florida, but that doesn't make for significant ties.

Now, while a consideration of these factors alone compels detention, the extraordinary characteristics of the defendant that we've outlined in our memorandum make it clear that there are no conditions that will reasonably assure his appearance. And I'll address these in more detail.

First, his self-professed claims of ties to foreign intelligence services including Russian intelligence; the between 3 million and $6 million in liquid funds he access to; three, the fact that he didn't disclose those assets to Pretrial Services or to the Court, and I'll address the defendant's recent reply on at least they only address the Pretrial Services disclosure and that, too, was deficient regardless of what's in their reply; and, finally, the fact that as a dual national he can obtain an Israeli passport at any time after he surrenders it.

Turning first to I think what is the most extraordinary feature of this defendant, his contacts with foreign intelligence. His contacts with foreign intelligence services, specifically Russian intelligence services and operatives, distinguish his case from the two cases cited by the defendant

in his motion for release, *Karni* and *Hanson*. And I would venture to guess that a situation like this has probably never been presented to the Court.

Those contacts are regular and recent. In our memorandum we quoted recently declassified FBI reporting summarizing the defendant's contact with Russian intelligence and others, and most notably his recent -- his most recent election disinformation story, the one he told the FBI in September 2023 about the Premier Palace Hotel in Kyiv and the recordings of Businessperson 1, came after he met with Russian intelligence.

Again, these contacts make this defendant different from other defendants who merely have foreign ties, and they heighten the risk of flight dramatically. And that is because he can use these contacts with foreign intelligence services to flee and to resettle overseas, something I would again venture to say is almost unique in the presentation of a defendant being considered for the pretrial release.

THE COURT: So let's say that happens. You don't think that the Federal Government would have the ability to find him and take action to bring him back? You think that these Russian ties that you're talking about are the type of people that would literally take him and secrete him from prosecution?

MR. WISE: If he were to resettle in Russian, we couldn't extradite him. Russian won't extradite under these

circumstances.

If he were to resettle in other -- in third countries, we couldn't extradite him. And so, yes, I think that is the case.

THE COURT: All right. Go ahead. I'll --

MR. WISE: That's even assuming we could find him. That's even assuming we could find him.

THE COURT: You think the long arm of the United States of America couldn't find him on this planet?

MR. WISE: Yes. I think the best thing we have going for us is the idea that people think we have that long arm, and having been in Government for 17 years, I'm routinely astonished at how short it is.

THE COURT: All right. Go ahead.

MR. WISE: The next factor that makes this defendant extraordinary is his access to funds and, worse, the fact that he didn't disclose these assets to Pretrial or to the Court last week.

Now, to be clear, the defendant's PSR says he has access to $6,500, $1,000 or $1,500 cash on hand and $5,000 in a checking account.

He actually has access to approximately $3 million in a -- in an account in the name of the Avalon Group where he is the sole signatory. We received a balance on that account as of this morning. It has $2,886,893.18. And contrary to what is in

the reply the Defense filed, this is not a business account. He uses it to pay personal expenses.

As we outlined in our filing, he's withdrawn $175,000 in cash out of it. He's transferred more than 2.6 million to his girlfriend who has then used that money to purchase the million dollar condominium they live in, to make credit card payments which is his primary means of paying these personal expenses in the amount of more than $100,000 in 2022, more than $275,000 in 2023, and there is no discernible business activity in this account nor can he or his girlfriend actually articulate what his business is.

The only personal checking account he appears to have has at last -- the last time we checked about $500 in it which is used only to make a very small recurring insurance payment. So this is his money. It is not the case that he was confused and thought this was a business account that he didn't have to disclose.

And, further, even if there was some confusion with Pretrial, which I submit there was not, these are his funds. We haven't seen the financial affidavit, but I have what -- I've seen what these financial affidavits that he filled out and submitted to Your Honor say. And it says: "Cash and bank accounts. Do you have any cash or money in savings or checking accounts?" Doesn't say personal accounts. Doesn't say business accounts. It says: "Cash or save" -- it says: "Cash or money

in savings or checking accounts." And he does.

THE COURT: Does the Government think -- well, let me ask first. Does the -- do you have any knowledge about what happens from the time of the arrest till the time of the initial appearance a few hours later?

MR. WISE: In what -- I'm sorry.

THE COURT: Well, just how the Pretrial interview goes and -- and the discussions and, you know, the time constraints that people are -- I mean, you're so certain that these are just blatant misrepresentations when there might have -- why wouldn't it possibly be confusion when he's just been arrested, he's been taken into custody, and somebody shows up and starts asking him questions?

MR. WISE: So if someone asked me what kind of funds I had access to and I had $3 million in an account and I told them I had $6,000 in an account, I think it would --

THE COURT: I don't know that they ask him what kind of funds he has access to. The questions are: Do you have a savings account? Do you have a checking account? And what's in them? I mean, I've sat in on these interviews for many, many years.

MR. WISE: And I think any defendant that was looking to be forthcoming would say, "I have this account that I use to pay my personal expenses out of. I have this account that I've transferred millions of dollars to the woman I live with to that

she's used to purchase the home we live in." I think -- I've heard these questions and I think they absolutely would call for this information.

THE COURT: Okay.

MR. WISE: And then when he sat in front of Your Honor and Your Honor asked him before appointing -- and as I said, we haven't seen the affidavit, but I'm fairly certain it didn't have $6 million on it or Your Honor wouldn't have appointed CJA for him. It says: "Do you have any cash or money or savings or checking accounts?" And he clearly did have that and he chose -- he chose not to disclose that information.

And, in addition, the balance in the DL -- what we refer to as the DL account as of today is an additional $3,784,218.51. And we see this pattern of him taking money out of the Avalon account, buying cashier's checks, giving it to DL. She then goes to a nearby branch within 30 minutes and deposit it, which makes it look like there's some kind of business relationship between her and this Avalon Group, but not with him.

THE COURT: Did you ever call Pretrial or reach out to Pretrial to ask about the circumstances of the questions to determine whether there might have been misunderstandings or that the questions weren't as direct so that it's not as clear in your mind that he's flat-out lying to them?

MR. WISE: Your Honor, my approach to Pretrial is that

they have a job to do as an agency of the Court, and I wouldn't be comfortable asking them to essentially become witnesses against the defendant under those circumstances. So I typical -- I haven't done that.

THE COURT: All right. Fair enough.

MR. WISE: But I think it is very clear that these are his funds as we outline --

THE COURT: Okay. So -- and you've made that clear in there. So move on past the funds. I understand that argument.

MR. WISE: And the other things -- you know, the other thing he said -- he made a number of statements to Pretrial that were untrue. He, for instance, said this condominium was leased by the girlfriend when we know in fact it was purchased by her with his funds. And Defense counsel even had to concede that in their -- in their filings. So we've got lies, sort of, big and small in his very first instance of interacting with the Court, when one would think you would err on the side of providing all of the information that might be necessary so that one might be released on conditions.

In short, the evidence that the defendant can't be trusted to abide by conditions and provide truthful information to Pretrial Services isn't speculation. He's shown that he can't be trusted by providing misinformation to his handler, and in his first interaction with Pretrial Services and the Court he withheld information that shows he has access to millions of

dollars that he could use if he were to flee the United States.

I'd like briefly now to turn, if Your Honor would like, or I can depending on how Your Honor -- the sequence, I can turn to some of the arguments made in the defendant's motion for pretrial release or I can wait until after they go, whatever Your Honor would prefer.

THE COURT: You argue how you feel appropriate.

MR. WISE: Sure.

So I'm not going to address all of the arguments. Some of them I think are -- are sort of on their face ones that I think I don't need to address, but the first -- the first thing I will note is that the defendant argues that the Government knew about Mr. Smirnov's alleged conduct for years, yet, took no steps to end his cooperation, seize his passports, or prosecute him for anything. And the Defense argues that should be kept firmly in mind when, as expected, the Government reverses course in this bail proceeding and suddenly protests that Mr. Smirnov now presents an extreme flight risk.

So the mistake the defendant makes is in thinking that the Government is a monolith. The FBI is divided into field offices and the Department of Justice and to U.S. Attorney's Offices. And while both organizations have some coordinating functions in Washington, they're limited.

And to be clear, in this case the defendant was the source for an agent based out of the Seattle field office and he

volunteered information about Burisma, volunteered, to that agent in 2017 which the agent recorded. Later in 2020 the FBI's Pittsburgh field office was conducting an assessment of information being provided by the public concerning the Ukraine, most notably Rudolph Giuliani, and reached out to the Seattle-based handler and asked him to interview the defendant about the defendant's 2017 reporting. And what the Seattle agent learned he reported back to the Pittsburgh Agent in June of 2020.

And -- and the FBI in Pittsburgh took some limited investigative steps, but their steps were limited by the fact that they were only conducting an assessment, which under FBI policies is not an investigation. And it prevents, for instance, the use of compulsory process like grand jury subpoenas or the compulsion of testimony. So based on that limited review, the FBI closed its assessment in August.

Fast-forward to July of 2023, that's when the FBI asked the U.S. Attorney's Office in the District of Delaware to assist in evaluating the claims in the 2020 1023. And in August the U.S. Attorney for the District of Delaware was made Special Counsel by the Attorney General. Also in August investigators in Delaware spoke with the defendant's handler for the first time, and then in September investigators in Delaware spoke with the defendant, again, for the first time.

After those meetings investigators began collecting

evidence on the defendant's allegations, including for the first time with the benefit of the grand jury. And it was through the use of the grand jury that investigators in Delaware learned that the defendant was lying. So it is not the case that the defendant -- that the Government knew he was lying back in 2020 and took no steps to address his conduct.

THE COURT: So what was the date, then, that you're saying you were aware that he was lying?

MR. WISE: Just this fall, in a run up to these charges. We first met with him in September --

THE COURT: That's the September 23rd -- September 2023 meeting you're talking about?

MR. WISE: Yes, Your Honor.

THE COURT: All right.

MR. WISE: That was the beginning -- after speaking with the handler in August that was really the beginning of the grand jury investigation, and then evidence was collected shortly thereafter that led to the presentation of these charges.

THE COURT: All right.

MR. WISE: Now, in addressing the 3142(g) factors, specifically the nature and seriousness of the offense, the defendants argues that "These allegations are make-weight and politically motivated. They do not involve espionage or theft and are, thus, not serious."

I didn't know what make-weight meant so I looked it up. According to Miriam Webster, the meaning of make-weight is something thrown into a scale to bring the weight to a desired value. I have no idea what that means in this context. Maybe Your Honor does.

And politically motivated, by whom? If Defense counsel is referring to his client's allegations, then we agree. His client's messages that are quoted in the indictment show political bias on his client's part.

Or is the -- is Defense counsel referring to us, the Government in this case? And that would certainly be curious. We're prosecuting Hunter Biden on tax and gun charges, and his lawyers make the unfounded claim that we're working at the direction of former President Trump and Congressional Republicans, although they can never explain why or how.

So then I guess what Defense counsel in this case is arguing is we're working at the direction --

THE COURT: Are you saying Mr. Chesnoff and Mr. Schonfeld said that in their pleadings?

MR. WISE: That's what they wrote. They wrote the charges in this case are make-weight and politically motivated.

THE COURT: So -- but where do they -- okay. But I -- you've taken that quite a bit beyond that they're saying -- what did you just say was ...

MR. WISE: Well, I'm trying to figure out -- it sounds

like they're saying we're working at the direction of the White House and the Biden campaign. And the other cases --

THE COURT: Is that a leap?

MR. WISE: And the other cases --

THE COURT: I guess you don't --

MR. WISE: -- the Defense counsels are making the opposite argument.

THE COURT: Well --

MR. WISE: So we're sort of curious which it is.

THE COURT: Well, and I'm not getting into the politics of this. I have to make a determination under the Bail Reform Act whether he's a flight risk or a danger and whether, if he is, there are conditions or a combination of conditions to address that.

MR. WISE: Right.

THE COURT: So I have no time for the politics of this case. I understand the underlying charges. There's a component to that. But I'm not going to spend a lot of time here talking about the politics.

MR. WISE: Good. Because when we saw that, we were shocked that he would make the accusations --

THE COURT: So go on and continue with your argument.

MR. WISE: Now, the Defense counsel calls the charges not serious, which begs the question is he serious. The defendant's lies have captured --

THE COURT: All right. I'm not going to get personal with the attacks on counsel. All right? Let's keep it to the facts and the law. You don't need to make snide remarks about "is he serious." And I'm not going to tolerate that from either side.

MR. WISE: Understood, Your Honor.

The defendant's lies in this case have captured the national imagination. And while the -- while the filing says they do not involve espionage, of course the charges do involve foreign intelligence services. The defendant claims to have met with Russian intelligence agencies on multiple occasions, and the U.S. intelligence community has concluded that Russian intelligence interfered in the 2020 election and continues to interfere in our elections by spreading misinformation.

And I can supplement the record with these two public reports, but in January of 2017 the Office of the Director of National Intelligence made public a declassified version of a highly classified assessment regarding Russia's efforts to interfere in the 2016 presidential election. And in 2020 the ODNI published a similar declassified report regarding the 2020 U.S. presidential election. And one of the key judgments of that report, which was expressed with high confidence, was that Putin authorized and a range of Government organize -- and a range of Russian government organizations conducted influence operations aimed at denigrating President Biden's candidacy and

the Democratic Party, supporting former President Trump, undermining public confidence in the electoral process, and exacerbating sociopolitical divisions in the United States. And that's a quote from that report that we can file as a supplement to the direct -- for the record.

Now, the defendant also argues for release, in part, based on where the defendant is currently housed. That's premised on the idea that he'll actually stay in that location, and I don't think that's correct. I think he was brought to that location temporarily, but if he were detained, I believe he would be detained in the Central District of California, not in the District of Nevada. And so whatever the conditions are at that facility I don't think bear on --

THE COURT: I think that's correct. If he's detained, he'll under Rule 5 be transferred to the Central District of California and they'll have the decision as to where he's housed and incarcerated -- or detained. I shouldn't say incarcerated. Detained pending trial. But go ahead.

MR. WISE: And the issue -- and this came up in the previous hearing. You know, the issue of the defendant's -- where he is detained, the conditions under which he is detained, those are all things that the Marshals or the Bureau of Prisons or we can work with Defense counsel to address. They are not factors that the law or the statute recognizes as bearing on whether he poses a risk of flight or whether there are

conditions that can reasonably assure his appearance.

In the last hearing we discussed the fact that he is, as the indictment makes clear, or was a confidential informant. And we take -- we take security seriously. We take safety seriously. And those -- those issues need to be addressed and will be addressed, but none of that bears on the determination of whether he poses a serious risk of flight which for all of the reasons we identify in our motion we believe he does.

THE COURT: And why -- there's no addressing -- and I think I know the answer, but I'd like to hear it from you -- no addressing the conditions that Pretrial suggests and why, you know, with the idea that it's -- Bail Reform Act, it's the least restrictive, you know, that I have to consider and the least restrictive conditions. Why won't some of the things that they recommended address these things? Is it just the trust issue or is there something more?

MR. WISE: So the trust issue is at the heart of it, Your Honor, but as we said, I mean, when you combine the resources he has access to, the fact that he can travel internationally on the second passport -- and as we point out, there is -- there is literally no way to prevent that. And this is a problem that's present with dual nationals where they can go into a consulate. They can say they lost their passport. They'll be issued another passport. There's no way that the Government -- our Government learns of that. There's no way

that there can be a stop at the border over that. It simply is --

THE COURT: What if I put geographical limits on where he can go and we monitor that so that the minute he leaves Clark County Pretrial's notified of that?

MR. WISE: My understanding of the technology is that it's not that -- it is limited, that there are lags, that there are -- you know, that the geographic space is not tight enough to know if someone is in an airport as opposed to some other location.

My experience with that is not that it's as precise as one would -- would think or hope.

THE COURT: All right. All right.

MR. WISE: But as I said, Your Honor, you know, usually the arguments are someone's whole family is here, their whole life is here, their job is here, this is where their, you know, livelihood comes from. We've seen none of that in this case. And that's why to answer Your Honor's question, I think -- I think the conditions simply -- simply don't reasonably assure his appearance.

And if -- if we could -- I mean, Defense counsel when he called me on Friday said, "Is there some" -- "Are there some conditions that we could agree on?" If we could, we would. I mean, this is not hyperbole. If we thought there was some way that we could reasonably assure that he would appear in this

proceeding, that would be where we'd go. But in light of the contact with foreign intelligence, in light of the $6 million in funds, in light of our experience so far with him, we simply don't believe that's the case.

THE COURT: All right. Thank you very much.

MR. WISE: Thank you, Your Honor.

THE COURT: Mr. Chesnoff, Mr. Schonfeld. One or the other, not both, please.

MR. CHESNOFF: May it please the Court.

Your Honor, it's amazing to me that the question the Court asked about the power of the Government to find somebody is so limited that to have the Government's position adopted by the Court would mean that nobody who they are concerned could run ever gets out. And that's not the Ninth Circuit law. The Court is well aware it's the least restrictive. The idea that someone cannot be geographically controlled, I've had multiple cases, as the Court knows, where people have been restricted not to go to a bus station, not to go to an airport, not to rent a car.

I have with me, Your Honor, his Israeli passport which I secured so that we could give it to Pretrial. The idea that the Court cannot make a condition that says you are not to apply for a new passport, U.S. or Israeli, happens all the time, Your Honor. Judges impose those conditions. If the Court could not impose those conditions, the Bail Reform Act, *Motamedi* and all

of its progeny, would have no meaning at all, at all.

I'm old enough, Your Honor, to have remembered when the Bail Reform Act was enacted in 1984. I did a deep dig into the legislative history. The legislative history of the Bail Reform Act, it was created to protect flight and danger from a small and discrete group of people, either violent offenders, people with prior records, people who had history of not showing up in court.

We have a gentleman who's an American citizen. He has an Israeli passport as well which he's willing to turn in. He's lived in L.A. where this case is for 16 years. He's lived here for two years. He lives with his significant other who's present in court.

I -- I -- the Court observed the idea of what happened in the beginning. His English is better than hers, but it's not the best. I don't think an interpreter was supplied to him during any of the interviews. I know for a fact that when his significant other spoke to Pretrial, she had the limited ability to communicate. I got her in my office. I got someone who spoke Russian. She then gave all the right and truthful answers to Pretrial Services.

Your Honor, we asked Pretrial Services about this question of financial disclosure because when we read their motion this morning, both Mr. Schonfeld and I said, "What happened here?" So we contacted the Pretrial officer. We asked

to meet with her. And we asked her specifically, "Did you ask him about any other account than a personal account?" And the officer was candid and said no. It's exactly why my client answered the question the way he did because he was not asked about anything else.

THE COURT: What about Mr. Wise's point, and I think there's some legitimacy to it, that, you know, you're in there talking that maybe he thinks, "Well, should I talk about these other accounts? You know, they're asking me about money" --

MR. CHESNOFF: Perhaps, if I had been there with him, Your Honor, because he didn't have counsel with him, I wasn't there, then those issues would be ferreted out. We would have explained to him the importance of being as complete as possible. But in this instance it was completely not his fault that the question was not asked, and he responded truthfully to the question.

Their suggestion that somehow that should lead the Court to question his overall truthfulness considering the context, the language, the fact that the Pretrial officer made her own evaluation of him when she spoke to him and has recommended to you that he be released, answers that question in my opinion, Your Honor.

Your Honor, the fact that they can document foreign travel, the Court can't lose sight of the fact that a lot of the foreign travel was at their behest. So it's kind of like a

catch 22. We're going to let you go there. We're going to send you there. We're going to use you for our purposes, which is what they did. And now they turn around and tell Your Honor, "See, he travels everywhere."

The other thing that they said was that the handler somehow found out now that he was untruthful. But for 10 years, Your Honor, apparently, he was truthful. Now, the question of whether he's not truthful now has not been decided. And as the Court knows, that's a factual question which is the least important factor that this Court should consider. And I can tell you, Your Honor, that there will be a vehement defense to the argument that in fact he was not truthful. He had this personal relationship with the handler. It was so personal, Your Honor, that he wouldn't even call him on his FBI phone; he would call him on his personal phone. So we're going to dig down once we start defending this case and we're going to find out who knew what when.

Now, when we made the suggestion, Your Honor, that he deserves to be out because of the fact that he needs to defend himself and the housing situation, I can tell you, Your Honor, I visited the MDC in L.A. for years representing clients. The conditions there are even tougher than the conditions in Pahrump vis-à-vis attorneys. The waiting period of time sometimes to see a client is hours upon hours.

If they are going to have him in PC like they do in

Pahrump, which I assume they will since they've managed to put out to the entire world his cooperation without any concern for his safety, but ultimately he is safer out as opposed to being in a detention facility in a major metropolitan city where I can tell you, Your Honor, I would be concerned about his safety.

THE COURT: I know there's constitutional considerations when it talks -- you know, when we consider his right to meet with counsel and prepare for trial and look at documents. But how does that play into the Bail Reform Act and my decision that I have to make?

MR. CHESNOFF: I can tell you, Your Honor.

It's almost a due process question that comes into conflict maybe with just looking at the Bail Reform Act as the only thing the Court considers. I cited to a case called *U.S. v. Kinney* where a State Court was holding somebody, and the Court decided that because of social reality it would be harder for a Defense attorney to speak to witnesses because the defendant came from a community that was foreign to the Defense lawyer.

In this case, Your Honor, we are going to need to speak to people in foreign countries that don't speak English, that speak Russian. Not to have the -- and I can tell you, Your Honor, the MDC in L.A. is not going to allow us to be calling Kyiv from the MDC with our client to speak to people.

So the -- the harm to him in defending himself against

-- and, Your Honor, when we say "not serious," obviously we're in Federal Court. It's a federal crime. What we're talking about, Your Honor, is this. Our guideline calculations show that at a max he's looking at three years. So when I say "not serious," it's not 10 years.

Why would somebody risk a bail jumping charge on top of really an admission of guilt by fleeing when in reality the maximum punishment at the best with the guidelines is three years? It's even lower without all the potential enhancements. It's absurd, Your Honor.

The only reason they want to keep him in is so that he cannot defend himself in a way which shows that the allegations that are being made against him are being made for whatever the Bureau's reasons, whatever Justice's reasons are. But he has a right, Your Honor, to straighten the record out as far as he's concerned, especially in light of the 10 years of service that he gave to the United States Government and to the people of the United States.

So to hold him in custody and restrict his ability to truly defend himself on a case where he's looking at 20 months, Your Honor, I -- I can't even really comprehend it.

THE COURT: So when you said "serious" or "not serious" in your pleading, you were referring to the amount of time and the potential exposure as opposed to the underlying --

MR. CHESNOFF: Yeah.

THE COURT: -- current of the case and the political ramifications?

MR. CHESNOFF: You know me -- known me a long time. I'm not belittling the seriousness that the Government feels about this. What I was talking about is the seriousness in terms of the ultimate --

THE COURT: Potential.

MR. CHESNOFF: -- potential problem.

(Defense conferring.)

MR. CHESNOFF: Mr. Schonfeld points out to me it's also not a presumption case, Your Honor, and that bespeaks the recommendation that has been made by Pretrial.

Court's indulgence.

(Pause.)

MR. CHESNOFF: Your Honor, every condition that's required by the Ninth Circuit law in terms of history, no drug usage, no alcohol, none of the things that are indicia of danger or flight exists. There's not a single representation, Your Honor, that he's ever committed a violent act, nothing, in the 10 years of his service with the FBI.

THE COURT: What -- you know, they raise a good point about being concerned about his access -- so let's set aside the disclosures to Pretrial and whether or not the circumstances rise to the level of he's not trustworthy such that I'll detain him. That will be something I address here in a moment.

But really, I mean, it's legitimate to say he's got access to a lot of money and he knows a lot of people that might be willing to help him out. I mean, how do I address those concerns that the Government's raised?

MR. CHESNOFF: Your Honor, he's on electronic monitoring. He's at -- we've offered, we suggest, third-party custodian. His lady friend is present in court. I've explained to her the implications of that, that she has an obligation to the Court if in fact he is doing anything that he's not supposed to do. I don't know what more you can do other than -- Your Honor, anybody can -- anybody can run. That's a fact. The fact that he has connections overseas, that can be addressed by the Court in terms of the conditions it sets: You stay -- this is where you're staying. This is what you're wearing.

Your Honor, you can even limit in terms of phone usage if you want, Your Honor. There are things that can be done, but the idea that somehow he's going to escape and the United States Government is not going to find him, I mean, they got I don't know how many people are here --

THE COURT: Yes, but counsel raises a good point that even though they know he's in Russia, they can't get him back.

MR. CHESNOFF: Well, I have a feeling the idea of him going to Russia is not really such a good idea for him since they've revealed that he helped the United States vis-à-vis Ukraine, and I don't think Russia's going to be too happy about

that.

THE COURT: Well, that's -- that's a relevant point. All right. Go ahead.

MR. CHESNOFF: Your Honor, I -- I think that the Court should follow the recommendation. I think that the Court understands that this is a situation where a man deserves an opportunity to truly defend himself. And he's never shown anybody that he has any disrespect for a courtroom or a Court. And the question of the veracity issue, that's the try -- that's the case, but that's not been proven. We just had a -- that's not proven.

THE COURT: All right.

MR. CHESNOFF: Thank you, Your Honor.

THE COURT: All right, Mr. Wise. Anything in response?

MR. WISE: Just briefly, Your Honor.

Counsel started with saying -- holding up the Israeli passport saying, "Well, the Court can impose a condition that you can't get a new passport." But of course the issue is you can impose the condition, but you can't police it. And that's what makes the problem of dual nationality particularly unique.

As to the question of a GPS anklet or bracelet, in addition to the technology not being as precise as one might assume in 2024, defendants can and do cut them off and then they alarm, but it's not like law enforcement can instantly respond. And in any location that's near a major city with an

international airport, the amount of response time is usually not -- is usually not short enough that it would prevent someone from going to an international airport or a location where they could -- where they could use air travel.

Counsel mentioned that the foreign -- what he calls the foreign travel was at our behest. Well, let me be very clear this -- we're not talking about foreign travel. What we point out is that the defendant self -- he claims himself to have all of these contacts with foreign intelligence services. He volunteers that information to the handler.

And, for instance, this most recent trip where he came back with this new disinformation story was absolutely of his own doing. And -- and he pushed that story when we met with him in September, and it shows that the bad conduct is not, as counsel says in their memorandum, limited to 2020. It is much more recent and much more -- and much more pronounced.

Counsel says, you know, that the Court can somehow address how he could have contact with overseas witness -- with folks overseas. I have no idea how that could be addressed by a court in the United States whose jurisdiction is limited to the United States. Counsel said there could be limits on phone usage. You can go to a kiosk in a mall and buy a burner phone. He was actually communicating over Signal and Telegram. Those are web-based applications that the Court would have no ability to police or prevent.

You know, while counsel claims, I guess -- I mean, in addition -- and I hear him say now that the "serious" comment was about the -- the sentence, but that's -- that's not actually what he wrote. He wrote: "These allegations are make-weight and politically motivated. They do not involve espionage or theft and are, thus, not serious."

That's -- that's his words. And he -- he actually ascribes bad motives to us. He says the only reason we want to keep him in is so that he can't defend himself, and he mentioned improper motives of the Bureau. I wasn't quite following what he meant.

MR. CHESNOFF: Your Honor, could you ask him to stop? Like, suggest -- enough is enough.

THE COURT: I'm allowing some leeway. Let's finish the argument.

Counsel.

MR. WISE: Third-party custodians that are wives or intimate partners are in the worst possible position one could be in. And I've seen this in case after case. To ask someone to --

THE COURT: I'm not going to do a third party. If I release, that's not going to be a condition so go ahead.

MR. WISE: Okay. Putting someone in that position I think is really untenable.

So I don't think that any of the -- any of the

suggestions that counsel make even come close to addressing the risks that this defendant presents for all the reasons we've outlined.

THE COURT: All right. Thank you.

Mr. Chesnoff, briefly.

MR. CHESNOFF: Yeah, just briefly. It's not just Chesnoff who says it; it's Pretrial that says it, Your Honor.

THE COURT: On the release?

MR. CHESNOFF: Yeah.

THE COURT: Understood. All right.

(Pause.)

THE COURT: Well, as the parties know, my decision is based upon what the Bail Reform Act tells me to consider and to apply to this particular case and this particular defendant, Mr. Smirnov, and his personal characteristics and history. There's two prongs to that. The first -- or I'll take the second which is generally the second, which is the danger prong, requires the Government to provide evidence of clear and convincing evidence that he's a danger to the community. That's not what they've asked or argued, and that's not what any of the parties have raised.

And so while one may argue the underlying politics of the case or the danger to our system as a whole or to the free elections or some of those issues, and while those may be issues that are ripe for intelligent, honest discussion, they aren't a

consideration for this Court under the Bail Reform Act as it relates to clear and convincing evidence of danger.

And so I don't find that Mr. Smirnov is a danger notwithstanding the underlying allegations. I know the Pretrial report suggested that he could be a danger based upon the underlying allegations. And as the parties have acknowledged, Mr. Chesnoff has argued, and I've stated, the underlying facts under Ninth Circuit case law are the least important factor of all of the other factors to consider, except on the level that it relates to the trust factor that the Government argues.

And so in terms of considering Mr. Smirnov's underlying actions, I think they do come into this idea of whether or not he can be trusted to the point where I would release him.

I think it's pretty clear to this Court that Mr. Smirnov is a flight risk by a preponderance of the evidence. His dual citizenship, his possession of passports, his foreign ties, his extensive foreign travel, and some questions about his employment and where he makes his money I think clearly rise to the level that he's a risk of nonappearance by a preponderance of the evidence. The bigger question, obviously, is whether or not there are conditions or a combination of conditions that can address those concerns.

I do have concerns about his access to money and -- and some of the representations made to Pretrial on Thursday, but I also place those in the context of the case insofar as the

language issue, the nature of the Pretrial interviews and how quickly they occur, he did not have counsel at the time, the context in which the questions were asked. I don't know that that rises to the level that I'm convinced that he was sitting there Thursday morning intentionally lying to Pretrial to keep them from knowing about his finances. I just -- I don't know that it rises to that level.

The other concern, obviously, is the allegations and his relationship with his handler. I will tell you I cannot even begin to understand or know what goes on in a relationship between an FBI handler and somebody who's cooperating and the dynamics of that relationship. I would suspect it gets close. I don't know how it couldn't when you're working that close with people.

I do on some level, like Mr. Chesnoff noted, recognize that how he deals with his handler and the FBI and how they're dealing with him in that complicated context would probably be different than how he would treat a Court order or a Court decision and whether or not the lack of trust he showed according to the Government with his handler would rise to the level of a lack of trust that he would not follow my orders or violate them if I gave him that chance. I'm not convinced of that given the complex nature of that relationship.

The Government has argued the nature and circumstances of the offense. They put about a quarter of their 28-page brief

to discuss the nature and circumstances and the weight of the evidence. And, again, those are the least important factors for the Court to consider. And they argue that his ties to the community are weak, and they've argued that both in their pleading and here today such that there are no condition or combination of conditions that would address that. And then they raise the four others.

I -- you know, I understand the concern about foreign intelligence agencies potentially resettling Mr. Smirnov outside of the United States, his connections to them, but I think on some level that's speculative as well because, as Mr. Chesnoff points out, I don't know what Mr. Smirnov will be thought of in Russia, but my guess is at this stage he probably thinks that's not the most attractive place to go either if he was in fact inclined to go hide somewhere.

So while I notice and note that that's a concern and certainly raised by the Government that I should consider it, I just don't know in the context of what's happened in the last couple of weeks with his arrest and everything else that that is as grave a concern as the Government outlines.

I've already addressed the concern about the money, and I'll have to make a decision here whether or not his access to those funds can be addressed with conditions. I've already addressed his disclosure of those and how that came about to Pretrial and the context in which I am placing that in. And

then the Government argues that as a dual citizen he can walk into an Israeli consulate and obtain a passport and be gone. And, again, the question is are there conditions that can address that.

As the parties may or may not know, this Court, as do most courts across the country, when making these decisions puts a lot of stock into Pretrial Services and their investigation and their recommendations and their belief about whether or not they believe somebody can be supervised with conditions. And in this case Pretrial Services believes notwithstanding some of the issues that the Government's raised, and they acknowledge those issues, they believe that Mr. Smirnov can be supervised and that there are conditions that can be placed upon him if I were to consider his release today. And so that carries weight with the Court as well. As Mr. Chesnoff points out, it's not just Mr. Chesnoff saying his client should be released, but Pretrial Services believes that conditions can be fashioned.

And, again, I recognize the underlying political ramifications of this investigation in this case and what the Government believes the effect on our country and on our elections that this might have had. But, again, other than how that relates to the trust issue, which I've discussed, and as it relates to his relationship with his handler, I'm not sure that those factors are of huge importance to the Court in making my determination.

So, Mr. Smirnov, you know, there's a lot of different issues here. But I do think that I can fashion conditions for your release. You may or may not make a mockery of me when I do that, but that's not for my consideration either. And when I say "mockery," meaning you don't follow the conditions or you flee. And so I recognize that the Government's made some arguments, but I think that despite those conditions can be fashioned.

But as you now know, under the Bail Reform Act -- and this may not be the end of it. They may decide to appeal this. But under the Bail Reform Act you can be detained, and in a case like this, as Mr. Chesnoff has referenced, it could be a lot of time before they can be ready for a trial and that could be a long time that you're detained while that's pending.

I'm finding today that the Government has not met their burden as it relates to conditions because I believe that conditions can be fashioned because Pretrial believes that, and so I'm going to give you that opportunity.

But if you come back before this Court or a Court in the Central District of California, I can assure you that if it is proven you have violated any of those conditions, there will not be any hesitation to revoke your release and to remand you to custody. And listen to the conditions because there's going to be some more that are not in the Pretrial report.

And I want to ask Pretrial, if we do the monitor travel

restrictions, I know Clark County is easier because of the different municipalities, but can we restrict him from the international airport as well?

OFFICER MCKILLIP: Yes, Your Honor. We can put an exclusion zone around the airport so if he goes into the area of the airport, we will get notified.

THE COURT: And that would be, say, without prior permission. So that if he with his lawyers say, "We're going to L.A. to appear or we're going to L.A. to work on the case, we'll be in the airport," that's something you can monitor as well?

OFFICER MCKILLIP: Yes, Your Honor, as long as he tells us beforehand.

THE COURT: Right.

All right. I'm going to release you on your personal recognizance, which is just your signature and promise to appear in court and to follow these conditions. If you do not, that will be revoked and you will be detained.

You will have time to go over these conditions with your officer and with your lawyers. I'm going to go through them somewhat quickly. If you don't understand everything, you will have time to talk to them and make sure you understand.

First, you're to submit to supervision by Pretrial Services. You should report immediately to their office and follow their direction for supervision.

I'm going to allow them to order you to seek

employment. I have -- you're not going to be able to continue with your consulting business while this case is pending. You're going to have to figure out some other way to conduct business because I'm not going to allow foreign travel. In fact, I'm not going to allow any travel. So you need to seek employment that Pretrial approves and that's appropriate while this case is pending.

You're to surrender your U.S. passport and your Israeli passport to Pretrial Services immediately. I believe that the Government took your United States passport. Mr. Chesnoff has your Israeli passport. He shall give that to Ms. McKillip upon the conclusion of this hearing.

Number four, you shall not obtain a passport or any other international travel documents. Number five, I'm going to order you that your travel is restricted to Clark County, Nevada. And the reason I say "Clark County" is it's too difficult if you're in Las Vegas and you cross into Henderson or you cross into North Las Vegas, that could create an issue. So I'm going to allow the travel in Clark County alone and exclude you from the airport.

So if you are in the zone of the airport, and they'll explain the zones, they will be notified immediately. Government counsel may be correct that they can't do anything quickly, but my guess is they will try. So you are not allowed to go to that airport.

You can go to Los Angeles for court appearances in this case and to prepare your case, but for no other reason. So while this case is pending, you're in Clark County, Nevada.

You are to avoid all contact directly or indirectly with any person who is or may be a victim or witness in the investigation or prosecution, and the Government will provide a list to you of who that is.

As it relates to the travel restriction, I'm going to order stand-alone monitoring with GPS. And again, as I've indicated, that will be restricted to Clark County and you will not be allowed to go to the airport.

We need a tampering restriction on that, don't we, Ms. McKillip? I think I might have one.

(Pause.)

OFFICER MCKILLIP: Yes, Your Honor. The defendant shall not tamper with, damage, or remove the monitoring device and shall charge the equipment according to the instructions provided by Pretrial Services.

THE COURT: All right. And, next, the defendant shall pay all or part of the costs of the location monitoring program based upon his ability to pay as determined by Pretrial Services or the supervising officer.

Ms. McKillip, do -- does Pretrial request any additional conditions to address the concerns that have been raised here today?

OFFICER MCKILLIP: No, Your Honor, but just in reference to the condition about not allowed to go to the airport, we would just ask without prior permission just so that he could get there --

THE COURT: Yes.

OFFICER MCKILLIP: -- to California for court.

THE COURT: Yes, without prior permission. But, again, the airport for that will only be to go to Los Angeles for court appearances, unless you find a need during the course of preparation for the defense that you need to travel somewhere else. But that will have to be outlined and get Court approval, Mr. Chesnoff.

MR. CHESNOFF: We will file whatever is appropriate, Your Honor.

THE COURT: All right.

All right. Mr. Chesnoff, Mr. Schonfeld, any questions about these conditions?

MR. CHESNOFF: No thank you, Your Honor.

THE COURT: Mr. Smirnov, any questions about these conditions?

THE DEFENDANT: No.

THE COURT: All right. Anything else from the Government, Mr. Wise?

MR. WISE: Your Honor, we would request -- respectfully request that you stay your order so that the Government can file

a motion for review in the court of original jurisdiction in the Central District of California before Judge Wright which we will do promptly.

THE COURT: All right. That will be denied.

Anything else?

MR. WISE: No, Your Honor.

THE COURT: Mr. Chesnoff, anything else?

MR. CHESNOFF: No. Have a nice afternoon, Your Honor.

THE COURT: All right. Court will be in recess.

MR. SCHONFELD: Thank you.

(Whereupon the proceedings concluded at 4:01 p.m.)

--oOo--

I, Patricia L. Ganci, court-approved transcriber, certify that the foregoing is a correct transcript transcribed from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/ PATRICIA L. GANCI — Patricia L. Ganci

FEBRUARY 20, 2024 — Date

# EXHIBIT M

# DEFENDANT'S RESPONSE TO GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION - Filed on February 20, 2024

2:24-mj-00166-DJA-1

DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant
ALEXANDER SMIRNOV

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDER SMIRNOV,<br><br>Defendant, | CASE NO. 2:24-mj-00166-DJA<br><br>DATE OF HEARING: FEB. 20, 2024<br>TIME OF HEARING: 3:00pm |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION**

COMES NOW, Defendant, ALEXANDER SMIRNOV, by and through his attorneys, DAVID Z. CHESNOFF, ESQ., and RICHARD A. SCHONFELD, ESQ., of the law firm of CHESNOFF & SCHONFELD and hereby Responds to the Government's Memorandum in Support of Detention.

///

This Response is made and based upon the attached Memorandum of Points and Authorities, the argument of counsel, and any other such evidence as may be presented at the time of hearing.

Dated this 20th day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ David Z. Chesnoff
DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant
ALEXANDER SMIRNOV

**MEMORANDUM OF POINTS AND AUTHORITIES**

Notwithstanding that counsel Chesnoff contacted out of state government counsel on Friday February 16, 2024, and asked to be apprised of any specific concerns that the government had related to its request for a continuance of the detention hearing, the government filed their Memorandum in Support of Detention this morning. While the Defendant cannot completely respond to the voluminous government filing, and will address the government assertions in court, there is one aspect that counsel will respond to herein.

On February 20, 2024, at approximately 1:00pm the undersigned counsel met with United States Pretrial Services Officer Emily McKillip who confirmed that Mr. Smirnov was only asked about his personal assets and not the business account.

Accordingly, the government's claim that "the fact that Smirnov misrepresented his assets alone should cause Smirnov to be detained…" is entirely misplaced and inaccurate.

DATED this 20th day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ David Z. Chesnoff
DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of February, 2024, I caused the forgoing document to be filed electronically with the Clerk of the Court through the CM/ECF system for filing; and served on counsel of record via the Court's CM/ECF system.

/s/ Rosemary Reyes
Employee of Chesnoff & Schonfeld

EXHIBIT N

GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION
- Filed on February 20, 2024

2:24-mj-00166-DJA-1

DAVID C. WEISS
Special Counsel
LEO J. WISE
Principal Senior Assistant Special Counsel
DEREK E. HINES
Senior Assistant Special Counsel
SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels
950 Pennsylvania Avenue NW, Room B-200
Washington, D.C. 20530
Telephone: (771) 217-6091
E-mail: Leo.Wise@USDOJ.GOV, DEH@USDOJ.GOV
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Alexander Smirnov,<br><br>Defendant. | 2:24-mj-00166-DJA<br><br>**Government's Memorandum in Support of Detention** |

Certification: This response is timely.

## I. Introduction

No condition or combination of conditions will reasonably assure the appearance of the defendant Alexander Smirnov as required. *See* 18 U.S.C. § 3142 (e)(1); *see also United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). As discussed in more detail below, the nature and circumstances of the offense, weight of the evidence, and the fact that Smirnov's ties to the community are weak establish that Smirnov should be detained. But, in addition,

there are four indisputable facts related to the characteristics of Smirnov that compel detention.

First, he claims to have contacts with multiple foreign intelligence agencies and had plans to leave the United States two days after he was arrested last week for a months-long, multi-country foreign trip. During this trip, the defendant claimed to be meeting with foreign intelligence contacts. Those foreign intelligence agencies could resettle Smirnov outside the United States if he were released.

Second, he has access to over $6 million in liquid funds—more than enough money for him to live comfortably overseas for the rest of his life.

Third, Smirnov did not disclose to Pretrial Services his access to these funds. He told Pretrial Services he only had $1,500 in cash-on-hand and $5,000 in a personal checking account. *See* Pretrial Services Report at page 2. As the attached bank statements make clear, as of the end-of-December, Smirnov has access to more than $2.9 million, *see* Exhibit 4 (under seal) and his wife/girlfriend (he refers to her both ways) (hereafter "DL") has access to more than $3.8 million, *see* Exhibit 7 (under seal). The latter's funds are available to him because most of the money in DL's account originated with Smirnov and she pays his personal expenses out of her account; in other words, these appear to be shared funds or funds controlled by Smirnov, regardless of whose name is on the bank account. The fact that Smirnov misrepresented his assets alone should cause Smirnov to be detained because it shows that, at the first opportunity, he did not provide true and complete information to Pretrial Services.

Fourth, as an Israeli citizen, Smirnov can obtain a new passport at any time by visiting an Israeli consulate. The closest Israeli consulate is approximately 5 hours away in Los

Angeles, California. Thus, even if he turns in his U.S. and Israeli passports, Pretrial Services has no way to prevent him from obtaining a new Israeli passport and leaving the United States using it at any time.

## II. Statement of Facts and Procedural History

Smirnov was a confidential human source ("CHS") with the Federal Bureau of Investigation ("FBI"). Indictment ¶ 2. As a CHS, Smirnov was assigned a handling agent (hereafter "the Handler") who was a special agent on an FBI squad that investigated violations of federal criminal law. *Id.*

Smirnov was admonished by the Handler that he must provide truthful information to the FBI when he first became a CHS in 2010 and on multiple occasions thereafter, including, but not limited to: 10/1/2010, 1/20/2011, 5/17/2011, 9/14/2011, 8/29/2012, 11/28/2012, 4/12/2013, 8/29/2013, 1/22/2014, 7/9/2014, 7/10/2015, 9/29/2016, 9/26/2017, 9/26/2018, 9/27/2019, 3/11/2020, 2/19/2021, 10/28/2021, 10/17/2022 and 9/29/2023. *Id.* at ¶ 4.

In addition, when Smirnov was authorized to engage in illegal activity for investigative purposes, he was further admonished that: "Under no circumstances may the CHS ... Participate in an act that constitutes obstruction of justice (e.g., perjury, witness tampering, witness intimidation, entrapment, or fabrication, alteration, or destruction of evidence, unless such illegal activity has been authorized)." *Id.* at ¶ 5. When Smirnov was given this admonishment, he signed an FBI form that contained this statement, including on 10/8/2014, 1/18/2017, 10/8/2018, 1/10/2019, and 8/7/2020. *Id.*

Despite repeated admonishments that he must provide truthful information to the FBI and that he must not fabricate evidence, Smirnov provided false derogatory information

to the FBI about Public Official 1, an elected official in the Obama-Biden Administration who left office in January 2017, and Businessperson 1, the son of Public Official 1, in 2020, after Public Official 1 became a candidate for President of the United States of America. *Id.* at ¶ 6.

In March 2017, Smirnov reported to the Handler that he had had a phone call with the owner of Ukrainian industrial conglomerate Burisma Holdings, Limited (hereafter "Burisma Official 1") concerning Burisma's interest in acquiring a U.S. company and making an initial public offering ("IPO") on a U.S.-based stock exchange. *Id.* at ¶ 6(a). In reporting that conversation to the Handler, Smirnov also noted that Businessperson 1, Public Official 1's son, was a member of Burisma's Board, a fact that was publicly known. *Id.*

Three years later, in June 2020, Smirnov reported, for the first time, two meetings in 2015 and/or 2016, during the Obama-Biden Administration, in which he claimed executives associated with Burisma, including Burisma Official 1, admitted to him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1, when Public Official 1 was still in office, so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with [the then-Ukrainian Prosecutor General]." *Id.* at ¶ 6(b).

Smirnov also reported two purported phone calls between himself and Burisma Official 1 wherein Burisma Official 1 stated that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1. *Id.* at ¶ 6(c).

The events Smirnov first reported to the Handler in June 2020 were fabrications. *Id.* at ¶ 6(d). In truth and fact, Smirnov had contact with executives from Burisma in 2017, after the end of the Obama-Biden Administration and after the then-Ukrainian Prosecutor General had been fired in February 2016, in other words, when Public Official 1 had no ability to influence U.S. policy and when the Prosecutor General was no longer in office. *Id.* In short, Smirnov transformed his routine and unextraordinary business contacts with Burisma in 2017 and later into bribery allegations against Public Official 1, the presumptive nominee of one of the two major political parties for President, after expressing bias against Public Official 1 and his candidacy. *Id.*

When he was interviewed by FBI agents in September 2023, Smirnov repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after he said he met with Russian officials. *Id.* at ¶ 6(e).

On February 14, 2024, a federal grand jury in the Central District of California returned a two-count indictment charging Smirnov with one count of making false statements to federal law enforcement, in violation of 18 U.S.C. § 1001 (Count One) and; one count of fabricating information in a federal investigation, in violation of 18 U.S.C. § 1519 (Count Two). *United States v. Smirnov*, Cr. No. 2:24-cr-00091-ODW (C.D. Cal. Feb. 14, 2024, ECF 1).

That same day, Smirnov was arrested in the District of Nevada as he returned to the United States on an international flight. Smirnov was scheduled to leave the United States two days later, on February 16, 2024, for a months-long, multi-country trip that, by his own description, involved meetings with officials of foreign intelligence agencies and governments. During his custodial interview on February 14, Smirnov admitted that officials

associated with Russian intelligence were involved in passing a story about Businessperson 1.

On February 15, 2024, Smirnov had an initial appearance in the District of Nevada. At that time the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(a) and (b) on the basis that Smirnov posed a serious risk of flight and a serious risk of obstruction of justice. The Government requested a three (3) day continuance of the detention hearing, pursuant to 18 U.S.C. § 3142(f)(2). A detention hearing is scheduled for February 20, 2024.

**III. Points and Authorities**

The facts before the Court establish that there are no conditions or combination of conditions that will reasonably assure Smirnov's appearance. Therefore, Smirnov should be detained pending trial.

Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985); *United States v. Kouyoumdjian*, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985). Title 18, United States Code, Section 3142 (hereafter the "Bail Reform Act") specifically provides, in relevant part, that "the judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required" consider the following factors:

(1) the nature and circumstances of the offense charged …;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; …

18 U.S.C. § 3142(g); *United States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015). A finding that that there are no conditions that will reasonably assure a defendant's appearance need only be established by a preponderance of the evidence. *Santos-Flores*, 794 F.3d at 1090; *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir.1991); *Motamedi*, 767 F.2d at 1407. "More finely put, this means that the Government must demonstrate that it is more likely than not that there is a serious risk that the defendant will flee, not that it is more likely than not that the defendant will flee." *United States v. Figueroa-Alvarez*, No. 4:23-CR-00171-DCN, 2023 WL 4485312, at *5 (D. Idaho July 10, 2023); *see United States v. Duarte-Vela*, No. 2:23-cr-00009-TOR-1, Amended Order Following Status Hearing Regarding Detention and Detention Hearing at 7 (Dkt. 32) (E.D. Wa. Jan. 25, 2023); *Alvarenga-Canan*, No. 1:23-cr-00042-BLW, Tr. at 7 (Dkt. 26) ("It's got to be 51 percent of a serious risk.").

**A. Smirnov is charged with lying to law enforcement and fabricating evidence.**

The nature and circumstances of the offense make clear that there are no conditions of release that will reasonably assure the appearance of Smirnov. Pretrial supervision is, at its core, based on trust. Pretrial Services must trust a defendant to abide by the conditions the court imposes and to accurately report information requested by Pretrial Services as they attempt to police those conditions. The circumstances of the offenses charged—that Smirnov lied to his FBI Handler after a 10-year relationship where the two spoke nearly every day—means that Smirnov cannot be trusted to provide truthful information to Pretrial Services. Critically, Smirnov lied to his FBI Handler after repeated admonishments that the information he provided to the FBI must be truthful. And the false information he provided was not trivial. It targeted the presumptive nominee of one of the two major political parties

in the United States. The effects of Smirnov's false statements and fabricated information continue to be felt to this day. Now the personal stakes for Smirnov are even higher. His freedom is on the line. If he could not be trusted to report truthful information to his FBI Handler, he cannot be trusted to report truthful information to Pretrial Services.

**B. The weight of the evidence against Smirnov is strong.**

As described in the indictment, the evidence against Smirnov is strong.

Smirnov is charged with lying to the FBI about two meetings in late 2015/2016 and two phone calls in 2016/2017 and 2019. Specifically, Smirnov told the FBI in 2020 that "in late 2015/2016 during the Obama/Biden Administration" he first met with Burisma Official 2 and that at that meeting Burisma Official 2 told him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems." Indictment at ¶ 24.

Smirnov also claimed that he met with Burisma Official 1 "one or two months later," around the time "[Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred on December 9, 2015, and that at that meeting Burisma Official 1 admitted that he had paid Businessperson 1 $5 million and Public Official 1 $5 million each so that "[Businessperson 1] will take care of all those issues through his dad," referring to the then-Ukrainian Prosecutor General's investigation into Burisma, and to "deal with [the then-Ukrainian Prosecutor General]." *Id.*

The evidence at trial will establish that no such statements were made to Smirnov because, in truth and fact, Smirnov met with officials from Burisma for the first time in 2017, after Public Official 1 left office in January 2017, and after the then-Ukrainian Prosecutor General had been fired in February 2016. *Id.* at ¶29. The evidence at trial will show

Smirnov's story to the FBI was a fabrication, an amalgam of otherwise unremarkable business meetings and contacts that had actually occurred but at a later date than he claimed and for the purpose of pitching Burisma on Smirnov's services and products, not for discussing bribes to Public Official 1 when he was in office.

Smirnov began to pursue business opportunities with Burisma in spring 2017, at the earliest, through two associates of his. *Id.* at ¶30. Associate 1 was a Ukrainian business consultant. *Id.* at ¶ 30(a). He was introduced to Smirnov by a mutual acquaintance who told Associate 1 that Smirnov was an expert in IPOs in the United States. *Id.* Smirnov and Associate 1 subsequently met in Kiev, Ukraine, and Smirnov asked Associate 1 to connect him to businesses in Ukraine interested in IPOs in the United States. *Id.* Associate 1 subsequently identified Burisma as such a company. *Id.* Associate 2 was an American who owned a cryptocurrency business. *Id.* at ¶ 30(b). In the spring of 2017, Smirnov presented Burisma to Associate 2 as a company that might be interested in a cryptocurrency product Associate 2 was trying to commercialize. *Id.* Around this time, Smirnov sent Associate 2 a link to the Board of Directors of Burisma. *Id.* Smirnov specifically called out the fact that Businessperson 1 was on the Board and indicated that because Businessperson 1 was on the Board, Smirnov thought Burisma was a company with which they could do business. *Id.*

Between March 2017, when Smirnov first reported on Burisma to the Handler, and June 2020, when he first made his false claims about bribes paid to Public Official 1 when he was in office, directly and through his son Businessperson 1, Smirnov had a series of routine business contacts with executives at Burisma. *Id.* at ¶ 31. All of these contacts occurred in 2017 and 2018, when Public Official 1 was out of office and after the then-Ukrainian Prosecutor General had been fired. *Id.*

The same day that he first reported on Burisma, March 1, 2017, Smirnov messaged the Handler a photograph of a business card for Burisma Official 2. *Id.* at ¶ 31(a).

In response, on that same day, the Handler asked Smirnov, "How's [Burisma Official 2] fit into the story", to which Smirnov responded, "This is the guy that will do the public company from there [sic.] side." *Id.* at ¶ 31(b).

The Handler then messaged Smirnov, "Looks like the CEO or Owner might be [Burisma Official 1] or []. Either sound familiar?", to which Smirnov responded with the first name of Burisma Official 1. *Id.* at ¶ 31(c). The Handler then asked Smirnov whether he was meeting with Burisma Official 1, to which Smirnov responded, "No. The guy that I send [sic.] you the business card." *Id.*

On April 13, 2017, the Handler messaged Smirnov asking him, "U know who from Burisma will be in the meeting," to which Smirnov responded, "Not yet Will know after we [sic.] I will get the email." *Id.* at ¶ 31(d).

Four days later, on April 17, 2017, Associate 1 sent Smirnov and Burisma Official 2 an email introducing them to each other. *Id.* at ¶ 31(e).

That same day, Associate 1 sent another email to Burisma Official 2 summarizing, in general terms, how a company could undertake an IPO in the United States. *Id.* at ¶ 31(f).

On or about April 27, 2017, Burisma Official 2 responded to Associate 1's April 17, 2017, email. Burisma Official 2 thanked Associate 1 for introducing him to Smirnov and promised to send Smirnov and Associate 1 information about Burisma's desire to buy an oil and gas company in the United States. *Id.* at ¶ 31(g).

On or around May 11, 2017, Burisma Official 4, another Burisma executive, emailed Associate 1 telling him that Burisma was not interested in pursuing an IPO in the United States and that their priority was acquiring a U.S.-based oil and gas company. *Id.* at ¶ 31(h).

Seven days later, on or about May 18, 2017, Associate 1 forwarded Burisma Official 4's email to Smirnov. *Id.* at ¶ 31(i).

On July 24, 2017, Smirnov messaged the Handler, "Cutting a deal with Burisma Will update you soon bro" and "It's gonna be a contract so we can review it first." *Id.* at ¶ 31(j).

On September 16, 2017, Associate 2, the individual whom Smirnov claimed in the 2020 1023 attended the first meeting Smirnov had with Burisma executives in late 2015 or early 2016, flew from New York to Kiev, via London. *Id.* at ¶ 31(k). Associate 2 remained in Ukraine until September 23, 2017, when he returned to the United States through London. *Id.*

During the six (6) day period that Associate 2 was in Ukraine, he and Smirnov met with representatives from Burisma, including Burisma Official 3, the daughter of Burisma's owner Burisma Official 1, to discuss a cryptocurrency product. *Id.* at ¶ 31(l). The meeting

was in Russian, and on the drive back from Burisma's headquarters, Smirnov described to Associate 2 what had been discussed. *Id.* Smirnov told Associate 2 that the Burisma representatives were not interested in the cryptocurrency product Smirnov and Associate 2 were selling and were instead trying to find an oil and gas company in the United States that Burisma could purchase. *Id.* Smirnov did not describe to Associate 2 any discussion of Businessperson 1 or Public Official 1 during this meeting. *Id.*

On September 19, 2017, Smirnov messaged the Handler photographs of business cards for Burisma Official 3, the person Smirnov claimed he met at the first meeting in late 2015 and or 2016 during the Obama-Biden Administration, and Burisma Official 4, the individual who had sent an email to Associate 1, which Associate 1 then forwarded to Smirnov, in May 2017, as described above. *Id.* at ¶ 31(m).

After the September 2017 meeting, Associate 2 prepared a document outlining steps that Burisma could take in order to acquire a company in the United States and use it for an IPO. *Id.* at ¶ 31(n). Associate 2 sent this document to Smirnov on September 22, 2017. *Id.*

Associate 2's trip to Kiev in September 2017 was the first time he had left North America since 2011. *Id.* at ¶ 31(o). Associate 2's travel records conclusively establish that fact. Thus, he could not have attended a meeting in Kiev, as Smirnov claimed, in late 2015

or early 2016, during the Obama-Biden Administration. *Id.* His trip to Ukraine in September 2017 was more than seven months after Public Official 1 had left office and more than a year after the then-Ukrainian Prosecutor General had been fired. *Id.*

On January 23, 2018, Associate 2 flew from Los Angeles to London. *Id.* at ¶ 31(p). During the previous week, on January 16, 2018, Smirnov messaged Associate 2 asking him, "Brother Send me the name of the place in London please," to which Associate 2 replied, "Baglioni." *Id.* On January 25, 2018, Smirnov attempted to call Associate 2. *Id.* Associate 2 responded, "Downstairs getting breakfast," and Smirnov responded, "Cool. See you in a few." *Id.* Both Smirnov and Associate 2 were staying at the Hotel Baglioni in London at that time. *Id.* When Associate 2 was with Smirnov in London, Smirnov told Associate 2 that he had received a call from the owner of Burisma, Burisma Official 1, and that Burisma Official 1 was interested in doing business with them. *Id.*

On January 26, 2018, Associate 2 flew from London to Kiev, staying until January 30, 2018. *Id.* at ¶ 31(q).

During that five (5) day period, Smirnov and Associate 2 traveled to Burisma's headquarters. *Id.* at ¶ 31(r). Once there, they had a brief meeting with Burisma Official 2, who told them that Burisma was not interested in their cryptocurrency product. *Id.* Burisma Official 2 spoke English during the meeting, and Associate 2 was able to participate. *Id.* At no point during this meeting between Smirnov, Associate 2, and Burisma Official 2 did Burisma Official 2 tell Smirnov that Burisma had hired Businessperson 1 to "protect us, through his dad, from all kinds of problems." *Id.*

All the contacts that Smirnov had with Burisma occurred no earlier than spring 2017, after the end of the Obama-Biden Administration. *Id.* at ¶ 32. Notably, Smirnov was only

introduced to Burisma Official 2, via email, on or about April 17, 2017. *Id.* Therefore, Smirnov's claim that he had met with Burisma Official 2 in "late 2015 or 2016, during the Obama/Biden administration," was false because if Smirnov had met Burisma Official 2 then, he would not have needed Associate 1 to introduce him to Burisma Official 2 in April 2017, and Burisma Official 2 would not have thanked Associate 1 for introducing them in April 2017. *Id.*

As to the second meeting, the one that supposedly happened in Vienna, contrary to what Smirnov told the Handler, Associate 1 did not meet with Smirnov and Burisma Official 1 at a café in Vienna around the time that Public Official 1 "made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred in December 2015. *Id.* at ¶ 33. In fact, Associate 1 has never met or spoken with Burisma Official 1. *Id.*

Further, based on his own travel records, Smirnov did not travel to Vienna "around the time [Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred in December 2015. *Id.* at ¶ 34.

As to the two phone calls Smirnov claimed to have in "2016/2017" and 2019, Smirnov told his Handler that Burisma Official 1 said he was "pushed to pay" Public Official 1 and Businessperson 1, had text messages and recordings that show he was coerced to make such payments, and it would take investigators ten years to find the records of illicit payments to Public Official 1. *Id.* at ¶57(c) and (d). When Smirnov was interviewed by the FBI in September 2023, he reversed himself and said he did not speak to Burisma Official 1 on the

phone after they met in a German speaking country in early 2016. *Id.* at ¶ 49. Further, Associate 1 has never spoke to Burisma Official 1. *Id.* at ¶ 36.

In sum, Smirnov's own travel records, emails and messages with his Handler, along with emails and travel records of the individuals who Smirnov claimed to have attended the two meetings with him, will all be used as evidence against him. Further, the individuals who participated in these meetings and phone calls will refute that there was ever any discussion of Public Official 1 or Businessperson 1 in those meetings or any phone calls at all.

**C. The history and characteristics of Smirnov make clear that no conditions can reasonably assure his appearance.**

Smirnov's personal history and characteristics also weigh in favor of detention. Smirnov has very weak ties to the community in Las Vegas. He has only lived in Las Vegas since 2022. Pretrial Services Report at 1. The condominium where he lives is owned by DL, a fact about which he lied, as will be addressed below. Exhibit 1 (under seal). He has no family in Las Vegas. To the contrary, he reports that his mother, father, and sister all reside in Israel. *Id.* Smirnov lived in Israel from 1992 to 2006, longer than he has lived in the United States. *Id.* He does not report any employment that is located in Las Vegas. Instead, he claims to have a "security business," that is registered in California, where he used to live. *See* Pretrial Services Report at 2. DL, with whom he lives, does not appear to even know what he does. *Id.* Nor do his bank records reflect that he is in the "security business," as he claims. *Id.* Instead, the statements for the accounts he controls show large wire transfers from what appear to be venture capital firms and individuals. *See* Exhibit 4 (under seal).

1. Smirnov claims to have contact with foreign intelligence agencies.

While Smirnov has no ties to the community in Las Vegas, what he does have is extensive foreign ties, including, most troublingly and by his own account, contact with foreign intelligence services, including Russian intelligence agencies, and has had such contacts recently. Smirnov could use these contacts to resettle outside the United States.

As noted, law enforcement knows about Smirnov's contact with officials affiliated with Russian intelligence because Smirnov himself reported on a number of those contacts to his FBI Handler. As described below, these contacts are extensive and extremely recent, and Smirnov had the intention of meeting with one of these officials on his upcoming planned overseas travel.

Of particular note, Smirnov has reported numerous contacts with Russian Official 1, who has been described by Smirnov in a number of ways, including as the son of a former high-ranking Russian government official, someone who purportedly controls two groups of individuals tasked with carrying out assassination efforts in a third-party country, a Russian representative to another country, and as someone with ties to a particular Russian intelligence service. This latter fact was reported by Smirnov in October, 2023.

In December 2023, Smirnov reported to his Handler about a recent overseas trip, where Smirnov attended a meeting with Russian Official 2, who Smirnov has described as a high-ranking member of a specific Russian foreign intelligence service. According to Smirnov, the purpose of the meeting was to discuss a potential resolution to Russia's war against Ukraine. During this same trip, Smirnov apparently attended a separate meeting with Russian Official 1, the individual who controls groups that are engaged in overseas assassination efforts. During this meeting with Russian Official 1, Russian Official 1 claimed

that another individual, Russian Official 4, the head of a particular unit of a Russian Intelligence Service, ran an intelligence operation at a "club" located at a particular hotel. Smirnov told the FBI Handler that the Russian Intelligence Service intercepted cell phone calls made by guests at the hotel. The Russian Intelligence Service intercepted several calls placed by prominent U.S. persons the Russian government may use as "kompromat" in the 2024 election, depending on who the candidates will be. As described below, this story, which again was relayed by Smirnov to his Handler in/about December, 2023, appears to mirror the story that Smirnov was pushing on investigators and prosecutors during their meeting with him in September, 2023 (in which Smirnov pushed investigators to look into whether Businessperson 1 had been recorded in a foreign hotel).

Most recently, Smirnov has reported:

a. Meetings in or about December 2023, outside the United States, between top officials of another country and Russian officials;

b. Contact with a Russian official on November 27, 2023, where the Russian official provided Smirnov with information on his knowledge of certain Russian military operations in a third country; and

c. Contact with a Russian intelligence service operative and top Russian representative to a third country on November 8, 2023.

Exhibit 2.

The following is a declassified summary of additional contacts that predate the contacts referenced above and in Exhibit 2. This summary was prepared by the FBI and taken from several reports he made to the FBI:

1. (U//FOUO) (Document 1)
   a. (U//FOUO) In or about October 2023, SMIRNOV reported the following:
      i. (U//FOUO) SMIRNOV was invited to and planned to attend the birthday party of an identified individual in the Middle East, COUNTRY A, which would include activities on a mega yacht owned by a high-ranking member of Russia's largest steel and mining company. SMIRNOV provided the names of individuals who might attend the birthday activities, including RUSSIAN OFFICIAL 1, who he identified as the son of a high-ranking former Russian government official, and RUSSIAN INDIVIDUAL 1, a high-ranking member of a Russia state-owned defense conglomerate.

2. (U//FOUO) (Document 2)
   a. (U//FOUO) In or about January 2023, SMIRNOV reported the following:
      i. (U//FOUO) In December 2022, SMIRNOV learned from a Russian Foreign Intelligence official the whereabouts of a particular Russian Foreign Intelligence officer living outside of Russia.
      ii. (U//FOUO) In or about January 2023, SMIRNOV spoke to another Russian Foreign Intelligence officer who provided the first name of the Russian Foreign Intelligence officer living outside of Russia.

3. (U//FOUO) (Document 3)
   a. (U//FOUO) On or about August 2023, SMIRNOV reported the following:
      i. (U//FOUO) SMIRNOV had been introduced to RUSSIAN INDIVIDUAL 2, a high-ranking member of a Russian steel company. RUSSIAN INDIVIDUAL 2 was organizing a birthday party for another person on RUSSIAN INDIVIDUAL 2's mega yacht. RUSSIAN INDIVIDUAL 2 mentioned that two of the oligarchs who would be attending the party have "connections" or "business ties" to a high-ranking member of a Russian Foreign Intelligence Service, RUSSIAN OFFICIAL 2. Because of the language used by RUSSIAN INDIVIDUAL 2, SMIRNOV was not clear about the precise nature of the relationship between the identified Russian oligarchs and RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service.

4. (U//FOUO) (Document 4)
   a. (U//FOUO) In or about October 2023, SMIRNOV reported the following information (this information was provided to supplement Document 1):
      i. (U//FOUO) The planned COUNTRY A birthday party may be attended by RUSSIAN OFFICIAL 1, the son of a former high-ranking Russian government official. An associate of SMIRNOV

provided SMIRNOV with a copy of RUSSIAN OFFICIAL 1's passport.

5. (U//FOUO) (Document 5)
    a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:
        i. (U//FOUO) SMIRNOV learned from RUSSIAN OFFICIAL 1 himself, that RUSSIAN OFFICIAL 1 has direct access to the highest levels of the Russian government. Although RUSSIAN OFFICIAL 1's father was a former high-ranking government official in Russia, RUSSIAN OFFICIAL 1's access to the highest levels of the Russian government is direct, and not through his father.
        ii. (U//FOUO) RUSSIAN OFFICIAL 1 is a top, unofficial representative of Russia to COUNTRY B.
        iii. (U//FOUO) SMIRNOV provided a photograph of RUSSIAN OFFICIAL 1 taken in or about November 2023, during RUSSIAN OFFICIAL 1's visit to COUNTRY A.

6. (U//FOUO) (Document 6)
    a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:
        i. (U//FOUO) SMIRNOV learned from sources, including RUSSIAN OFFICIAL 1, that a particular individual, RUSSIAN OFFICIAL 3, is the representative of the former head of a particular unit of a Russian Intelligence Service, RUSSIAN OFFICIAL 4.
        ii. (U//FOUO) SMIRNOV provided information about RUSSIAN OFFICIAL 4's chain of command. SMIRNOV named three individuals who have direct, immediate access to the highest levels of the Russian government, including the father of RUSSIAN OFFICIAL 1.

7. (U//FOUO) (Document 7)
    a. (U//FOUO) In or about December 2023, SMIRNOV reported the following information (which is also reported in Document 6).
        i. (U//FOUO) SMIRNOV learned from sources, including RUSSIAN OFFICIAL 1, that a particular individual, RUSSIAN OFFICIAL 3, is the representative of the former head of a particular unit of a Russian Intelligence Service, RUSSIAN OFFICIAL 4.

8. (U//FOUO) (Document 8)
    a. (U//FOUO) In or about November 2023, SMIRNOV reported the following information:
        i. (U//FOUO) In October 2023, SMIRNOV had in-person conversations with RUSSIAN OFFICIAL 1 overseas. During these conversations, RUSSIAN OFFICIAL 1 discussed his knowledge

and seeming control of two groups of Russian operatives who were previously tasked with the assassination of a high-ranking official of COUNTRY C. RUSSIAN OFFICIAL 1 offered to stop the assassination efforts in exchange for certain things, including an agreement by COUNTRY C to stop targeting civilian-family-members of certain Russian officials living in Moscow.

ii. (U//FOUO) RUSSIAN OFFICIAL 1 also provided SMIRNOV with specific information about Russia's military resources for a winter attack in COUNTRY C. RUSSIAN OFFICIAL 1 also told SMIRNOV about the Russian government's intentions for their war in Ukraine.

9. (U//FOUO) (Document 9)

a. (U//FOUO) In or about December 2023, SMIRNOV reported the following information:

i. (U//FOUO) SMIRNOV attended a meeting in COUNTRY A in December 2023 that was attended by RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service. The primary purpose of the meeting was to discuss a potential resolution to the Russia-Ukraine war.

ii. (U//FOUO) On this same trip, SMIRNOV attended another meeting with, among others, RUSSIAN OFFICIAL 1.

iii. (U//FOUO) Unrelated to the above, SMIRNOV had a separate conversation with RUSSIAN OFFICIAL 1, wherein RUSSIAN OFFICIAL 1 claimed that RUSSIAN OFFICIAL 4, the head of a particular unit of a Russian Intelligence Service, ran an intelligence operation at a "club" located on a particular floor of HOTEL 1, which is in COUNTRY C. SMIRNOV stated the Russian Intelligence Service intercepted cell phone calls made by guests at the hotel. The Russian Intelligence Service intercepted several calls placed by prominent US persons the Russian government may use as "kompromat" in the 2024 election, depending on who the candidates will be.

iv. (U//FOUO) SMIRNOV later had a meeting with another COUNTRY C government official, who stated it was common knowledge that the Russian Intelligence Service did, in fact, run such intelligence operations at HOTEL 1.

10. (U//FOUO) (Document 10)

a. (U//FOUO) In or about February 2022, SMIRNOV provided the following information:

i. (U//FOUO) When SMIRNOV was working in COUNTRY D circa 2002, he conducted a joint operation to recruit two individuals: 1) RUSSIAN OFFICIAL 5, Russian consular to COUNTRY D, who was caught spying; and, 2) a COUNTRY E consular to COUNTRY D.

ii. (U//FOUO) SMIRNOV first met RUSSIAN OFFICIAL 5 at an event/party COUNTRY D put on for foreign officials. Thereafter, SMIRNOV spent numerous months developing a "friendship" with RUSSIAN OFFICIAL 5. After some time, SMIRNOV was asked by COUNTRY D to contact RUSSIAN OFFICIAL 5 and tell them that COUNTRY D had info that RUSSIAN OFFICIAL 5 was spying. Rather than arresting/PNGing RUSSIAN OFFICIAL 5, COUNTRY D told RUSSIAN OFFICIAL 5 had to leave within 48 hours or there would be "adverse consequences", but that RUSSIAN OFFICIAL 5 should keep in touch with COUNTRY D and SMIRNOV. Thereafter, RUSSIAN OFFICIAL 5 would occasionally provide SMIRNOV with information. RUSSIAN OFFICIAL 5 never provided information that was "adverse" to Russia.

iii. (U//FOUO) Approximately three years before the time of this reporting, possibly in 2019, SMIRNOV traveled to Russia and met with RUSSIAN OFFICIAL 5. They had a very careful, coded conversation about what Russia might look like under different leadership. For background, SMIRNOV understood that RUSSIAN OFFICIAL 5's spouse is somehow related to RUSSIAN OFFICIAL 6, a former high-ranking member of a Russian Intelligence Service. SMIRNOV has never met RUSSIAN OFFICIAL 6, however SMIRNOV once called RUSSIAN OFFICIAL 5 who was in the car at the time with RUSSIAN OFFICIAL 6, who spoke very briefly to SMIRNOV over speaker phone.

iv. (U//FOUO) During a subsequent meeting two days later, SMIRNOV and RUSSIAN OFFICIAL 5 spoke again about matters pertaining to Russia. RUSSIAN OFFICIAL 5 indicated that RUSSIAN OFFICIAL 6 was not happy with Russian leadership, and that RUSSIAN OFFICIAL 6 was also close friends/associates with RUSSIAN OFFICIAL 2, a high-ranking member of a Russian Foreign Intelligence Service.

v. (U//FOUO) First call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): Prior to a recent overseas trip, SMIRNOV contacted RUSSIAN OFFICIAL 5 to see if he could arrange to have RUSSIAN OFFICIAL 2, speak to a high-ranking official of COUNTRY C. SMIRNOV contacted RUSSIAN OFFICIAL 5 and provided him with a proposed date and time for RUSSIAN OFFICIAL 2 to call. SMIRNOV obtained a "throw-phone" and foreign SIM card and provided RUSSIAN OFFICIAL 5 with the number. SMIRNOV indicated that a call subsequently took place between RUSSIAN OFFICIAL 2 and a high-ranking official COUNTRY C, the subject matter of which SMIRNOV was aware.

vi. (U//FOUO) Second call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): In January 2022, SMIRNOV had a second call with RUSSIAN OFFICIAL 2 (SMIRNOV used a second throw phone). SMIRNOV asked RUSSIAN OFFICIAL 2 for a "favor"—namely that Russian troops do not hurt SMIRNOV's associate, an official of COUNTRY C. RUSSIAN OFFICIAL 2 asked what SMIRNOV thought of SMIRNOV's associate. SMIRNOV later reiterated his "ask" that his associate not be harmed during any Russian incursion. RUSSIAN OFFICIAL 2 said he was told by RUSSIAN OFFICIAL 5, who SMIRNOV "befriended" years earlier after RUSSIAN OFFICIAL 5 was caught spying, that SMIRNOV was a "good guy," and therefore RUSSIAN OFFICIAL 2 would help to ensure SMIRNOV's associate was not killed or harmed.

vii. (U//FOUO) Third call with RUSSIAN OFFICIAL 2 (High-ranking member of a Russian Foreign Intelligence Service): After SMIRNOV returned from his overseas trip, he again asked RUSSIAN OFFICIAL 5 to set up another call with RUSSIAN OFFICIAL 2. During the call, SMIRNOV discussed the additional escalation of Russian troops along the Ukraine border and asked RUSSIAN OFFICIAL 2 whether he could provide any details about Russia's intentions. RUSSIAN OFFICIAL 2 stated he was 99% that only a skirmish would occur.

11. (U//FOUO) <u>(Document 11)</u>

a. (U//FOUO) In or about October 2023, SMIRNOV provided the following information:

i. (U//FOUO) Photo of passport of RUSSIAN OFFICIAL 1.

ii. (U//FOUO) In October 2023, SMIRNOV advised that RUSSIAN OFFICIAL 1, the son of a high-ranking former Russian government official, was invited to attend a birthday party in October 2023 in COUNTRY A, which will be held on RUSSIAN INDIVIDUAL 2's mega yacht. SMIRNOV received a copy of RUSSIAN OFFICIAL 1's Russian passport.

Smirnov's anticipated travel from the United States, on Friday of last week, two days after his return, was for the purpose of meeting with Russian intelligence officials, among others. Specifically:

12. (U//FOUO) <u>(Document 12)</u>

a. (U//FOUO) In or about January 2024, SMIRNOV provided the following information. The information was recorded in an FD-1040a, CHS travel/ET Activity Request Form.

i. SMIRNOV reported future travel and meeting itineraries to his FBI Handler, which outlined travel to various countries in February 2024. SMIRNOV planned to meet with RUSSIAN OFFICIAL 1, an operative of a Russian Intelligence Service. The primary purpose of the meeting with RUSSIAN OFFICIAL 1 was to discuss the exchange of Russian and Ukrainian military prisoners. The meeting was set to occur in COUNTRY A.

Smirnov's contacts with Russian officials who are affiliated with Russian intelligence services are not benign. At his meeting with FBI investigators in September 2023, Smirnov pushed a new story about Public Official 1 and Businessperson 1, as described in the indictment. Indictment at ¶51. Specifically, Smirnov wanted them to look into whether Businessperson 1 was recorded in a hotel in Kiev called the Premier Palace. *Id.* Smirnov told investigators that the entire Premier Palace Hotel is "wired" and under the control of the Russians. *Id.* Smirnov claimed that Businessperson 1 went to the hotel many times and that he had seen video footage of Businessperson 1 entering the Premier Palace Hotel. *Id.* Investigators know that Smirnov's new story is false because Businessperson 1 has never travelled to Ukraine. *Id.* at ¶ 54.

Smirnov suggested that investigators check to see if Businessperson 1 made telephone calls from the Premier Palace Hotel since those calls would have been recorded by the Russians. *Id.* at ¶ 52. Smirnov claimed to have obtained this information a month earlier by calling a high-level official in a foreign country. *Id.* Smirnov also claimed to have learned this information from four different Russian officials. *Id.*

Smirnov told investigators that the four different Russian officials are all top officials and two are the heads of the entities they represent. *Id.* at ¶ 53. These Russians said that conversations with Ukrainians about ending the war will include the next U.S. election. Smirnov told investigators he is involved in negotiations over ending the war and had been

for the previous four months. *Id.* According to Smirnov, the Russians want Ukraine to assist in influencing the U.S. election, and Smirnov thinks the tapes of Businessperson 1 at the Premier Palace Hotel is all they have. *Id.* Smirnov told investigators he wants them to ask Businessperson 1 how many times he visited and what he did while at the Premier Palace Hotel. *Id.*

Thus, Smirnov's efforts to spread misinformation about a candidate of one of the two major parties in the United States continues. The Court should consider this conduct as well when evaluating his personal history and characteristics. What this shows is that the misinformation he is spreading is not confined to 2020. He is actively peddling new lies that could impact U.S. elections after meeting with Russian intelligence officials in November. In light of that fact there is a serious risk he will flee in order to avoid accountability for his actions.

2. Smirnov has access to millions of dollars that he did not disclose to Pretrial Services.

Smirnov has already demonstrated that he cannot be trusted to provide truthful information to Pretrial Services. When he was interviewed, he told Pretrial Services that he only had access to $1,500 in cash and another $5,000 in a checking account. *See* Pretrial Services Report at 2.

That is not true. Smirnov is the sole signatory on a Bank of America business checking account ending with 3928 in the name of Avalon Group Inc. (hereafter "BOA 3928") Exhibit 3 (under seal). *As of December 31, 2023, BOA 3928 had a balance of $2,917,496.61.* Exhibit 4 (under seal). The fact that Smirnov lied to Pretrial Services in his very first interaction with them establishes conclusively that there are no conditions that could

reasonably assure his appearance. That is because the effectiveness of any condition or combination relies on Pretrial Services ability to obtain truthful information from Smirnov.

Smirnov uses BOA 3928 to fund his and DL's lifestyle, although the transfers themselves look like payments from a business, "Avalon Group, Inc." to DL. From February 2020, when the account was opened, through December 31, 2022, Smirnov withdrew $1,737,500 to purchase cashier's checks in the name of "Avalon Group Inc." and payable to DL. *Id.* Those cashier's checks were then deposited in DL's account, in some cases within 30 minutes of Smirnov withdrawing the funds to purchase the checks. *See* Exhibit 10 (under seal). DL deposited these cashier's checks into one of her accounts at a branch near where Smirnov withdrew the funds. *Id.* For example, on October 13, 2020, a withdrawal was conducted by Avalon Group Inc. in the amount of $599,000 from BOA 3928. Exhibit 5 (under seal). The transaction was conducted at a Bank of America branch located in San Juan Capistrano, California. *Id.* A handwritten note on the withdrawal slip identified "CADL XXXX349 4/26/2022," which was Smirnov's California driver's license. *Id.* Immediately following the withdrawal, Bank of America official check 1145711247 in the amount of $599,000 payable to DL was purchased using the funds. Exhibit 6 (under seal). On October 14, 2020, Bank of America official check 1145711247 was deposited to DL's Wells Fargo account ending 1356, for which she is the sole signer. *Id.* The transaction was conducted at a Wells Fargo branch located in San Juan Capistrano, California. *Id.* The withdrawal from BOA 3928 was funded by a previous wire transfer of $600,000 received from Economic Transformation Technologies Corporation on September 22, 2020. The BOA 3928 account balance prior to receipt of the wire transfer was approximately $31.

Smirnov also wired DL $785,000 in two payments, $740,000 at the end of 2020 and another $45,000 at the end of 2022. Exhibit 4 (under seal).

*As of February 1, 2024, DL had $3,827,460 in her Wells Fargo account ending in 1356.* Exhibit 7 (under seal).

In 2022 and 2023, after Smirnov began making these substantial transfers to DL, albeit using cashier's checks that make it appear she is receiving the funds from a business, "Avalon Group Inc.," DL made payments to Smirnov's Citi credit card, which is the primary means by which he pays personal expenses. *See* Exhibit 10 (under seal). Specifically, in 2022, DL paid $108,916.52 towards Smirnov's Citi credit card debt and in 2023, she paid $275,869.44. *Id.*

Smirnov told Pretrial Services that he lives with DL in a condominium she leases. *See* Pretrial Services Report at 1. That is also not true. The attached report shows she is in fact the owner, having purchased it on February 28, 2022, for the sale price of $1,425,000. *See* Exhibit 1 (under seal). In February 2022, DL purchased a condominium in Las Vegas where she and Smirnov reside. *Id.* While the condominium is titled in her name, she purchased it after receiving more than $2.4 million from Smirnov. *See* Exhibit 10 (under seal).

Smirnov also withdrew $174,219 in cash from the account, including $60,304.25 in 2023. Exhibit 4 (under seal). In addition to DL paying his personal expenses, Smirnov also pays various personal expenses out of this account including gasoline, credit card payments, restaurants, duty free shopping and others. *Id.*

The government assumes that Smirnov did not disclose these substantial assets to the Court when he submitted his financial affidavit. That is because while the government has not seen the affidavit, the Court appointed the Office of the Federal Public Defender to

represent Smirnov at his initial appearance. The court specifically admonished Smirnov that he was submitting his financial affidavit under the penalties of perjury. If he did not disclose his substantial assets the this is a second example of an instance where Smirnov lied to the Court.

In the event that Smirnov did not disclose these assets, the government respectfully requests that the Court release the affidavit to the government so that the government can consider whether to charge Smirnov with perjury.

3. Smirnov can obtain an Israeli passport at any time.

Finally, the Court should also consider that Smirnov is a dual national who holds both U.S. citizenship, and a U.S. passport, and Israeli citizenship, and an Israeli passport. While Smirnov can be ordered to turn both passports in to Pretrial Services and could be prohibited from obtaining a new U.S. passport, he cannot be prohibited from obtaining a new Israeli one. He can obtain a new Israeli passport in the United States by visiting any one of Israel's consulates in Washington, DC, New York, Houston, Miami or Los Angeles. *See* Exhibits 8 and 9.

## IV. Conclusion

Based on the above, this Court should conclude that no condition or combination of conditions will reasonably assure the appearance of the Smirnov as required and order him detained pending trial.

Respectfully submitted this 20th day of February, 2024.

Respectfully submitted,

DAVID C. WEISS
Special Counsel

/s/ Leo J. Wise

LEO J. WISE
Principal Senior Assistant Special Counsel

DEREK E. HINES
Senior Assistant Special Counsel

SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels

United States Department of Justice

(328 of 420), Page 328 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 328 of 420

# Exhibit 1

AA000322

# Israel's Diplomatic Missions

Search by selecting one or more of the following options

Continent

United States of America

Embassy

## 10 Results

Country and Region: United States of America X

**Country and Region:**
United States of America

**Embassy:**
Washington

**Status:**
Embassy

**Address:**
EMBASSY 3514 INTERNATIONAL DR. N.W. WASHINGTON D.C. 20008

**Tel:**
00-1-202-3645500

**Fax:**
00-1-202-3645607

**Reception hours:**
Mon - Fri 09:30 12:30

**Contact us:**
info@washington.mfa.gov.il

**Mission website:**
https://www.embassies.gov.il/washington/

**Visa to Israel:**
No

---

**Country and Region:**
United States of America

**Embassy:**
New York

**Status:**
Consulate General

**Address:**
CONSULATE GENERAL OF ISRAEL 800 SECOND AVENUE NEW YORK, N.Y. 10017

**Tel:**
00-1-212-4995000

**Fax:**
00-1-212-4995355

**Reception hours:**
Mon - Fri 09:30 12:30

**Contact us:**
info@newyork.mfa.gov.il

**Mission website:**
https://embassies.gov.il/new-york/Pages/defaul

**Visa to Israel:**
No

---

**Country and Region:**
United States of America

**Embassy:**
Atlanta

**Status:**
Consulate General

**Address:**
CONSULATE GENERAL 1100 SPRING ST.NW SUITE 440 ATLANTA, GEORGIA 30309 U.S.A

**Tel:**
00-1-404-4876500

**Fax:**
00-1-404-4876555

**Reception hours:**
Mon - Fri 09:00 13:00

**Contact us:**
info@atlanta.mfa.gov.il

**Mission website:**
https://atlanta.mfa.gov.il

**Visa to Israel:**
No

---

**Country and Region:**
United States of America

**Embassy:**
Boston

**Status:**
Consulate General

**Address:**
CONSULATE GENERAL 20 PARK PLAZA, SUITE 1020 BOSTON, MA 02116

**Tel:**
00-1-617-5350200

**Fax:**
00-1-617-5350255

**Reception hours:**

**Contact us:**

**Mission website:**

Mon - Fri 10:00 13:00 info@boston.mfa.gov.il https://boston.mfa.gov.il

**Visa to Israel:**
No

---

**Country and Region:** United States of America
**Embassy:** Chicago
**Status:** Consulate General
**Address:** CONSULATE GENERAL 500 W. MADISON ST. CITIGROUP CENTER, SUITE 3100 CHICAGO, IL 60661 U.S.A
**Tel:** 00-1-312-3808800
**Fax:** 00-1-312-3808855
**Reception hours:** Mon - Thu 09:30 12:30 Fri 09:30 12:00
**Contact us:** info@chicago.mfa.gov.il
**Mission website:** https://chicago.mfa.gov.il
**Visa to Israel:** No

---

**Country and Region:** United States of America
**Embassy:** Houston
**Status:** Consulate General
**Address:** CONSULATE GENERAL 24 GREENWAY PLAZA, SUITE 1500 HOUSTON, TEXAS 77046 HOUSTON
**Tel:** 00-1-832-3013500
**Fax:** 00-1-832-2018700
**Reception hours:** Mon - Fri 09:30 12:30
**Contact us:** consular.dep@houston.mfa.gov.il
**Mission website:** https://embassies.gov.il/houston
**Visa to Israel:** No

---

**Country and Region:** United States of America
**Embassy:** Los Angeles
**Status:** Consulate General
**Address:** CONSULATE GENERAL 11766 WILSHIRE BLVD. SUITE 1600 LOS ANGELES,CALIFORNIA 90025 USA
**Tel:** 00-1-323-8525500
**Fax:** 00-1-323-8525555
**Reception hours:** Mon - Fri 09:00 12:00
**Contact us:** info@losangeles.mfa.gov.il
**Mission website:** https://embassies.gov.il/la
**Visa to Israel:** No

---

**Country and Region:** United States of America
**Embassy:** Miami
**Status:** Consulate General
**Address:** CONSULATE GENERAL 100 N. BISCAYNE BLVD SUITE 1800, MIAMI, FLORIDA 33132
**Tel:** 00-1-305-9259400
**Fax:** 00-1-305-9259451
**Reception hours:** Mon - Fri 09:30 12:30
**Contact us:** consular.dep@miami.mfa.gov.il
**Mission website:** https://miami.mfa.gov.il
**Visa to Israel:** No

---

**Country and Region:** United States of America
**Embassy:** San Francisco
**Status:** Consulate General
**Address:** CONSULATE GENERAL 456 MONTGOMERY ST. SUITE 2100 SAN FRANCISCO CA. 94104 U.S.A
**Tel:** 00-1-415-8447500
**Fax:** 00-1-415-8447555
**Reception hours:**
**Contact us:**
**Mission website:**

| | | |
|---|---|---|
| Mon - Fri 10:00 13:00 | info@sanfrancisco.mfa.gov.il | https://www.israeliconsulate.org |

**Visa to Israel:**
No

---

| | | |
|---|---|---|
| **Country and Region:** United States of America | **Embassy:** New York/U.N | **Status:** Delegation |
| **Address:** PERMANENT MISSION TO THE UNITED NATIONS 800 SECOND AVENUE NEW YORK U.N 10017 | **Tel:** 00-1-212-4995321 | **Fax:** 00-1-212-4995516 00-1-212-4995515 |
| **Reception hours:** No info | **Contact us:** info@newyork.mfa.gov.il | **Mission website:** https://embassies.gov.il/un |

**Visa to Israel:**
No

---

This page was last updated on 19.05.2021

### Useful information

All services
Contact the government
RSS
Terms of use

### Support

Call Us 1299
Central Government Call Center
Technical support for online services
Contact information security

### More information

About
Accessibility
Site map
Freedom of Information (Heb)
Use of cookies

# Exhibit 2

# FD-209a CHS Contact Report

CHS Number: [redacted]
Date: 11/08/2023
CHS Status: Open
Created By: [redacted]
CHS Last Opened Date: 09/30/2010
Case Agent: [redacted]

Field Office: Seattle

Squad: [redacted]

## Filing and Security

**Overall Document Classification**

**Classification Block**

[redacted]

## Contact Report Details

**CHS Contact Report Synopsis**

Supplemental reporting re[redacted] and top Russian representative to Country B, Russian Official 1

**Date of Contact**

11/8/2023

**Participant**

- [redacted]

**Contact Type**

Messaging Platform

**Derogatory Information**

Does this form contain potentially derogatory information that might reduce the CHS's reliability or credibility?

No

Case 2:24-mj-00166-DJA   Docu███-1   Filed 02/20/24   Page 3 of 17

## FD-209a CHS Contact Report

Federal Bureau of Investigation (FBI) • Source ███ • Page 3 of 4



**Life Changes**
Has the CHS experienced any of the following significant life changes?

- No. Child custody dispute
- No. Death or serious illness of close family member or friend
- No. Divorce or Separations
- No. Major life change, such as relocation, job loss, or significant loss of income
- No. Serious Illness of CHS
- No. Serious legal issues
- No. Other
- Yes. None of the above

**Appearance Changed**
Has the CHS's appearance changed to indicate any of the following?

- No. Evidence of change in mental state
- No. Evidence of radicalization
- No. Evidence of significant increase in unexplained income
- Yes. None of the above

**Behavior Issues**
Did the CHS exhibit any of the following?

- No. Egotism
- No. Excessive gambling
- No. Financial issues
- No. Impulsiveness
- No. Misuse of alcohol
- No. Misuse of prescription medication or illicit drug use
- No. Risky sexual behavior
- Yes. None of the above

**Disobeyed Instructions**
Has the CHS done any of the following?

- No. Disclosed their FBI affiliation to a foreign entity without Handling Agent authorization
- No. Disclosed their FBI affiliation to a subject without Handling Agent authorization
- No. Disclosed their FBI affiliation to the media
- No. Failed to follow taskings or instructions
- No. Taken operational action without the Handling Agent's consent
- No. Unresponsive on multiple occasions to communication attempts, to include repeatedly cancelling meetings, missing meetings, or being late to meetings
- Yes. None of the above

**Inadequate Reporting**
Was the CHS's information any of the following?

- No. Contradicted by other intelligence reporting
- No. Derived from open sources
- No. Indicative of deliberate deception, fraudulence, or fabrication
- Yes. None of the above

Case 2:24-mj-00166-DJA   Docu███████-1   Filed 02/20/24   Page 4 of 17

## FD-209a CHS Contact Report

Federal Bureau of Investigation (FBI) • Source ████████ • Page 3 of 4



**Investigative Techniques**
Describe the FBI investigative techniques and information revealed to the CHS for operational purposes

N/A

**Access to Information**
What was the CHS's access to the specific information being reported?
Direct

**Database Access**
Was the CHS tasked to obtain information from an employer database during this contact?

No

**Other Pertinent Information**
This field may be utilized for any pertinent information regarding the CHS contact, and should be used to identify CHS acquisition of information by sub-sources/3rd parties reported in the associated FD-1023.

N/A

AA000329

FD-209a CHS Contact Report

# FD-209a CHS Contact Report

OFFICIAL RECORD

CHS Number: [redacted]
Date: 12/04/2023
CHS Status: Open
Created By: [redacted]
CHS Last Opened Date: 09/30/2010
Case Agent: [redacted]

Field Office: Seattle

Squad: C3

## Filing and Security

**Overall Document Classification**

**Classification Block**
[redacted]

[redacted]

## Contact Report Details

**CHS Contact Report Synopsis**
Partial identification of Russian national Russian Official 3, an alleged representative of Russian Official 4, former head of [redacted].

**Date of Contact**
11/27/2023

**Participant**
[redacted]

**Contact Type**
In Person

[redacted]

**Derogatory Information**
Does this form contain potentially derogatory information that might reduce the CHS's reliability or credibility?
No

[redacted]

Case 2:24-mj-00166-DJA    ████████████  Filed 02/20/24    Page 7 of 17

## FD-209a CHS Contact Report

Federal Bureau of Investigation (FBI) • Source ████ • Page 2 of 3



OFFICIAL RECORD

### Life Changes
Has the CHS experienced any of the following significant life changes?

- No. Child custody dispute
- No. Death or serious illness of close family member or friend
- No. Divorce or Separations
- No. Major life change, such as relocation, job loss, or significant loss of income
- No. Serious illness of CHS
- No. Serious legal issues
- No. Other
- Yes. None of the above

### Appearance Changed
Has the CHS's appearance changed to indicate any of the following?

- No. Evidence of change in mental state
- No. Evidence of radicalization
- No. Evidence of significant increase in unexplained income
- Yes. None of the above

### Behavior Issues
Did the CHS exhibit any of the following?

- No. Egotism
- No. Excessive gambling
- No. Financial issues
- No. Impulsiveness
- No. Misuse of alcohol
- No. Misuse of prescription medication or illicit drug use
- No. Risky sexual behavior
- Yes. None of the above

### Disobeyed Instructions
Has the CHS done any of the following?

- No. Disclosed their FBI affiliation to a foreign entity without Handling Agent authorization
- No. Disclosed their FBI affiliation to a subject without Handling Agent authorization
- No. Disclosed their FBI affiliation to the media
- No. Failed to follow taskings or instructions
- No. Taken operational action without the Handling Agent's consent
- No. Unresponsive on multiple occasions to communication attempts, to include repeatedly cancelling meetings, missing meetings, or being late to meetings
- Yes. None of the above

### Inadequate Reporting
Was the CHS's information any of the following?

- No. Contradicted by other intelligence reporting
- No. Derived from open sources
- No. Indicative of deliberate deception, fraudulence, or fabrication
- Yes. None of the above

AA000332



Case 2:24-mj-00166-DJA ████████████ Filed 02/20/24 Page 8 of 17

## FD-209a CHS Contact Report

Federal Bureau of Investigation (FBI) • Source ████████ • Page 3 of 4



**Investigative Techniques**
Describe the FBI investigative techniques and information revealed to the CHS for operational purposes

N/A

**Access to Information**
What was the CHS's access to the specific information being reported?
Direct and Indirect

**Database Access**
Was the CHS tasked to obtain information from an employer database during this contact?

No

**Other Pertinent Information**
This field may be utilized for any pertinent information regarding the CHS contact, and should be used to identify CHS acquisition of information by sub-sources/3rd parties reported in the associated FD-1023.

N/A

AA000333

FD-209a CHS Contact Report



FD-209a CHS Contact Report

OFFICIAL RECORD

CHS Number: [redacted]
Date: 12/06/2023
CHS Status: Open
Created By: [redacted]
CHS Last Opened Date: 09/30/2010
Case Agent: [redacted]

Field Office: Seattle

Squad: C3

## Filing and Security

**Overall Document Classification**

**Classification Block**

[redacted]

[redacted]

## Contact Report Details

**CHS Contact Report Synopsis**

Russian Official 1's [redacted] knowledge of certain Russian military operations in Country C.

**Date of Contact**

11/27/2023

**Participant**

[redacted]

**Contact Type**

In Person

[redacted]

**Derogatory Information**

Does this form contain potentially derogatory information that might reduce the CHS's reliability or credibility?

No

[redacted]

FD-209a CHS Contact Report





**Life Changes**
Has the CHS experienced any of the following significant life changes?

- No, Child custody dispute
- No, Death or serious illness of close family member or friend
- No, Divorce or Separations
- No, Major life change, such as relocation, job loss, or significant loss of income
- No, Serious Illness of CHS
- No, Serious legal issues
- No, Other
- Yes, None of the above

**Appearance Changed**
Has the CHS's appearance changed to indicate any of the following?

- No, Evidence of change in mental state
- No, Evidence of radicalization
- No, Evidence of significant increase in unexplained income
- Yes, None of the above

**Behavior Issues**
Did the CHS exhibit any of the following?

- No, Egotism
- No, Excessive gambling
- No, Financial issues
- No, Impulsiveness
- No, Misuse of alcohol
- No, Misuse of prescription medication or illicit drug use
- No, Risky sexual behavior
- Yes, None of the above

**Disobeyed Instructions**
Has the CHS done any of the following?

- No, Disclosed their FBI affiliation to a foreign entity without Handling Agent authorization
- No, Disclosed their FBI affiliation to a subject without Handling Agent authorization
- No, Disclosed their FBI affiliation to the media
- No, Failed to follow taskings or instructions
- No, Taken operational action without the Handling Agent's consent
- No, Unresponsive on multiple occasions to communication attempts, to include repeatedly cancelling meetings, missing meetings, or being late to meetings
- Yes, None of the above

**Inadequate Reporting**
Was the CHS's information any of the following?

- No, Contradicted by other intelligence reporting
- No, Derived from open sources
- No, Indicative of deliberate deception, fraudulence, or fabrication
- Yes, None of the above

FD-209a CHS Contact Report

**Investigative Techniques**
Describe the FBI investigative techniques and information revealed to the CHS for operational purposes

N/A

**Access to Information**
What was the CHS's access to the specific information being reported?
Direct

**Database Access**
Was the CHS tasked to obtain information from an employer database during this contact?

No

**Other Pertinent Information**
This field may be utilized for any pertinent information regarding the CHS contact, and should be used to identify CHS acquisition of information by sub-sources/3rd parties reported in the associated FD-1023.

N/A

FD-209a CHS Contact Report

Federal Bureau of Investigation (FBI) * Source [redacted] * Page 4 of 4

# FD-209a CHS Contact Report

OFFICIAL RECORD

CHS Number: [redacted]
Date: 12/20/2023
CHS Status: Open
Created By: [redacted]
CHS Last Opened Date: 09/30/2010
Case Agent: [redacted]

Field Office: Seattle

Squad: C3

## Filing and Security

**Overall Document Classification**

**Classification Block**
[redacted]

[redacted]

## Contact Report Details

**CHS Contact Report Synopsis**
Meetings [redacted] in Country A, between top Country C officials and Russian Official 2 [redacted] and Russian Official 1 [redacted]

**Date of Contact**
12/11/2023

**Participant**
- [redacted]

**Contact Type**
Messaging Platform

**Derogatory Information**
Does this form contain potentially derogatory information that might reduce the CHS's reliability or credibility?
No

FD-209a CHS Contact Report

**Life Changes**
Has the CHS experienced any of the following significant life changes?

- No, Child custody dispute
- No, Death or serious illness of close family member or friend
- No, Divorce or Separations
- No, Major life change, such as relocation, job loss, or significant loss of income
- No, Serious Illness of CHS
- No, Serious legal issues
- No, Other
- Yes, None of the above

**Appearance Changed**
Has the CHS's appearance changed to indicate any of the following?

- No, Evidence of change in mental state
- No, Evidence of radicalization
- No, Evidence of significant increase in unexplained income
- Yes, None of the above

**Behavior Issues**
Did the CHS exhibit any of the following?

- No, Egotism
- No, Excessive gambling
- No, Financial issues
- No, Impulsiveness
- No, Misuse of alcohol
- No, Misuse of prescription medication or illicit drug use
- No, Risky sexual behavior
- Yes, None of the above

**Disobeyed Instructions**
Has the CHS done any of the following?

- No, Disclosed their FBI association to a foreign entity without Handling Agent authorization
- No, Disclosed their FBI association to a subject without Handling Agent authorization
- No, Disclosed their FBI association to the media
- No, Failed to follow taskings or instructions
- No, Taken operational action without the Handling Agent's consent
- No, Unresponsive on multiple occasions to communication attempts, to include repeatedly cancelling meetings, missing meetings, or being late to meetings
- Yes, None of the above

**Inadequate Reporting**
Was the CHS's information any of the following?

- No, Contradicted by other intelligence reporting
- No, Derived from open sources
- No, Indicative of deliberate deception, fraudulence, or fabrication
- Yes, None of the above

## FD-209a CHS Contact Report

Federal Bureau of Investigation (FBI) • Source ▓▓▓▓ • Page A of 1



**Investigative Techniques**
Describe the FBI investigative techniques and information revealed to the CHS for operational purposes

N/A

**Access to Information**
What was the CHS's access to the specific information being reported?
Direct

**Database Access**
Was the CHS tasked to obtain information from an employer database during this contact?

No

**Other Pertinent Information**
This field may be utilized for any pertinent information regarding the CHS contact, and should be used to identify CHS acquisition of information by sub-sources/3rd parties reported in the associated FD-1023.

N/A

AA000341

FD-209a CHS Contact Report

OFFICIAL RECORD

(349 of 420), Page 349 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 349 of 420

# Exhibit 8

AA000343

# Issue or extend Israeli travel documents abroad

**Israeli citizens and residents living abroad can use this service to apply for or extend Israeli non-biometric travel documents.**

**Who can apply**

Israeli citizens and residents living abroad can apply for, and renew the following documents:

- Travel documents (passport or laissez-passer).
- Travel documents that have expired or whose pages have become full.
- New travel documents issued due to loss, theft, destruction, or wear and tear of the previous document

**All applications must be made in person by the applicant.**

## Applicants under 18

- Parents must make the application together with their children (who are under 18).
- Divorced, separated, common-law spouses, or single parents must submit written consent of both parents. You can sign the consent form in the presence of the a consul in any Israeli mission abroad, in the presence of a notary, or in an office of the Population and Immigration Authority.

## Notes

- Travel documents (passports and laissez-passer documents) issued by the State of Israel to its citizens are the property of the state, and must be kept safe.
- Israeli citizens must leave and enter Israel using Israeli travel documents only.
- Israeli biometric travel documents cannot be issued outside Israel.

**Replacing an expired or full travel document (passport or laissez-passer)**

## What you need

- .Two current, identical, passport photos in color, 5 by 5 centimeters, on a white background
- .A photo ID (such as an ID card or Israeli driver's license)
- .the completed and signed passport or laissez-passer application form

## Service fee

Consult the fees table to see fees application prices:

- See fees in US Dollar and Euro
- For local currencies, check your local consul's fees table

**Issuing a travel document in case of loss, theft or damage**

If your travel document has been lost stolen or damaged while abroad, you must appear at the nearest Israeli mission to issue a new travel .document

.The type of document issued will be determined by the consular representative at the mission

## What you need

- .Two current, identical passport photos in color, 5 by 5 centimeters, on a white background
- .A photo ID (such as an ID card or Israeli driver's license)
- .Declaration of loss / theft / destruction of a passport or laissez passer form The completed and signed

- .Application form for a passport or laissez-passer, completed and signed

## Service fee

Consult the fees table to see fees application prices:

- See fees in US Dollar and Euro
- For local currencies, check your local consul's fees table

**In addition to the service fee, you will be required to pay a fine for the loss, theft or damage of your travel document.**

### Extending an Israeli travel document

- You can extend the validity of a non-biometric passport if no more than 5 years have passed from the day it was issued to the end of the extension period.
- You cannot extend the validity of a biometric passport.
- Extensions for citizens eligible for military service will be restricted subject to the regulation of their status with the army.

## What you need

- Application for extending or making changes to a passport or laissez-passer
- .The passport or laissez-passer that you want to extend

## The service is free of charge

Please note, if there is any difference or conflict between the information on this page and the law, the provisions of the law will apply.

### Files for download

**Application to extend/make changes to a passport/laissez passer**
File type : pdf Size : 147.43 Kb

Ministry of Foreign Affairs

### More on the subject

Documentation requests from the Population Registry and from the Israel Police at Israeli missions abroad
Authenticate Israeli Population Registry documents with an apostille stamp at Israeli missions abroad
Notarization and consular authorizations
Apply for positions in overseas Ministry of Foreign Affairs missions - for local Israeli citizens
Apply for a position in the Ministry of Foreign Affairs overseas security division
Applying for positions in the Ministry of Foreign Affairs in Israel

MFA Scholarships for international students (academic year 2023-2024)

Pay for Ministry of Foreign Affairs services

This page was last updated on 05.11.2023

**Useful information**

All services

Contact the government

RSS

Terms of use

**Support**

Call Us 1299

Central Government Call Center

Technical support for online services

Contact information security

**More information**

About

Accessibility

Site map

Freedom of Information (Heb)

Use of cookies

# EXHIBIT O

# DEFENDANT'S MOTION FOR PRETRIAL RELEASE

- Filed on February 19, 2024

2:24-mj-00166-DJA-1

DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant, ALEXANDER SMIRNOV

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
* * * * * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALEXANDER SMIRNOV,

Defendant,

CASE NO. 2:24-CR-00091-ODW

DATE OF HEARING: FEB. 20, 2024
TIME OF HEARING: 3:00pm

**DEFENDANT'S MOTION FOR PRETRIAL RELEASE**

COMES NOW, Defendant, ALEXANDER SMIRNOV (hereinafter "Mr. Smirnov"), by and through his attorneys, DAVID Z. CHESNOFF, ESQ., and RICHARD A. SCHONFELD, ESQ., of the law firm of CHESNOFF & SCHONFELD and hereby move this Honorable Court for pretrial release in the instant case.

///

This Motion for Pretrial Release is made and based upon the attached Memorandum of Points and Authorities, the argument of counsel, and any other such evidence as may be presented at the time of hearing.

Dated this 19th day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ David Z. Chesnoff

DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant ALEXANDER SMIRNOV

## MEMORANDUM OF POINTS AND AUTHORITIES

**A. Proposed Conditions of Release:**

At the outset, Mr. Smirnov notes that he is an American citizen, that the Government has possession of his United States passport, that the undersigned counsel has possession of his Israeli passport and can surrender said passport to United States Pretrial Services, that he is a resident of Las Vegas, that before moving to Las Vegas he was a long time resident of the State of California, and that he has no criminal history of any sort.

Given that, Mr. Smirnov respectfully submits that the following conditions of pretrial release will provide ample, statutorily sufficient assurances to the Court that he is neither a risk of flight nor a danger to the community:[1]

- A personal recognizance signature bond;
- Supervision with the United States Pretrial Services' office in both the District of Nevada (where he is a resident) and the Central District of California (where the instant case is pending), to include electronic monitoring, maintaining his current residence, and no travel except as ordered to appear in the Central District of California;
- Surrender of his Israeli passport (the Government already has possession of his United States passport);

[1] Critically, the Pretrial Services Office for the District of Nevada has recommended Mr. Smirnov's pretrial release, correctly recognizing that conditions can indeed be fashioned regarding the factor of alleged flight.

- Compliance with any other conditions, orders or admonishments imposed by this Court, by the District Court in the Central District of California, or by any Pretrial Services Officer of either Court.

**B. Procedural History:**

Mr. Smirnov was arrested on or about February 14, 2024, in Las Vegas, Nevada. The two-count Indictment filed in the Central District of California charges Mr. Smirnov with : 1) Making False Statements to a Government Agent, in violation of 18 U.S.C. § 1001; and 2) Falsification of Records in a Federal Investigation, in violation of 18 U.S.C. § 1519.

As alleged in the Indictment, Mr. Smirnov served as a confidential human source ("CHS") for the FBI for several preceding years. Virtually all of the allegations recited in Count One, however, occurred in 2020 (*see* Ind. at 34, ¶57) and the alleged falsifications pertain to alleged acts taking place between 2015 and 2017. *See id.* at 34-35. Similarly, the alleged falsifications charged in Count Two pertain to alleged acts that took place in June 2020.

The fact that the Government knew about Mr. Smirnov's alleged conduct for years – yet took no steps to end his cooperation, seize his passports, or prosecute him for *anything* – should be kept firmly in mind when (as expected) the Government reverses course in this bail proceeding and suddenly protests that Mr. Smirnov now presents an "extreme flight risk" who must be detained pending his initial appearance in the Central District of California.

Any bail assertion that Mr. Smirnov suddenly presents an unmanageable "flight risk" should, therefore, be considered in light of the Government's prior, nonchalant assessment of that very same risk.

It should further be noted that the United States Sentencing Guidelines calculation for the offenses with which Mr. Smirnov is charged include a base offense level of 14 which results in a sentencing range of 15-21 months if convicted at trial. *See* U.S.S.G. 2J1.2[2].

**C. Mr. Smirnov's Background:**

Mr. Smirnov is 43 years old, has no prior criminal history, has been in a relationship with his significant other, Diana Lavrenyuk ("Diana"), for decades, resides with Diana in the home that she owns in Las Vegas, has resided in Las Vegas for two years, has a Nevada Driver's License, and resided in California for the 16 years prior to moving to Las Vegas. Mr. Smirnov clearly has a stable residential history.

United State Pretrial Service was able to verify Mr. Smirnov's relationship status, residential history, and the fact that he can return to his current residence if released from custody. Further, Mr. Smirnov has a long term stable employment history.

Mr. Smirnov also has significant ties to the United States with familial relationships. Diana's son (who has been a part of Mr. Smirnov's life for decades) resides in Washington D.C. along with his wife and has a good relationship with Mr. Smirnov. Additionally, Mr. Smirnov's cousin Linor Shefer resides in Florida and it is anticipated that she will travel to Las Vegas for his Court appearance on February 20, 2024[3]. Mr. Smirnov and Ms. Shefer have a great relationship.

---

[2] In anticipation of the Government asserting that every conceivable guideline enhancement applies, which they do not, the highest guideline level that the Government could seek is a level 19 which results in a sentencing range of 30-37 months.

[3] Counsel understands that additional family members/friends will be traveling to Las Vegas to support Mr. Smirnov in Court.

Mr. Smirnov suffers from significant medical issues related to his eyes and his treatment providers are in Las Vegas. Mr. Smirnov has had seven surgeries in the last year, is required to take prescription medication daily, and requires ongoing care.

Finally, it should be note that Mr. Smirnov has no history of drug or alcohol abuse and has no history of mental illness. Smirnov's personal history supports release on conditions to be fashioned by this Honorable Court.

**D. Statement of the Law:**

As the Supreme Court stated in *United States v. Salerno*, 481 U.S. 739, 107 S. Ct. 2095 (1987), in the United States, liberty is the norm, and detention is the carefully limited exception. The Court found that the Bail Reform Act of 1984 operates only on individuals who have been arrested for particularly serious offenses, and carefully delineates the narrow circumstances under which detention is permitted.

The Bail Reform Act of 1984 does allow a court to detain a defendant if no release conditions "will reasonably assure the appearance of the person and the safety of any other person in the community." But it is only under those rare circumstances where no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community, that a court may reasonably (not to mention, constitutionally) order the pretrial detention of a never-convicted, presumptively innocent defendant like Mr. Smirnov.

These principles were reinforced in *United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991), where the Ninth Circuit stated that the Bail Reform Act required release of persons under the least restrictive condition or combination of conditions that will reasonably assure appearance of the person and the safety of community. *See Gebro*, 948 F.2d at 1121. "Only in rare circumstances should release be denied, and doubts regarding the propriety of release should

be resolved in the defendant's favor." *Id.* (citing *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)). Finally, "[o]n a motion for pretrial detention, the government bears the burden of showing [1] by a preponderance of the evidence that the defendant poses a flight risk, and [2] by clear and convincing evidence that the defendant poses a danger to the community." *Gebro*, 948 F.2d at 1121.

Citing 18 U.S.C. § 3142(g), the *Motamedi* Court stated: "The court must take into account available information concerning the nature and circumstances of the offense charged, the weight of the evidence against the person, the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug and alcohol abuse, criminal history, record concerning appearance at court proceedings, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Motamedi*, 767 F.2d at 1407.

As shown below, these factors – coupled with the Pretrial Service Office's recommendation of pretrial release for Mr. Smirnov – militate overwhelmingly in favor of release in this case. This Court should thus release Mr. Smirnov on the recommended conditions and order him to appear in California on the date and time set for his initial appearance.

**E. The *Motamedi* Factors Militate Overwhelmingly In Favor Of Release:**

**Nature and seriousness of the offense charged.**

As stated above, Mr. Smirnov is charged under 18 U.S.C. § 1001 and 18 U.S.C. § 1519, both of which accuse him of making false statements in connection the current president's (and, particularly, the current president's son's) connection to a business deal with a company based in the Ukraine. These allegations are makeweight and politically-motivated; they do not involve espionage or theft and are thus not "serious."

**Weight of evidence against defendant.**

The Ninth Circuit has held that the "weight of the evidence" is the least important factor to be considered during the pretrial detention hearing. *See, e.g., Motamedi*, 767 F.2d at 1408. This guards against the possibility of making a "preliminary determination of guilt" that then leads to punishment in the form of a refusal to grant release. *Id.* "The [ ] factor may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Id.*; *see also United States. v. Armstrong*, 2010 WL 5102203 (D. Ariz. 2010) (granting pretrial release to defendant charged with two separate armed bank robberies while recognizing that the evidence against the defendant was strong because bank surveillance photos show her committing the robberies and because she admitted her participation.).

While it is not clear what the government's evidence consists of at this preliminary stage, it is respectfully submitted that when considered in conjunction with the other factors outlined here, the balance weighs in favor of release.

**Defendant's character, physical and mental condition.**

Mr. Smirnov has an exemplary character and is in good mental health. Mr. Smirnov has ongoing medical issues related to his eyes and will need continuing care.

**Defendant's family and community ties.**

Mr. Smirnov has lived in Las Vegas for two years, lived in California for the sixteen years prior to moving to Las Vegas, has relatives that live in the United States, and has his long term significant other that he resides with in Las Vegas. He thus has strong ties to the community and has the strong support of family and friends.

**Defendant's past conduct, history relating to drug and alcohol abuse, criminal history.**

Mr. Smirnov has no criminal history and there is no indication of any drug or alcohol abuse whatsoever.

**The nature and seriousness of danger to any person or community that would be posed by defendant's release.**

Mr. Smirnov is 43 years old and has no criminal history. Any concern that Mr. Smirnov is a danger while on release can be adequately addressed through the imposition of certain conditions including electronic monitoring, maintaining his residence, travel restrictions, and any other condition the Court deems necessary.

**Additional, Critical Factors Unique to This Case.**

As this motion is being written, Mr. Smirnov is detained in Pahrump, Nevada pending his hearing on February 20, 2024, in the District of Nevada. It took the undersigned several hours on February 16, 2024 (not to mention dozens of phone calls), to secure even a brief phone call with Mr. Smirnov – at which the matter of legal representation, and nothing else, was discussed.

Moreover – and particularly relevant to the issue of pretrial release – a representative from the facility where Mr. Smirnov is being held advised counsel: 1) that Mr. Smirnov is in protective custody; and 2) that, given this restrictive classification, the entire facility needed to be "frozen" just so Mr. Smirnov could take this brief, non-substantive phone call.

Given the foregoing – and coupled with the volume of records that the government will doubtless produce and the overriding need for in-person trial preparation with the client – it will be virtually impossible to mount an effective trial defense through intermittent telephone calls and truncated, sparse jail visits.

The federal courts warn that pretrial detention can hamstring trial preparation:

> The Supreme Court has recognized that "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during trial itself." *Maine v. Molton*, 474 U.S. 159, 170, 106 S. Ct. 477 (1985); see also Wolfish v. Levi, 573 F.2d 118, 133 (2d Cir.1978) ("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds, Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861 (1979).

*Estrada v. Munoz*, No. 2010 WL 1999525, at *2 (C.D. Cal. May 17, 2010).

Moreover, with Mr. Smirnov in custody he will not be able to facilitate his counsel's contact with critical witnesses, and assist counsel with language barriers that are sure to exist. In *Kinney v. Lenon*, 425 F.2d 209 (9th Cir. 1970), the Ninth Circuit found the detention of a juvenile to interfere with his due process right to a fair trial, as the Defendant was likely the only person that witnesses would cooperate with due to "age and race." Here, with the cultural and language barriers, it is anticipated that Mr. Smirnov will be the only person that can effectively contact and facilitate interviews of critical witnesses for his defense.

Keeping Mr. Smirnov in custody will thus work an irreparable harm to his ability – indeed, *right* – to prepare effectively for trial.

**F. Mr. Smirnov is Neither a Flight Risk Nor a Danger to the Community:**

Federal courts embrace the "strong presumption against detention." *See, e.g., United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.C. 2009); *United States v. Karni*, 298 F. Supp. 2d 129 (D.C. 2004).

In both *Hanson* and *Karni*, the courts held that conditions for release could be fashioned to ensure the appearance of defendants who – unlike the Mr. Smirnov – did *not* have significant ties to the United States and who *did* pose a serious danger to the United States. There, the defendant was an Israeli national who had been residing in South Africa for the last eighteen years. He was charged with violating federal law by allegedly acquiring "products that are

capable of triggering nuclear weapons and [exporting] them to Pakistan, via South Africa, avoiding the requirement of obtaining an export license for the devices." *Karni*, 298 F. Supp. 2d at 130. Despite the serious nature of his crime and the fact that he "had no ties to the United States or to the Washington, D.C. area," the court determined that the defendant should be released subject to certain conditions including release into third party custody, home detention, and electronic monitoring.

In *Hanson*, the defendant was a Chinese citizen who had become a naturalized citizen of the United States. She was alleged to have illegally exported unmanned aerial vehicle ("UAV") autopilot components to the People's Republic of China. According to the government, Mrs. Hanson carried these UAV components to Germany and handed them to an acquaintance who took them to China. The government represented that these sophisticated components enable UAVs to perform certain tasks without the aid of human pilots, including autonomous take offs, bungee launches, and hand launches and landings, and that they have other tactical military uses. Moreover, according to the government's expert, UAVs equipped with these components could be used to simulate stealth planes and cruise missiles to test air defense detection systems, and potentially could be armed. The government argued that she was a tremendous flight risk because 1) she had closer ties to China than to the United States; 2) her marital relationship in the United States was faltering, and she had no other family ties here; 3) she faced a steep jail sentence and the government had strong evidence against her; 4) it would have been easy for her to get a new Chinese passport and depart to China; 5) and she had strong business interests, family ties, and property in China. After hearing the evidence, the court found that conditions could be fashioned that would reasonably assure the defendant's presence at trial.

These cases (and countless others like them) illustrate the type of conditions that can easily be fashioned to ensure that Mr. Smirnov attends all Court hearings and ensure the safety of the community.

Again, it should also be noted that Mr. Smirnov is dual-citizen who is lawfully in the United States. His dual citizenship should not be a concern for this Honorable Court, and Pretrial Services has recognized that conditions can be fashioned regarding the factor of alleged flight.

**G. CONCLUSION:**

In light of the foregoing, Mr. Smirnov offers the following bail proposal:

- A personal recognizance signature bond;
- Supervision with the United States Pretrial Services' office in both the District of Nevada (where he is a resident) and the Central District of California (where the instant case is pending), to include electronic monitoring, maintaining his current residence, and no travel except as ordered to appear in the Central District of California;
- Surrender of his Israeli passport (the Government already has possession of his United States passport);
- Compliance with any other conditions, orders or admonishments imposed by this Court, by the District Court in the Central District of California, or by any Pretrial Services Officer of either Court.

Because the government cannot prove by a preponderance of the evidence that Mr. Smirnov poses a risk of non-appearance, much less clear and convincing evidence of any

"danger," this Court should, as recommended by Pretrial Services, order him released on conditions.

DATED this 19th day of February, 2024.

Respectfully Submitted:

CHESNOFF & SCHONFELD

/s/ David Z. Chesnoff
DAVID Z. CHESNOFF, ESQ.
Nevada Bar No. 2292
RICHARD A. SCHONFELD, ESQ.
Nevada Bar No. 6815
520 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702)384-5563
rschonfeld@cslawoffice.net
dzchesnoff@cslawoffice.net
Attorneys for Defendant
ALEXANDER SMIRNOV

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of February, 2024, I caused the forgoing document to be filed electronically with the Clerk of the Court through the CM/ECF system for filing; and served on counsel of record via the Court's CM/ECF system.

/s/ Rosemary Reyes
Employee of Chesnoff & Schonfeld

EXHIBIT P

INDICTMENT
- Filed on February 14, 2024

2:24-CR-91-ODW

FILED
CLERK, U.S. DISTRICT COURT
2/14/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: TV DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2023 Grand Jury

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALEXANDER SMIRNOV,

Defendant.

No. 2:24-cr-00091-ODW

I N D I C T M E N T

[18 U.S.C. § 1001: false statement; 18 U.S.C. § 1519: creating a false and fictitious record]

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

1. Defendant ALEXANDER SMIRNOV was a resident of Los Angeles, California in 2020.

A. The Defendant was an FBI Confidential Human Source.

2. The Defendant was a confidential human source ("CHS") with the Federal Bureau of Investigation ("FBI"). As a CHS, the Defendant was assigned a handling agent (hereafter "the Handler") who was a special agent on an FBI squad that investigated violations of federal criminal law.

3. As a CHS, the Defendant provided information to the Handler that was then used in various criminal investigations conducted by the FBI. The Defendant knew that information he provided was used in criminal investigations because, among other reasons, the Handler advised him that he might have to testify in court based on the information he provided on multiple occasions, including, but not limited to: 10/1/2010, 5/17/2011, 11/28/2012, 04/12/2013, 8/29/2013, 7/10/2015 and 3/11/2020. The Defendant also knew the information he provided was used in criminal investigations because the Defendant participated in a number of operations where he was authorized to engage in criminal activity as part of an on-going criminal investigation.

4. The Defendant was admonished by the Handler that he must provide truthful information to the FBI when he first became a CHS in 2010 and on multiple occasions thereafter, including, but not limited to: 10/1/2010, 1/20/2011, 5/17/2011, 9/14/2011, 8/29/2012, 11/28/2012, 4/12/2013, 8/29/2013, 1/22/2014, 7/9/2014, 7/10/2015, 9/29/2016, 9/26/2017, 9/26/2018, 9/27/2019, 3/11/2020, 2/19/2021, 10/28/2021, 10/17/2022 and 9/29/2023.

5. In addition, when the Defendant was authorized to engage in illegal activity for investigative purposes, he was further admonished that: "Under no circumstances may the CHS … Participate in an act that constitutes obstruction of justice (e.g., perjury, witness tampering, witness intimidation, entrapment, or fabrication, alteration, or destruction of evidence, unless such illegal activity has been authorized)." When the Defendant was given this admonishment, he signed an FBI form that contained this statement, including on 10/8/2014, 1/18/2017, 10/8/2018, 1/10/2019, and 8/7/2020.

6. Despite repeated admonishments that he must provide truthful information to the FBI and that he must not fabricate evidence, the Defendant provided false derogatory information to the FBI about Public Official 1, an elected official in the Obama-Biden Administration who left office in January 2017, and Businessperson 1, the son of Public Official 1, in 2020, after Public Official 1 became a candidate for President of the United States of America.

a. As described in greater detail below, in March 2017, the Defendant reported to the Handler that he had had a phone call with the owner of Ukrainian industrial conglomerate Burisma Holdings, Limited (hereafter "Burisma Official 1") concerning Burisma's interest in acquiring a U.S. company and making an initial public offering ("IPO") on a U.S.-based stock exchange. In reporting that conversation to the Handler, the Defendant also noted that Businessperson 1, Public Official 1's son, was a member of Burisma's Board, a fact that was publicly known.

b. Three years later, in June 2020, the Defendant reported, for the first time, two meetings in 2015 and/or 2016, during the Obama-Biden Administration, in which he claimed executives associated with Burisma, including Burisma Official 1, admitted to him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1, when Public Official 1 was still in office, so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with [the then-Ukrainian Prosecutor General]."

c. The Defendant also reported two purported phone calls between himself and Burisma Official 1 wherein Burisma Official 1 stated that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1.

d. As alleged herein, the events the Defendant first reported to the Handler in June 2020 were fabrications. In truth and fact, the Defendant had contact with executives from Burisma in 2017, after the end of the Obama-Biden Administration and after the then-Ukrainian Prosecutor General had been fired in February 2016, in other words, when Public Official 1 had no ability to influence U.S. policy and when the Prosecutor General was no longer in office. In short, the Defendant transformed his routine and unextraordinary business contacts with Burisma in 2017 and later into bribery allegations against Public Official 1, the presumptive nominee of one of the two major political parties for President, after expressing bias against Public Official 1 and his candidacy.

e. When he was interviewed by FBI agents in September 2023, the Defendant repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after he said he met with Russian officials.

B. <u>In 2017, the Defendant provided the FBI Handler with information that Burisma was interested in acquiring an American oil and gas company</u>.

7. On or about March 1, 2017, the Defendant provided information to the Handler concerning Burisma for the first time. That information was memorialized in an official record of the FBI on a Form 1023 (hereafter the "2017 1023"). The following is the entirety of what

the Defendant told the Handler in March 2017 that was memorialized in the 2017 1023:

> During the week of 2/27/2017, CHS received a telephone call from [Associate 1] (a subject of prior CHS reporting regarding ties to ROC). Also on the call was [Burisma Official 1], whom CHS understood is the "CEO or owner" of Burisma Holdings - Ukraine. During the call, [Associate 1] mentioned they are interested in acquiring a U.S.-based petroleum business with a market capitalization between $50-$100 million. They would then use this US-based entity as the parent company for Burisma Holdings (or a subdivision thereof), which they would then seek to register on a US exchange.
>
> This CEO and [Associate 1] made statements that led CHS to believe that Burisma Holdings has overstated its corporate assets in various public filings in Ukraine (NFI).
>
> The individual in Ukraine who is currently assigned to manage this acquisition is [Burisma Official 2], whose title is "Board Advisor - Director for International Cooperation and Strategic Development", email [] @burisma.com, 10-A Ryleyeva Str., Kyiv 04073, Ukraine, office phone [], fax: []. During the week of March 6, 2017, [Burisma Official 2] plans to travel to Washington D.C. (NFI), and may meet with the CHS sometime thereafter on the West Coast.
>
> **During this call, there was a brief, non-relevant discussion about [Public Official 1]'s son, [Businessperson 1], who is currently on the Board of Directors for Burisma Holdings [No Further Information].**

(emphasis added). Notably, the Defendant did not report in 2017 that in the preceding two years, Burisma Official 1 admitted to the Defendant that he had paid Public Official 1 $5 million when Public Official 1 was still in office, as the Defendant later claimed.

C. Three years later, in May 2020, the Defendant sent the Handler a series of messages expressing bias against Public Official 1, who was then a candidate for President of the United States of America and the presumptive nominee of one of the two major political parties.

8. On May 19, 2020, the Defendant messaged the Handler the following:

It's all over the news in Russia and Ukraine as well as live calls between [Public Official 1] and [President of Ukraine]
5:37 PM

Smells bad for [Public Official 1] 5:37 PM

9. On that day, May 19, 2020, it was publicly reported that:

> A Ukrainian lawmaker who met with [] late last year released recordings of private phone calls several years ago between [Public Official 1] and [], then Ukraine's president, in a new broadside against the presumptive [] nominee for U.S. president that has raised questions about foreign interference in the 2020 election.

10. Approximately 20 minutes after his first message on May 19, 2020, the Defendant volunteered his view that:

Public Official 1 going to jail )))) 5:56 PM

11. One minute later, the Defendant opined:

May 19, 2020

Dems tried to impeacn Public Official 2 for same 5:57 PM

Even less 5:57 PM

All those polititions same shit 5:57 PM

Jail for all of them 5:57 PM

Plus bribe of Public Official 1 should be soon in the news))) 5:57 PM

12. To which the Handler responded:

> ??? Only if you believe that his request to get rid of [Prosecutor General] was only because of Burisma...which my all accounts it was not
>
> 5:58 PM

13. The Defendant offered the following:

> For sure yes 5:58 PM
>
> I'll try to prove it for you bro
>
> 5:58 PM

14. To which the Handler responded:

> Bride payment to [Public Official 1] Or are you talking about the aid withheld unless they fired [Prosecutor General] 5:59 PM

15. The Defendant then further offered the following:

I'll get those other recordings of [Public Official 1] son telling to Boriama that his dad will take care of [Prosecutor General]

Bribe to [Public Official 1] and his son 5:59 PM

16. To which the Handler responded:

That would be a game changer
5:59 PM

17. The Defendant then stated:

I'll meet with the guys as soon as I will be able to fly 5:59 PM

The Defendant did not indicate who "the guys" were.

[this space intentionally left blank]

18. The following day, May 20, 2020, the Defendant messaged the Handler a link to an article titled, "Senate Republicans issue first subpoena in [Public Official 1]-Burisma probe":

19. The Handler did not respond.

[this space intentionally left blank]

20. The next day, May 21, 2020, the Defendant messaged the Handler the following:

May 21, 2020

Ukraine opening investigation ))))$ 9:11 AM

Ok Public Official 1 9:11 AM

I think it's gonna help him to be elected)))) 9:12 AM

We need a new runner 9:12 AM

Let me know when you can talk. Have some interesting update 9:13 AM

[this space intentionally left blank]

21. Less than thirty minutes later, the Defendant messaged the Handler the following:

9:42 AM
Public Official 1 & Businessperson 1
with CEO of Burisma

Contrary to the Defendant's representation, this was not, in fact, a photograph of Public Official 1 and Businessperson 1 with the CEO of Burisma.

D. One month later, and three years after first reporting on Burisma, the Defendant reported bribery allegations against Businessperson 1 and Public Official 1.

22. In June 2020, the Handler reached out to the Defendant concerning the 2017 1023. This was done at the request of the FBI's Pittsburgh Field Office (hereafter "FBI Pittsburgh"). In the first half of 2020, the United States Attorney's Office for the Western District of Pennsylvania (hereafter "USAO WDPA") had been tasked by the Deputy Attorney General of the United States to assist in the "receipt, processing, and preliminary analysis of new information provided by the public that may be relevant to matters relating to Ukraine." As part of that process, FBI Pittsburgh opened an assessment, 58A-PG-3250958, and in the course of that assessment identified the 2017 1023 in FBI holdings and shared it with USAO WDPA. USAO WDPA then asked FBI Pittsburgh to reach out to the Handler to ask for any further information about the reference in his 2017 1023 that stated, "During this call, there was a brief, non-relevant discussion about former [Public Official 1]'s son, [Businessperson 1], who is currently on the Board of Directors for Burisma Holdings [No Further Information]".

23. On or about June 26, 2020, FBI Pittsburgh contacted the Handler regarding the 2017 1023. That same day, the Handler spoke with the Defendant, who was in Los Angeles, by telephone. The information the Defendant provided the Handler was memorialized on a Form 1023 (hereafter the "2020 1023"), an official record of the FBI, which was finalized on June 30, 2020.

24. During their call on June 26, 2020, when the Handler asked the Defendant about the "brief, non-relevant discussion about former [Public Official 1]'s son, [Businessperson 1], who is currently on the Board of Directors for Burisma Holdings," the Defendant described, for the first time, two purported meetings and two purported phone calls with various Burisma executives where Businessperson 1 and Public Official 1 were discussed. The two phone calls were in addition to the one the Defendant reported on in the 2017 1023. This time, rather than a passing reference to Businessperson 1 being on Burisma's Board, the Defendant claimed that Burisma executives at two meetings in 2015 and/or 2016, during the Obama-Biden Administration, told him that they were paying Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1, when he was in office, and Businessperson 1 so that "[Businessperson 1] will take care of all those issues through his dad," referring to a criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma and to "deal with" the then-Ukrainian Prosecutor General. In describing the phone calls, the Defendant claimed that Burisma Official 1 said he was "pushed to pay" Public Official 1 and Businessperson 1, had text messages and recordings that show he was coerced to make such payments, and it would take investigators ten years to find the records of illicit payments to Public Official 1. The Defendant made these statements to the Handler in June 2020, when Public Official 1 was a candidate for President of the United States and the presumptive nominee of one of the two major political parties.

25. Critically, the payments the Defendant described occurred, according to the Defendant, during the Obama-Biden Administration in

2016, when Public Official 1 was in a position to influence U.S. policy towards Ukraine, and prior to February 2016 when the then-Ukrainian Prosecutor General was fired and, in any event, prior to the change in Administrations in January 2017.

26. Specifically, the Defendant claimed the following about the first and second meetings:

> First Meeting with Burisma Executives in Kyiv, Ukraine 2015/2016. **In late 2015 or 2016, during the Obama/Biden administration, CHS was first introduced to officials at Ukraine natural gas business Burisma Holdings ("Burisma") through CHS's associate, [Associate 1]** (alternate transliteration - [Associate 1]; for full identification of [Associate 1], see attachments to [], a FD-1023 by CHS serialized on 1/2/2018).
>
> CHS and [Associate 1] traveled to Ukraine and went to Burisma's office that was located 20 minutes away from the City Center. The purpose of the meeting was to discuss Burisma's interest in purchasing a US-based oil and gas business, for purposes of merging it with Burisma for purposes of conducting an IPO in the US. Burisma was willing to purchase a US-based entity for $20-30 million.
>
> **At this meeting was CHS, CHS's former business partner, [Associate 2] (an USPER who does not speak Russian), [Associate 1], Burisma's CFO, [Burisma Official 2]** (email []@Burisma.com, telephone []), **[Burisma Official 3] (the daughter to Burisma's CEO and founder [Burisma Official 1) and her husband (FNU LNU).** The conversation was in Russian, and thus [Associate 2] did not participate therein.
>
> During the meeting, [Burisma Official 2] asked CHS whether CHS was aware of Burisma's Board of Directors. CHS replied "no", and [Burisma Official 2] advised the board members included: 1) the former President or Prime Minister of Poland; and, 2) **[Public Official 1]'s son, [Businessperson 1].** [Burisma Official 2] said Burisma hired the former President or Prime Minister of Poland to leverage his contacts in Europe for prospective oil and gas deals, **and they hired [Businessperson 1] to "protect us, through his dad, from all kinds of problems"** (CHS was certain [Burisma Official 2] provided no further/specific details about what that meant).

CHS asked why they (Burisma) needed to get CHS's assistance regarding the purchase/merger of a US-based company when [Businessperson 1] was on their board. [Burisma Official 2] replied that [Businessperson 1] was not smart, and they wanted to get additional counsel. The group then had a general conversation about whether the purchase/merger with a US company would be a good business decision.

Meeting with CHS, [Associate 1], and [Burisma Official 1] in Vienna, Austria in 2016. **Approximately one or two months after the aforementioned Burisma meeting in Ukraine, CHS traveled to Vienna, Austria with [Associate 1] and met with [Burisma Official 1] at an outside coffee shop.** The trio continued to talk about the feasibility of Burisma acquiring a US-based entity. **CHS recalled this meeting took place around the time [Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office.** CHS told [Burisma Official 1] that **due to [the then-Ukrainian Prosecutor General]'s investigation into Burisma**, which was made public at this time, **it would have a substantial negative impact on Burisma's prospective IPO in the United States. [Burisma Official 1] replied something to the effect of, "Don't worry [Businessperson 1] will take care of all of those issues through his dad."** CHS did not ask any further questions about what that specifically meant.

CHS asked [Burisma Official 1] why Burisma would pay $20-30 million to buy a US company for IPO purposes when it would be cheaper to just form a new US-entity, or purchase a corporate shell that was already listed on an exchange. [Burisma Official 1] responded that [Businessperson 1] advised Burisma it could raise much more capital if Burisma purchased a larger US-based business that already had a history in the US oil and gas sector. CHS recalled [Burisma Official 1] mentioned some US-based gas business(es) in Texas, the names of which CHS did not recall. **CHS advised [Burisma Official 1] it would be problematic to raise capital in the US given [the then-Ukrainian Prosecutor General]'s investigation into Burisma as nobody in the US would invest in a company that was the subject of a criminal investigation.** CHS suggested it would best if Burisma simply litigate the matter in Ukraine, and pay some attorney $50,000. [Burisma Official 1] said he/Burisma would likely lose the trial because he could not show that Burisma was innocent; [Burisma Official 1] also laughed at CHS's number of $50,000 (not because of the small amount, but because the number contained a "5") **and said that "it cost 5 (million) to pay [Public Official 1], and 5 (million) to**

> **[Businessperson 1]." CHS noted that at this time, it was unclear to CHS whether these alleged payments were already made.**
>
> CHS told [Burisma Official 1] that **any such payments to [Public Official 1 and Businessperson 1]** would complicate matters, and Burisma should hire "some normal US oil and gas advisors" because [Public Official 1 and Businessperson 1] have no experience with that business sector. [Burisma Official 1] made some comment that although [Businessperson 1] "was stupid, and his ([Burisma Official 1]'s) dog was smarter," **[Burisma Official 1] needed to keep [Businessperson 1] (on the board) "so everything will be okay." CHS inquired whether [Businessperson 1] or [Public Official 1] told [Burisma Official 1] he should retain [Businessperson 1]; [Burisma Official 1] replied, "They both did."** CHS reiterated CHS's opinion that [Burisma Official 1] was making a mistake and he should fire [Businessperson 1] and deal with [**the then-Ukrainian Prosecutor General]'s investigation** directly so that the matter will remain an issue in Ukraine, and not turn in to some international matter. [Burisma Official 1] responded something to the effect of, **"Don't worry, this thing will go away anyway."** CHS replied that, notwithstanding [the then-Ukrainian Prosecutor General]'s investigation, it was still a bad decision for Burisma to spend $20-$30 million to buy a US business, and that CHS didn't want to be involved with the [Public Official 1 and Businessperson 1] matter. [Burisma Official 1] responded that he appreciated CHS's advice, but that "it's too late to change his decision." **CHS understood this to mean that [Burisma Official 1] had already had [sic.] paid [Public Official 1 and Businessperson 1], presumably to "deal with [the then-Ukrainian Prosecutor General]."**

(emphases added).

E. <u>The Defendant's 2020 story was a fabrication</u>.

27. The Defendant's claim that "in late 2015/2016 during the Obama/Biden Administration" he first met with Burisma Official 2 and that at that meeting Burisma Official 2 told him that they hired Businessperson 1 to "protect us, through his dad, from all kinds of problems" was false, as he knew.

28. Similarly, the Defendant's claims that he met with Burisma Official 1 "one or two months later," around the time "[Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred on December 9, 2015, and that at that meeting Burisma Official 1 admitted that he had paid Businessperson 1 $5 million and Public Official 1 $5 million each so that "[Businessperson 1] will take care of all those issues through his dad," referring to the then-Ukrainian Prosecutor General's investigation into Burisma, and to "deal with [the then-Ukrainian Prosecutor General]," were false, as the Defendant knew.

29. No such statements were made to the Defendant because, in truth and fact, Defendant met with officials from Burisma for the first time in 2017, *after* Public Official 1 left office in January 2017, and *after* the then-Ukrainian Prosecutor General had been fired in February 2016. The first meeting the Defendant had with officials from Burisma occurred at a time when Public Official 1 no longer had the ability to influence U.S. policy and after the then-Ukrainian Prosecutor General was out of office. The Defendant's story to the FBI was a fabrication, an amalgam of otherwise unremarkable business meetings and contacts that had actually occurred but at a later date than he claimed and for the purpose of pitching Burisma on the Defendant's services and products, not for discussing bribes to Public Official 1 when he was in office.

30. The Defendant began to pursue business opportunities with Burisma in spring 2017, at the earliest, through two associates of his.

a. Associate 1 was a Ukrainian business consultant. He was introduced to the Defendant by a mutual acquaintance who told

Associate 1 that the Defendant was an expert in IPOs in the United States. The Defendant and Associate 1 subsequently met in Kiev, Ukraine, and the Defendant asked Associate 1 to connect him to businesses in Ukraine interested in IPOs in the United States. Associate 1 subsequently identified Burisma as such a company.

b. Associate 2 was an American who owned a cryptocurrency business. In the spring of 2017, the Defendant presented Burisma to Associate 2 as a company that might be interested in a cryptocurrency product Associate 2 was trying to commercialize. Around this time, the Defendant sent Associate 2 a link to the Board of Directors of Burisma. The Defendant specifically called out the fact that Businessperson 1 was on the Board and indicated that because Businessperson 1 was on the Board, the Defendant thought Burisma was a company with which they could do business.

31. Between March 2017, when the Defendant first reported on Burisma to the Handler, and June 2020, when he first made his false claims about bribes paid to Public Official 1 when he was in office, directly and through his son Businessperson 1, the Defendant had a series of routine business contacts with executives at Burisma. All of these contacts occurred in 2017 and 2018, when Public Official 1 was out of office and after the then-Ukrainian Prosecutor General had been fired. Specifically:

a. The same day that he first reported on Burisma, March 1, 2017, the Defendant messaged the Handler a photograph of a business card for Burisma Official 2.

b. In response, on that same day, the Handler asked the Defendant, "How's [Burisma Official 2] fit into the story", to which the Defendant responded, "This is the guy that will do the public company from there [sic.] side."

c. The Handler then messaged the Defendant, "Looks like the CEO or Owner might be [Burisma Official 1] or []. Either sound familiar?", to which the Defendant responded with the first name of Burisma Official 1. The Handler then asked the Defendant whether he was meeting with Burisma Official 1, to which the Defendant responded, "No. The guy that I send [sic.] you the business card."

d. On April 13, 2017, the Handler messaged the Defendant asking him, "U know who from Burisma will be in the meeting," to which

the Defendant responded, "Not yet Will know after we [sic.] I will get the email."

e. Four days later, on April 17, 2017, Associate 1 sent the Defendant and Burisma Official 2 an email introducing them to each other.

f. That same day, Associate 1 sent another email to Burisma Official 2 summarizing, in general terms, how a company could undertake an IPO in the United States.

g. On or about April 27, 2017, Burisma Official 2 responded to Associate 1's April 17, 2017, email. Burisma Official 2 thanked Associate 1 for introducing him to the Defendant and promised to send the Defendant and Associate 1 information about Burisma's desire to buy an oil and gas company in the United States.

h. On or around May 11, 2017, Burisma Official 4, another Burisma executive, emailed Associate 1 telling him that Burisma was not interested in pursuing an IPO in the United States and that their priority was acquiring a U.S.-based oil and gas company.

i. Seven days later, on or about May 18, 2017, Associate 1 forwarded Burisma Official 3's email to the Defendant.

j. On July 24, 2017, the Defendant messaged the Handler, "Cutting a deal with Burisma Will update you soon bro" and "It's gonna be a contract so we can review it first."

k. On September 16, 2017, Associate 2, the individual whom the Defendant claimed in the 2020 1023 attended the first meeting the Defendant had with Burisma executives in late 2015 or 2016, flew from New York to Kiev, via London. Associate 2 remained in Ukraine until September 23, 2017, when he returned to the United States through London.

l. During the six (6) day period that Associate 2 was in Ukraine, he and the Defendant met with representatives from Burisma, including Burisma Official 3, the daughter of Burisma's owner Burisma Official 1, to discuss a cryptocurrency product. The meeting was in Russian, and on the drive back from Burisma's headquarters, the Defendant described to Associate 2 what had been discussed. The Defendant told Associate 2 that the Burisma representatives were not interested in the cryptocurrency product the Defendant and Associate 2 were selling and were instead trying to find an oil and gas company in the United States that Burisma could purchase. The Defendant did not describe to Associate 2 any discussion of Businessperson 1 or Public Official 1 during this meeting.

m. On September 19, 2017, the Defendant messaged the Handler photographs of business cards for Burisma Official 3, the

person the Defendant claimed he met at the first meeting in late 2015 or 2016 during the Obama-Biden Administration, and Burisma Official 4, the individual who had sent an email to Associate 1, which Associate 1 then forwarded to the Defendant, in May 2017, as described above.

n. After the September 2017 meeting, Associate 2 prepared a document outlining steps that Burisma could take in order to acquire a company in the United States and use it for an IPO. Associate 2 sent this document to the Defendant on September 22, 2017.

o. Associate 2's trip to Kiev in September 2017 was the first time he had left North America since 2011. Thus, he could not have attended a meeting in Kiev, as the Defendant claimed, in late 2015 or 2016, during the Obama-Biden Administration. His trip to Ukraine in September 2017 was more than seven months after Public Official 1 had left office and more than a year after the then-Ukrainian Prosecutor General had been fired.

p. On January 23, 2018, Associate 2 flew from Los Angeles to London. During the previous week, on January 16, 2018, the Defendant messaged Associate 2 asking him, "Brother Send me the name of the place in London please," to which Associate 2 replied, "Baglioni." On January 25, 2018, the Defendant attempted to call Associate 2. Associate 2 responded, "Downstairs getting breakfast," and the Defendant responded, "Cool. See you in a few." Both the Defendant and Associate 2 were staying at the Hotel Baglioni in London at that time. When Associate 2 was with the Defendant in London, the Defendant told Associate 2 that he had received a call from the owner of Burisma, Burisma Official 1, and that Burisma Official 1 was interested in doing business with them.

q. On January 26, 2018, Associate 2 flew from London to Kiev, staying until January 30, 2018.

r. During that five (5) day time period, the Defendant and Associate 2 traveled to Burisma's headquarters. Once there, they had a brief meeting with Burisma Official 2, who told them that Burisma was not interested in their cryptocurrency product. Burisma Official

2 spoke English during the meeting, and Associate 2 was able to participate. At no point during this meeting between the Defendant, Associate 2, and Burisma Official 2 did Burisma Official 2 tell the Defendant that Burisma had hired Businessperson 1 to "protect us, through his dad, from all kinds of problems."

32. As described above, all the contacts that the Defendant had with Burisma occurred no earlier than spring 2017, after the end of the Obama-Biden Administration. Notably, the Defendant was only introduced to Burisma Official 2, via email, on or about April 17, 2017. Therefore, the Defendant's claim that he had met with Burisma Official 2 in "late 2015 or 2016, during the Obama/Biden administration," was false because if the Defendant had met Burisma Official 2 then, he would not have needed Associate 1 to introduce him to Burisma Official 2 in April 2017, and Burisma Official 2 would not have thanked Associate 1 for introducing them in April 2017.

33. As to the second meeting, the one that supposedly happened in Vienna, contrary to what the Defendant told the Handler, Associate 1 did not meet with the Defendant and Burisma Official 1 at a café in Vienna around the time that Public Official 1 "made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred in December 2015. In fact, Associate 1 has <u>never</u> met or spoken with Burisma Official 1.

34. Further, the Defendant did not travel to Vienna "around the time [Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred in December 2015.

35. When the Handler interviewed the Defendant on June 26, 2020, the Defendant also falsely told the Handler that he had two phone calls with Burisma Official 1, one in "2016/2017" shortly after the U.S. election but before the end of the Obama-Biden Administration and a second one in 2019. The following is what the Defendant told the Handler about those two calls that was also memorialized in the 2020 1023:

> Subsequent Telephone Calls Between CHS and [Burisma Official 1].
>
> 2016/2017 Telephone Call. Shortly after the 2016 US election and during [Public Official 2] transition period, CHS participated in a conference call with [Associate 1] and [Burisma Official 1]. CHS inquired whether [Burisma Official 1] was happy with the US election results. [Burisma Official 1] replied that he was not happy [Public Official 2] won the election. CHS asked [Burisma Official 1] **whether he was concerned about Burisma's involvement with [Public Official 1 and Businessperson 1]. [Burisma Official 1] stated he didn't want to pay the [Public Official 1 and Businessperson 1] and he was "pushed to pay" them.** (CHS explained the Russian term [Burisma Official 1] used to explain the payments was "poluchili" (transliterated by the CHS), which literally translates to got it" or "received it", but is also used in Russian-criminal-slang for being "forced or coerced to pay." [Burisma Official 1] stated [the then-Ukrainian Prosecutor General] had already been fired, and no investigation was currently going on, **and that nobody would find out about his financial dealings with the [Public Official 1 and Businessperson 1]. CHS then stated, "I hope you have some back-up (proof) for your words (namely, that [Burisma Official 1] was 'forced' to pay [Public Official 1 and Businessperson 1]). [Burisma Official 1] replied he has many text messages and "recordings" that show that he was coerced to make such payments** (See below, subsequent CHS reporting on 6/29/2020). CHS told [Burisma Official 1] he should make certain that he should retain those recordings. [Burisma Official 1] asked whether it would make any (legal) difference whether he voluntarily made such payments, or if he was "forced" to make them.
>
> [Burisma Official 1] then asked CHS whether CHS could provide any assistance in Ukraine (with the [] regime) if something

were to happen to [Burisma Official 1] in the future. CHS replied that CHS didn't want to get involved in any such matters.

[Note: See previous CHS report dated 3/1/2017 Serial 7, wherein CHS reported the foregoing, and stated the call took place during the week of 2/27/2017. At that time, CHS stated that [Burisma Official 1] briefly discussed [Businessperson 1], but the topic was not relevant to Burisma's interest in acquiring a US-based petroleum business for $50-$100 million. At this time CHS also reported aforementioned [Burisma Official 2] (alternate transliteration [Burisma Official 2]) was assigned by Burisma to manage the acquisition, and he was planning to travel to Washington, D.C. in March, 2017.

2019 Telephone call. After the aforementioned 2016 telephone call, CHS had no Interactions with [Burisma Official 1]/Burisma whatsoever, until 2019. In 2019, CHS met with [Associate 1] in London to discuss various business matters (which had nothing to do with [Burisma Official 1], Burisma, or the gas/oil industry; CHS noted that CHS's meeting with [Associate 1] took place at a "Russian coffee house near Knightsbridge Street located near Harrods department store," and that [Associate 1]'s fiancée lives in London). **At some point during this meeting, [Associate 1] advised CHS he was going to call [Burisma Official 1].** At this time, CHS understood [Burisma Official 1] was living somewhere in Europe (NFI). During the call, [Burisma Official 1] asked CHS and/or [Associate 1] if they read the recent news reports about the investigations into [Public Official 1 and Businessperson 1] and Burisma, and [Burisma Official 1] jokingly asked CHS if CHS was an "oracle" (due to CHS's prior advice that [Burisma Official 1] should not pay [Public Official 1 and Businessperson 1] and instead to hire an attorney to litigate the allegations concerning [the then-Ukrainian Prosecutor General]'s investigation). **CHS mentioned [Burisma Official 1] might have difficulty explaining suspicious wire transfers that may evidence any (illicit) payments to [Public Official 1 and Businessperson 1]. [Burisma Official 1] responded he did not send any funds directly to the "Big Guy" (which CHS understood was a reference to [Public Official 1]). CHS asked [Burisma Official 1] how many companies/bank accounts [Burisma Official 1] controls; [Burisma Official 1] responded it would take them (investigators) 10 years to find the records (i.e. illicit payments to [Public Official 1]).** CHS told [Burisma Official 1] if he ever needed help in the future and wanted to speak to somebody in the US government about that matter, that CHS could introduce him to someone.

> Regarding the seemingly open and unsolicited admissions by [Burisma Official 2] and [Burisma Official 1] about the purpose for their retention of [Businessperson 1], and the "forced" payments [Burisma Official 1] made to [Public Official 1 and Businessperson 1], CHS explained it is very common for business men in post-Soviet countries to brag or show-off. Additionally, it is extremely common for businesses in Russia and Ukraine to make **"bribe" payments** to various government officials. CHS noted that in corporate budgets for other Russian and Ukrainian businesses which CHS has inspected in the past, CHS observed budget-line-items in Russian called "Podmazat" (transliterated by CHS), which literally translates to "oil, lubricate, or make things run smoothly," which companies routinely use to account for anticipated **bribe payments**. As such, given the pervasive necessity to **bribe government officials** in Ukraine and Russia, CHS did not perceive [Burisma Official 2]'s or [Burisma Official 1]'s statements to be unusual, self-serving, or pretextual. Additionally, regarding important business meetings, it is also common in Ukraine and Russia for persons to make covert recordings. However, CHS has only met [Burisma Official 1] in person on one occasion and has spoken to him only twice on the telephone; as such, CHS is not able to provide any further opinion as to the veracity of [Burisma Official 1]'s aforementioned statements.

(emphases added).

36. Associate 1 never spoke to Burisma Official 1 on the phone, or in person. Therefore, the Defendant's claim that Associate 1 called Burisma Official 1 in 2019 is false for that reason as well.

37. Moreover, at no point when the Defendant was messaging the Handler in May 2020 about Public Official 1 did he mention that he had had two purported meetings when Public Official 1 was in office in the United States where Burisma executives told him that they paid Businessperson 1 to "protect us, through his dad, from all kinds of problems," and later that they had specifically paid $5 million each to Public Official 1 and Businessperson 1 so that "[Businessperson 1] will take care of all those issues through his dad," referring to a

criminal investigation being conducted by the then-Ukrainian Prosecutor General into Burisma, and to "deal with" the then-Ukrainian Prosecutor General. Nor did he tell the Handler he had two subsequent phone calls where Burisma Official 1 told him that he had been forced to pay Public Official 1 and Businessperson 1 and that it would take investigators 10 years to find records of illicit payments to Public Official 1. This was despite the Defendant's stated interest in proving to the Handler that the bribe had occurred and his offer to go to Ukraine to "meet with the guys" to obtain incriminating recordings of Businessperson 1 telling Burisma officials that his father would "take care" of the then-Ukrainian Prosecutor General.

38. On June 29, 2020, the Defendant provided further supplemental information to the Handler concerning his allegations. These were memorialized in the 2020 1023 before it was finalized and consisted of the following:

> Regarding CHS's aforementioned reporting that [Burisma Official 1] said - "he has many text messages and 'recordings' that show he was coerced to make such payments ' - CHS clarified [Burisma Official 1] said he had a total of "17 recordings" involving [Public Official 1 and Businessperson 1]; two of the recordings included [Public Official 1], and the remaining 15 recordings only included [Businessperson 1]. CHS reiterated that, per [Burisma Official 1], these recordings evidence **[Burisma Official 1] was somehow coerced into paying [Public Official 1 and Businessperson 1] to ensure [the then-Ukraine Prosecutor General] was fired.** [Burisma Official 1] stated he has two "documents (which CHS understood to be wire transfer statements, bank records, etc.), that evidence some payment(s) to [Public Official 1 and Businessperson 1] were made, presumably in exchange for [the then-Ukrainian Prosecutor General]'s firing.
>
> Regarding aforementioned [Associate 1] (alternate spelling, [Associate 1]), who originally introduced CHS into this matter, [Associate 1] currently "works in some office for the administration of [] (NFI)", and also works for [], who

> is the founder/CEO of cryptocurrency and blockchain technology business [].

(emphasis added)

39. After the Defendant made these reports, the FBI asked him for travel records, which he provided, in an attempt to determine whether the information he provided was accurate.

40. By August 2020, FBI Pittsburgh concluded that all reasonable steps had been completed regarding the Defendant's allegations and that their assessment, 58A-PG-3250958, should be closed. On August 12, 2020, FBI Pittsburgh was informed that the then-FBI Deputy Director and then-Principal Associate Deputy Attorney General of the United States concurred that it should be closed.

F. <u>The Defendant was interviewed by FBI investigators in September 2023, and repeated some of his false claims, changed his story as to other of his claims, and promoted a new false narrative after meeting with Russian officials</u>.

41. In July 2023, the FBI requested that the U.S. Attorney's Office for the District of Delaware assist the FBI in an investigation of allegations related to the 2020 1023. At that time, the United States Attorney's Office for the District of Delaware was handling an investigation and prosecution of Businessperson 1.

42. On August 11, 2023, the Attorney General appointed David C. Weiss, the United States Attorney for the District of Delaware, as Special Counsel. The Special Counsel was authorized to conduct the investigation and prosecution of Businessperson 1, as well as "any matters that arose from that investigation, may arise from the Special Counsel's investigation, or that are within the scope of 28 C.F.R. § 600.4(a)."

43. On August 29, 2023, FBI investigators spoke with the Handler in reference to the 2020 1023. During that conversation, the Handler indicated that he and the Defendant had reviewed the 2020 1023 following its public release by members of Congress in July 2023, and the Defendant reaffirmed the accuracy of the statements contained in it.

44. The Handler provided investigators with messages he had with the Defendant, including the ones described above. Additionally, the Handler identified and reviewed with the Defendant travel records associated with both Associate 2 and the Defendant. The travel records were inconsistent with what the Defendant had previously told the Handler that was memorialized in the 2020 1023. The Defendant also provided email communications with both Associate 2 and Burisma personnel beginning in 2017 to the Handler, which the Handler reviewed with the Defendant and shared with FBI investigators.

45. The Defendant was interviewed by FBI investigators on September 27, 2023. At the start of the interview, the Defendant was warned of his duty to tell the truth pursuant 18 U.S.C. § 1001.

46. The Defendant repeated his claim that his first meeting with Burisma was much earlier than 2017. He further told investigators that the first meeting was arranged after Associate 1 called him and said that a company wanted to enter the U.S. market either through an IPO or an acquisition. The Defendant repeated the claim that Burisma Official 2 was at this meeting and possibly Burisma Official 4, based on the Defendant's recent review of his messages with the Handler that included an image of Burisma Official 4's business card, as described above. The Defendant told investigators that, during this meeting, Burisma Official 2 said something to the effect of "Did you see my Board, I'm not going to be fucked," and that one member of the Board

was the son of Public Official 1. The Defendant told investigators that Burisma Official 2 said, "I am paying for familia," which the Defendant said was a reference to family or a last name. Later in the interview, the Defendant said he was 100 percent certain that Associate 1 attended the first meeting.

47. The Defendant also told investigators that while he had initially recalled two Burisma meetings, after reviewing Associate 2's travel records provided by the Handler, along with an email the Defendant found, the Defendant concluded that there were maybe two to five meetings. Later in the interview, the Defendant said he did recall that Associate 2 was present for two meetings.

48. The Defendant told investigators that he had a meeting with Burisma Official 1 at a coffee shop in a German speaking country, possibly Vienna as he had previously reported, after the 2016 election, so in late 2016. Then he told investigators he could not recall when it occurred, and then, when shown the emails he had with Associate 1 as described above, stated he thought it was after those, which would put it in 2017. Notably, these new and inconsistent statements arose only after the Defendant had reviewed messages, emails, and travel information that were in direct conflict with what he reported in the 2020 1023. The Defendant also told investigators that the meeting in the German speaking country, possibly Vienna, occurred because Associate 1 told the Defendant that Burisma Official 1 wanted to meet, and the Defendant agreed. Later in the interview, he told investigators that this meeting occurred before the then-Ukrainian Prosecutor General resigned, which was in early 2016.

49. The Defendant told investigators he did not recall talking to Burisma Official 1 ever again after the meeting in the German

speaking country and did not have any phone calls with Burisma Official 1 after this meeting.

50. The Defendant told investigators that he had asked the then-Ukrainian President to arrange a meeting between himself and the then-Ukrainian Prosecutor General to talk about Burisma. The Defendant told investigators that this meeting occurred before the then-Ukrainian Prosecutor General resigned, which was early 2016. The Defendant also told investigators this meeting occurred before his meeting with Burisma Official 1 in the coffee shop in a German speaking country. The Defendant told investigators that after he met with the then-Ukrainian Prosecutor General, he met with the then-Ukrainian President. The Defendant did not provide any of this information to the Handler in 2020.

51. The Defendant also shared a new story with investigators. He wanted them to look into whether Businessperson 1 was recorded in a hotel in Kiev called the Premier Palace. The Defendant told investigators that the entire Premier Palace Hotel is "wired" and under the control of the Russians. The Defendant claimed that Businessperson 1 went to the hotel many times and that he had seen video footage of Businessperson 1 entering the Premier Palace Hotel.

52. The Defendant suggested that investigators check to see if Businessperson 1 made telephone calls from the Premier Palace Hotel since those calls would have been recorded by the Russians. The Defendant claimed to have obtained this information a month earlier by calling a high-level official in a foreign country. The Defendant also claimed to have learned this information from four different Russian officials.

53. The Defendant told investigators that the four different Russian officials are all top officials and two are the heads of the entities they represent. These Russians said that conversations with Ukrainians about ending the war will include the next U.S. election. The Defendant told investigators he is involved in negotiations over ending the war and had been for the previous four months. According to the Defendant, the Russians want Ukraine to assist in influencing the U.S. election, and the Defendant thinks the tapes of Businessperson 1 at the Premier Palace Hotel is all they have. The Defendant told investigators he wants them to ask Businessperson 1 how many times he visited and what he did while at the Premier Palace Hotel.

54. Businessperson 1 has never traveled to Ukraine. The few Burisma Board meetings that Businessperson 1 did attend were all outside of Ukraine.

55. At the conclusion of the interview, the Defendant was asked if he wanted to clarify or correct anything he had stated during this interview, and the Defendant said that he did not need to clarify or correct anything he had stated.

COUNT ONE

[18 U.S.C. § 1001: false statement to a government agent]

56. The Grand Jury re-alleges paragraphs 1 through 55 of this Indictment here.

57. That on or about June 26, 2020, the defendant ALEXANDER SMIRNOV, did willfully and knowingly make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States, to a special agent of the Federal Bureau of Investigation at Los Angeles, California, in the Central District of California, that is to say:

a. The Defendant's claims that "in late 2015/2016 during the Obama/Biden Administration" he met with Burisma Official 2 and that at that meeting Burisma Official 2 told him that Burisma hired Businessperson 1 to "protect us, through his dad, from all kinds of problems," were false, as he knew.

b. The Defendant's claims that he met with Burisma Official 1 "one or two months later," in Vienna, Austria, around the time "[Public Official 1] made a public statement about [the then-Ukrainian Prosecutor General] being corrupt, and that he should be fired/removed from office," which occurred on December 9, 2015, and that at that meeting Burisma Official 1 admitted that he had paid Businessperson 1 $5 million and Public Official 1 $5 million so that "[Businessperson 1] will take care of all those issues through his dad," referring to the then-Ukrainian Prosecutor General's investigation into Burisma, and to "deal with" the then-Ukrainian Prosecutor General, were false, as the Defendant knew.

c. The Defendant's claims that he had a telephone call with Burisma Official 1 in 2016 or 2017 wherein Burisma Official 1 stated he did not want to pay Public Official 1 and Businessperson 1 and he was "pushed to pay" them; that nobody would find out about his financial dealings with Public Official 1 and Businessperson 1; and that Burisma Official 1 had many text messages and "recordings" that show that he was coerced to make such payments, were false, as he knew.

d. The Defendant's claims that in 2019 he was present when Associate 1 called Burisma Official 1 and Burisma Official 1 stated that he did not send any funds directly to the "Big Guy" (which the Defendant understood was a reference to Public Official 1) and that Burisma Official 1 stated it would take them (investigators) 10 years to find the records (i.e., illicit payments to Public Official 1), were false, as he knew.

58. The statements and representations were false because, as ALEXANDER SMIRNOV then and there knew:

a. The Defendant met with officials from Burisma for the first time in 2017, after the end of the Obama-Biden Administration. Thus, Public Official 1, then a private citizen, had no ability to "protect" Burisma from "all kinds of problems." And, there was no discussion of Public Official 1 or Businessperson 1 at this first meeting with Burisma.

b. The Defendant's second meeting with officials from Burisma also occurred in 2017, not at the end of 2015 when Public Official 1 made public statements critical of the Ukrainian Prosecutor General's Office. The second meeting also occurred *after* Public Official 1 left office and *after* the then-Ukrainian Prosecutor General had been fired in February 2016. Like the first meeting, the second

meeting the Defendant had with officials from Burisma occurred at a time when Public Official 1 no longer had the ability to influence U.S. policy. The Defendant also did not travel to Vienna, Austria in December 2015, as he claimed. And, there was no discussion of Public Official 1 or Businessperson 1 at this second meeting.

c. As to phone calls with Burisma Official 1 in 2016 or 2017 and then in 2019, in a subsequent interview with law enforcement in 2023, the Defendant told investigators he had never spoken to Burisma Official 1 on the phone after meeting with Burisma Official 1 in a German speaking country in 2016, and that his last contact with Burisma Official 1 was that meeting in early 2016.

d. Further, Associate 1 never spoke to Burisma Official 1 on the phone or in person, in 2019 or at any other time.

In violation of Title 18, United States Code, Section 1001.

COUNT TWO

[18 U.S.C. § 1519: falsification of records in federal investigation]

1. The Grand Jury re-alleges paragraphs 1 through 55 of this Indictment here.

2. Between on or about June 26 and 30, 2020, in the Central District of California, the defendant, ALEXANDER SMIRNOV, did knowingly cause the making of a false entry in an FBI Form 1023, a record and document, with the intent to impede, obstruct, and influence a matter that the Defendant knew and contemplated was within the jurisdiction of the United States Department of Justice, a department and agency of the United States, in violation of Title 18, United States Code, Section 1519, and Title 18, United States Code, Section 2.

A TRUE BILL

/S/

Foreperson

DAVID C. WEISS
Special Counsel

LEO J. WISE
Principal Senior Assistant Special Counsel

DEREK E. HINES
Senior Assistant Special Counsel

SEAN F. MULRYNE
CHRISTOPHER M. RIGALI
Assistant Special Counsels

United States Department of Justice

(406 of 420), Page 406 of 420 Case: 24-1133, 03/08/2024, DktEntry: 6.2, Page 406 of 420

EXHIBIT Q

DOCKET

2:24-CR-91-ODW

AA000400

Query Reports Utilities Help Log Out

WESTERN,APPEAL

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)**
**CRIMINAL DOCKET FOR CASE #: 2:24-cr-00091-ODW-1**

Case title: USA v. Smirnov

Date Filed: 02/14/2024

---

Assigned to: Judge Otis D. Wright, II

Appeals court case number: 24-1133 9th CCA

**Defendant (1)**

**Alexander Smirnov**

represented by **Mark A. Byrne**
Byrne and Nixon LLP
700 North Brand Boulevard, Suite 1180
Glendale, CA 91203
213-620-8003
Fax: 213-620-8012
Email: markbyrne@byrnenixon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard A Schonfeld**
Chesnoff and Schonfeld
520 South 4th Street
Las Vegas, NV 89101-6593
702-384-5563
Fax: 702-598-1425
Email: rschonfeld@cslawoffice.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David Z Chesnoff**
Chesnoff and Schonfeld
520 South 4th Street
Las Vegas, NV 89101
702-384-5563
Email: dzchesnoff@cslawoffice.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Naser J. Khoury**
Naser J. Khoury Law Offices
14427 Sylvan Street
Van Nuys, CA 91401-2649

818-654-0001
Fax: 818-654-0007
Email: naseratlaw@gmail.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| 18:1001: False Statement (1) | |
| 18:1519: Creating a False and Fictitious Record (2) | |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Plaintiff**

**USA** represented by

**Derek Edward Hines**
US Department of Justice
Office of Special Counsel David C. Weiss
950 Pennsylvania Avenue NW Room B-200
Washington, DC 20530
771-217-6091
Email: deh@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Leo J. Wise**
US Department of Justice
Office of Special Counsel David C. Weiss
950 Pennsylvania Avenue, NW, Room B-200
Washington, DC 20530
771-217-6091
Email: LJW@USDOJ.GOV *(Inactive)*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Christopher Michael Rigali**
Office of Special Counsel, U.S. Dept. of Justice
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
202-616-2652
Email: christopher.rigali2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Sean F Mulryne**
Office of the Special Counsel - Weiss
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
202-430-4880
Email: sfm@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/14/2024 | 1 | INDICTMENT filed as to Alexander Smirnov (1) count(s) 1, 2. Offense occurred in LA. (mhe) (Entered: 02/15/2024) |
| 02/14/2024 | 2 | CASE SUMMARY filed by AUSA Leo J Wise as to Defendant Alexander Smirnov; defendants Year of Birth: 1980 (mhe) (Entered: 02/15/2024) |
| 02/14/2024 | 4 | EX PARTE APPLICATION to Seal Case Filed by Plaintiff USA as to Defendant Alexander Smirnov. (mhe) (Entered: 02/15/2024) |
| 02/14/2024 | 5 | ORDER by Magistrate Judge Michael R. Wilner: granting 4 EX PARTE APPLICATION to Seal Case as to Alexander Smirnov (1) (mhe) (Entered: 02/15/2024) |
| 02/14/2024 | 6 | Notice of Appearance or Withdrawal of Counsel: Adding Derek E Hines as counsel of record for Alexander Smirnov for the reason indicated in the G-123 Notice. Filed by plaintiff USA. (mhe) (Entered: 02/15/2024) |
| 02/15/2024 | 7 | SEALED EX PARTE APPLICATION to Unseal Case Filed by Plaintiff USA as to Defendant Alexander Smirnov. (mhe) (Entered: 02/15/2024) |
| 02/15/2024 | 8 | SEALED ORDER UNSEALING INDICTMENT AND RELATED DOCUMENTS by Magistrate Judge Michael R. Wilner: granting 7 EX PARTE APPLICATION to Unseal Case as to Alexander Smirnov (1) (mhe) (Entered: 02/15/2024) |
| 02/15/2024 | 9 | Notice of Appearance or Withdrawal of Counsel: for attorney Sean F Mulryne counsel for Plaintiff USA. Adding Sean Francis Mulryne as counsel of record for United States of America for the reason indicated in the G-123 Notice. Filed by Plaintiff United States of America. (Attorney Sean F Mulryne added to party USA(pty:pla))(Mulryne, Sean) (Entered: 02/15/2024) |
| 02/15/2024 | 10 | NOTICE OF APPEARANCE OR REASSIGNMENT of AUSA Christopher Michael Rigali on behalf of Plaintiff USA. Filed by Plaintiff USA. (Attorney Christopher Michael Rigali added to party USA(pty:pla))(Rigali, Christopher) (Entered: 02/15/2024) |
| 02/21/2024 | 11 | APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE/DETENTION Filed by Plaintiff USA as to Defendant Alexander Smirnov. (Attachments: # 1 Exhibit 2, # 2 Exhibit 8, # 3 Exhibit 9) (Hines, Derek) (Entered: 02/21/2024) |

| | | |
|---|---|---|
| 02/21/2024 | 12 | EX PARTE APPLICATION for Leave to File Government's Ex Parte Application for Order Sealing Certain Exhibits to Government's Application for Review of Magistrate Judge's Bail Order. Filed by Plaintiff USA as to Defendant Alexander Smirnov. (Attachments: # 1 Proposed Order) (Hines, Derek) (Entered: 02/21/2024) |
| 02/21/2024 | 13 | ORDER SEALING CERTAIN EXHIBITS TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL ORDER as to Alexander Smirnov (1) 12 by Judge Otis D. Wright, II: Pursuant to Local Criminal Rule 49-1.2(b)(3), exhibits 1, 3, 4, 5, 6, 7,10 and 11 shall be kept under seal. (lc) (Entered: 02/21/2024) |
| 02/21/2024 | 14 | NOTICE OF APPEARANCE of attorney Richard A Schonfeld, (Retained), appearing on behalf of Defendant Alexander Smirnov, filed by Defendant Alexander Smirnov. (Schonfeld, Richard) (Entered: 02/21/2024) |
| 02/21/2024 | 17 | SEALED - EXHIBIT 1 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 18 | SEALED - EXHIBIT 3 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 19 | SEALED - EXHIBIT 4 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 20 | SEALED - EXHIBIT 5 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 21 | SEALED - EXHIBIT 6 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 22 | SEALED - EXHIBIT 7 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 23 | SEALED - EXHIBIT 10 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/21/2024 | 24 | SEALED - EXHIBIT 11 TO GOVERNMENT'S APPLICATION FOR REVIEW OF MAGISTRATE JUDGE'S BAIL REVIEW ORDER (bm) (Entered: 02/22/2024) |
| 02/22/2024 | 25 | APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-36960987) Filed by Defendant Alexander Smirnov. Application set for hearing on 2/22/2024 at 03:29 PM before Judge Otis D. Wright II. (Attorney Naser J. Khoury added to party Alexander Smirnov(pty:dft)) (Khoury, Naser) (Entered: 02/22/2024) |
| 02/22/2024 | 26 | NOTICE OF APPEARANCE of attorney David Z. Chesnoff, (Retained), appearing on behalf of Defendant Alexander Smirnov, filed by Defendant Alexander Smirnov. (Khoury, Naser) (Entered: 02/22/2024) |
| 02/22/2024 | 27 | ORDER SETTING HEARING ON GOVERNMENT MOTION FOR REVIEW OF RELEASE ORDER by Judge Otis D. Wright (bm) Modified on 2/23/2024 (bm). (Entered: 02/22/2024) |
| 02/23/2024 | 28 | COUNSEL ARE NOTIFIED, the Application for Non Resident 25 was set for a hearing (2-22-24) which is invalid and VACATED. The parties were emailed an order with the correct date and time: (2-26-24 @ 9am).THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 02/23/2024) |
| 02/23/2024 | 29 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. |

| | | |
|---|---|---|
| | | ACACDC-36960987) 25 . The following error(s) was/were found: Local Rule 83-2.1.3.3(d) Certificate of Good Standing not attached for every state court listed to which the applicant has been admitted. Local Rule 83-2.1.3.3(b) Proposed order not attached. (ak) (Entered: 02/23/2024) |
| 02/23/2024 | 30 | Second APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (Pro Hac Vice Fee - $500 Previously Paid on 2/22/2024, Receipt No. 36960987) Filed by Defendant Alexander Smirnov. Application set for hearing on 2/26/2024 at 09:00 AM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order) (Khoury, Naser) (Entered: 02/23/2024) |
| 02/23/2024 | 31 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: Second APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (Pro Hac Vice Fee - $500 Previously Paid on 2/22/2024, Receipt No. 36960987) 30 . The following error(s) was/were found: Local Rule 83-2.1.3.3(d) Certificate of Good Standing not attached for every state court listed to which the applicant has been admitted. (sbou) (Entered: 02/23/2024) |
| 02/23/2024 | 32 | NOTICE OF CLERICAL ERROR, as to Defendant Alexander Smirnov: Due to clerical error the Notice of Deficiency was issued in error. Re: Notice of Deficiency in Electronically filed Pro Hac Vice Application (G-112C) - optional html form, 31 (sbou) (Entered: 02/23/2024) |
| 02/23/2024 | 33 | OPPOSITION to APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE/DETENTION 11 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Schonfeld, Richard) (Entered: 02/23/2024) |
| 02/23/2024 | 35 | ORDER GRANTING APPLICATION of Non-Resident Attorney David Z. Chesnoff to Appear Pro Hac Vice on behalf of Defendant Alexander Smirnov (1) and designating Naser I. Khoury as local counsel 30 by Judge Otis D. Wright, II. (lc) (Entered: 02/26/2024) |
| 02/26/2024 | 34 | SUPPLEMENT to APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE/DETENTION 11 (Schonfeld, Richard) (Entered: 02/26/2024) |
| 02/26/2024 | 36 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Non Appeal.(Hines, Derek) (Entered: 02/26/2024) |
| 02/26/2024 | 37 | TRANSCRIPT ORDER as to Defendant Alexander Smirnov for Court Smart (CS). Order for: Criminal Appeal. Court will contact Camie Linnell at clinnell@cslawoffice.net with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Schonfeld, Richard) (Entered: 02/26/2024) |
| 02/26/2024 | 40 | MINUTES OF POST-INDICTMENT ARRAIGNMENT: held before Judge Otis D. Wright, II as to Defendant Alexander Smirnov (1) Count 1,2. Defendant arraigned, states true name is the name on the charging document. Defendant entered not guilty plea to all counts as charged. Attorney: David Z. Chesnoff, Retained present. Case assigned to Judge Otis D. Wright,II. Jury Trial set for 4/23/2024 09:00 AM before Judge Otis D. Wright II.. Judge Wright is located in 5D, Los Angeles - United States Courthouse, 350 W 1st Street, CA 90012-4565. Court Smart: 02/26/2024. (tba) (Entered: 02/27/2024) |
| 02/26/2024 | 43 | MINUTES OF ARREST ON INDICTMENT HEARING held before Judge Otis D. Wright, II as to Defendant Alexander Smirnov. Court issues Order under Fed. R. Crim. P. 5(f) concerning prosecutor's disclosure obligations;see General Order 21-02 (written order). Defendant states true name as charged. Attorney: David Z Chesnoff, Retained, present. Defendant remanded to the custody of the USM. Court Smart: CS 2/26/24. (mhe) (Entered: 03/01/2024) |

| | | |
|---|---|---|
| 02/26/2024 | 44 | ABSTRACT OF COURT PROCEEDING Issued by Judge Otis D. Wright, II as to Alexander Smirnov. Defendant be provided with a medical examination and/or medical treatment. (mhe) (Entered: 03/01/2024) |
| 02/26/2024 | 45 | ADVISEMENT OF STATUTORY & CONSTITUTIONAL RIGHTS filed by Defendant Alexander Smirnov. (mhe) (Entered: 03/01/2024) |
| 02/26/2024 | 46 | ORDER OF DETENTION by Judge Otis D. Wright, II as to Defendant Alexander Smirnov, (mhe) (Entered: 03/01/2024) |
| 02/26/2024 | 47 | DESIGNATION AND APPEARANCE OF COUNSEL; filed by Richard A Schonfeld, David Z Chesnoff appearing for Alexander Smirnov (mhe) (Entered: 03/01/2024) |
| 02/27/2024 | 38 | TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings held on 02/26/2024. Electronic Court Recorder: EXCEPTIONAL REPORTING SERVICES, INC., phone number (361) 949-2988. Transcript may be viewed at the court public terminal or purchased through the Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 3/19/2024. Redacted Transcript Deadline set for 3/29/2024. Release of Transcript Restriction set for 5/28/2024. (yja) (Entered: 02/27/2024) |
| 02/27/2024 | 39 | NOTICE OF FILING TRANSCRIPT filed as to Defendant Alexander Smirnov for proceedings 02/26/2024 re Transcript 38 THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (yja) TEXT ONLY ENTRY (Entered: 02/27/2024) |
| 02/29/2024 | 41 | NOTICE OF APPEAL to Appellate Court re: Conditions of Release filed by Defendant Alexander Smirnov Filing fee $605, receipt number ACACDC-37009687. (Schonfeld, Richard) (Entered: 02/29/2024) |
| 02/29/2024 | 42 | REPORT COMMENCING CRIMINAL ACTION as to Defendant Alexander Smirnov; defendants Year of Birth: 1980; date of arrest: 2/14/2024 (mhe) (Entered: 03/01/2024) |
| 03/01/2024 | 48 | NOTICE of and Request to Designate a Classified Information Security Officer filed by Plaintiff USA as to Defendant Alexander Smirnov (Attachments: # 1 Proposed Order) (Rigali, Christopher) (Entered: 03/01/2024) |
| 03/01/2024 | 50 | NOTIFICATION by Circuit Court of Appellate Docket Number 24-1133 as to Defendant Alexander Smirnov, 9th CCA regarding Notice of Appeal - Conditions of Release to 9th Circuit Court of Appeals 41 . (mat) (Entered: 03/04/2024) |
| 03/04/2024 | 49 | ORDER DESIGNATING A CLASSIFIED INFORMATION SECURITY OFFICER AND ALTERNATE CLASSIFIED INFORMATION SECURITY OFFICERS 48 as to Defendant Alexander Smirnov 48 by Judge Otis D. Wright, II : The Court HEREBY APPOINTS W. Scooter Slade, Supervisory Security Specialist, for the position of ClassifiedInformation Security Officer in the above-captioned matter. The Court FURTHER APPOINTS Jennifer H. Campbell, Daniel O. Hartenstine, Daniella M. Medel, Matthew W. Mullery, and Harry J. Rucker as Alternate Classified Information Security Officers in the above captioned matter. (lc) (Entered: 03/04/2024) |
| 03/05/2024 | 51 | DESIGNATION AND APPEARANCE OF COUNSEL; filed by Mark A. Byrne appearing for Alexander Smirnov (Attorney Mark A. Byrne added to party Alexander Smirnov(pty:dft))(Byrne, Mark) (Entered: 03/05/2024) |

---

| PACER Service Center |
|---|
| Transaction Receipt |

| 03/06/2024 13:42:52 | | | |
|---|---|---|---|
| **PACER Login:** | CSlawoffice | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:24-cr-00091-ODW End date: 3/6/2024 |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

EXHIBIT R

DOCKET

2:24-mj-00166-DJA-1

CLOSED,ON BOND

**United States District Court**
**District of Nevada (Las Vegas)**
**CRIMINAL DOCKET FOR CASE #: 2:24-mj-00166-DJA-1**

Case title: USA v. Smirnov

Date Filed: 02/15/2024

Other court case number: 2:24-cr-00091-ODW Central District of California

Date Terminated: 03/01/2024

---

Assigned to: Magistrate Judge Daniel J. Albregts

**Defendant (1)**

**Alexander Smirnov**
*TERMINATED: 03/01/2024*

represented by **Richard A Schonfeld**
Chesnoff & Schonfeld
520 S. 4th St.
Las Vegas, NV 89101-
702-384-5563
Fax: 702-598-1425
Email: rschonfeld@cslawoffice.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David Z. Chesnoff**
Chesnoff & Schonfeld
520 S Fourth St
Las Vegas, NV 89101-
702-384-5563
Fax: 702-598-1425
Email: dzchesnoff@cslawoffice.net
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Margaret W. Lambrose**
Federal Public Defender
411 E Bonneville Ave., Ste. 250
Las Vegas, NV 89101-
702-388-6577
Fax: 702-388-6261
Email: maggie_lambrose@fd.org
*TERMINATED: 02/22/2024*
*ATTORNEY TO BE NOTICED*
*Designation: FPD*

**Pending Counts**

None

**Disposition**

**Highest Offense Level (Opening)**

None

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| Rule 5 | Rule 5 |

---

**Plaintiff**

**USA** represented by **Christopher R. Rigali**
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
(771) 217-6091
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: USA*

**Derek E. Hines**
DOJ-USAO
United States Attorney's Office
615 Chestnut Street, Ste. 1250
Philadelphia, PA 19106
215-861-8632
Email: derek.hines@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: USA*

**Leo J. Wise**
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
(771) 217-6091
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: USA*

**Sean F. Mulryne**
950 Pennsylvania Avenue NW, Room B-200
Washington, DC 20530
(771) 217-6091
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: USA*

**Supriya Prasad**
US Attorney's Office
501 Las Vegas Boulevard South
Suite 1100
Las Vegas, NV 89101
702-388-6336
Email: supriya.prasad@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: USA*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/15/2024 | | Case assigned to Magistrate Judge Daniel J. Albregts. (KL) (Entered: 02/15/2024) |
| 02/15/2024 | 1 | Rule 5(c)(3) Documents Received as to Alexander Smirnov. Documents received from Central District of California include Indictment. (JQC) (Entered: 02/16/2024) |
| 02/15/2024 | 2 | MINUTES OF PROCEEDINGS - Initial Appearance in Rule 5(c)(3) Proceeding as to Alexander Smirnov held on 2/15/2024 before Magistrate Judge Daniel J. Albregts. Crtrm Administrator: *J. Ries*; AUSA: *Leo Wise, Central District of California*; Def Counsel: *Margaret Lambrose*; PTS: *Emily McKillip*; Recording start and end times: *3:22:19 - 3:59:45 Courtrooms 3A & 3B*; Courtroom: *3A*; Defendant is present in custody without restraints. Financial Affidavit filed. The Federal Public Defenders Office is appointed as defense counsel. Waiver of Identity Hearing filed. ORDERED defendant identified as named defendant in indictment and is held to answer in the Central District of California. Government counsel seeks detention and requests a continuance of the detention hearing, which is GRANTED. This hearing is under seal 3:30:19 - 3:58:58 ctrms 3A & 3B. Hearing proceedings on the record 3:59:45. Defendant is remanded to custody. Rule 5 deadline set for 2/29/2024. Detention Hearing set for 2/20/2024 at 03:00 PM in LV Courtroom 3A before Magistrate Judge Daniel J. Albregts.**(no image attached)** (Copies have been distributed pursuant to the NEF - JAR) (Entered: 02/16/2024) |
| 02/15/2024 | 4 | ORDER APPOINTING COUNSEL as to Alexander Smirnov. FPD appointed as counsel for Defendant. Subpoenas issued upon request, with exception to out-of-state subpoenas which will require court approval. Appearance by: Maggie Lambrose. Signed by Magistrate Judge Daniel J. Albregts on 2/15/2024. (Copies have been distributed pursuant to the NEF - DLS) (Entered: 02/16/2024) |
| 02/15/2024 | 5 | WAIVER of Rule 5 and 5.1 Hearings by Alexander Smirnov. (DLS) (Entered: 02/16/2024) |
| 02/15/2024 | 6 | ORDER SCHEDULING A DETENTION HEARING.Detention Hearing set for **2/20/2024 at 3:00 PM** in LV Courtroom 3A before Magistrate Judge Daniel J. Albregts.Signed by Magistrate Judge Daniel J. Albregts on 2/15/2024. (Copies have been distributed pursuant to the NEF - DLS) (Entered: 02/16/2024) |
| 02/17/2024 | 7 | NOTICE OF ATTORNEY APPEARANCE: Richard A Schonfeld appearing for Alexander Smirnov *Notice of Appearance of Counsel for Defendant Alexander Smirnov David Z. Chesnoff, Esq. and Richard A. Schonfeld, Esq.* (Schonfeld, Richard) (Entered: 02/17/2024) |
| 02/19/2024 | 8 | MOTION for Pretrial Release by Alexander Smirnov. Responses due by 3/4/2024. (Schonfeld, Richard) (Entered: 02/19/2024) |
| 02/20/2024 | 9 | MOTION to Admit Government Attorney Christopher R. Rigali by USA. (RJDG) (Entered: 02/20/2024) |

| | | |
|---|---|---|
| 02/20/2024 | 10 | MOTION to Admit Government Attorney Leo J. Wise by USA. (RJDG) (Entered: 02/20/2024) |
| 02/20/2024 | 11 | MOTION to Admit Government Attorney Derek E. Hines by USA. (RJDG) (Entered: 02/20/2024) |
| 02/20/2024 | 12 | MOTION to Admit Government Attorney Sean F. Mulryne by USA. (RJDG) (Entered: 02/20/2024) |
| 02/20/2024 | 13 | MOTION to Seal by USA as to Alexander Smirnov. (RJDG) (Entered: 02/20/2024) |
| 02/20/2024 | 15 | MEMORANDUM in Support of Detention by USA as to Alexander Smirnov re 6 Order. (Attachments: # 1 Exhibit 2, # 2 Exhibit 8, # 3 Exhibit 9)(RJDG) (Entered: 02/20/2024) |
| 02/20/2024 | 16 | RESPONSE to 15 Memorandum, *Defendant's Response to Government's Memorandum in Support of Detention* by Alexander Smirnov. (Schonfeld, Richard) (Entered: 02/20/2024) |
| 02/20/2024 | 17 | MINUTES OF PROCEEDINGS - Detention Hearing as to Alexander Smirnov held on 2/20/2024 before Magistrate Judge Daniel J. Albregts. Crtrm Administrator: *J. Ries*; AUSA: *Leo Wise, Central District of California*; Def Counsel: *David Chesnoff and Richard Schonfeld*; PTS: *Emily McKillip*; Recording start and end times: *3:02 - 4:01*; Courtroom: *3A*; Defendant is present in custody without restraints. The court canvasses and hears representations from the parties. ORDERED motions to admit government attorney 9 , 10 , 11 & 12 are GRANTED. FURTHER ORDERED motion to seal 13 is GRANTED, as stated on the record. Government counsel continues to seek detention and the court hears arguments. ORDERED defendant is placed on a personal recognizance bond. Government counsel moves the court to stay its release order, which is DENIED. Defendant is remanded to custody for release. **(no image attached)** (Copies have been distributed pursuant to the NEF - JAR) (Entered: 02/20/2024) |
| 02/20/2024 | 18 | PR BOND Entered as to Alexander Smirnov Alexander Smirnov (1) : D Released on personal recognizance with conditions specified. (GA) (Entered: 02/20/2024) |
| 02/20/2024 | 19 | ORDER Requiring a Defendant to Appear in the District where Charges are Pending and Transferring Bail. See Order for details. Signed by Magistrate Judge Daniel J. Albregts on 2/20/24. (Copies have been distributed pursuant to the NEF - RJDG) (Entered: 02/20/2024) |
| 02/21/2024 | 20 | TRANSCRIPT of Proceedings, 17 Detention Hearing, as to Alexander Smirnov held on 02/20/2024 before Magistrate Judge Daniel J. Albregts. Court Reporter/Transcriber: Patricia Ganci, PG@nvd.uscourts.gov. Any Redaction Request is due by 3/13/2024. Release of the Transcript Restriction is set for 5/21/2024. Before release date, the transcript may be viewed at the court public terminal or purchased through the court reporter. After release date, it may be obtained through the court reporter or PACER.<br><br>**THIS TRANSCRIPT MUST NOT BE ATTACHED AS AN EXHIBIT OR MADE PART OF AN APPENDIX. See Local Rule IA 10-3.(b).**<br>(PG) (Entered: 02/21/2024) |
| 02/22/2024 | 21 | CLERK'S NOTICE. Attorney Action Required to ECF No. 7 to be in compliance with LR IA 11-6(c). **(no image attached)** (CJS) (Entered: 02/22/2024) |
| 02/22/2024 | 22 | MOTION to Substitute Attorney by Alexander Smirnov. (Chesnoff, David) (Entered: 02/22/2024) |
| 02/22/2024 | 23 | DESIGNATION of Retained Counsel by David Z. Chesnoff on behalf of Alexander Smirnov. (Chesnoff, David) (Entered: 02/22/2024) |
| 02/22/2024 | 24 | MOTION Defendant's Emergency Motion for Immediate Detention Hearing and Release on Previously Imposed Conditions by Alexander Smirnov. Responses due by 3/7/2024. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Schonfeld, Richard) (Entered: 02/22/2024) |
| 02/22/2024 | 25 | CLERK'S NOTICE Regarding Local Rule IC 5-1(b). ECF No. 24 was not filed pursuant to LR IC 5-1(b). Please note the signatory must be the attorney or pro se party who electronically files the document.<br>**No further action is required concerning this document at this time. (no image attached)** (CJS) (Entered: 02/22/2024) |
| 02/22/2024 | 26 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Daniel J. Albregts, as to Alexander Smirnov on 2/22/2024.<br><br>Re: 24 Defendant's Emergency Motion for Immediate Detention Hearing and Release on Previously Imposed Conditions.<br><br>Defendant moves on an emergency basis for an immediate detention hearing and release on previously imposed conditions. (ECF No. 24 ). **IT IS ORDERED** that the government must respond to this motion before **February 23, 2024 at 4:30 PM PST.**<br><br>**(no image attached)** (Copies have been distributed pursuant to the NEF - TG) (Entered: 02/22/2024) |
| 02/22/2024 | 27 | ORDER **granting** ECF No. 22 Motion to Substitute Attorney as to Alexander Smirnov (1) : Retained Attorneys David Z. Chesnoff, and Richard A. Schonfeld substituted in the place and stead of Attorney Heidi Ojeda. Signed by Magistrate Judge Daniel J. Albregts on 2/22/2024. (Copies have been distributed pursuant to the NEF - DRM) (Entered: 02/22/2024) |
| 02/22/2024 | 28 | MOTION Defendant's Emergency Motion for Court Order Directing the United States Marshal Service to Keep the Defendant in this District Pending Disposition of Defendant's Emergency Motion for Immediate Detention Hearing and Release on Previously Imposed Conditions by Alexander Smirnov. Responses due by 3/7/2024. (Schonfeld, Richard) (Entered: 02/22/2024) |
| 02/23/2024 | 29 | NOTICE OF ATTORNEY APPEARANCE Derek E. Hines appearing for USA. (Hines, Derek) (Entered: 02/23/2024) |
| 02/23/2024 | 30 | MINUTE ORDER IN CHAMBERS of the Honorable Magistrate Judge Daniel J. Albregts, as to Alexander Smirnov on 2/23/2024.<br><br>Re: 24 Defendant's Emergency Motion for Immediate Detention Hearing and Release on Previously Imposed Conditions; and 28 Defendant's Emergency Motion for Court Order Directing the United States Marshal Service to Keep the Defendant in this District Pending Disposition of Defendant's Emergency Motion for Immediate Detention Hearing and Release on Previously Imposed Conditions.<br><br>The Central District of California has issued an order setting a hearing on the government's motion for review of this Court's release order. *See United States v. Alexander Smirnov,* 2:24-cr-00091-ODW at ECF No. 27 (C.D. Cal.). That order provides that the United States Mashal Service shall bring Defendant before the Central District of California for a detention hearing.<br><br>Given the order setting a hearing in the Central District of California, this Court no longer has jurisdiction to decide Defendant's motions (ECF Nos. 24 and 28 ) and **DENIES** them as moot.<br><br>The Court also **VACATES** the government's response deadline set in the minute order at ECF No. 26 . |

| | | |
|---|---|---|
| | | (Copies have been distributed pursuant to the NEF - TG) (Entered: 02/23/2024) |
| 03/01/2024 | 31 | TRANSMITTAL to Central District of California.<br>Your case number: 2:24-cr-00091-ODW.<br>Our case number: 2:24-mj-00166-DJA-1.<br>Please be advised that Defendant Alexander Smirnov was arrested in the District of Nevada, Las Vegas on a warrant issued by the District of Central District of California and appeared before United States Magistrate Judge Daniel J. Albregts on 2/15/2024.<br>The Defendant was released on bond and ordered to appear in your court.<br>All documents completed in this district may be accessed via PACER and our website at https://ecf.nvd.uscourts.gov.<br>(JQC) (Entered: 03/01/2024) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/06/2024 13:32:32 | | | |
| **PACER Login:** | CSlawoffice | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:24-mj-00166-DJA |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |